**LATHAM & WATKINS LLP**
Kevin M. McDonough
Michael Lacovara (admitted *pro hac vice*)
Arthur F. Foerster (admitted *pro hac vice*)
Johanna Spellman (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
(212) 906-1200

*ATTORNEYS FOR DEFENDANT BMW OF NORTH AMERICA, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA HU, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BMW OF NORTH AMERICA LLC, a Delaware corporation; and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT (BMW AG), a corporation organized under the laws of Germany, ROBERT BOSCH GMBH, a corporation organized under the laws of Germany; and ROBERT BOSCH LLC, a Delaware Limited Liability Company,<br><br>Defendants. | Civil Action No. 2:18-cv-04363 (JMV) (MF)<br><br>**Oral Argument Requested**<br><br>**MOTION DAY**: October 15, 2018<br><br>*Filed Electronically* |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BMW OF NORTH AMERICA, LLC'S MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    FACTUAL BACKGROUND .............................................................................3

    A.    The Parties, the Vehicles at Issue, and the Applicable Regulatory Regime ...........3
    B.    Diesel Emissions Control Technologies ....................................................7
    C.    The Supposed "Defect Device" .................................................................8
        1.    Allegations Regarding Other Manufacturers and Other Vehicles ..............8
        2.    Counsel's Vehicle Testing ...............................................................11
    D.    The Claims ..........................................................................................16

III.   LEGAL STANDARDS .....................................................................................19

IV.    ARGUMENT .....................................................................................................20

    A.    Plaintiffs Lack Standing.........................................................................20
        1.    The Complaint Does Not Allege Injury in Fact.........................................21
        2.    The Complaint Does Not Allege an Injury Fairly Traceable to
               BMW NA's Conduct. ......................................................................26
    B.    Plaintiffs' RICO Claims Do Not State a Claim upon which Relief Can Be
        Granted..................................................................................................28
        1.    The Complaint Does Not Sufficiently Allege Predicate Acts of
               Mail or Wire Fraud. .......................................................................30
            a.    The Complaint Fails To Allege a Fraudulent Scheme..................30
            b.    The Complaint Does Not Plead BMW NA's Specific Intent
                To Defraud. ...........................................................................34
            c.    The Complaint Does Not Plead the Use of Mail and Wire
                Transmissions with Particularity..............................................35
        2.    The Complaint Does Not Plead a RICO Enterprise with
               Particularity...................................................................................37
        3.    The Complaint Does Not Allege RICO Injury. ......................................39
        4.    The Complaint Does Not Allege Injury Proximately Caused by
               BMW NA's Alleged Conduct....................................................41
    C.    The Complaint's State-Law Claims Must Be Dismissed. ....................................43
        1.    Plaintiffs Lack Standing To Assert Most of Their State-Law
               Claims. ..........................................................................................43
        2.    The CAA Preempts the Complaint's State-Law Claims............................44
        3.    The State-Law Claims Do Not Satisfy Rule 9(b). .................................46
        4.    The Complaint's Claims Brought under State Consumer Protection
               Statutes Suffer Additional Deficiencies.............................................49
            a.    Certain Class Claims Are Pleaded under State Statutes that
                Prohibit Class Actions.............................................................49
            b.    The Mississippi Consumer Protection Act Claims Must Be
                Dismissed for Failure To Allege Participation in a Pre-Suit
                Settlement Program.................................................................50

c.  The Georgia Uniform Deceptive Trade Practices Act and Minnesota Deceptive Trade Practices Act Prohibit Private Causes of Action for Damages. ......................................................51

d.  The Kentucky Consumer Protection Act Must Be Dismissed for Failure To Allege Privity of Contract....................51

e.  Plaintiffs' Claims under the Alabama Deceptive Trade Practices Act Are Barred by the Statute of Repose. ......................51

f.  The Complaint's Statutory Claims "For Notice Purposes Only" Are Not Valid Claims............................................................52

V.  CONCLUSION.............................................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abuhouran v. KaiserKane, Inc.*,
 2011 WL 6372208 (D.N.J. Dec. 19, 2011) ................................................................45, 46

*Adams v. Am. Suzuki Motor Corp.*,
 2011 WL 1304766 (N.J. Super. Ct. App. Div. Apr. 7, 2011) ..................................23

*In re Aetna UCR Litig.*,
 2015 WL 3970168 (D.N.J. June 30, 2015) ................................................29, 38, 41

*Anjelino v. N.Y. Times Co.*,
 200 F.3d 73 (3d Cir. 1999) ......................................................................................25

*Anza v. Ideal Steel Supply Corp.*,
 547 U.S. 451 (2006) ................................................................................................42

*Argabright v. Rheem Mfg. Co.*,
 201 F. Supp. 3d 578 (D.N.J. 2016) .........................................................................48

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................................................19

*Barnard v. Verizon Commc'ns, Inc.*,
 451 F. App'x 80 (3d Cir. 2011) ..............................................................................48

*Battiste v. Arbors Mgmt., Inc.*,
 522 F. App'x 171 (3d Cir. 2013) ............................................................................28

*Benipayo v. Volkswagen Grp. of Am., Inc.*,
 3:15-cv-04314-CRB (N.D. Cal. Sept. 21, 2015) ...................................................21

*Bledsoe v. FCA US LLC*,
 307 F. Supp. 3d 646 (E.D. Mich. 2018) ................................................22, 23, 32, 33

*In re Blood Reagents Antitrust Litig.*,
 756 F. Supp. 2d 623 (E.D. Pa. 2010) ......................................................................34

*Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*,
 87 F. App'x 227 (3d Cir. 2003) ..............................................................................37

*Bowman v. Ram Med., Inc.*,
 2012 WL 1964452 (D.N.J. May 31, 2012) .............................................................26

*Capalbo v. Prison/Med. Staff of FCI Fort Dix*,
2014 WL 6895615 (D.N.J. Dec. 5, 2014) ............................................................20

*Cargill, Inc. v. Degesch Am., Inc.*,
875 F. Supp. 2d 667 (E.D. La. 2012) ..................................................................47

*Carlin v. Dairy Am., Inc.*,
2014 WL 6390569 (E.D. Cal. Nov. 17, 2014) .....................................................35

*Carlson v. Gen. Motors Corp.*,
883 F.2d 287 (4th Cir. 1989) ..............................................................................23

*In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*,
2015 WL 4591236 (D.N.J. July 29, 2015) .....................................................44, 45

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015) ................................................................................34

*Cinkutis v. Confederation Life Ins. Co.*,
1990 WL 161260 (E.D. Pa. Oct. 19, 1990) .........................................................41

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................................26

*Collins v. Davol, Inc.*,
56 F. Supp. 3d 1222 (N.D. Ala. 2014) ................................................................52

*Counts v. Gen. Motors LLC*,
237 F. Supp. 3d 572 (E.D. Mich. 2017) ..............................................................46

*Crozier v. Johnson & Johnson Consumer Cos., Inc.*,
901 F. Supp. 2d 494 (D.N.J. 2012) .....................................................................47

*Davis v. Fed. Election Comm'n*,
554. U.S. 724 (2008) ...........................................................................................19

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
2008 WL 5413105 (D.N.J. Dec. 23, 2008) ..........................................................40

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
784 F. Supp. 2d 508 (D.N.J. 2011) ................................................................20, 48

*Donna v. Countrywide Mortg.*,
2015 WL 9456325 (D. Colo. Dec. 28, 2015) ......................................................47

*In re Duramax Diesel Litig.*,
298 F. Supp. 3d 1037 (E.D. Mich. 2018) ............................................................33

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*,
    541 U.S. 246 (2007)....................................................................................46

*Estrada v. Johnson & Johnson*,
    2017 WL 2999026 (D.N.J. July 14, 2017), *appeal argued*, No. 17-2980 (3d
    Cir. June 14, 2018)...............................................................................21, 25

*Ferguson v. Moeller*,
    2016 WL 1106609 (W.D. Pa. Mar. 22, 2016) .......................................41

*Frederico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007)...................................................................20

*In re Gerber Probiotic Sales Practices Litig.*,
    2013 WL 4517994 (D.N.J. Aug. 23, 2013) .......................................27, 28

*Gray v. Bayer Corp.*,
    2009 WL 1617930 (D.N.J. June 9, 2009) ...............................................48

*Groover v. Torkell*,
    645 S.W.2d 403 (Tenn. Ct. App. 1982) ..................................................47

*Heinold v. Perlstein*,
    651 F. Supp. 1410 (E.D. Pa. 1987) .........................................................40

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)....................................................................37

*Int'l Transp. Mgmt. Corp. v. Brooks Fitch Apparel Grp., LLC*,
    2012 WL 295847 (D.N.J. Feb. 1, 2012) ..................................................36

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) .........................................................35

*Jackson v. Gen. Motors Corp.*,
    770 F. Supp. 2d 570 (S.D.N.Y 2011)..................................................45, 46

*Joan Cravens, Inc. v. Deas Constr. Inc.*,
    2016 WL 9240622 (S.D. Miss. May 5, 2016) .........................................50

*Kamal v. J. Crew Grp., Inc.*,
    2017 WL 2443062 (D.N.J. June 6, 2017) ................................................19

*Keaton v. G.C. Williams Funeral Home, Inc.*,
    436 S.W.3d 538 (Ky. Ct. App. 2013), *discretionary review denied*....................................51

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991)..................................................................30

*Koronthaly v. L'Oreal USA, Inc.*,
    374 F. App'x 257 (3d Cir. 2010) ........................................................23

*Lassen v. Nissan N. Am., Inc.*,
    211 F. Supp. 3d 1267 (C.D. Cal. 2016) .............................................24

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993).................................................................29

*Longmont United Hosp. v. Saint Barnabas Corp.*,
    2007 WL 1850881 (D.N.J. June 26, 2007) .......................................43

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...........................................................................21

*Lynch v. Capital One Bank (USA), N.A.*,
    2013 WL 2915734 (E.D. Pa. June 14, 2013) ....................................41

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000).................................................39, 40, 41

*Manhattan Telecomms. Corp., Inc. v. DialAmerica Mktg., Inc.*,
    156 F. Supp. 2d 376 (S.D.N.Y. 2001)...............................................29

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010)...............................................................19

*McGuire v. BMW of N. Am., LLC*,
    2014 WL 2566132 (D.N.J. June 6, 2014) ....................................43, 44

*Medley v. Johnson & Johnson Consumer Cos.*,
    2011 WL 159674 (D.N.J. Jan. 18, 2011) ..........................................24

*Mega Concrete, Inc. v. Smith*,
    2011 WL 1103831 (E.D. Pa. Mar. 24, 2011)............................37, 38, 39

*In re Mercedes-Benz Emissions Litig.*,
    2016 WL 7106020 (D.N.J. Dec. 6, 2016)................................26, 27, 28

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981)...............................................................................44

*Mladenov v. Wegmans Food Markets, Inc.*,
    124 F. Supp. 3d 360 (D.N.J. 2015) ...................................................48

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)...........................................................................45

*Murphy v. Bancroft Constr. Co.*,
  2002 WL 31641641 (D. Del. Nov. 15, 2002) ........................................................20

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002) .........................................................................19

*Napleton Orlando Imports, LLC v. Volkswagen Grp. of Am., Inc.*,
  1:16-cv-04071 (N.D. Ill. Apr. 6, 2016) ..............................................................21

*Naporano Iron & Metal Co. v. Am. Crane Corp.*,
  79 F. Supp. 2d 494 (D.N.J. 1999) ....................................................................20

*In re Office of Attorney Gen. of State of New York*,
  269 A.D.2d 1 (1st Dep't 2000) ........................................................................45

*Ottilio v. Valley Nat'l Bancorp*,
  2014 WL 906138 (D.N.J. Mar. 7, 2014) .............................................................20

*Phillips v. Bally Total Fitness Holding Corp.*,
  865 N.E.2d 310 (Ill. App. Ct. 2007) .................................................................44

*Pryor v. CCEC, Inc.*,
  571 S.E.2d 454 (Ga. Ct. App. 2002) .................................................................47

*Raymo v. FCA US LLC*,
  2:17-cv-12168-TGB-SDD (E.D. Mich. Jul. 3, 2017) .............................................21

*RBC Bank (USA) v. Petrozzini*,
  2012 WL 1965370 (D.N.J. May 31, 2012) ..........................................................48

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011) .............................................................................26

*Ridge Training Stables v. Safeco Title Ins. Co.*,
  719 P.2d 531 (Wash. 1986) .............................................................................47

*Sarpolis v. Tereshko*,
  26 F. Supp. 3d 407 (E.D. Pa. 2014) ...............................................................35, 36

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012) ...........................................................................34

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
  2009 WL 2043604 (D.N.J. July 10, 2009) ........................................................33, 40

*Shtutman v. Carr*,
  2017 WL 4402045 (N.J. Super. Ct. App. Div. Oct. 4, 2017) ...................................49

*Silverstein v. Percudani*,
  422 F. Supp. 2d 468 (M.D. Pa. 2006), *aff'd*, 207 F. App'x 238 (3d Cir. 2006) .....................36

*Slukina v. 409 Edgecombe Ave. Hous. Dev. Fund Corp.*,
  2013 WL 4446914 (N.Y. Sup. Ct. N.Y. Cty. 2013) ................................................................52

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ......................................................................................................21, 22

*Stevenson v. Mazda Motor of Am., Inc.*,
  2015 WL 3487756 (D.N.J. June 2, 2015) ................................................................................42

*Storino v. Borough of Point Pleasant Beach*,
  322 F.3d 293 (3d Cir. 2003) ....................................................................................................26

*Strauss v. Ford Motor Co.*,
  439 F. Supp. 2d 680 (N.D. Tex. 2006) ....................................................................................23

*In re Synchronoss Sec. Litig.*,
  705 F. Supp. 2d 367 (D.N.J. 2010) ..........................................................................................19

*Taylor v. McNichols*,
  149 Idaho 826 (2010) ..............................................................................................................51

*In re Terazosin Hydrochloride Antitrust Litig.*,
  160 F. Supp. 2d 1365 (S.D. Fla. 2001) ....................................................................................44

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &*
  *Prods. Liab. Litig.*,
  826 F. Supp. 2d 1180 (C.D. Cal. 2011) ....................................................................................39

*United States v. Dobson*,
  419 F.3d 231 (3d Cir. 2005).....................................................................................................34

*United States v. Pearlstein*,
  576 F.2d 531 (3d Cir. 1978).....................................................................................................33

*Videon Chevrolet, Inc. v. Gen. Motors Corp.*,
  992 F.2d 482 (3d Cir. 1993).....................................................................................................28

*W.S. Carnes, Inc. v. Bd. of Supervisors of Chesterfield Cty.*,
  252 Va. 377 (1996) ..................................................................................................................50

*Walter v. Palisades Collection, LLC*,
  480 F. Supp. 2d 797 (E.D. Pa. 2007) ................................................................................41, 42

*Wehner v. Linvatech Corp.*,
  2008 WL 495525 (D. Minn. Feb. 20, 2008) ............................................................................51

*Weiss v. First Unum Life Ins.*,
  2003 WL 25713970 (D.N.J. Aug. 27, 2003) ...........................................27, 37, 48

*Young v. Johnson & Johnson*,
  2012 WL 1372286 (D.N.J. Apr. 19, 2012) .............................................24, 25, 40

*Zavala v. Wal-Mart Stores, Inc.*,
  447 F. Supp. 2d 379 (D.N.J. 2006) ...........................................................39

## STATUTES

18 U.S.C.
  § 1961(4) ....................................................................................................37
  § 1962(c) ....................................................................................................20

42 U.S.C.
  § 7543(a) ...............................................................................................44, 45
  § 7543(b) ....................................................................................................44

Ala. Code § 8-19-14 .......................................................................................52

Ariz. Rev. Stat. Ann. § 44-1522 ...................................................................47

Ark. Code Ann. § 4-88-113(f)(1)(b) .............................................................50

Cal. Bus. & Prof. Code § 17203 ...................................................................50

Ga. Code Ann.
  § 10-1-373 .................................................................................................51
  § 10-1-399(a) ............................................................................................49

Iowa Code § 714H.7 ......................................................................................50

La. Rev. Stat. 51:1409(A) .............................................................................50

Minn. Stat. Ann.
  § 325d.45 ...................................................................................................51
  § 325F.69 ...................................................................................................47

Miss. Code Ann.
  § 75-24-15(2) ............................................................................................50
  § 75-24-15(4) ............................................................................................49

Mont. Code Ann. § 30-14-133(1) ..................................................................49

S.C. Code Ann. § 39-5-140(a) .......................................................................49

# RULES

Fed. R. Civ. P.
    9(b) ................................................................................................ *passim*
    12(b)(1) .............................................................................................19
    12(b)(6) .............................................................................................19

# REGULATIONS

40 C.F.R.
    § 86.159-08 .......................................................................................14
    § 86.160-00 .......................................................................................14
    § 86.1803-01 .......................................................................................5
    § 86.1811-04 .......................................................................................14
    § 86.1811-04(c) ..................................................................................14

# OTHER AUTHORITIES

A. Dörner, *U.S. Environmental Agency EPA wants to intensify emissions controls on vehicles – Harsh Criticism of VW*, Handelsblatt (May 24, 2018) ........................................3

A. Goodwin, *Fool me once: EPA to enhance emissions testing post VW scandal*, CNET (Sept. 25 2015) ..................................................................................5

Beny, BimmerToday, *Environmental Agency EPA Clears BMW Diesel Engines* (May 29, 2018) .....................................................................................3

C. Threewitt, *How the Engine Control Module Works*, HowStuffWorks .......................................9

CARB, *CARB approves plan to mitigate harm from Volkswagen defeat devices* (May 25, 2018) ......................................................................................1

D. Shepardson, *U.S. approves 2016 BMW diesel X5 SUV after EPA review*, Thompson Reuters (Dec. 10, 2015) ...................................................................10

EPA, *All Volkswagen 3.0-Liter Diesel Engine Vehicles Affected* (Nov. 20, 2015) ........................1

EPA, Determination of PEMS Measurement Allowances for Gaseous Emissions Regulated Under the Heavy-Duty Diesel Engine In-Use Testing Program 365, EPA 420-R-08-005 (2008) .............................................................................13

J. Plungis, et al., *VW's Emissions Cheating Found by Curious Clean-Air Group*, Bloomberg (Sept. 19, 2015) ...........................................................................2

M. Biesecker and T. Krisher, *VW and regulators agree on fix for cars in cheating scandal*, Phys.org (July 27, 2017) .......................................................................25

M. Seiwert, *Green Light for BMW in the USA*, WirtschaftsWoche (May 25, 2018) ...............3, 10

R. Read, *EPA to let BMW Sell Diesels in U.S. for 2017* ...............................................................10

S. Edelstein, *Which states follow California's emission and zero-emission vehicle rules?*, Green Car Reports (Mar. 7, 2017) .................................................................5

S. Glinton, *How a Little Lab in West Virginia Caught Volkswagen's Big Cheat*, NPR (Sept. 24, 2015) .................................................................................2

S. Maalouf *et al.*, *Constraining Variabilities Of On-Road Portable Emission Measurement Testing For Light Duty Vehicles*, California Air Resources Board (Mar. 22, 2018) .................................................................13

S. Morris, *Titan of the Plaintiffs Bar: Hagens Berman's Steve Berman*, Law360 (May 9, 2018).............................................................................12

BMW of North America, LLC ("BMW NA") respectfully submits this Memorandum of Law in support of its motion to dismiss the Consolidated Class Action Complaint ("Complaint").

## I.    INTRODUCTION[1]

Before the Court is but one example of a run of actions filed against major automotive manufacturers in the wake of the so-called "Dieselgate" scandal that befell Volkswagen starting in 2015.[2]  Immediately after the first news reports about Volkswagen, regulators and independent testing organizations around the world have leveled unrivaled and exacting scrutiny of manufacturers of diesel-powered vehicles.  The leading U.S. environmental regulators, the United States Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB"), global leaders for decades in the development of emissions regulation and testing, have been at the forefront of these efforts.  Searching inquiry and extensive, professional vehicle testing have resulted in regulatory actions accusing a number of manufacturers of having in one way or another engaged in improper conduct with regard to the management of diesel emissions.[3]  The

---

[1] In all quotations, unless otherwise noted, internal quotations and citations are omitted and emphasis is supplied.

[2] *See, e.g.*, *Bledsoe v. FCA US LLC*, No. 16-cv-14024 (E.D. Mich. Nov. 14, 2016); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*, No. 17-md-2777 (N.D. Cal. Apr. 5, 2017); *Counts v. Gen. Motors LLC*, No. 16-cv-12541 (E.D. Mich. July 7, 2016); *In re Duramax Diesel Litig.*, No. 17-cv-11661 (E.D. Mich. May 25, 2017); *Gamboa v. Ford Motor Co.*, No. 18-cv-10106 (E.D. Mich. Jan. 10, 2018); *Lynevych v. Mercedes-Benz USA, LLC*, No. 16-cv-881 (D.N.J. Feb. 18, 2016); *Raymo v. FCA US LLC*, No. 17-cv-12168 (E.D. Mich. July 3, 2017); *In re Volkswagen Clean Diesel Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-md-2672 (N.D. Cal. Dec. 8, 2015).

[3] *See, e.g.*, EPA, *All Volkswagen 3.0-Liter Diesel Engine Vehicles Affected* (Nov. 20, 2015), (Exhibit 1 to the Request for Judicial Notice (the "RJN")) ("On November 2, 2015, EPA . . . alleged that [Volkswagen AG, Audi AG, and Porsche AG] vehicles included defeat devices."); CARB, *CARB approves plan to mitigate harm from Volkswagen defeat devices* (May 25, 2018), (Exhibit 2 to the RJN) ("CARB engineers uncovered the defeat device[s]" in Volkswagen vehicles).  As explained in the RJN filed as a companion to this motion, the Court can take judicial notice of these materials and the other news articles, regulatory press releases, and other publicly-available materials cited in this Memorandum (all of which are attached to the RJN for the Court's convenience).

Complaint narrates much of this history in almost gleeful detail.  What the Complaint *doesn't* say, however, is why any of that should be relevant to BMW NA.[4]

Even the latest pleading in this matter, filed on August 3, 2018, omits at least two material facts.  *First*, when the International Council for Clean Transportation ("ICCT"), the very group that uncovered the emissions issues that led to the Volkswagen scandal, performed independent road testing on a BMW X5—one of the two BMW models at issue here and the model Plaintiffs' counsel used for its paid, litigation-driven emissions testing (*see* disc. *infra* at Section IV.B.1.a) – the BMW X5 "passed" the road test.[5]  That omission cannot have been an accident: the Complaint affirmatively invokes the ICCT study, even as it declines to tell the Court the superior results of the BMW vehicle tested.  Here is what the ICCT testing actually revealed *about BMW*:  "In none of [the ICCT's] road tests could they get their two Volkswagen cars to meet the claims, *even though a BMW they tested did fine*."[6]  *Second*,  the Complaint declines to mention that no U.S. regulator has so much as *suggested* that any BMW entity "cheated" or engaged in any sort of wrongful conduct with respect to its U.S. emissions control technology or regulatory certification efforts.  To the contrary, a senior EPA official responsible for such matters—in an unprecedented public statement—announced that the EPA tested BMW vehicles extensively after the Volkswagen

---

[4] BMW NA is an indirect subsidiary of Bayerische Motoren Werke AG ("BMW AG"), a German corporation.  BMW NA is a Delaware corporation, with its principal place of business in New Jersey, that markets and sells BMW vehicles (principally to dealers) in the United States.  At the time of this filing, BMW AG has not been served.

[5] J. Plungis, et al., *VW's Emissions Cheating Found by Curious Clean-Air Group*, Bloomberg (Sept. 19, 2015) (Exhibit 3 to the RJN) ("The BMW X5 passed the road test."); *see also EPA's Notice of Violation of the Clean Air Act to Volkswagen*, ICCT (Sept. 18, 2015) (Exhibit 4 to the RJN) (noting that the BMW X5's "performance on the in-use tests shows that the technology needed to meet the U.S. motor vehicle air pollution emission standards for diesels is available").

[6] S. Glinton, *How a Little Lab in West Virginia Caught Volkswagen's Big Cheat*, NPR (Sept. 24, 2015) (Exhibit 5 to the RJN) (relied upon by Complaint at ¶ 144 n.10).

scandal broke, and concluded that BMWs achieved favorable test results *honestly and without any evidence of "cheating" whatsoever.*[7]  But the EPA official did not stop there; he then disparaged —explicitly and publicly—the very sort of litigation-friendly "testing" that counsel for Plaintiffs paid for here.[8]

When the Court reviews the allegations of the Complaint relevant to BMW NA, ignores the transparent guilt-by-association narrative that occupies the bulk of the "facts" alleged, and discerns the gap between the relevant facts and the sweeping fraud claims alleged, it is evident that the Complaint must be dismissed.

## II.    FACTUAL BACKGROUND

### A.    The Parties, the Vehicles at Issue, and the Applicable Regulatory Regime

The original complaint before the Court was captioned *Garner Rickman, et al. v. BMW of North America LLC, et al.*, Case No. 2:18-cv-04363, which was amended as of right to *Chad Maccanelli, et al. v. BMW of North America LLC, et al.* on April 19, 2018, principally to add additional plaintiffs and to allege additional state-law claims.  On May 8, 2018, certain other plaintiffs, represented by the same counsel, filed a complaint captioned *Ricky Evans, et al. v. BMW of North America LLC, et al.*, Case No. 2:18-cv-08935, which added twenty-one new plaintiffs,

---

[7]A. Dörner, *U.S. Environmental Agency EPA wants to intensify emissions controls on vehicles – Harsh Criticism of VW*, Handelsblatt (May 24, 2018) (a certified translation is attached for the Court's convenience as Exhibit 6 to the RJN) ("We have investigated every product very thoroughly and have not found any illegal technology."); *see also* M. Seiwert, *Green Light for BMW in the USA*, WirtschaftsWoche (May 25, 2018) (certified translation attached as Exhibit 7 to the RJN) ("The highest American U.S. environmental authority, the EPA, has cleared BMW of the suspicion of having illegally manipulated emissions technology in models sold in the U.S.A.").

[8] Seiwert, RJN Exhibit 7 ("EPA Director Grundler said that the solicitor Mr. Berman certainly does not have the expertise and laboratory technology that the EPA has.  He is aware of the fact that there are companies that made such measurements for solicitors, but they did not work on them to a high standard. 'We call them two men and a PEMS.'"); *see also* Beny, BimmerToday, *Environmental Agency EPA Clears BMW Diesel Engines* (May 29, 2018) (certified translation attached as Exhibit 8 to the RJN).

but was otherwise substantially identical to the complaint in *Maccanelli*. On August 3, 2018, the plaintiffs in both the *Maccanelli* and *Evans* actions (the "Plaintiffs") filed the Consolidated Class Action Complaint (the "Complaint"), which is currently the subject of this motion. (*See* Dkt. # 26).

The Plaintiffs are forty-three named individuals who allege they purchased or leased a total of forty-four new or used BMW 335d or X5 diesel vehicles between 2010 and 2018.[9]  *See* Compl. ¶¶ 21-60.  The Complaint generally alleges that "BMW"[10] promoted its 335d and X5 models as diesel vehicles that satisfied the emissions requirements of all fifty states, claiming that "BMW" advertised these vehicles as "having reduced NOx emissions, or as [] clean vehicle[s]," and that they purchased their BMW diesel vehicles because they believed the vehicles to be "'clean diesel' and/or [] 'low emission diesel'" vehicles.  *See id.* ¶¶ 21-60, 119.  The Complaint equates the phrases "clean diesel" or "low emission diesel" with compliance with prevailing U.S. regulatory emissions standards.  Although sometimes hard to infer, given the Complaint's welter of irrelevance and bluster, the basic alleged claim of falsehood appears to be that the two BMW models at issue were not compliant with those regulations, but succeeded in "passing" the relevant emissions tests through some form of technical artifice, now known colloquially as a "defeat device."  *Id.* ¶¶ 21-60, 252.

In order to be sold in the United States, a vehicle must be covered by a certificate of

---

[9] Plaintiff Miguel Fragoso, first introduced to this litigation in the most recent pleading, asserts claims based on his alleged purchase of a BMW 2014 535d.  *See* Compl. ¶ 47.  The 535d utilizes an entirely different engine and exhaust system from the X5 and 335d and is not mentioned in Plaintiffs' proposed class definition.  *See id.* ¶ 289.  In addition, the Complaint fails to provide any information regarding Plaintiff Gene Quint (also added on August 3, 2018).  After naming Mr. Quint, the Complaint repeats the allegations about Plaintiff Charles Rogers.  *See id.* ¶ 35.

[10] The Complaint generally cites to "BMW" generically or refers collectively to the "BMW Defendants," rather than to a particular defendant.  This practice makes for both confusing imprecision and adds to the myriad pleading deficiencies of the Complaint, as described below.

conformity ("COC") from the EPA.  The COC certifies that the vehicle comports with the emissions standards for pollutants promulgated under the Clean Air Act (the "CAA").[11]  *See* Compl. ¶¶ 77, 108.  To receive a COC, a manufacturer submits an application including, among other things, a detailed description of any auxiliary emission control device ("AECD") installed in the vehicle.  *See id.* ¶ 109.[12]  "[V]ehicles must be accurately described in the COC application 'in all material respects' to be deemed covered by a valid COC."  Compl. ¶ 85.

The Complaint alleges that BMW NA failed to disclose in its COC applications that its vehicles are equipped with "defeat devices" that enable the vehicle to detect when it is being tested for certification.  *See* Compl. ¶¶ 4, 210-211.  According to the Complaint, when the vehicle "senses that it is not in the certification test cycle," the "defeat device" reduces the effectiveness of the emission control system, causing the vehicle to emit certain gases or particulates in excess of applicable standards.  *See id.* ¶ 4.  This is the behavior to which Audi, Volkswagen, and Porsche admitted as part of the Dieselgate scandal.  *See id.* ¶ 3.[13]  The admissions of those companies are relevant to consideration of this motion, but not for the reason the Complaint suggests: the facts that emerged with respect particularly to Volkswagen caused every major auto manufacturer with

---

[11] CARB "requires a similar application from automakers to obtain an Executive Order [('EO')] confirming compliance with California's emission regulations."  Compl. ¶ 85.  A number of other states have adopted California's standards.  *See* S. Edelstein, *Which states follow California's emission and zero-emission vehicle rules?*, Green Car Reports (Mar. 7, 2017) (Exhibit 9 to the RJN).

[12] An AECD is "any element of design which senses temperature, vehicle speed, engine [revolutions per minute], transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  40 C.F.R. § 86.1803-01.

[13] *See also* Nov. 20, 2015 EPA Statement, RJN Exhibit 1 ("During a meeting on November 19, 2015 VW and Audi officials told EPA that the [the existence of defeat devices] . . . extend to all 3.0 liter diesel engines from model years 2009 through 2016.").

a diesel vehicle in its line-up to be subject to hitherto unknown regulatory scrutiny.[14]   The EPA

and CARB have been on high alert with regard to *all* manufacturers, including BMW.  So, what

has happened?  No U.S. regulator has accused BMW NA of employing a defeat device in any U.S.

model, and the Complaint offers no *facts* that suggest the contrary.

Instead, the Complaint liberally cuts and pastes "BMW" for "Volkswagen":  it alleges that

BMW AG and BMW NA colluded with the other defendants in this action, Robert Bosch GmbH

and Robert Bosch LLC (collectively, "Bosch"), to create a defeat device in BMW X5 and 335d

diesel vehicles by manipulating the hardware and software that controls the relevant vehicles'

emissions control system, the Bosch Electronic Diesel Control Unit 17 ("EDC17").  *See* Compl.

¶¶ 15, 201-214.  The Complaint asserts, without any facts and in derogation of the EPA's contrary

conclusion, that Bosch and "BMW" collaborated "to develop and implement a specific and unique

set of software algorithms" in the EDC17 that enabled BMW vehicles to detect when the vehicle

was undergoing emissions testing.  *See id.* ¶ 306.  The Complaint claims the EDC17 "upgraded

the emission control systems' performance."  *See id.* ¶ 208.  When not being tested, the vehicle

would emit "the full amount of illegal NOx emissions out on the road," at least "in certain

conditions" (not specified in the Complaint).  *See id.* ¶ 208.  (The Complaint never pleads that

BMW NA violated a particular law or regulation, so the word "illegal" is both unjustified and

offensively prejudicial.)

All of the foregoing allegations are stated as "facts" *relevant to the testing performed to*

*obtain a COC on a new vehicle type*.  But the Complaint offers not a single fact that suggests this

was so; instead, every single allegation regarding emissions levels comes from their litigation-

---

[14] *See, e.g.*, A. Goodwin, *Fool me once: EPA to enhance emissions testing post VW scandal*, CNET (Sept. 25 2015) (Exhibit 10 to the RJN) ("The EPA isn't alone in its toughening of testing practices . . . [r]egulators worldwide are . . . putting all automakers under the microscope.").

friendly "testing" of a *single, six-year old vehicle with unknown maintenance history and in unknown condition.  See* Compl. ¶ 141.  Moreover, although Plaintiffs have now (in their fourth-filed pleading) described their two paid experts, they still curiously decline to name them, and (BMW NA believes) have failed to disclose that the principal business of one their two "experts" would benefit materially and directly from positive outcomes in these cases.  *See* disc. *infra* at Section II.C.2.

### B.    Diesel Emissions Control Technologies

Diesel vehicles generally offer higher fuel efficiency, enhanced drivability, and more power than comparable gasoline-powered vehicles.  Diesel engines also tend to produce a larger amount of certain exhaust emissions.  *See* Compl. ¶ 5.  Such engines emit a number of oxides of nitrogen, collectively called "NOx."  *See id.* ¶ 6.  NOx is generally considered harmful to the environment, and NOx reduction has been a subject of emissions regulation all over the world. *See id.* ¶ 6.  In order to curtail the production of NOx and provide consumers with vehicles that are both powerful and meet the most exacting emissions regulations, BMWs sold in the U.S. employ multiple, innovative systems to treat exhaust emissions.  *See id.* ¶¶ 92-97.

First, carefully-designed fuel-injection timing in BMWs reduces emissions and improves efficiency.  *See* Compl. ¶ 97.  Second, BMW diesel vehicles use Exhaust Gas Recirculation ("EGR"), which reintroduces a portion of the exhaust exiting the engine back into the engine intake, resulting in lower peak temperatures during combustion and lower NOx concentrations.  *See id.* ¶ 99.  Third, BMW diesels employ a Diesel Oxidation Catalyst ("DOC") to convert hydrocarbons and carbon monoxide into water and carbon dioxide and to convert nitric oxide to nitrogen dioxide to generate favorable conditions for NOx reduction in other systems within the vehicle.  *See id.* ¶ 101.  Fourth, after exiting the DOC, the exhaust travels through a

diesel particulate filter ("DPF'), in which soot is trapped and stored and then cleaned through both passive and active "regeneration."[15]  *See id.* ¶ 103.  Fifth, the exhaust travels through the Selective Catalytic Reduction ("SCR") system, where it is injected with diesel exhaust fluid ("DEF") (also known as "AdBlue") that converts NOx into nitrogen and water.  *See id.* ¶ 105.  BMWs in the U.S. employed *all* of these systems to reduce emissions by recycling and repurposing them into environmentally-compatible vapors.[16]

### C.      The Supposed "Defeat Device"

The Complaint's false allegations that Plaintiffs' vehicles contain defeat devices rests on (i) allegations regarding *other* manufacturers whose vehicles included a Bosch-supplied component that also appears in BMW diesel engines; and (ii) testing that paid litigation consultants allegedly performed on a single, used 2012 BMW X5.  The first are relevant only to the extent they underscore the contrasts between BMW and other manufacturers; the latter (even if the Court were to credit the completeness, fair description and overall *bona fides* of such litigation-directed testing) says absolutely nothing about the emissions levels of the BMW models tested—and properly certified—when new by the EPA and CARB.

### 1.      Allegations Regarding Other Manufacturers and Other Vehicles

Plaintiffs devote pages and pages to push on a door that the EPA and CARB opened long ago:  *other* diesel vehicle manufacturers used, or have been accused by regulators of using, illegal defeat devices.  *See* Compl. ¶¶ 9-11, 65, 73-75, 201-263.  The Complaint alleges that Bosch

---

[15] "Passive regeneration" occurs automatically while driving during certain conditions whereas "active regeneration" occurs only when the engine senses the DPF is approaching maximum capacity and needs to be cleaned.  *See* Compl. ¶ 103.

[16] Independent testing organizations consistently deem BMW to represent the engineering and performance standard to which others should aspire.  *See, e.g.*, ICCT Press Statement, RJN Exhibit 4 ("*The BMW vehicle's performance on the in-use tests shows that the technology needed to meet the U.S. motor vehicle air pollution emission standards for diesels is available.*").

supplied the "EDC17" to other vehicle manufacturers that allegedly evaded emissions requirements, including Volkswagen, Fiat Chrysler Automobiles ("FCA"), and others. *See id.* ¶¶ 15, 75, 201, 215-256.[17]   The EDC17 is an Engine Control Unit ("ECU," also known as an Engine Control Module or "ECM").  Plaintiffs concede that ECUs are highly malleable computers, encoded with changeable software, designed for each manufacturer to create unique "specifications and software code to manage [its] vehicles' engine operation."[18]   *See* Compl. ¶¶ 202-203.  From this uncontroversial premise, the Complaint makes an incorrect logical leap:  it concludes that, because BMW X5 and 335d vehicles are equipped with the same basic EDC17 module as supplied by Bosch to other manufacturers, the BMWs at issue must have been configured to enable the vehicle to cheat on emissions testing.  *See id.* ¶ 75.  That assertion is both unsupported by facts in the Complaint and inconsistent with other allegations in the Complaint itself:  if an ECU is highly malleable, programmable, and customizable (as the Complaint admits), the fact that the same basic model is sold to a number of manufacturers is not intrinsically significant; the key question—and the one the Complaint never answers—is how does that device actually function in the BMW vehicles at issue?  The Complaint does not contain a single fact identifying *any* way in which the EDC17 in any BMW was configured or programmed in a manner that was unlawful, deceptive, or otherwise improper.

The Complaint itself highlights the dispositive difference between BMWs and the vehicles of other manufacturers.  Unlike Volkswagen and FCA, for example, there has been no enforcement action against BMW NA in the United States related to defeat devices in BMW diesel vehicles

---

[17] Plaintiffs piously note that "this case is not about Volkswagen" (Compl. ¶ 215), and *then discuss Volkswagen for 32 pages*.  *See id.* ¶¶ 201-278.

[18] *See also* C. Threewitt, *How the Engine Control Module Works*, HowStuffWorks (Exhibit 11 to the RJN).

sold in the United States, and BMW NA has not made (or had reason to make) an admission regarding the use of defeat devices (*because there is nothing to admit*).  *Compare* Compl. ¶ 3 ("Volkswagen pled guilty to criminal violations of the Clean Air Act, Mercedes is under investigation by the Department of Justice, and FCA has been sued by the EPA . . . ."), *with, e.g.*, M. Seiwert, *Green Light for BMW in the USA*, WirtschaftsWoche (May 25, 2018) (Exhibit 7 to the RJN) ("The highest American U.S. environmental authority, the EPA, has cleared BMW of the suspicion of having illegally manipulated emissions technology in models sold in the U.S.A.").

In other cases, the regulators did the heavy lifting for would-be plaintiffs, leading to complaints full of references to regulatory findings, actions, and sanctions against the defendants. Here there is *not a word* about any regulatory action against BMW NA (or any other BMW entity) related to defeat devices in BMWs sold in the United States.  Instead, the only EPA statement relevant to BMWs is that the agency examined BMW diesel vehicles "*very thoroughly and [has] not found any illegal technology.*"[19]

Faced with contrary findings by the regulatory authorities responsible for determining whether any defeat devices exist, the Complaint resorts to irrelevance and slander.  As to the former, the Complaint makes general reference to purported findings of studies done on European cars, including some European BMWs.  *See* Compl. ¶¶ 199-200, 272-279.  The Complaint contains zero facts, however, that European BMWs tested in Europe are representative of the U.S. vehicles

---

[19] Dörner, RJN Exhibit 6.  And the rigorous testing continues.  Commenting specifically on tests done on model year 2017 BMWs, the Director of EPA's Office of Transportation and Air Quality said that his team had tested the cars "'every which way from Sunday,' and they passed." R. Read, *EPA to let BMW Sell Diesels in U.S. for 2017*, The Car Connection (Aug. 5, 2016) (Exhibit 12 to the RJN).  The same is true for 2016 vehicles as well.  *See* D. Shepardson, *U.S. approves 2016 BMW diesel X5 SUV after EPA review*, Thomson Reuters (Dec. 10, 2015) (Exhibit 21 to the RJN) ("EPA spokeswoman Laura Allen said Thursday that the agency—along with California and Canada—was doing additional testing before approving new diesel vehicles. 'Our screening tests found no evidence of a defeat device in the 2016 BMW X5,' she said.").

at issue here, or even whether those European vehicles utilize the same emission control system. *See id.* ¶¶ 200, 279.  To the contrary, the Complaint concedes that much of the European road testing was compared to a standard "lower than the United States."  *Id.* ¶ 278.  Finally, the Complaint ignores the fact that ICCT, one of the groups that did European testing (*see id.* ¶ 279), also tested one of the U.S. models at issue, and held up the BMW X5 as the standard for meeting the emission rules.[20]  Testing different cars under different standards are not facts suggesting the existence of defeat devices in Plaintiffs' cars applying U.S. standards.

But the Complaint does not just plead irrelevance; it tacks close to slander (directed at both BMW NA and the Federal Government).  It insinuates a falsehood, suggesting—utterly without factual support—that BMW NA reached a "political deal" with the EPA under which EPA (apparently—the logic is hard to follow) agreed to bless BMW cars even though they were in fact not compliant when sold.  Compl. ¶ 212.  This assertion is unsupported and false, and its desperation highlights that Plaintiffs have no credible, factual basis to dispute the EPA's and the ICCT's conclusions that the BMW models at issue both had no defeat devices and complied with EPA regulations when sold.  Throwing mud is not a substitute for alleging facts.[21]

### 2.    Counsel's Vehicle Testing

Lacking any regulatory or other objective basis for their allegations, counsel for Plaintiffs decided to design and pay for a very particular set of tests (*not* the same tests as the ones performed by the EPA).  And they had a stable of vehicles to test and describe to the Court: one of the lead

---

[20] *See* ICCT Press Statement, RJN Exhibit 4; Glinton, RJN Exhibit 5, (relied upon by Complaint at ¶ 144 n.10) ("In none of their road tests could they get their two Volkswagen cars to meet the claims, *even though a BMW they tested did fine*.").

[21] BMW NA believes the offending paragraph to be "impertinent" and "scandalous" within the meaning of Federal Rule of Civil Procedure 12(f) and should be stricken by the Court.

counsel here has acquired almost twenty cars[22] to find support for claims against diesel vehicle manufacturers, and the Plaintiffs collectively allege that they purchased or leased a total of *forty-four* BMWs.  *See* Compl. ¶¶ 21-60.  One would assume, then, that counsel for Plaintiffs—to give the Court a complete, accurate picture of the emissions profile of the vehicles about which they have direct knowledge and control—would test *all* vehicles they could and include the results of *all* testing in their pleadings.  For reasons known only to Plaintiffs and their lawyers, that didn't happen.

Instead, the Complaint seeks to allege a broad, durable pattern of fraud based on opaque testing of *one* vehicle.  One can assume then only that the other *forty-four* vehicles owned by Plaintiffs (and the myriad others to which their counsel had access) either were never tested (unlikely) or perhaps just couldn't be made to show the desired results.  All that made it into the Complaint, for whatever reason, is an allegation that Plaintiffs hired (unnamed) consultants to design and perform a unique series of bespoke on-the-road portable emissions measurement system ("PEMS") and chassis dynamometer testing on a used, model year 2012 BMW X5 xDrive35d.  Plaintiffs do not detail the driving history or maintenance record of that vehicle, nor do they disclose its VIN (vehicle identification number), which might allow BMW NA to do so.  To be clear, counsel did *not* replicate the EPA tests required for certification; they made up their own testing protocol (or perhaps several), and disclosed only the results they like.  *See* Compl. ¶ 141.

Plaintiffs then just assert that this single vehicle is "representative" of all 2009-2013 BMW X5s, and also representative of all 2009-2011 BMW 335d vehicles.  Compl. ¶¶ 161-162.  Again,

---

[22] S. Morris, *Titan of the Plaintiffs Bar: Hagens Berman's Steve Berman*, Law360 (May 9, 2018) (Exhibit 13 to the RJN) (quoting counselor Berman during an interview on his involvement in emissions litigation: "I now own about 20 different cars and trucks").

they had at least *forty* other BMWs to test (which would have given at least some sense whether the single light truck they tested was representative of a larger universe of vehicles).  Plaintiffs allege that the results of their on-road testing showed that the test vehicle exceeded some aspect of the self-proclaimed "NOx standard" they had just created.  *See id.* ¶¶ 177-189.  Based on testing one car against a made-up "standard," the Complaint then asks the Court to credit two fanciful assertions:  (i) that *all* "2009-2013 X5 and 2009-2011 335d vehicles" emit excessive emissions, *and* (ii) that they do so because those vehicles employ "an illegal software defeat [device]" (which, BMW notes, neither counsel nor their paid "experts" describe).  *See id.* ¶¶ 2, 199.

Put another way, every claim of wrongdoing rests on: (i) the reliability of the PEMS testing on a single vehicle; (ii) the proposition that if a vehicle exceeds the federal NOx standard during road-testing, it must contain an illegal defeat device; and (iii) the underlying plausibility of the claim that one used vehicle can serve as the sole "class representative" for *every* vehicle potentially at issue.

As to the first of these, Plaintiffs say that PEMS testing is "highly accurate."  *See* Compl. ¶ 144.  The regulators, however, correctly caution that PEMS testing produces widely variable results, highly dependent on testing conditions.  For example, in the heavy-duty context, the EPA has noted that "there is considerable variability arising from PEMS to PEMS and installation to installation."[23]  CARB officials similarly warn that "PEMS testing is subject to many explainable real world testing variabilities that have different effects on emission results."[24]

---

[23] *See* EPA, Determination of PEMS Measurement Allowances for Gaseous Emissions Regulated Under the Heavy-Duty Diesel Engine In-Use Testing Program 365, EPA 420-R-08-005 (2008) (Exhibit 14 to the RJN).

[24] *See* S. Maalouf *et al.*, *Constraining Variabilities Of On-Road Portable Emission Measurement Testing For Light Duty Vehicles*, California Air Resources Board (Mar. 22, 2018) (Exhibit 15 to the RJN); *see also* CARB, *Evaluation of Portable Emissions Measurement Systems (PEMS) for*

As to the second assumption, it is just not true that a vehicle that has a COC from the EPA but exceeds the federal NOx emission standard on the road must contain a prohibited defeat device. *See* Compl. ¶ 199.  The Complaint posits this falsehood by suggesting that the CAA and its implementing regulations deem the federal NOx standard a "maximum" NOx level, that is, a level vehicles are never permitted to exceed. *Id.* ¶ 2.  Not so: neither the CAA nor the applicable EPA regulations prescribe "maximum standards" that must be met at all times and under all conditions on the highway.  In fact, the EPA has not promulgated *any* on-the-road emissions testing criteria or emissions standards for automobiles; the real "standards" (as opposed to the ones paid experts made up for this case) relate to emissions measured over the tests and duty cycles specified in the regulations.  *See, e.g.*, 40 C.F.R. § 86.1811-04(c) (noting vehicle may not exceed standard "when tested over the Federal Test Procedure (FTP) described in subpart B of this part").  As important as what the tests *are* is how the test results are evaluated.  The tests are *average* tests: even Plaintiffs admit that emissions can exceed the purported "maximums" for portions of the tests themselves, including when on the highway.  *See* Compl. ¶¶ 181-189.  Plaintiffs' "maximum" 50 mg/mile NOx standard to which the Complaint at times refers (*see, e.g.*, *id.* ¶¶ 163-166) is only one of many tests performed during the certification process, many of which explicitly allow significantly higher NOx emission limits than the Complaint incorrectly[25] describes as a unitary "standard."[26]

---

*Inventory Purposes and the Not-to-Exceed Heavy-Duty Diesel Engine Regulation* (June 2006), (Exhibit 16 to the RJN).

[25] Plaintiffs incorrectly posit a NOx emission standard of 50 mg/mile in a number of places (*see, e.g.*, Compl. ¶ 182), in which the actual standard is 70 mg/mile or 90 mg/mile.  *See, e.g.*, 40 C.F.R. § 86.1811-04.  BMW NA assumes this is just sloppiness, not advertent misstatement.

[26] The US06 Supplemental Federal Test Procedure is a test cycle that involves aggressive, high speed, and high acceleration driving behavior.  *See* 40 C.F.R. § 86.159-08.  The SC03 Supplemental Federal Test Procedure represents emissions with the use of air conditioning.  *See* 40 C.F.R. § 86.160-00.  Both tests set forth significantly higher emission standards than the Complaint claims as the "standard" (*e.g.*, *440 mg/mile* (NMHC + NOx) for US06 and *600 mg/mile* (NMHC + NOx) for SC03).  *See id.* § 86.1811-04(f)(1).

Having created a fictitious "maximum standard," the Complaint further erodes the plausibility (and *bona fides*) of its "testing" by asserting that the single test vehicle represents "[a]ll variants of the X5 and 335d sold in the United States" because the engine architecture is "nearly identical" for the X5 and 335d. *See* Compl. ¶¶ 161-162. Lacking are facts that explain why a used 2012 BMW X5 (officially classified as a light truck) with substantial (but unknown) driving history and an equally unknown maintenance history should be credited as a valid proxy for all model year 2009-2013 X5s, much less all model year 2009-2011 335d vehicles (which are cars, not trucks).[27] The Complaint even admits the 2012 X5 test vehicle employs a *different* EGR system than a 335d (*see* Compl. ¶¶ 100, 161), but does not explain how one vehicle with a particular emissions-reduction system (*see id.* ¶ 99) can be a proxy for thousands of other vehicles with different systems. And the Complaint just ignores the inconvenient fact that the X5 and 335d are covered by different certifications and are tested separately under EPA regulations.[28]

Finally, it is worth a moment to consider the nature of the litigation testing from another perspective. Because of the unhelpful fact that no regulator or other neutral party has so much as claimed that BMW NA uses defeat devices in the vehicles at issue (and have determined the exact opposite), Plaintiffs and their counsel needed to create their evidence. They paid consultants to do some tests—on an unknown number of vehicles. (The Complaint does not allege that its allegations cover either *all of the vehicles tested or all of the tests on the one vehicle discussed.* Both aspects of that omission are, to be generous, curious.) As important, despite their now fourth

---

[27] Not surprisingly, a 2010 X5 weighs a *half a ton* more than the 335d. *See* Nada Guides, *2010 BMW X5 Spec & Performance* (Exhibit 17 to the RJN); Nada Guides, *2010 BMW 3 Series Spec & Performance* (Exhibit 18 to the RJN).

[28] *See* EPA Certificate of Conformity of 2010 BMW X5 (Sept. 10, 2009) (Exhibit 19 to the RJN); *cf.* EPA Certificate of Conformity of 2010 BMW 335d (Sept. 10, 2009) (Exhibit 20 to the RJN).

attempt at pleading, the Complaint still does not identify who performed the testing, nor does it bother to inform the Court or BMW of the testing protocols used.[29]  The newest iteration of the Complaint purports to describe some qualifications of their consultants, (*see* Compl. ¶ 142), but, without descriptions of the testing protocols employed (and without knowing the results of tests and tested vehicles *not* shared with the Court), those qualifications serve only to highlight that Plaintiffs' consultants know just enough to manage PEMS emissions testing to achieve the desired, litigation-driven results.  *See* disc. *infra* at Section IV.A.1.  Every omission—of information within the possession of Plaintiffs and their counsel which could easily have been pleaded—suggests that the testing was performed according to protocols that were created to support litigation, not to discover the truth.

### D.  The Claims

Plaintiffs assert RICO and state-law claims against two different BMW entities:  (1) BMW AG, whose "general purpose," the Complaint alleges, "is the development, production and sale of engines, engine-equipped vehicles, related accessories and products of the machinery and metal-working industry;" and (2) BMW NA, which the Complaint, somewhat inaccurately, alleges "manufactured, sold, and warranted" BMW diesel vehicles throughout the United States.  *See* Compl. ¶¶ 62-63.  Plaintiffs assert their claims on behalf of a putative nationwide class of "[a]ll persons who purchased or leased a model year 2009-2013 BMW X5 or 2009-2011 BMW 335d vehicles."  *Id.* ¶ 289.

---

[29]  Although the Complaint does not identify Plaintiffs' consultants, it does allege certain information about their training and experience in the field of emissions control.  *See* Compl. ¶ 142. Based on that information, BMW NA believes it has identified Plaintiffs' consultants, at least one of whom appears to have a direct financial interest, through his private business ventures, in retrofitting vehicles with emissions control equipment.  Thus, he has a direct economic incentive to claim that defeat devices exist and to design protocols that help sell the equipment that appears to be his primary source of income.

Plaintiffs' claims all sound fundamentally in fraud.  Specifically, the Complaint alleges that BMW NA:

- "did not fully disclose, and affirmatively concealed from government regulators" the presence of defeat devices when applying for COCs (Compl. ¶ 210);

- "[m]isrepresent[ed] and omitt[ed] . . . vehicle specifications on COC and EO applications" (*Id.* ¶ 319);

- "[c]onceal[ed] the existence of the defeat devices and the unlawfully high emissions from regulators and consumers" (*Id.* ¶ 319);

- "[m]isl[ed] government regulators as to the nature of the defeat devices and the defects in the Polluting BMW Vehicles" (*Id.* ¶ 319);

- "[m]isl[ed] consumers as to the nature of the defeat devices and the defects in the Polluting BMW Vehicles" (*Id.* ¶ 319); and

- "[d]esign[ed] and distribut[ed] marketing materials that misrepresented and concealed the defects . . . in the vehicles" (*Id.* ¶ 319).

The Complaint identifies supposedly misleading "BMW" marketing materials, such as press releases and product brochures.  *See* Compl. ¶¶ 121-140.  Although the Complaint alleges that Plaintiffs believed the vehicles they purchased were "clean diesel" vehicles (*see id.* ¶¶ 21-60), none of the advertisements in the Complaint actually uses the phrase "clean diesel."  *See id.* ¶¶ 121-140.  To the extent the advertisements in the Complaint contain statements about emissions, many of those statements are simply that the X5 and 335d vehicles are compliant with the emissions standards of all 50 states, which is true.  *See id.* ¶¶ 121, 125, 128, 133, 135, 138; *see also* disc. *infra* at Section IV.B.1.a.  Also true are advertising statements that "BMW's" Blue Performance Technology turns NOx into nitrogen and water vapor.  *See* Compl. ¶¶ 123, 128, 133; *see also* disc. *supra* at Section II.B.  Many of the advertisements that reference the environment refer to "BMW's" "EfficientDynamics" strategy—a strategy that involves the use of various technologies besides diesel engines, including gasoline, hybrid, hydrogen and electric vehicles.  *See*, *e.g.*, *id.* ¶ 125 ("At BMW, we . . . are also busy finding ways to sustain this level of

17

performance while incorporating innovative fuels and technologies to help preserve the environment. This is what we refer to as 'EfficientDynamics.' This goal has led to the visionary CleanEnergy hydrogen-powered engine."); *id*. ¶ 134 (regardless of whether a consumer purchased a gasoline or diesel vehicle, "you'll enjoy the thrill of BMW performance while helping to protect the environment every day"). And although some advertisements regarding "EfficientDynamics" refer to "less emissions," such statements refer broadly to technologies in addition to diesel vehicles, and compare the advertised vehicles to vehicles manufactured earlier. *See*, *e.g.*, Compl. ¶ 127 ("more efficient than previous generation diesel"); *id*. ¶ 132 ("Since 1995 BMW has been able to reduce the CO2 emissions of its entire fleet by approximately 30 percent."); *id*. ¶ 132 (noting "commitment to EfficientDynamics" and citing "the continuing optimization of conventional diesel- and gasoline-powered models" and the fact that "BMW hybrid vehicles are already on the road"); *id*. ¶ 127 ("Cleaner, quicker and far more efficient than previous generation diesel.").

The Complaint alleges that Plaintiffs suffered the following injuries:

- overpayment in that they would not have purchased their vehicles if they had known of the alleged defeat device, and thus did not receive the benefit of their bargain;

- the payment of a "diesel premium" of at least $1,500 and, depending on the Plaintiff, of between $1,500 and $20,000, for which they did not receive value; and

- the expectation that they will need to address "future attempted repairs, future additional fuel costs, and decreased performance of the vehicles once a repair to the emissions system is made."

*See* Compl. ¶¶ 21-60, 268, 345.

In the RICO claim, the Complaint alleges that BMW NA, BMW AG, and two Bosch entities conspired to participate in a pattern of racketeering activity predicated on mail and wire fraud. *See* Compl. ¶¶ 324-346. It seeks to allege use of the mails and wires to conduct various activities related to alleged misrepresentations regarding the emissions compliance of BMW

vehicles, resulting in injuries to Plaintiffs.  *See id.* ¶¶ 326-342.

Plaintiffs also assert state law fraudulent concealment claims and claims under the consumer protection statutes of all fifty states.  *See* Compl. ¶¶ 347-1342.  The Complaint generally alleges that Plaintiffs were deceived by the marketing of BMW vehicles as low emissions vehicles and suffered damages in the form of overpayment for their vehicles.  *See, e.g.*, *id.* ¶¶ 409-412.

## III.   LEGAL STANDARDS

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully," because even notice pleading demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*; *see also Mayer v. Belichick*, 605 F.3d 223, 229-30 (3d Cir. 2010).

First, and fundamentally, each plaintiff "must demonstrate standing for each claim he seeks to press."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).  Where a plaintiff lacks Article III standing, a Court must dismiss the matter for lack of jurisdiction pursuant to Rule 12(b)(1).  *See Kamal v. J. Crew Grp., Inc.*, 2017 WL 2443062, at *2 (D.N.J. June 6, 2017).

Even if the Court were to conclude that Plaintiffs have standing, the Court should not accept as true the "unsupported conclusions and unwarranted inferences" that make up the preponderance of the allegations here.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1323 (3d Cir. 2002).  Rather, the Court must evaluate whether the assertions advanced qualify as "facts" and disregard those that are not.  *See, e.g.*, *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 382 (D.N.J. 2010) ("Plaintiffs' . . . assertions . . . cannot be qualified as facts: at best, they could be qualified as an inadmissible non-expert opinion.").  Moreover, experts cannot "create" claims for a plaintiff to plead.  *See, e.g.*, *Capalbo v. Prison/Med. Staff of FCI Fort Dix*, 2014 WL 6895615, at *3-4 (D.N.J.

Dec. 5, 2014) (dismissing complaint where plaintiff failed to plead facts independent of those advanced by expert).

And the Complaint warrants more exacting review than applied in a typical case: its claims sound in fraud and, thus, must survive the heightened pleading requirements of Rule 9(b). *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) ("the circumstances constituting fraud or mistake shall be stated with particularity"). The Complaint must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure or substantiation into a fraud allegation." *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 527 (D.N.J. 2011). "[P]leadings containing collectivized allegations against defendants" do not meet Rule 9(b)'s stringent requirement. *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 511 (D.N.J. 1999).

With specific reference to the Complaint's fraud-based RICO claims, the Complaint also must allege with particularity "(1) the existence of a RICO enterprise; (2) the existence of a pattern of racketeering activity [known as 'predicate acts']; (3) a nexus between the defendant, the pattern of racketeering activity or the RICO enterprise; and (4) resulting injury to plaintiff, in his business or property." *Murphy v. Bancroft Constr. Co.*, 2002 WL 31641641, at *3 (D. Del. Nov. 15, 2002); *see also* 18 U.S.C. § 1962(c). And where "multiple defendants are accused of mail or wire fraud, the Complaint must plead the fraud with particularity as to each defendant." *Ottilio v. Valley Nat'l Bancorp*, 2014 WL 906138, at *2 (D.N.J. Mar. 7, 2014).

## IV.   ARGUMENT

### A.   Plaintiffs Lack Standing.

At the threshold of the Court's review is the question whether Plaintiffs have standing to bring their claims. To allege standing, the Complaint must allege that Plaintiffs suffered injury-in-fact fairly traceable to *BMW NA's* conduct. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547

(2016).  An "injury in fact" occurs only if one has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  For the injury to be traceable to a defendant's conduct, "there must be a causal connection between the injury and the conduct complained of."  *Estrada v. Johnson & Johnson*, 2017 WL 2999026, at *4 (D.N.J. July 14, 2017), *appeal argued*, No. 17-2980 (3d Cir. June 14, 2018).

Here, BMW NA highlights the general standing problems with the Complaint.  BMW NA addresses specific standing deficiencies applicable to the Complaint's RICO and state-law claims within the broader discussion of those claims (*see* disc *infra* Sections IV.B.3 and IV.C.1).  In both instances, the same deficiency is manifest: the Complaint fails sufficiently to allege an injury in fact or, as fundamental, to plead facts that show that any action or inaction by *BMW NA* caused cognizable injury.

### 1.	The Complaint Does Not Allege Injury in Fact.

Borrowing from cases in which manufacturers either admitted to employing, or have been found to have employed, defeat devices,[30] the Complaint seeks to allege three types of injury: (1) overpayment, based on the claim that Plaintiffs would not have purchased their vehicles had they had known of the alleged (and non-existent) defeat device, and thus did not receive the benefit of their bargain; (2) the payment of a so-called "diesel premium" of at least $1,500 and "more likely in the range of $5,000 to $20,000 per vehicle," for which they did not receive value; and (3)

---

[30] *See, e.g.*, Complaint ¶ 99, *Napleton Orlando Imports, LLC v. Volkswagen Grp. of Am., Inc.*, 1:16-cv-04071 (N.D. Ill. Apr. 6, 2016), Dkt. #1 ("Volkswagen admitted that the software was a 'defeat device' forbidden by the CAA and state regulations."); Complaint ¶ 10, *Benipayo v. Volkswagen Grp. of Am., Inc.*, 3:15-cv-04314-CRB (N.D. Cal. Sept. 21, 2015), Dkt. #1 ("Volkswagen admitted that the EPA allegations were true.  It admitted using a 'defeat device' in the Affected Vehicles."); Complaint ¶ 14, *Raymo v. FCA US LLC*, 2:17-cv-12168-TGB-SDD (E.D. Mich. July 3, 2017) Dkt. #1 (alleging "the EPA issued a notice of violation against FCA").

the expectation of "future attempted repairs, future additional fuel costs, and decreased performance of the vehicles once a repair to the emissions system is made." *See* Compl. ¶¶ 21-60, 345. Each claimed injury assumes that the vehicles Plaintiffs purchased in fact contain defeat devices. *See id.* ¶¶ 21-60.

To repeat, the Complaint does not allege facts sufficient to support even a reasoned inference that the BMW diesel models at issue contain defeat devices or "emit[] unlawfully high levels of pollutants." Compl. ¶¶ 21-60. Saying it—indeed, saying it over and over—is not the same as pleading "facts" credibly suggesting it is so (or controverting the public facts that give the lie to the claim). The Complaint contains not a single fact that demonstrates that *any* U.S. BMW diesel model was certified as being emissions-compliant improperly, nor does it acknowledge (must less rebut) the EPA's public statement (made months before the Complaint was filed) that the agency searched diligently for defeat devices in BMW vehicles sold in the U.S. and concluded there were none.[31] It is thus hard to discern what Plaintiffs are talking about when they wax on about "unlawfully high levels of pollutants." *See* Compl. ¶ 424. Those are just inflammatory words (almost surely actionable as defamatory if made outside of litigation); they are unmoored from any reference to a law or regulation that sets a maximum "level[] of pollutants."

Without facts supporting a plausible inference that Plaintiffs' vehicles contain defeat devices, the Complaint does not allege cognizable injury, and Plaintiffs' claims must be dismissed. *See Spokeo*, 136 S. Ct. at 1547; *Bledsoe v. FCA US LLC*, 307 F. Supp. 3d 646, 654 (E.D. Mich. 2018) (holding that plaintiffs' "PEMS testing of one vehicle [fails to] plausibly show[] the presence of a defeat device, a defect in the tested truck, or a defect that exists in the 'Affected

---

[31] *See also* Seiwert, RJN Exhibit 7, ("The highest American U.S. environmental authority, the EPA, has cleared BMW of the suspicion of having illegally manipulated emissions technology in models sold in the U.S.A.").

Vehicles'").   The court's analysis in *Bledsoe* is instructive.   There, the plaintiffs cited the Volkswagen scandal and the results of PEMS testing their "experts" performed on a single used vehicle to support the existence of an alleged defeat device in two different FCA models.   *See Bledsoe*, 307 F. Supp. 3d at 657.   The court held those allegations failed to give rise to a plausible inference that the FCA vehicles at issue contained a defeat device.   *See id.* at 655.   Because the plaintiffs' "purported injuries hinge[d] on the Complaint's conclusory allegations that . . . the 'Affected Vehicles' . . . contain . . . defeat device[s]," the court held the plaintiffs failed to plead an injury in fact and dismissed their claims.   *See id.* at 655-56, 660.

Here, as in *Bledsoe*, the dearth of facts that, if true, plausibly suggest the existence of a defeat device requires dismissal.   Even if the Court were to move beyond this fundamental pleading failure, however, standing would still not exist, because Plaintiffs' alleged damages fail to constitute an injury in fact for three additional reasons.

*First*, the Complaint acknowledges that the vehicles at issue "achieved [their] promised fuel economy and performance," *see* Compl. ¶¶ 21-60, and, in so doing, concedes that the vehicles worked for their intended purpose.   *See*, *e.g.*, *Adams v. Am. Suzuki Motor Corp.*, 2011 WL 1304766, at *5 (N.J. Super. Ct. App. Div. Apr. 7, 2011) ("The ordinary purpose for which a car is intended is transportation"); *Strauss v. Ford Motor Co.*, 439 F. Supp. 2d 680, 685 (N.D. Tex. 2006) (same).   Because Plaintiffs fail to allege that they "received a product that failed to work for its intended purpose or was worth *objectively* less than what one could reasonably expect," they have, as a matter of law, not suffered injury.   *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) (no injury in fact where plaintiff "asserted only a subjective allegation that the trace amounts of lead in the lipsticks are unacceptable to her"); *see also Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 298 (4th Cir. 1989) (no injury in fact where plaintiffs alleged only a diminution in

value and no defect); *Young v. Johnson & Johnson*, 2012 WL 1372286, at *4 (D.N.J. Apr. 19, 2012) (no injury in fact where only allegations were in regards to plaintiff's "own subjective belief" as to the product's performance); *Medley v. Johnson & Johnson Consumer Cos.*, 2011 WL 159674, at *2 (D.N.J. Jan. 18, 2011) (no injury in fact where shampoo "worked as intended," even if plaintiffs would not have purchased the product had they "known [its] true nature").

*Second*, the Complaint's claim to the payment of a supposed "diesel premium of at least $1,500," and "more likely in the range of $5,000 to $20,000," for which Plaintiffs did not receive value, is unsupported by any factual allegations; these are no more than random numbers chosen to bootstrap a claim to financial injury. *See Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1280 (C.D. Cal. 2016) ("It is true that both overpayment and diminution in value are theoretically cognizable injuries-in-fact . . . [b]ut, a plaintiff must still plead facts sufficient to establish these injuries-in-fact."). The Complaint lacks any *facts* that support the assertion that BMW diesel vehicles were more expensive than gas-powered vehicles, let alone that they were "at least $1,500" more expensive (the number when the first complaints were filed in this action, a number that magically has increased three to fifteen-fold without a single underlying alleged fact added to the Complaint). Not surprisingly—given that the number has gone from $1500 to $20,000 by act of word processing alone, the Complaint offers no facts regarding how any supposed premium or overpayment was calculated, whether it varied from year to year, or whether it was the same for X5s and 335ds and every configuration of those two model types.

The Complaint's allegations, moreover, suggest that any alleged overpayment is based not on objective criteria, such as model type or year, but on each Plaintiff's subjective sense of what she would have paid for her vehicle had she known the alleged "truth" about its emissions control system. For example, one Plaintiff who purchased a used 2011 335d alleges overpayment of "at

least $1500," while another who purchased a used 2011 335d alleges overpayment "in excess of $5,000." *See* Compl. ¶¶ 45, 56; *see also id*. ¶ 32 (purchaser of used 2011 BMW X5 alleging overpayment "in excess of $5,000"); *id*. ¶ 37 (purchaser of a used 2011 BMW X5 alleging overpayment of "at least $1500").[32]  Plaintiffs' alleged "diesel premium" is too "conjectural or hypothetical" to confer standing.  *See Estrada*, 2017 WL 2999026, at *15 (holding complaint failed to "set forth any comparable, cheaper products to demonstrate that Baby Powder was in fact sold at a premium price.  Accordingly, Plaintiff has not sufficiently alleged that she purchased Baby Powder at a premium."); *Young*, 2012 WL 1372286, at *4 (granting motion to dismiss in part because plaintiff failed to "set forth allegations as to how he paid a premium").

*Third*, the Complaint's allegations that Plaintiffs might suffer future out-of-pocket costs, *if* repairs to the emissions systems are required and *if* such repairs result in additional fuel costs and decreased performance, are both contingent and too speculative to confer standing.  *See, e.g.*, Compl. ¶¶ 21-60.  The assertions are just lifted whole-cloth from the Volkswagen situation, but *there* Volkswagen had admitted both to the existence of defeat devices and that it was obligated *to repair or replace every vehicle.*[33]  Here, the situation could not be more different.  The Complaint offers no facts from which the Court plausibly could infer that *any* repairs will be required to redress a violation that, as the EPA has stated, does not exist.  *See* disc. *supra* at Section I.  In addition, because future injuries are necessarily conjectural, a claim grounded in future injury must be both concrete and imminent to confer standing.  *See, e.g.*, *Anjelino v. N.Y. Times Co*., 200 F.3d 73, 88 (3d Cir. 1999); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[W]e

---

[32] Notably, no Plaintiff seeks rescission of her purchase or alleges that her vehicle does not function as intended.  *See* Compl. at *passim*.

[33] *Cf.* M. Biesecker and T. Krisher, *VW and regulators agree on fix for cars in cheating scandal*, Phys.org (July 27, 2017) (Exhibit 22 to the RJN).

have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact," and "[a]llegations of possible future injury are not sufficient.") (emphases omitted); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (allegedly increased risk of identity theft and costs to monitor credit activity following a security breach were too conjectural to confer standing).

The Complaint lacks any allegations plausibly suggesting any concrete injury, much less an imminent one, in the form of costs associated with required repairs or increased fuel costs. Accordingly, Plaintiffs lack standing to pursue claims for redress of speculative future harm. *See*, *e.g.*, *Bowman v. Ram Med., Inc.*, 2012 WL 1964452, at *1 (D.N.J. May 31, 2012) (dismissing case where "Plaintiffs vaguely state they will incur future costs to repair the damages caused by Defendants' unlawful activity but omit to further explain such repair[]"); *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 298 (3d Cir. 2003).

### 2. The Complaint Does Not Allege an Injury Fairly Traceable to BMW NA's Conduct.

The Complaint also must allege that Plaintiffs' alleged injuries are "fairly traceable to the challenged conduct of" *BMW NA* specifically. *See In re Mercedes-Benz Emissions Litig.*, 2016 WL 7106020, at *2 (D.N.J. Dec. 6, 2016). The Complaint devotes twenty repetitive pages to ads, largely focused on the groundless suggestion that the ads speak in misleading ways regarding the environmental friendliness of BMW vehicles. *See* Compl. ¶¶ 119-140. The Complaint implies that allegedly false advertising about emissions (presumably issued by BMW NA, although the Complaint does not say so specifically) duped Plaintiffs into buying vehicles that did not actually comport with prevailing emissions regulations. *See id.* ¶¶ 119-140. As an initial matter, every Plaintiff, save two, does not even *allege* that she saw or relied on *any* advertising containing statements about the environment or emissions. *See generally id.* ¶¶ 21-60. Instead, the Complaint asserts that before purchasing their vehicles, Plaintiffs "reviewed advertisements on BMW's [sic]

26

website and representations from [dealers] touting the efficiency, fuel economy, and power and performance of the engine." *See id.* ¶¶ 21-60. No Plaintiff alleges any issue with those aspects of her purchase decision, and each Plaintiff who has not expressly alleged that she relied on advertising relating to the environment or emissions cannot claim to have suffered injury "fairly traceable" to BMW NA's marketing regarding its vehicles' emissions. *See In re Mercedes*, 2016 WL 7106020, at *8 (no standing where plaintiffs failed to allege "that they actually viewed any category of advertisements – *i.e.*, Defendants' website, press releases, etc.—that contained the alleged misrepresentations"); *see also In re Gerber Probiotic Sales Practices Litig.*, 2013 WL 4517994, at *6 (D.N.J. Aug. 23, 2013) (holding plaintiffs lacked standing where they failed to "allege facts as to how misrepresentations in the 'advertising' caused their injuries").

Plaintiff Charles Chapman does allege that he selected his vehicle "explicitly because BMW's marketing promoted their [sic] 'clean diesel' and Blue Performance Technology as 'using Diesel Exhaust Fluid and a diesel particulates filter to turn nitric oxides into environmentally compatible nitrogen and water vapor.'" *See* Compl. ¶ 43. Another, Werner Rogmans, alleges he relied on "the dealership's labeling and representations regarding the car's emissions, fuel economy, and power and performance of the engine as part of his purchasing decision, as well as doing a significant amount of individual research on BMW vehicles." *See id.* ¶ 27. They both also lack standing. First, neither Chapman's nor Rogmans' allegations relate to a particular BMW entity and are inherently deficient for that reason. *See Weiss v. First Unum Life Ins.*, 2003 WL 25713970, at *6 (D.N.J. Aug. 27, 2003). The Complaint does not allege that BMW NA owns the dealerships from which Chapman or Rogmans purchased their vehicles; it does not and is not

responsible for what its dealers might say in an individual purchase transaction.[34]   Second, Rogmans fails to identify what the alleged "labeling and representations regarding the car's emissions" actually said, and neither Chapman nor Rogmans explains what was false about the statements on which they allegedly relied.  Indeed, the marketing materials on which Chapman alleges he relied, at least as he describes them, state accurately what the relevant emissions control technologies do.  *See* disc. *supra* at Section II.B.  Third, Chapman does not "allege[] even the general type or medium of 'advertising'" that contained any supposed misrepresentations regarding "clean diesel" technologies.  *Compare with In re Gerber*, 2013 WL 4517994, at *6.  *See* Compl. ¶ 43.[35]  Accordingly, the Complaint provides the Court no basis to connect the statements to any alleged injury of Chapman or Rogmans, and therefore lacks an essential pleading element required for standing.  *See In re Mercedes*, 2016 WL 7106020, at *8.

**B.**   **Plaintiffs' RICO Claims Do Not State a Claim upon which Relief Can Be Granted.**

Plaintiffs' RICO allegations suffer from several fatal defects; the most significant is the failure to allege with particularity any plausible basis to infer the existence of a single predicate act, let alone a "pattern" of acts that amount to a criminal conspiracy.  *See Battiste v. Arbors Mgmt., Inc.*, 522 F. App'x 171, 172 (3d Cir. 2013).  As described above, there is a gulf between the

---

[34] Indeed, in some states car manufacturers are expressly prohibited from controlling certain statements and representations made by car dealerships and salespersons.  *See Videon Chevrolet, Inc. v. Gen. Motors Corp.*, 992 F.2d 482, 485 (3d Cir. 1993) (explaining that manufacturers are "prohibit[ed] [from] forcing a dealer to participate in an advertising campaign").

[35] As the Court can discern from the website to which the Complaint refers, BMW NA maintains advertisements on its website only for current models.  Accordingly, the Plaintiffs who purchased *used* vehicles could not have viewed an advertisement for the model year of the vehicle they purchased, a fact which their counsel readily could (and should) have discerned as part of their required pre-filing investigation.  *See* https://www.bmwusa.com/; *see also, e.g.*, Compl. ¶ 25 (alleging Plaintiff Maccanelli purchased a used 2011 BMW 335d in 2015); *id.* ¶ 29 (alleging Plaintiff Price purchased a used 2009 BMW X5 in 2016).

allegations against BMW NA and the other automotive firms that Plaintiffs' counsel have pursued—in many of those other cases, manufacturers either conceded or stood accused by government regulators of selling vehicles with "defeat devices."  No such admission by BMW NA exists here, and no U.S. government agency has claimed, much less established, otherwise.  To the contrary, the EPA publicly has concluded both that no such defeat device exists *and* pointedly disparaged the type of litigation-driven PEMS "testing" performed by Plaintiffs, calling out one of Plaintiffs' lead counsel by name and chiding the counsel-sponsored testing as "two men and a PEMS" who lack the EPA's "expertise."  *See* Seiwert (Exhibit 7 to the RJN).

Moreover, the Complaint lacks a factual basis even to infer the existence of a defeat device (much less any facts affirmatively demonstrating its existence).  At most, the Complaint says that in one used car (of entirely indeterminate driving and maintenance history), Plaintiffs' counsel and their paid (and, bizarrely, still-unnamed) consultants were able to gin up emissions under a subset of driving conditions that exceeded what *they* (*not* the regulators) expected or required.  It is a huge, groundless leap from that observation to the conclusion that BMW NA engaged in fraudulent (even criminal) conduct by installing defeat devices on every—or any—new vehicle in the models at issue.  There is no factual basis for that leap, certainly none pleaded with the particularity required by Rule 9(b).  *See In re Aetna UCR Litig.*, 2015 WL 3970168, at *25 (D.N.J. June 30, 2015); *Manhattan Telecomms. Corp., Inc. v. DialAmerica Mktg., Inc.*, 156 F. Supp. 2d 376, 380 (S.D.N.Y. 2001).[36]

---

[36] Because Plaintiffs' substantive RICO claims must be dismissed, so must their RICO conspiracy claims.  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) (explaining that a RICO conspiracy claim "necessarily must fail if the substantive claims are themselves deficient").

1.      **The Complaint Does Not Sufficiently Allege Predicate Acts of Mail or Wire Fraud.**

The Complaint seeks to allege predicate acts of mail and wire fraud by relying on general marketing materials and reciting the dates on which BMW NA allegedly "used the wires and mails to apply for, or submit revisions to, certificates of compliance with the Clean Air Act." Compl. ¶ 327. The pleading is deficient in multiple respects:

a.      **The Complaint Fails To Allege a Fraudulent Scheme.**

A well-pleaded fraudulent scheme "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *See Kehr Packages, Inc. v. Fidelcor*, *Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991). Plaintiffs' mail and wire fraud allegations rest on the assertion that BMWs are equipped with illegal defeat devices, which BMW NA allegedly concealed from regulators and consumers. *See* Compl. ¶¶ 336-340. Yet the Complaint alleges *no* particularized facts raising a plausible inference that the vehicles Plaintiffs purchased include defeat devices (and thus that there existed anything for BMW NA fraudulently to conceal).

First, there is no factual basis to infer fraud related to the process by which the applicable BMW models obtained COCs from the EPA or statements made by BMW NA that the diesel-powered BMWs complied with all applicable emissions regulations. To the contrary, the Complaint concedes both that the BMW models at issue were certified as compliant by the EPA and CARB, (*see* Compl. ¶ 210), and that for several years federal regulatory authorities have been focused on identifying the existence of defeat devices in diesel vehicles and have found and sought to punish violating manufacturers. *See id.* ¶¶ 9-11, 244, 248. No U.S. regulatory authority has suggested that the COCs for the BMWs at issue were fraudulently obtained, or otherwise invalid or improperly issued. Rather, lazily borrowing from other pleadings, the Complaint incorrectly

claims that "[t]he RICO Defendants suppressed and/or ignored warnings from . . . governmental entities" and "obfuscated the true nature of the emissions systems even after regulators raised concerns."   *Id.* ¶ 338.   But, nowhere does the book-length Complaint identify any U.S. "governmental entity" or "regulator" claiming that *BMWs* sold in the United States contain defeat devices.   *See id.* at *passim*.   To credit the Complaint's naked assertions of the existence of a defeat device, the Court must not only ignore the lack of facts; it must also conclude that the EPA was incompetent or just missed something in the agency's "thorough[]" investigation of BMW diesel models sold in the U.S. and the agency's conclusion that it has "not found any illegal technology."[37]   There is no credible basis for doing so.

Confronted with valid COCs and the EPA's public pronouncements that BMW diesel vehicles sold in the U.S. do not contain defeat devices, Plaintiffs' only refuge is their testing of a single used vehicle pursuant to a litigation-driven protocol of their lawyers' devising.   *See* Compl. ¶¶ 163-176; *see also* disc. *supra* at Section I.   The Complaint asserts that Plaintiffs' testing revealed "[t]he Polluting BMW Vehicles emit more than expected and exceed emissions standards[,]" but the Complaint does not allege that what it labels a "standard" is anything more than a number conveniently selected—*not by the EPA or CARB*—but by the lawyers and their hired hands *after* the "two men a PEMS" had completed their tests.   *Id.* ¶¶ 162-163.   That is not science—it's just reverse engineering to shake down a company that fairly earned the imprimatur of the EPA and of independent, objective testing entities for its emissions control innovations and efforts.   *See* disc. *supra* at Section I.   Indeed, it is so subjective that it could be made to apply to *any* car on any set of manufactured "facts."

---

[37] Dörner, RJN Exhibit 6, ("Grundler declared that all of the diesel models sold by BMW in the U.S.A. are clean. 'We have investigated every product very thoroughly and have not found any illegal technology,' said Grundler.").

Furthermore, one cannot reconcile the assertion that one carefully-chosen test vehicle emitted emissions higher than "what a reasonable consumer would expect," (Compl. ¶ 2,) with the concession that the very same vehicle *"appear[ed] to be working as designed" when tested "in strict accordance with the code of federal regulations, as would be required for certification testing."* *Id.* ¶¶ 189, 177.  Even if the subset of Plaintiffs' vehicle testing results that they have disclosed were accurate, the fact that one BMW X5 flunked a non-sanctioned, litigation-driven test designed by an unidentified, paid "expert" does not raise a plausible inference that all 2009-2013 BMW X5 and 2009-2011 BMW 335d vehicles contain illegal defeat devices.  *See, e.g.*, *Bledsoe*, 307 F. Supp. 3d at 657 (holding that "[p]laintiffs' allegations of the presence of a defect or a defeat device in [] identified vehicles, based on results of their PEMS testing on a single [vehicle], are conclusory [and] are not founded on specific allegations of fact").  The Complaint's favored sources in fact support the *contrary* inference (that is, that BMW vehicles do *not* contain defeat devices): the road-test study that uncovered the Volkswagen scandal and is liberally invoked by the Complaint (*see* Compl. ¶ 144) concluded that the same BMW model tested by Plaintiffs (a BMW X5) "passed" the organization's independent, non-litigation driven, in-use road tests.[38]

Plaintiffs also concede that the test vehicle described in the Complaint, a BMW X5, employs a different EGR system than a BMW 335d, the other alleged model of "Polluting BMW Vehicle."  *See* Compl. ¶¶ 141, 161.  The Complaint does not explain how, in a case centered on emissions technology, of which EGR is a key component (*see*, *e.g.*, *id.* ¶ 99), a vehicle with one EGR system can stand as the proxy for vehicles with an entirely different system.  Nor does the Complaint explain why PEMS road-testing—which, as EPA and CARB have stated, produces widely variable results—performed on a six-year old vehicle with an undisclosed maintenance and

---

[38] *See* Plungis, RJN Exhibit 3; ICCT Press Statement, RJN Exhibit 4; Glinton, RJN Exhibit 5.

driving record, provides a plausible basis from which to draw conclusions about the emissions systems of every model year at issue. *See* disc. *supra* at Section II.C.2; *see also Bledsoe*, 307 F. Supp. 3d at 659 (dismissing claims and holding that "[p]laintiffs' PEMS results from one tested vehicle do not raise a plausible inference of wrongdoing because they do not permit the court to infer more than the mere possibility that the affected vehicles perform as alleged by Plaintiffs").

The Complaint also fails adequately to allege in any detail the *object of the fraud* itself, namely the alleged BMW "defeat device." No fact, certainly none pleaded with particularity, describes a function, algorithm, or process that "cheats" during testing. *See* Compl. ¶¶ 161-162. This failure makes it impossible to determine whether the results of Plaintiffs' paid litigation "testing" have any relation at all to the alleged "defeat devices." *Compare with In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1047 (E.D. Mich. 2018) (noting plaintiffs had provided a detailed "technical explanation" of three distinct defeat devices that worked in tandem in GM engines to control emissions).

Similarly, vague references to statements (none of which Plaintiffs claim to have seen or relied upon in deciding to buy their vehicles) by "BMW" about vehicles being "clean" and "environmentally friendly" do not make out a claim for mail or wire fraud. *See, e.g.*, *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *13 (D.N.J. July 10, 2009) ("While puffery may be actionable under [other statutes], it is not a violation of RICO."); *United States v. Pearlstein*, 576 F.2d 531, 540 n.3 (3d Cir. 1978) (puffing statements such as products were "among the finest . . . in the world" are "not cognizable under the federal mail fraud statute").

Finally, the Complaint's 30+ pages of allegations about the purported conduct of other manufacturers does not raise a plausible inference that *BMW NA* committed mail and wire fraud

under RICO.  Plaintiffs' extensive attention to the behavior of other diesel vehicle manufacturers reflects an attempt to lump BMW NA into a group of supposedly bad actors in the diesel vehicle industry through improper guilt-by-association pleadings.  *See* Compl. ¶¶ 15, 75, 227-231, 243-247.  Allegations regarding Volkswagen and other manufacturers raise *no* inference at all regarding BMW NA's conduct, let alone a plausible one.  *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015) (allegations that "if it happened there, it could have happened here" do not suffice to make a claim); *see also In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 248 (3d Cir. 2012) (holding defendant's prior false advertising of two drugs "failed to show the requisite causal relationship" for standing between that prior conduct and plaintiff's alleged injury of purchasing a third, different drug); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 n.2 (E.D. Pa. 2010) (rejecting plaintiff's "assertion that allegations of unrelated . . . improprieties [elsewhere] help to bestow plausibility on the allegations [] in the Complaint").

> **b.    The Complaint Does Not Plead BMW NA's Specific Intent To Defraud.**

The Complaint also does not allege specific facts showing, particularly as to *each defendant*, a "specific intent to defraud."  *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005).  The form of pleading itself highlights this material deficiency:  the Complaint alleges that "BMW" (without distinguishing between BMW NA and BMW AG) (i) installed and used defeat devices in its vehicles, (ii) applied for and obtained certifications for its vehicles even though the vehicles did not comply with emissions standards, and (iii) deceived "regulators and potential consumers into believing [that the vehicles] were 'clean' and 'environmentally friendly.'"  Compl. ¶¶ 223, 302.  For the same reasons Plaintiffs' allegations fail to raise a plausible inference that the BMWs contain defeat devices or do not in fact comply with all applicable emissions standards,

and thus are every bit as "clean" as the law requires, these generic assertions are inadequate to give rise to the inference that BMW NA acted with a specific intent to defraud.  *See* disc. *supra* at Section II.D.

Perhaps recognizing just how contrived its allegations are, the Complaint eventually defaults to the shopworn contention that "BMW" (again, described in monolithic terms) behaved improperly because it wanted to increase its profits and market share.  *See* Compl. ¶ 302.  Courts long ago discredited this trope, because it speaks as much to legitimate business motives as to wrongful ones.  *See, e.g.*, *Carlin v. Dairy Am., Inc.*, 2014 WL 6390569, at *7 (E.D. Cal. Nov. 17, 2014) ("The court cannot infer . . . an 'intent to defraud'" from a defendant's attempt to "maximize [business] profits."); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 284 (D.N.J. 2007) (In pleading fraud, "a plaintiff may not rely on facts indicating that the defendant had certain goals or aspirations (or sought to engage in the industry practices) common to the law-abiding business community, since such goals or practices cannot amount to a valid motive for the purposes of showing scienter.").

### c.  The Complaint Does Not Plead the Use of Mail and Wire Transmissions with Particularity.

Although the Complaint's RICO claims invoke mail and wire fraud as predicate acts, the pleading does not "identify each separate predicate act, of which [Plaintiffs have] knowledge, indicating the date, the particular person or entity who sent the [transmission] in question, the recipient, and, most importantly, the way in which the particular transmission furthered the pattern of racketeering activity and the overall fraudulent scheme."  *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 428-29 (E.D. Pa. 2014).  Instead, the Complaint points only to general categories of documents and communications allegedly transmitted by "the RICO Defendants or third parties" (*see* Compl. ¶ 326); it does not specify to or from whom these materials were sent, when they were

sent or, most importantly, *what aspect of any communication was false*.  *See id*. ¶¶ 324-346. Vacuous pleading like this is exactly what Rule 9(b) and settled RICO doctrine proscribe.  *See Sarpolis*, 26 F. Supp. 3d at 428-29.

The Complaint suggests that "the RICO Defendants" used the mails and wires "to apply for, or submit revisions to" COCs (and that is true at least as to *some* of the Defendants), but then the pleading just lists the dates the applications and revisions allegedly were sent.  Nowhere does it plead (much less describe with particularity) the supposedly fraudulent content in those transmissions.  *See* Compl. ¶ 327.  To be precise, a minimally-pleaded RICO claim grounded in fraud (or, as discussed below, in the state-law causes of action) would (i) specify the nature and contents of the "defeat device" they falsely posit; (ii) provide the Court with some basis for discrediting the EPA's statements that the COCs granted for the X5s and 335ds were appropriately obtained and supported by accurate testing; and (iii) plead a factual basis for concluding that the various marketing statements dredged up were something other than accurate.  *See Silverstein v. Percudani*, 422 F. Supp. 2d 468, 472 (M.D. Pa. 2006), *aff'd*, 207 F. App'x 238 (3d Cir. 2006) (dismissing RICO claim because 9(b) required plaintiffs to describe the "precise content of each particular mailing").  The Court has none of that before it.

Further, the Complaint engages in impermissible group pleading, noting that "the RICO Defendants or third parties" sent allegedly fraudulent documents, and that "many of the documents . . . were sent by BMW, not Bosch," without ever actually specifying or distinguishing which documents allegedly were sent by BMW NA, BMW AG, or either Bosch entity.  *See* Compl. ¶¶ 326, 329; *see also Silverstein*, 422 F. Supp. 2d at 473 (dismissing RICO claims because "[a] complaint that lumps together numerous defendants does not provide sufficient notice of which defendants allegedly made the misrepresentations); *Int'l Transp. Mgmt. Corp. v. Brooks Fitch*

36

*Apparel Grp., LLC*, 2012 WL 295847, at *5 (D.N.J. Feb. 1, 2012) (denying leave to amend where RICO claim failed to put defendants "on notice of the precise misconduct with which they are charged"); *Weiss*, 2003 WL 25713970, at *6 ("[G]eneral allegations of fraud against multiple defendants without informing each defendant as to the specific fraudulent acts he or she is alleged to have committed do not satisfy Rule 9(b)."); *Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003).

### 2.   The Complaint Does Not Plead a RICO Enterprise with Particularity.

Nor does the Complaint plead the existence of a RICO enterprise with particularity.  The supposed enterprise is "the BMW Diesel Fraud Enterprise," which purportedly consists of BMW NA, BMW AG, Robert Bosch GmbH, and Robert Bosch LLC.  Compl. ¶ 303.  RICO defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although *not* a legal entity."  18 U.S.C. § 1961(4).  As the enterprise claimed here is a group of entities associated in fact, the Complaint must, but does not, demonstrate "a common purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 368 (3d Cir. 2010).

Rather than describe something nefarious in the relationship among the defendants in this case, the Complaint dwells on Bosch's relationships with *other* vehicle manufacturers, supposedly to "add[] plausibility to its participation in the" BMW Diesel Fraud Enterprise.  *See, e.g.*, Compl. ¶ 307.  The allegations concerning purported misconduct by other manufacturers and Bosch are insufficient to raise a plausible inference that there existed a separate RICO "enterprise" involving BMW NA.  *See Mega Concrete, Inc. v. Smith*, 2011 WL 1103831, at *10 (E.D. Pa. Mar. 24, 2011) (dismissing RICO claim where "there [were] no facts to support a reasonable inference that any of

the . . . defendants engaged in activities constituting 'participation' in the affairs of the enterprise"). The remaining enterprise allegations are equally irrelevant or contrived, especially the summary assertion that because Bosch sent *Volkswagen* a letter stating its vehicles could not be lawfully operated if the emissions control systems were disabled, "[t]he same logic applies to the BMW [sic] Polluting BMW Vehicles—*i.e.*, they could not be lawfully operated with the defeat device." Compl. ¶ 310. But a communication with *someone else* is not a fact supporting the existence of an association-in-fact between Bosch and any BMW entity. *See Mega Concrete*, 2011 WL 1103831, at *10. Moreover, there is no communication even alleged between any Bosch entity and *BMW NA*, and thus no basis for concluding that *BMW NA* was part of any RICO enterprise. *Id.*

The failure adequately to plead relationships among the supposed members of the "BMW Diesel Fraud Enterprise" is just the start of the problem—also missing from the Complaint is any allegation that the "enterprise" had a purpose distinct from a normal business relationship. A RICO "plaintiff[] must allege that the defendants engaged in a degree of cooperation that fell outside the bounds of the parties' normal commercial relationships." *In re Aetna UCR Litig.*, 2015 WL 3970168, at *30. Yet all the Complaint describes is an ordinary supplier-manufacturer relationship. *See* Compl. ¶ 202 ("Bosch worked with [BMW] to create a unique set of specifications and software code to manage the vehicles' engine operation"); *id.* ¶ 203 ("Bosch employees regularly communicated with BMW employees concerning dosing rates into the SCR catalyst . . . ."). The Complaint again makes BMW NA's point: it alleges that the purported RICO conspirators banded together with the "common purposes of increasing their revenues and market share, and minimizing losses." *Id.* ¶ 317. So do parties to *every* commercial relationship, and the fact-free assertion that the "Defendants' primary business activity—the design, manufacture, and

38

sale or lease of [] vehicles—was conducted fraudulently" makes their claims "incompatible" with the definition of a RICO enterprise.  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202–03 (C.D. Cal. 2011) (dismissing RICO claim where plaintiffs "do nothing more than allege that Defendants associated in fact to carry on their own primary business purposes"); *Mega Concrete*, 2011 WL 1103831, at *10 (dismissing RICO claim because mere allegations that "defendants operated their own businesses [are] clearly insufficient to allege that they participated in . . . [the RICO] enterprise").[39]

### 3.     The Complaint Does Not Allege RICO Injury.

A cognizable RICO claim alleges "injury to business or property," meaning a "concrete financial loss" in the form of an "actual monetary" or "out-of-pocket loss."  *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).  The Complaint's assertions of RICO injury—that Plaintiffs "overpaid by many thousands of dollars" and will have to pay for "future attempted repairs, future additional fuel costs, and decreased performance of the vehicles once a repair to the emissions system is made," (Compl. ¶¶ 21-60, 345) —do not meet this requirement, for reasons that largely mirror the broader standing problems Plaintiffs face.[40]  *See* disc. *supra* at Section IV.A.

*First*, Plaintiffs claim to have paid a so-called "diesel premium" and overpaid by "at least" $1,500 and "more likely in the range of $5,000 to $20,000".  *See* Compl. ¶¶ 21-60, 268.  As noted

---

[39] As set forth more fully in Section III(A)(1) of the memorandum of law of Robert Bosch LLC, which BMW NA adopts and incorporates by reference, Plaintiffs' RICO claims also fail because the Complaint defines RICO "persons" and RICO "enterprise" identically.  *See* Compl. ¶¶ 320-323, 326; *see also Zavala v. Wal-Mart Stores, Inc.*, 447 F. Supp. 2d 379, 382 (D.N.J. 2006) (dismissing RICO claim with prejudice where it "contains a serious, fatal problem, in that it alleges that the RICO person[s] and the RICO enterprise are the same").

[40] Plaintiffs claim that they purchased their vehicles under the "mistaken belief" that they were "clean diesel" and/or "low emission diesel" vehicles and that Plaintiffs were harmed as a result. Compl. ¶¶ 21-60.  A failed promise of "environmental friendliness" is not a harm to "business or property" within the meaning of the RICO statute.  *See Maio*, 221 F.3d at 483 (mere "injury to a valuable intangible property interest" insufficient under RICO).

above, the Complaint lacks facts that explain how the supposed "premium" or "overpayment" was calculated or derived or facts from which the Court could reasonably infer that any overpayment exists (at all, much less in the amount claimed). *See* disc. *supra* at Section IV.A.1; *see also Young v. Johnson & Johnson*, 2012 WL 1372286, at *4 (D.N.J. Apr. 19, 2012) (dismissing claim where plaintiff failed to "set forth allegations as to how he paid a premium"); *In re Schering-Plough Corp.*, 2009 WL 2043604 at *11 (finding that "simply alleging an injury to business or property resulting from an alleged RICO violation is not enough to defeat a motion to dismiss").

RICO requires *more* than a contention that one paid "too much" for a "product [that] was inferior to the product . . . defendants promised to deliver." *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105, at *7 (D.N.J. Dec. 23, 2008) (dismissing RICO claim where injury alleged was the "difference in value between the [product] promised and the [allegedly 'inferior' and less valuable product] actually received"). Plaintiffs' vehicles work as intended; their contention is only that they would have paid less for their vehicles if they knew about the (phantom) defeat devices. *See* Compl. ¶ 345. The law holds them to more. *See Dist. 1199P Health & Welfare Plan*, 2008 WL 5413105, at *7-8; *see also Heinold v. Perlstein*, 651 F. Supp. 1410, 1412 (E.D. Pa. 1987) (dismissing RICO claim for lack of standing "[w]here, as here, the only property to which a plaintiff alleges injury is an expectation interest that would not have existed but for the alleged RICO violation"). Similarly, there are no *facts* from which the Court could infer that Plaintiffs failed to receive the expected value of their vehicles when they bought them. *See Maio*, 221 F.3d at 480, 488 (allegations that plaintiffs had paid "more for their HMO plans than those plans [were] worth" did not plead RICO injury, because no plaintiff was alleged to have received a "compromised or diminished" product).

*Second*, Plaintiffs' prospective injuries—"future attempted repairs, future additional fuel

costs, and decreased performance of the vehicles once a repair to the emissions system is made," Compl. ¶¶ 21-60—are contingent and speculative and thus flout RICO's "concrete financial injury" requirement. *See, e.g.*, *Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 804-05 (E.D. Pa. 2007) ("[P]rospective damages are not actionable. RICO liability cannot attach to future contingent damages."); *Ferguson v. Moeller*, 2016 WL 1106609, at *8 (W.D. Pa. Mar. 22, 2016) ("Plaintiffs cannot base their RICO theory on any prospective injuries . . . ."); *Cinkutis v. Confederation Life Ins. Co.*, 1990 WL 161260, at *7 (E.D. Pa. Oct. 19, 1990) ("[P]laintiffs claim at best the possibility of a future injury . . . but plaintiffs have not suffered an actual past injury [and] potential injury is insufficient to confer RICO standing."). The contingency is made only more acute given that the EPA has determined that BMWs have no defeat devices, meaning there will never be anything to fix. *See* disc. *supra* at Section II.C.

### 4.    The Complaint Does Not Allege Injury Proximately Caused by BMW NA's Alleged Conduct.

Even assuming well-pleaded RICO injury, the Complaint must be dismissed because it does not properly allege that BMW NA proximately caused that injury. *See Maio*, 221 F.3d at 483; *see also In re Aetna UCR Litig.*, 2015 WL 3970168, at *31. Plaintiffs rely on two theories of proximate causation: (i) that they relied on allegedly false advertising (allegedly sponsored by BMW NA) that the vehicles were "clean" and "environmentally friendly" in deciding to purchase their vehicles; and (ii) that they relied on the regulatory certification of the X5s and 335ds that they purchased. *See* Compl. ¶¶ 326, 341-342. Neither theory has merit.

With respect to advertising materials (*see, e.g.*, Compl. ¶¶ 21-60, 341), the Complaint does not adequately plead reliance on any specific fraudulent misstatements; that failure defeats an inference of proximate causation. *See Lynch v. Capital One Bank (USA), N.A.*, 2013 WL 2915734, at *3 (E.D. Pa. June 14, 2013) ("Some form of reliance on the defendant's misrepresentation is

necessary to properly establish proximate cause for a RICO violation based on mail or wire fraud."); *Walter*, 480 F. Supp. 2d at 806 (explaining that "a RICO plaintiff must show that his injury was proximately caused by the defendant's misrepresentations . . . if a plaintiff did not rely on the defendant's misrepresentations, his injury could not have been proximately caused by them.").   Many of the advertisements reproduced in the Complaint assert that the X5 and 335d comply with U.S. emissions standards, which is true.  *See* Compl. ¶¶ 121, 125, 128, 133, 135, 138. The other advertisements that touch on the environment constitute non-actionable puffery.  *See id.* ¶ 128; *see also* disc. *supra* at Section IV.B.1.a.  Further, the Complaint does not allege that any named Plaintiff specifically relied on any of the statements in any of those materials, much less on any statement reasonably deemed fraudulent.  *See id.* ¶¶ 1, 2, 15; *see also* disc. *supra* at Section IV.A.2.  Moreover, the Complaint does not plead the dates on which the information was reviewed, what the advertisements said, or even that the advertisements included statements about the vehicles' emissions or impact on the environment.  *See id.* ¶¶ 21-60; *see also Stevenson v. Mazda Motor of Am., Inc.*, 2015 WL 3487756, at *8 (D.N.J. June 2, 2015) (holding that failure to include specific details about where and when an individual viewed statements was fatal to claim).

With respect to the certification materials (*see, e.g.*, Compl. ¶ 369), the Complaint lacks any suggestion that Plaintiffs actually relied on COCs in deciding to purchase their vehicles.  That omission rebuts an inference of proximate causation.  Though Plaintiffs repeatedly reference general descriptions of the vehicles as "clean" and "environmentally friendly" (*see, e.g.*, *id.* ¶¶ 8, 128), there are no facts suggesting that those simple marketing phrases were considered or approved by the EPA or any other regulator.[41]  The Court thus lacks a basis to draw a proximate

---

[41] Even assuming the Complaint did contain such a suggestion, those facts would, at best, tend only to show that the regulators, and not Plaintiffs, were the direct victims of BMW NA's alleged fraud.  Where a plaintiff fails to allege that they were the "direct victim" of a claimed RICO

causal link between the EPA's issuance of COCs (which are not alleged with any specificity to have been improperly granted) and any purported injury. *See Longmont United Hosp. v. Saint Barnabas Corp*., 2007 WL 1850881, at *4 (D.N.J. June 26, 2007) (explaining that "the proximate cause requirement is a key limitation on the expansive use of civil RICO" and demands that RICO plaintiffs "show some direct relation between the injury asserted and the injurious conduct alleged").

### C.   The Complaint's State-Law Claims Must Be Dismissed.

#### 1.   Plaintiffs Lack Standing To Assert Most of Their State-Law Claims.

"[C]ourts must initially review the standing of actual, not proposed plaintiffs to assert the claims in a class action complaint" *McGuire v. BMW of N. Am., LLC*, 2014 WL 2566132, at *6 (D.N.J. June 6, 2014). While the Complaint asserts causes of action under the consumer protection statutes of fifty states, it brings claims on behalf of forty-three named Plaintiffs residing and/or purchasing or leasing BMW diesel vehicles in just twenty-eight states.[42] The named Plaintiffs do not allege they reside or were injured in the remaining twenty-two states,[43] and causes of action

---

violation, no proximate causation exists. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-58 (2006).

[42] *See* Compl. ¶¶ 21-60 (named Plaintiffs reside in Alabama, Arizona, California, Colorado, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Minnesota, Mississippi, Montana, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Virginia, Washington and Wisconsin). The Complaint designates named Plaintiffs under only twenty-four states, but a few Plaintiffs allegedly either reside in or purchased or leased their BMW diesel vehicle in four additional states (Florida, Maine, Missouri and South Carolina). For example, named Plaintiff Campbell is designated as a "Georgia Plaintiff" but is alleged to reside in South Carolina (*id.* ¶ 32), and named Plaintiff Li is designated as a "Maryland Plaintiff" but is alleged to reside in Florida (Compl. pg. 35 at 10(a)) (paragraph number missing from Complaint). BMW NA assumes that Plaintiffs will contend to have suffered injury in the four additional states listed.

[43] Plaintiffs do not allege residence or injury in Alaska, Arkansas, Connecticut, Delaware, Hawaii, Idaho, Iowa, Kansas, Massachusetts, Michigan, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, Rhode Island, South Dakota, Utah, Vermont, West Virginia or Wyoming. *See* Compl. at *passim*.

under each of those states' consumer protection statutes must be dismissed for lack of standing. *See McGuire*, 2014 WL 2566132, at *6 ("Named plaintiffs lack standing to assert claims under the law of the states in which they do not reside or in which they suffered no injury."); *see also, e.g.*, *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) ("[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."); *Phillips v. Bally Total Fitness Holding Corp.*, 865 N.E.2d 310, 316 (Ill. App. Ct. 2007) (finding out-of-state plaintiffs have no cause of action under the Illinois Consumer Fraud Act where the overwhelming majority of the circumstances pertaining to their claims took place outside Illinois).

### 2.       The CAA Preempts the Complaint's State-Law Claims.

The Complaint's state-law claims have another fundamental threshold deficiency:  each is preempted by the CAA.  The CAA "is a comprehensive federal law that regulates air emissions under the auspices of the United States Environmental Protection Agency ('EPA'). . . . Section 202(a)(1) of the Act directs the EPA to prescribe standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines."  *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *8 (D.N.J. July 29, 2015).  CAA Section 209(a) contains a "specific and unambiguous" express preemption provision which "prohibits states from *adopting or enforcing* 'any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines.'"  *Id.* at 10.[44]  There is no right to bring a private action for money damages under the CAA.  *See, e.g.*, *Middlesex Cty. Sewerage*

---

[44] CAA Section 209(a) provides:  "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles[.]" 42 U.S.C. § 7543(a).  The CAA allows California to adopt and enforce its own emissions standards if those standards are approved by the EPA.  *See* 42 U.S.C. § 7543(b).

*Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17 n.27 (1981) ("[P]rivate enforcement suits were intended to be limited to the injunctive relief expressly provided for.").

The CAA preempts "enforcement actions that have any connection with or reference to the control of emissions from motor vehicles." *See Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 577 (S.D.N.Y 2011). And, consumer protection claims that sound in regulatory violations (as here) constitute "enforcement" of those regulations. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992); *In re Caterpillar*, 2015 WL 4591236, at *12 ("[A] state common law tort action that questions whether a defendant complied with standards promulgated under the CAA is an example of a state attempting to enforce the CAA, and is therefore subject to preemption.").

"[C]ourts have understood the Supreme Court's interpretation of [the CAA preemption provision] to include numerical limits on emissions or equipment and design requirements related to emissions control," which is exactly what is at issue here. *In re Caterpillar*, 2015 WL 4591236, at *11; *see also In re Office of Attorney Gen. of State of New York*, 269 A.D.2d 1, 12 (1st Dep't 2000) (dismissing as preempted fraud and breach of warranty claims based on alleged "defeat devices" because they were "the exact[] sort [of violations] proscribed by section 209(a) of the CAA"); *see also Abuhouran v. KaiserKane, Inc.*, 2011 WL 6372208, at *4-5 (D.N.J. Dec. 19, 2011) (dismissing private damages actions based on violations of CAA's "emission standards"). Indeed, the Complaint contains numerous references comparing the test vehicle's emissions levels in direct numeric relation to purported "maximum" federal standards. *See*, *e.g.*, Compl. ¶¶ 167-168, 173, 175-176.

The Complaint explicitly seeks to articulate a bespoke "standard" based on the PEMS tests counsel paid for, and then to have the Court rely on the "violation" of that purported standard as

the basis on which to find a violation of multiple state laws.  That is, however, exactly what CAA Section 209(a) prohibits.  *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253-54 (2004); *see also Abuhouran*, 2011 WL 6372208, at *4-5 (dismissing private damages actions based on violations of CAA's "emission standards"); *Jackson*, 770 F. Supp. 2d at 575 ("a state common law tort action that questions whether a defendant complied with standards promulgated under the CAA is an example of [an attempt] to enforce the CAA, and is therefore subject to preemption").  If Plaintiffs could maintain state-law claims based on no more than their own litigation-driven PEMS testing, manufacturers would be subject to liability for violations of those made-up emissions "standards"—even when, as here, the EPA properly certified their vehicle models as compliant, has never once suggested noncompliance, and cleared the vehicles of any defect devices after a "thorough[]" investigation.[45]  The CAA preempts claims based on one-off environmental standards.[46]  *See Counts v. Gen. Motors LLC*, 237 F. Supp. 3d 572, 590 (E.D. Mich. 2017) ("[T]o the extent Plaintiffs are suing GM for manufacturing a vehicle that emits more than a certain amount of NOx or particulate emissions in violation of EPA regulations or that is not equipped with properly functioning and federally required emission-control technology, their claims are pre-empted by the CAA.").

### 3.    The State-Law Claims Do Not Satisfy Rule 9(b).

Even those few state-law claims that might survive proper standing analysis must be dismissed for failure to satisfy Fed. R. Civ. P. 9(b).  Just as Plaintiffs' RICO claims, Plaintiffs' state-law claims are based on the supposed concealment of an alleged defeat device and misrepresentations about the emissions associated with BMW diesel vehicles.  *See*, *e.g.*, Compl.

---

[45] Dörner, RJN Exhibit 6.

[46] A contrary conclusion is an invitation to mischief about which the EPA appropriately is concerned.  *See Jackson*, 770 F. Supp. 2d at 575.

¶ 409 (alleging violation of California Legal Remedies Act based on alleged failure to disclose that BMW vehicles "employed a 'Defeat Device'"); *id.* ¶ 452 (alleging fraudulent concealment claim under California law based on concealment of alleged defeat device); *id.* ¶¶ 470-473 (alleging violation of Colorado Consumer Protection Act based on same); *see generally* Compl. ¶¶ 347-1342.[47]  All of those claims, and the comparable claims alleged under the laws of other states, sound in fraud and must meet the strictures of Rule 9(b).  *Crozier v. Johnson & Johnson Consumer Cos., Inc.*, 901 F. Supp. 2d 494, 506 (D.N.J. 2012) (for claims that "sound in fraud or misrepresentation, Rule 9(b) of the Federal Rules of Civil Procedure applies").  They do not.

---

[47] While the language of each state's consumer protection statute varies, every applicable statute requires the Complaint to allege at least one of: (1) a deceptive act/omission or practice; (2) reliance—or at least a "causal nexus" between the alleged unlawful conduct and any alleged injury; and/or (3) concrete, non-speculative damages.  *See* Appendix A.  Several state statutes go even further and require pleading and proof of an intent to deceive and/or an effect on public interest. *See, e.g.*, ARIZ. REV. STAT. ANN. § 44-1522 (declaring unlawful a deceptive act or practice made "with intent that others rely on such concealment, suppression or omission") (Compl. Count 4); *Cargill, Inc. v. Degesch Am., Inc.*, 875 F. Supp. 2d 667, 676-77 (E.D. La. 2012) (dismissing Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA") claim for failure adequately to allege defendant's intent to deceive and holding "the range of prohibited practices under LUTPA is extremely low") (Compl. Count 21); MINN. STAT. ANN. § 325F.69 (defining unlawful practice as "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise") (Compl. Count 25); *Groover v. Torkell*, 645 S.W.2d 403, 409 (Tenn. Ct. App. 1982) (reversing and remanding directed verdict for insured and holding "the concept of 'deceptive' carries with it an element of intent which we do not find present in this case") (Compl. Count 44); *Donna v. Countrywide Mortg.*, 2015 WL 9456325, at *4 (D. Colo. Dec. 28, 2015) (holding plaintiff failed to meet the pleading standard for a deceptive trade practice, which requires *inter alia* "a showing that the defendant knowingly made a misrepresentation or a false representation that had the capacity to deceive" and even if plaintiff adequately alleged fraud, she failed to sufficiently plead "that the alleged deceptive trade practice had a significant public impact" as required by Colorado Consumer Protection Act) (Compl. Count 10); *Pryor v. CCEC, Inc.*, 571 S.E.2d 454, 455 (Ga. Ct. App. 2002) (affirming summary judgment where plaintiff did not prove that alleged fraudulent behavior harmed or had potential to harm the public as required by Georgia Fair Business Practices Act) (Compl. Count 12); *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 719 P.2d 531, 539 (Wash. 1986) (reversing judgment for plaintiff on Washington Consumer Protection Act claim where, *inter alia*, "[t]he public interest element is not met") (Compl. Count 50).

First, the claims do not allege conduct specifically and separately as to each BMW entity. Rather, the conduct is alleged as to the "BMW Defendants"; Rule 9(b) requires more.  *See Weiss v. First Unum Life Ins.*, 2003 WL 25713970, at *6 (D.N.J. Aug. 27, 2003).  Moreover, as set forth above, because the Complaint does not plead facts raising a plausible inference that BMWs were equipped with a defeat device and does not describe any alleged fraud with particularity, the state-law claims, which sound in fraud, must be dismissed.  *See RBC Bank (USA) v. Petrozzini*, 2012 WL 1965370, at *3 (D.N.J. May 31, 2012) (finding a plaintiff must provide a "specific explanation as to why" a defendant's representations "were false"); *see also* disc. *supra* at Section IV.B.1.a-b.

In addition, the Complaint's state-law claims do not allege with requisite particularity the purported misrepresentations on which Plaintiffs claim to have relied, the content thereof, or when the supposed misrepresentations were made.  *See* disc. *supra* at Section IV.A.2; *see also Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 527 (D.N.J. 2011).  Nor does the Complaint allege that Plaintiffs relied on any specific representations regarding emissions or the environmental impact of the BMW vehicles at issue when they decided to purchase their vehicles, a logical and legal precondition to state consumer fraud (and analogous) causes of action. *See* disc. *supra* at Section IV.B.4; *see also Barnard v. Verizon Commc'ns, Inc.*, 451 F. App'x 80, 85 (3d Cir. 2011) (dismissing fraud claims for failure to adequately allege reliance); *Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360, 373-74 (D.N.J. 2015) (dismissing fraud claims when plaintiff alleged the existence of misrepresentations but not the fact that he viewed them prior to purchase); *Gray v. Bayer Corp.*, 2009 WL 1617930, at *3 (D.N.J. June 9, 2009) (holding plaintiffs must "specify what misrepresentations [they] relied upon or when [they] [were] exposed

to those misrepresentations"); Appendix A.[48]

### 4. The Complaint's Claims Brought under State Consumer Protection Statutes Suffer Additional Deficiencies.

The Complaint's claims under state consumer protection statutes must also be dismissed for the reasons set forth in the sections below and in Appendix A.[49]  For ease of reference, this Memorandum addresses in text the deficiencies in the statutory claims as to which Plaintiffs arguably have standing (*see* disc. *supra* at Section IV.C.1), and addresses the deficiencies in the remaining statutory claims in footnotes.

### a. Certain Class Claims Are Pleaded under State Statutes that Prohibit Class Actions.

The Complaint's causes of action for violation of the California Unfair Competition Law (Compl. Count 7); Georgia Fair Business Practices Act (Compl. Count 12); Louisiana Unfair Trade Practices and Consumer Protection Law (Compl. Count 21); Mississippi Consumer Protection Act (Compl. Count 28); Montana Unfair Trade Practices and Consumer Protection Act of 1973 (Compl. Count 30); South Carolina Unfair Trade Practices Act (Compl. Count 74); and Virginia Consumer Protection Act (Compl. Count 48) also must be dismissed because none of these statutes permit the maintenance of class claims.  The Georgia, Mississippi, Montana, and South Carolina statutes prohibit class actions altogether.  *See* GA. CODE ANN. § 10-1-399(a); MISS. CODE ANN. § 75-24-15(4); MONT. CODE ANN. § 30-14-133(1); S.C. CODE ANN. § 39-5-140(a).  The Virginia

---

[48] Advertisements that BMW diesel vehicles have "less emissions" and are "environmentally friendly" (*see* Compl. ¶¶ 126, 128) constitute non-actionable puffery.  *See* disc. *supra* at Section IV.B.1.a and IV.B.4; *see also Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 608 (D.N.J. 2016) (holding that even where plaintiffs pleaded alleged misrepresentations with particularity, claims that "products are 'top-quality,' 'innovative,' and 'dependable' with 'great warranties' and 'excellent service and support'" were non-actionable); *Shtutman v. Carr*, 2017 WL 4402045, at *5-6 (N.J. Super. Ct. App. Div. Oct. 4, 2017) (statements mounting to puffery not actionable).

[49] BMW NA reserves the right to file a motion under Rule 12(c) raising additional deficiencies with particular state law claims should those claims survive the present motion.

statute does not expressly allow an individual to sue in a representative capacity, and in Virginia "[a]n individual or entity does not acquire standing to sue in a representative capacity by asserting the rights of another, unless authorized by statute to do so." *W.S. Carnes, Inc. v. Bd. of Supervisors of Chesterfield Cty.*, 252 Va. 377, 383 (1996). The Louisiana statute allows class actions only if brought by that state's attorney general. *See* LA. REV. STAT. 51:1409(A). The California statute allows class actions only for injunctive relief. *See* CAL. BUS. & PROF. CODE § 17203. Therefore, Counts 12, 21, 28, 48 and 74 of the Complaint must be dismissed. Count 7 of the Complaint must be dismissed insofar as it seeks any remedy other than injunctive relief.[50]

> **b.    The Mississippi Consumer Protection Act Claims Must Be Dismissed for Failure To Allege Participation in a Pre-Suit Settlement Program.**

The Mississippi Consumer Protection Act ("MCPA") requires that a party participate in a pre-suit settlement program approved by the Mississippi Attorney General as a condition precedent to filing suit. MISS. CODE ANN. § 75-24-15(2). The Complaint does not allege that any Plaintiff participated in any settlement program approved by the Mississippi Attorney General. *See* Compl. Count 28. "Because Plaintiffs have not alleged that they utilized such programs, the Court must conclude that their claims under the MCPA are barred under the plain language of the statute," and Count 28 of the Complaint must be dismissed. *Joan Cravens, Inc. v. Deas Constr. Inc.*, 2016 WL 9240622, at *2 (S.D. Miss. May 5, 2016).

---

[50] The Complaint's Arkansas (Compl. Count 55) cause of action must also be dismissed because the statute prohibits class actions. *See* ARK. CODE § 4-88-113(f)(1)(B) (prohibiting private class action unless the claim being asserted is for violation of the Arkansas Constitution, Amendment 89 (usury provision)). Its Iowa cause of action (Compl. Count 61) must be dismissed for failure to allege that the any Plaintiff obtained attorney general approval to file suit. IOWA CODE § 714H.7 ("A class action lawsuit alleging a violation of this chapter shall not be filed with a court unless it has been approved by the attorney general.").

**c.    The Georgia Uniform Deceptive Trade Practices Act and Minnesota Deceptive Trade Practices Act Prohibit Private Causes of Action for Damages.**

The Georgia Uniform Deceptive Trade Practices Act and Minnesota Deceptive Trade Practices Act claims (Compl. Counts 13 and 26, respectively) must be dismissed because those statutes do not allow private actions for damages. GA. CODE ANN. § 10-1-373; MINN. STAT. ANN. § 325d.45. Further, because these claims are based on past conduct (*i.e.*, the alleged selling of cars that were subjectively worth less as a result of BMW's allegedly deceptive conduct), Plaintiffs lack standing to seek injunctive relief under these statutes. *See Wehner v. Linvatech Corp.*, 2008 WL 495525, at *4 (D. Minn. Feb. 20, 2008) ("Plaintiff lacks standing to seek injunctive relief based on his past injury."). Accordingly, Counts 13 and 26 of the Complaint must be dismissed.

**d.    The Kentucky Consumer Protection Act Must Be Dismissed for Failure To Allege Privity of Contract.**

The claim for violation of the Kentucky Consumer Protection Act (Compl. Count 19) must be dismissed because the Complaint does not allege privity of contract with BMW NA. *See Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 546 (Ky. Ct. App. 2013) (affirming summary judgment for defendant where "[t]here was no privity of contract between any [plaintiff] and [defendant], thus depriving the [plaintiffs] of standing to pursue the claim against [defendant]"), *discretionary review denied*. In this case, Plaintiffs do not allege any contractual relationship between Mr. Avic (the Kentucky named Plaintiff) and BMW NA. In fact, Mr. Avic alleges he purchased his BMW from a Volvo dealership. Compl. ¶ 37.[51]

**e.    Plaintiffs' Claims under the Alabama Deceptive Trade Practices Act Are Barred by the Statute of Repose.**

---

[51] The analysis and conclusion apply equally to the Complaint's Idaho cause of action (Compl. Count 60). *See Taylor v. McNichols*, 149 Idaho 826, 846-47 (2010) (holding plaintiff "failed to state claims for relief under the [Idaho Consumer Protection Act]" where he did not allege a contractual relationship with defendant).

Plaintiffs' claims under the Alabama Deceptive Trade Practices Act ("ADTPA") (Count 2) are barred by the ADTPA's statute of repose because they were brought "more than four years from the date of the transaction giving rise to the cause of action." ALA. CODE § 8-19-14 ("in no event may any action be brought under this chapter more than four years from the date of the transaction giving rise to the cause of action"). The ADTPA's statute of repose is not subject to tolling. *See Collins v. Davol, Inc*., 56 F. Supp. 3d 1222, 1228 (N.D. Ala. 2014) (statute of repose extinguished ADTPA claim notwithstanding alleged fraud delaying discovery). The Alabama Plaintiffs purchased used model year 2011 and 2013 BMWs that presumably were originally purchased in or near 2011 and 2013, placing Plaintiffs' claims well outside the four-year statute of repose. Compl. ¶¶ 21-22.[52] Because the Complaint was filed in August 2018, more than four years after the transaction giving rise to Plaintiffs' ADTPA claims, Count 2 must be dismissed.

### f.    The Complaint's Statutory Claims "For Notice Purposes Only" Are Not Valid Claims.

The Complaint asserts claims for violation of the Alaska Unfair Trade Practices and Consumer Protection Act (Compl. Count 54) and the West Virginia Consumer Credit and Protection Act (Compl. Count 78) "for notice purposes only." Compl. ¶¶ 1127, 1325. BMW NA takes this to mean that the Complaint is not presently alleging those claims, given that no Plaintiff has standing to assert them. *See* disc. *supra* at Section IV.C.1. Accordingly, this Court should dismiss Counts 54 and 78 brought for "notice purposes only." *See Slukina v. 409 Edgecombe Ave. Hous. Dev. Fund Corp.*, 2013 WL 4446914, at *7 (N.Y. Sup. Ct. N.Y. Cty. 2013) (dismissing complaint against defendants *sua sponte* where complaint alleged defendants were named "for notice purposes only").

---

[52] Indeed, Plaintiff Hu alleges he purchased his used 2011 BMW 335d on April 13, 2014. *See* Compl. ¶ 21. Thus his claim, filed on August 3, 2018, is time-barred.

## V.       CONCLUSION

For the foregoing reasons, BMW NA respectfully requests the Court dismiss with prejudice the Complaint in its entirety and grant it whatever further relief is appropriate under the circumstances.

Respectfully submitted,

LATHAM & WATKINS LLP

_/s/ Kevin M. McDonough_____
Kevin M. McDonough
*kevin.mcdonough@lw.com*
Michael Lacovara (admitted *pro hac vice*)
*michael.lacovara@lw.com*
Arthur F. Foerster (admitted *pro hac vice*)
*arthur.foerster@lw.com*
Johanna Spellman (admitted *pro hac vice*)
*johanna.spellman@lw.com*
885 Third Avenue
New York, New York 10022
(212) 906-1200

*Attorneys for BMW of North America, LLC*

53