# CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.

### COUNSELLORS AT LAW

CHARLES C. CARELLA
BRENDAN T. BYRNE
PETER G. STEWART
JAN ALAN BRODY
JOHN M. AGNELLO
CHARLES M. CARELLA
JAMES E. CECCHI

JAMES D. CECCHI (1933-1995)
JOHN G. GILFILLAN III (1936-2008)
ELLIOT M. OLSTEIN (1939-2014)

JAMES T. BYERS
DONALD F. MICELI
A. RICHARD ROSS
CARL R. WOODWARD, III
MELISSA E. FLAX
DAVID G. GILFILLAN
G. GLENNON TROUBLEFIELD
BRIAN H. FENLON
LINDSEY H. TAYLOR
CAROLINE F. BARTLETT

**5 BECKER FARM ROAD**
**ROSELAND, N.J.  07068-1739**
**PHONE (973) 994-1700**
**FAX (973) 994-1744**
**www.carellabyrne.com**

FRANCIS C. HAND
AVRAM S. EULE
CHRISTOPHER H. WESTRICK*
JAMES A. O'BRIEN  III**

—————
OF COUNSEL

*CERTIFIED BY THE SUPREME COURT OF
 NEW JERSEY AS A CIVIL TRIAL ATTORNEY
**MEMBER NY AND MA BARS ONLY

RAYMOND J. LILLIE
WILLIAM SQUIRE
STEPHEN R. DANEK
DONALD A. ECKLUND
MEGAN A. NATALE
ZACHARY S. BOWER+
MICHAEL CROSS
CHRISTOPHER J. BUGGY
JOHN V. KELLY III
MICHAEL A. INNES

+MEMBER FL BAR ONLY

April 10, 2019

**VIA ECF**

Honorable John M. Vazquez, U.S.D.J.
United States District Court
District of New Jersey
M.L. King, Jr. Federal Building
   and U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

Re:    *Hu v. BMW of North America LLC*
        Civil Action No. 2:18-cv-04363 *(JMV) (MF)*

Dear Judge Vazquez:

Plaintiffs in the above-referenced action respectfully write to bring to the Court's attention an order issued on March 31, 2019 in *Gamboa v. Ford Motor Co., Robert Bosch GMBH, Robert Bosch LLC*, No. 18-10106, 2019 WL 1441615 (E.D. Mich. Mar. 31, 2019) ("Order" or "*Gamboa*") (copy annexed hereto as Exhibit 1).  In *Gamboa*, a similar case involving alleged emissions cheating in Ford's F-250 and F-350 "Super Duty" vehicles, the plaintiffs claimed that the defendants had developed, manufactured, and sold vehicles that were equipped with the emissions-cheating software.  The *Gamboa* court denied the motions to dismiss of the defendants Ford and Robert Bosch LLC.  The court rejected many of the same or similar arguments made by the Defendants in this case in their pending motions to dismiss.

*Gamboa* held that the federal Clean Air Act does not preempt plaintiffs' claims, noting that "Plaintiffs have stated that in order to prove their fraud claims, they are not required to demonstrate directly or indirectly that Ford committed fraud on the EPA by using a defeat device."  Order at 20.   The *Gamboa* court "agree[d] that Plaintiffs' claims are not contingent on their ability to prove that Ford used defeat devices in its vehicles."  *Id*.  The "Plaintiffs have sufficiently stated a claim for fraud, under state laws, without relying Ford's alleged use of defeat devices."  *Id*. at 21.  The court rejected the defendants' express and implied preemption defenses.  *Id*. at 20-22.

April 10, 2019
Page 2

In addition, *Gamboa* held that the plaintiffs' state law claims complied with Rule 9(b) by adequately pleading actionable fraudulent omissions. *Id.* at 24-32.[1] *Gamboa* found that "Ford had a duty to disclose information about the defeat devices that were installed in their vehicles because the omissions were material and not necessarily connected to EPA regulations." *Id.* at 31.

As further relevant here, *Gamboa* held that the plaintiffs adequately pleaded standing to assert their claims under the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), in that they adequately pleaded a RICO injury ("to their 'business or property by reason of a violation of section 1962'"). Order at 33-37. The court held that plaintiff's allegation "that they overpaid for their vehicles based on Ford's alleged omissions" was sufficient to demonstrate RICO injury and standing. *Id.* at 36-37.

*Gamboa* further held that the plaintiffs adequately pleaded their claim under section 1962(c) of the RICO law, 18 U.S.C. § 1962(c), in that they (1) adequately alleged a RICO "Enterprise"; (2) adequately alleged the RICO predicate acts of mail or wire fraud; (3) are not required to allege that Bosch LLC had a duty to disclose information about the defeat devices; and (4) adequately alleged that Ford and Bosch LLC proximately caused the plaintiffs' RICO injuries. Order at 37-49.

With respect to whether the plaintiffs in *Gamboa* would be able to assert claims on behalf of absent class members under the laws of other states, the court declined to dismiss those claims on standing grounds. *Id.* at 49-52. The court found that "[i]f the class is certified, [the] [named] Plaintiffs will be able to advance state law claims on behalf of the unnamed Plaintiffs." *Id.* at 51. The issue is "indistinguishable from the . . . Rule . . . 23 analysis." *Id.*

The *Gamboa* court also rejected the argument of Bosch LLC that the plaintiffs lacked Article III standing. *Id.* at 52-56. The court found that the "Plaintiffs' overpayment theory is sufficient to provide standing to sue Bosch LLC because of its role in the use and concealment of a cheat device" in the plaintiffs' vehicles, for which they paid a "premium." *Id.* at 54-55.

With respect to those issues that were ruled upon in *Gamboa* in the plaintiffs' favor and that are likewise pending before this Court in the instant case, *Gamboa* supports the denial of the Defendants' motions to dismiss in this case.

---

[1]    *Gamboa* also found that the plaintiffs had not adequately pleaded affirmative misrepresentations, holding that such allegations were based on non-actionable puffery. Order, at 28-29.

April 10, 2019
Page 3

We thank the Court for its consideration of this decision and letter.

Respectfully submitted,

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
By /s/ James E. Cecchi
JAMES E. CECCHI
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744

By /s/ Steve W. Berman
STEVE W. BERMAN
Sean R. Matt
Jessica A. Thompson
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594

By /s/ Christopher A. Seeger
CHRISTOPHER A. SEEGER
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey
Tel: (973) 639-9100
Fax: (973) 639-9393

*Interim Lead Counsel for Plaintiffs and the
Proposed Classes*

cc: All Counsel of Record

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LEN GAMBOA, et al.,

                Plaintiffs,            CASE NO. 18-10106
                                    HON. DENISE PAGE HOOD

v.

FORD MOTOR COMPANY,
ROBERT BOSCH GMBH,
ROBERT BOSCH LLC,

                Defendants.

_____/

**ORDER GRANTING PLAINTIFFS' MOTION FOR THE APPOINTMENT OF INTERIM CLASS COUNSEL [#27], DENYING DEFENDANTS' MOTIONS TO DISMISS [#28; #29], GRANTING DEFENDANTS' MOTIONS TO CONSOLIDATE CASES [#39; #46], AND SETTING DATES**

## I. BACKGROUND

### A. Procedural Background

On January 10, 2018, Plaintiffs Len Gamboa, Jeff Retmier, Nikiah Nudell, David Bates, Pete Petersen, and William Sparks, individually, and on behalf of all other similarly situated individuals (collectively, "Plaintiffs" or the "Gamboa Plaintiffs"), commenced this action (the "Gamboa Action") against Defendants Ford Motor Company ("Ford"), Robert Bosch GmbH ("Bosch GmbH"), and Robert Bosch LLC ("Bosch LLC") (collectively, "Defendants"). (Doc # 1)

Plaintiffs allege that Defendants unlawfully manufactured and sold defective vehicles that had defective emissions controls in violation of: the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d) (Count 1); and various state consumer protection statutes (Counts 2-57). (*Id.*)

On April 6, 2018, Plaintiffs James Ruston, Vic Sparano, Andreas Alsdorf, Jeffrey Martin, Ken Ryan, Christopher Dieterick, Johnny Tolly, Kohen Marzolf, and Bruce Szepelak, individually, and on behalf of all other similarly situated individuals filed a Complaint (the "Ruston Action")[1] against all Defendants from the Gamboa Action. These plaintiffs are represented by the same attorneys who represented the Gamboa Plaintiffs. The same attorneys who represented Defendants in the Gamboa Action are representing Defendants in the Ruston Action. In the Ruston Action, the plaintiffs allege that in connection with Ford's vehicles, Defendants were in violation of: RICO (Count 1); and various state consumer protection statutes (Counts 2-63).

On April 20, 2018, Plaintiffs Glenn Goodroad, Jr., Richard Castro, Alan Flanders, Edward Hatten, Michael King, William McKnight, Luther "Ed" Palmer, Don Recker, Ivan Tellez, Brian Urban, Christina Bouyea, Value Additives LLC, and Michael Wilson, individually, and on behalf of all other similarly situated

---

[1] *Ruston et al. v. Ford Motor Company et al.*, Case No. 2:18-cv-11108.

individuals filed a Complaint (the "Goodroad Action")[2] against all Defendants from the Gamboa Action as well as James Hackett ("Hackett"), Mark Fields ("Fields"), and Volkmar Denner in the United States District Court, Northern District of California. Attorneys Elizabeth J. Cabraser, David Stellings, Gretchen Freeman Cappio, Jason Henry Alperstein, Lynn L. Sarko, and Paul Jeffrey Geller represent the plaintiffs. Ford is represented by Attorneys Jeffrey M. Yeatman, Joel A. Dewey ("Dewey") , Stephanie A. Douglas, and Susan M. McKeever. Attorney Dewey represents Hackett and Fields. Attorney Matthew D. Slater represents Bosch GmbH and Bosch LLC in the Goodroad Action. In the Goodroad Action, the plaintiffs allege that in connection with Ford's vehicles, the defendants were in violation of: RICO (Count 1); and fraud by concealment (Count 2).

On June 14, 2018, the plaintiffs and defendants in the Goodroad Action agreed to stipulate to a transfer of the case to the Eastern District of Michigan. When the parties agreed to this stipulation, they both expressed that once their case was transferred, they would work with the plaintiffs from the Gamboa and Ruston Actions to file a consolidated amended complaint in the Eastern District of Michigan. (Doc # 39-2) On June 14, 2018, the Honorable Beth Labson Freeman signed a Stipulation and Order to Transfer the Class Action Complaint Pursuant to

---

[2] *Goodroad, Jr. et al. v. Ford Motor Company et al.*, Case No. 5:18-cv-02403.

28 U.S.C. § 1404(a). On June 15, 2018, the Goodroad case was transferred from the Northern District of California to the Eastern District of Michigan.[3]

On July 31, 2018, Dina Badagliacco ("Badagliacco") individually, and on behalf of all other similarly situated individuals filed a Complaint (the "Badagliacco Action")[4] against all Defendants from the Gamboa Action. Attorneys Sharon S. Almonrode, Melvin B. Hollowell, and E. Powell Miller represent Badagliacco. The same attorneys who represented Defendants in the Gamboa Action are representing Defendants in the Badagliacco Action. In the Badagliacco Action, Badagliacco alleges that in connection with Ford's vehicles, Defendants were in violation of: RICO (Count 1); New Jersey's Consumer Fraud Act (Count 2); and fraud by concealment under New Jersey common law (Count 3).

On April 9, 2018, Gamboa Plaintiffs filed a Motion for the Appointment of Interim Class Counsel. (Doc # 27) Defendants filed their Response to this Motion on April 23, 2018. (Doc # 31) On April 27, 2018, Gamboa Plaintiffs filed their Reply. (Doc # 33)

---

[3] *Goodroad, Jr. et al. v. Ford Motor Company et al.*, Case No. 2:18-cv-11900.
[4] *Badagliacco v. Ford Motor Company et al.*, Case No. 2:18-cv-12379.

On April 9, 2018, Ford filed a Motion to Dismiss Gamboa Plaintiffs' Complaint.  (Doc # 28)  Gamboa Plaintiffs filed their Response to this Motion on June 15, 2018.  (Doc # 35)  On July 18, 2018, Ford filed its Reply.  (Doc # 42)

On April 9, 2018, Bosch LLC filed a Motion to Dismiss Gamboa Plaintiffs' Complaint.  (Doc # 29)  Gamboa Plaintiffs filed their Response to this Motion on June 15, 2018.  (Doc # 34)  On July 18, 2018, Bosch LLC filed its Reply.  (Doc # 43)

On July 9, 2018, Defendants filed a Motion to Consolidate Cases.  (Doc # 39) Gamboa Plaintiffs filed their Response to this Motion on July 23, 2018.  (Doc # 44)  On July 30, 2018, Defendants filed their Reply.  (Doc # 45)

On August 17, 2018, Ford filed a second Motion to Consolidate Cases. (Doc # 46) Plaintiffs have not responded to this Motion.

These five Motions are currently before the Court.  A hearing on these five Motions was held on September 17, 2018.

## B. Factual Background

Plaintiffs are suing Ford, Bosch GmbH, and Bosch LLC for allegedly selling vehicles that were not sold to consumers as advertised.  (Doc # 1)  According to Plaintiffs, Ford made several claims to consumers regarding its Ford F-250 and F-350 "Super Duty" vehicles that were untrue, including that its: (1) 6.7-liter Power

Stroke Diesel is the "Cleanest Super Diesel Ever"; (2) proven technology and innovative strategies were used to meet the latest federal emissions standards; (3) vehicles reduced nitrogen oxide ("NOx") by 80% over previous models; and (4) vehicles were "best-in-class" with respect to fuel economy and that they were the most tested Power Stroke diesel engines ever.  (*Id.* at 9.)  Plaintiffs contend that scientifically valid emissions testing revealed that Ford's Super Duty vehicles emit levels of NOx that are many times higher than: (1) its gasoline counterparts; (2) what a reasonable consumer would expect; (3) what Ford had advertised; (4) the Environmental Protection Agency's ("EPA") maximum standards; and (5) the levels set for the vehicles to obtain a certificate of compliance, which allows them to be sold in the United States.  (*Id.*)  Plaintiffs state in their Complaint that exposure to the pollutants from NOx has been linked with "serious respiratory illnesses and premature death due to respiratory-related or cardiovascular-related effects."  (*Id.* at 12.)

Plaintiffs' claims are based on the fact that they believe that "Ford's top selling Super Duty vehicles often emit far more pollution on the road than in the emissions-certification testing environment."  (*Id.* at 10.)  Plaintiffs argue that Ford's vehicles employ "defeat devices" to turn down emissions controls when the vehicles sense that they are not in the certification test cycle.  (*Id.*) According to Plaintiffs, Ford benefits by using defeat devices because they allow Ford to reverse

the traditional order of the exhaust treatment components and put the selective catalytic reduction in front of the diesel particulate filter. (*Id.* at 11.) Plaintiffs state that in modern vehicles with electronic engine controls, defeat devices are almost always activated by illegal software in each vehicle's engine control module. (*Id.*) Plaintiffs contend that these defeat devices give Ford the ability to obtain and market higher power and fuel efficiency from its engines while still passing cold-start emissions certifications tests. (*Id.*)

Plaintiffs argue that Ford's representations are "deceptive and false" and should cause Ford to be held legally responsible for selling their vehicles while omitting information that would be material to a reasonable consumer. (*Id.* at 16.) It is Plaintiffs' contention that Ford had a duty to disclose that in real-world driving conditions, Ford's vehicles could "only achieve high fuel economy, power, and durability by reducing emission controls in order to spew NOx into the air." (*Id.* at 18.) Plaintiffs further contend that Ford was responsible for disclosing to consumers that their vehicles may be "clean" diesels in certain circumstances, but are "dirty" diesels under common driving conditions. (*Id.*)

Plaintiffs bring their present lawsuit forward against the named Defendants because they believe that they are all responsible for the harms associated with Ford's alleged misrepresentations. While these are Ford's vehicles, Plaintiffs name Bosch GmbH and Bosch LLC as defendants because Plaintiffs allege that

they were active and knowing participants in Ford's scheme. (*Id.* at 18-19.) Plaintiffs claim that Bosch GmbH and Bosch LLC developed, manufactured, and tested electronic diesel controls that allowed Ford to implement the defeat devices. (*Id.*)

Plaintiffs bring this action individually, but also on behalf of all other current and former owners or lessees of the vehicles. (*Id.* at 19.) Plaintiffs are seeking damages, injunctive relief, and equitable relief for Defendants' alleged misconduct related to the design, manufacture, marketing, sale, and leasing of the vehicles. (*Id.*)

## II.   MOTION TO CONSOLIDATE CASES

### A. Standard of Review

Rule 42(a)(2) provides that a court may consolidate actions involving "a common question of law or fact." Fed. R. Civ. P. 42(a)(1); *Cantrell v. GAF Corp.,* 999 F.2d 1007, 1011 (6th Cir. 1993). The objective of consolidation is to administer the court's business with expedition and economy while providing justice to the parties. *Advey v. Celotex Corp.,* 962 F.2d 1177, 1181 (6th Cir. 1992). Consolidation of separate actions does not merge the independent actions into one suit. *Id.* at 1180. The party seeking consolidation bears the burden of demonstrating the commonality of law, facts or both in cases sought to be combined. *Young v. Hamrick,* 2008 WL 2338606 at *4 (E.D. Mich. 2008). Once

the threshold requirement of establishing a common question of law or fact is met, the decision to consolidate rests in the sound discretion of the district court. *Stemler v. Burke,* 344 F.2d 393, 396 (6th Cir. 1965). The court weighs the interests of judicial economy against the potential for new delays, expense, confusion, or prejudice. *Banacki v. OneWest Bank, FSB,* 276 F.R.D. 567, 571 (E.D. Mich. 2011). Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial. *Id.* at 572. Consolidation is not justified or required simply because the actions *include* a common question of fact or law. *Id.* When cases involve *some* common issues but individual issues predominate, consolidation should be denied. *Id.*

The trial court must consider whether the specific risks of prejudice and possible confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on the parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives. *Cantrell,* 999 F.2d at 1011 (citations omitted). "Care must be taken that consolidation does not result in unavoidable prejudice or unfair advantage." *Id.* Even though conservation of judicial resources is a laudable goal, if the savings to the judicial system are slight, the risk of prejudice to a party must be viewed with even greater scrutiny. *Id.*

**B. Whether Plaintiffs Have Sufficiently Demonstrated That They Will be Prejudiced if the Four Actions are Consolidated**

Defendants request that the Ruston, Goodroad, and Badagliacco Actions be consolidated with the Gamboa Action under Federal Rule of Civil Procedure 42. (Doc # 39; Doc # 46)  The Court finds that Defendants have demonstrated that it is necessary to consolidate these four actions.  First, Defendants have adequately satisfied their requirement of demonstrating that the four actions share common questions of law and fact.  In the four actions, the Gamboa, Ruston, Goodroad, and Badagliacco Plaintiffs allege that Ford was dishonest with regard to the claims that were made about its vehicles that are equipped with 6.7-liter Power Stroke diesel engines.  All of the plaintiffs similarly contend that because of these alleged misrepresentations, Ford violated RICO and various consumer protection state statutes.  All of the plaintiffs argue that they have been harmed by Ford in the same manner, and request the same relief.  Commonality of law and facts exist.

The Court has a legitimate interest in judicial economy here that is not outweighed by potential prejudice.  In Plaintiffs' Response, their only substantial argument raised demonstrating prejudice is insufficient.  Plaintiffs argue that they would be unfairly prejudiced by consolidation because it would unfairly give Defendants the opportunity to revise their previously submitted motions to dismiss, which they would then in theory offer this Court in response to a consolidated complaint.  (Doc # 44, Pg ID 1876-1877)  Due to this "unfairness," Plaintiffs

request that this Court only consider consolidating these actions after ruling on the Defendants' pending motions to dismiss. (*Id.* at 1877.)

The Court does not consider Defendants' ability to potentially revise their previous motions prejudicial enough to warrant denying Defendants' Motions to Consolidate Cases. If Defendants were to alter their motions to dismiss, Plaintiffs will still be afforded with the chance to adequately respond to any such filings. Plaintiffs have not shown prejudice that would result from the consolidation. For the sake of efficiency, time, and resources, in this instance, it is in the interest of judicial economy to consolidate the four actions.

## III. MOTION FOR THE APPOINTMENT OF INTERIM CLASS COUNSEL

### A. Standard of Review

Federal Rule of Civil Procedure 23(g)(3) provides that "[t]he court may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3). "[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." Manual for Complex Litigation (Fourth) § 21.11. Designation of interim counsel is particularly appropriate when a number of

lawyers have filed related "copycat" actions. *Tolmasoff v. Gen. Motors, LLC*, No. 16-11747, 2016 WL 3548219, at \*9 (E.D. Mich. June 30, 2016).

Courts have determined that the considerations set out in Rule 23(g)(1), which govern the appointment of post-certification class counsel, are equally applicable to a decision on whom to designate as interim class counsel. *Id.* (citing *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006)). In deciding whether to designate Plaintiff's counsel as interim class counsel, courts consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). The Court will also consider whether Plaintiff's counsel will "fairly and adequately represent the interests of the [putative] class." Fed. R. Civ. P. 23(g)(4).

**B. Whether it is Appropriate to Designate Interim Class Counsel**

Plaintiffs request that the Court appoint E. Powell Miller ("Miller") of the Miller Law Firm and Steve Berman ("Berman") of the Hagens Berman Law Firm as interim co-lead class counsel, and an interim executive committee consisting of Miller, Berman, Christopher A. Seeger of the Seeger Weiss Law Firm, and James Cecchi of the Carella Byrne Law Firm to assist them in this case. (Doc # 27, Pg ID

12

1161)  Plaintiffs state that appointment of class counsel is appropriate at this time in order to define the roles and responsibilities of the different law firms presently involved with this case and that are representing the individual plaintiffs.  (*Id.*) Plaintiffs have sufficiently demonstrated that each aforementioned attorney has spent a significant amount of time and energy identifying and investigating potential claims in the Gamboa Action.  (*Id.* at 1162-1163.)  In Plaintiffs' Motion, they thoroughly explain in detail that each aforementioned attorney has extensive experience handling class actions and complex litigation, including automobile defect cases.  (*Id.*)  Additionally, Plaintiffs believe that having four law firms lead this litigation will ensure that there are sufficient resources available to handle this high stakes action.  (Doc # 27, Pg ID 1163)

Defendants' only argument in response to Plaintiffs' Motion is that Plaintiffs' request is premature because "there are only two lawsuits in this Court," and therefore, there is no need to establish interim class counsel nor an interim executive committee.  (Doc # 31, Pg ID 1539-1540)  This argument fails however because at this point in the case, there are now four similar lawsuits before this Court.  Defendants have not demonstrated that there is any reason to deny Plaintiffs' request to appoint both interim class counsel and an interim executive committee to assist with the complexities involved in this case.  The Court grants Plaintiffs' Motion.

## IV.  DEFENDANTS FORD MOTOR COMPANY AND ROBERT BOSCH LLC'S MOTIONS TO DISMISS[5]

### A. Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  This type of motion tests the legal sufficiency of the plaintiff's complaint.  *Davey v. Tomlinson*, 627 F. Supp. 1458, 1463 (E.D. Mich. 1986).  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A court, however, need not accept as true legal conclusions or unwarranted factual inferences."  *Id.* (*quoting Gregory v. Shelby Cnty.*, 220 F.3d 443, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice."  *Edison v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

As the Supreme Court has explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level… ."

---

[5] Ford and Bosch LLC essentially make the same arguments in their Motions to Dismiss (Doc # 28; Doc # 29).  In certain sections however, Bosch LLC makes separate arguments, and the Court has addressed those accordingly.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see LULAC v. Bresdesen*, 500 F.3d 523, 527 (6th Cir. 2007). To survive dismissal, the plaintiff must offer sufficient factual allegations to make the asserted claim plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Id.*)

## B. Clean Air Act

Ford alleges that all of Plaintiffs' state law claims are expressly and impliedly preempted by the Clean Air Act ("CAA"), 42 U.S.C. § 7543(a).

"[Preemption] may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). In all preemption cases, and especially where "Congress has 'legislated...in a field in which the States have traditionally occupied,'...[courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "Environmental regulation is a field that the states have traditionally occupied." *Merrick v. Diageo Americas*

*Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015). The same is true of consumer protection and advertising regulations. *See In re Ford Fusion & C–Max Fuel Econ. Litig.*, No. 13-MD-2450 KMK, 2015 WL 7018369, at *28 (S.D.N.Y. Nov. 12, 2015); *Gilles v. Ford Motor Co.*, 24 F.Supp.3d 1039, 1047 (D. Colo. 2014). Where the statute does not expressly preempt state law, preemption may be implied. The Supreme Court has recognized:

> two types of implied preemption: field preemption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict preemption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Gade*, 112 S.Ct. at 2389 (internal citations omitted).

Ford's preemption arguments are premised on Section 209 of the CAA. That section, codified at 42 U.S.C. § 7543, reads as follows:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a).

Section 7543 also specifies, that "[n]othing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control,

16

regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." *Id.* at § 7543(d).

### 1. Express Preemption

Ford alleges that Section 209 of the CAA expressly preempts Plaintiffs' state law claims. According to Ford, since the Supreme Court recently decided that there is no longer a presumption against preemption, this Court is required to evaluate Plaintiffs' claims based on the plain language of the CAA. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (explaining that any claim of preemption must be grounded in statutory language). The CAA explicitly preempts "any standard relating to the control of emissions." 42 U.S.C. § 7543(a). Ford argues that Plaintiffs' state law claims fall under this CAA provision because they are filled with conclusions pertaining to Ford's vehicles' emission levels. Ford acknowledges that courts have held that plaintiffs' claims are not preempted by the CAA if plaintiffs do not attempt to enforce a numerical standard. *See, e.g.*, *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1058-59 (E.D. Mich. 2018) ("Duramax"). However, Ford argues that these rulings are not supported by the CAA's text, and even if they are, Plaintiffs are attempting to enforce a standard "based purely on numeric comparisons between Plaintiffs' own emissions measurements and federal standards."

17

In response, Plaintiffs argue that the Supreme Court's ruling in *Franklin California Tax-Free* confirms that their state law claims are valid according to the CAA's plain language. Plaintiffs claim that they are not seeking to enforce any numerical emissions levels, and state that their fraud-on-the-consumer claims only seek to redress Ford's deception. Plaintiffs explain that the Supreme Court construes the term "standard" narrowly, and only refers to "requirements such as numerical emissions levels with which vehicles or engines must comply…or emission-control technology with which they must be equipped." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004).

Courts in this district have recently ruled on claims that are similar to the Plaintiffs'. In *Counts v. General Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017) ("*Counts I*") and *Duramax*, courts held that the CAA does not preempt state-law consumer fraud claims because they do not seek to set or enforce any emissions standards or obligations. *Counts I*, 237 F. Supp. 3d at 591 ("Plaintiffs' claims…focus on the deceit about compliance, rather than the need to enforce compliance") (internal quotation marks and citation omitted); *Duramax*, 298 F. Supp. 3d at 1062 ("The gravamen of [plaintiffs'] state law claims is that they purchased a vehicle which polluted at levels far greater than a reasonable consumer would expect."). While this Court is not bound by the rulings from *Counts I* and *Duramax*, it does find those holdings to be persuasive. Ford has not attempted to

18

distinguish *Counts I* and *Duramax* from this present case. Instead, Ford argues that both the *Counts I* and *Duramax* courts reached decisions that were inconsistent with the CAA. The Court agrees that Plaintiffs' state law claims pertain to Ford's alleged fraudulent claims and not emissions standards.

Ford also argues that Plaintiffs' state law claims should be dismissed because they are premised on the fact that Ford's vehicles allegedly contain illegal "defeat devices." In Ford's Motion, it mentions that in *Counts I*, the Court held that when plaintiffs sue defendants for manufacturing a vehicle that emits an excessive amount of NOx or particulate emissions in violation of EPA regulations, or claim that vehicles are not equipped with properly functioning and federally required emission-control technology, their claims are preempted by the CAA. Ford goes on to recognize that in *Counts I* and *Duramax*, the Court found that plaintiffs' claims were not preempted because they did not attempt to define the term "defeat device" using the EPA definition, and therefore, they did not technically allege the existence of a defeat device. Ford argues that those holdings do not apply in the present case. Ford claims that Plaintiffs defined "defeat device" using the exact wording of federal law, and do not make generalized claims like plaintiffs did in *Counts I* and *Duramax*. Ford further claims that Plaintiffs "cannot simultaneously base their claims on these federal predicates, and

then disclaim them in favor of some theoretical parallel state standard in an attempt to evade preemption."

Plaintiffs argue that their claims do not require proof that Ford used a "defeat device" as defined by federal law, and state that they are not seeking to replace existing EPA certification tests. Plaintiffs contend that their claims are analogous to the plaintiffs' claims from *Counts I* and *Duramax* because they are similarly using the term "defeat device" as "shorthand to describe Ford's bait and switch by touting its intentionally defective technology." Furthermore, Plaintiffs have stated that in order to prove their fraud claims, they are not required to demonstrate directly or indirectly that Ford committed fraud on the EPA by using a defeat device. Plaintiffs believe that they can alternatively prove their fraud claims by reference to what a reasonable consumer would have expected of the "clean" vehicles without proof of Ford's regulatory noncompliance.

The Court agrees that Plaintiffs' claims are not contingent on their ability to prove that Ford used defeat devices in its vehicles. Although Ford correctly asserts that this present case is dissimilar from *Counts I* and *Duramax* because Plaintiffs define "defeat device" using the exact statutory language that Congress has used in its definition,[6] Ford fails to point out that even if Plaintiffs were no longer able to refer to Ford's alleged use of defeat devices, Plaintiffs could still succeed with

---

[6] *Compare* Doc # 1, Pg ID 11, 114, 121-122 *with* 40 C.F.R. § 86.1803-01.

their fraud claims.  The true issue with regard to Plaintiffs' fraud claims is whether or not Ford materially deceived (under the various state laws) its consumers.  The Court finds that Plaintiffs have sufficiently stated a claim for fraud, under state laws, without relying on Ford's alleged use of defeat devices.

## 2. Implied Preemption

In addition to express preemption, Ford claims that Plaintiffs' state law claims are impliedly preempted.  As explained previously, there are two types of implied preemption.  The first, field preemption, occurs where federal regulations are so expansive that Congress has left no room for supplemental state regulation.  Defendants do not advance a field preemption argument.  Field preemption is inapplicable in this case because the CAA includes a "savings clause" wherein Congress expressly confirms that states retain the ability to regulate "the use, operation, or movement" of motor vehicles.  § 7543(d).  *See also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000).

The second kind of implied preemption that courts have recognized is conflict preemption.  *Gade*, 505 U.S. at 98.  There are two types of conflict preemption.  First, conflict preemption exists when compliance with both federal and state requirements is physically impossible.  *Id.*  Ford does not advance that argument.  Second, conflict preemption exists when state law would operate as an obstacle to "the accomplishment and execution of the full purposes and objectives

of Congress." *Id.* (internal citations omitted). Ford argues that Plaintiffs' claims represent an obstacle to Congress's purpose and objectives in enacting the CAA. Specifically, Ford argues that if this Court grants Plaintiffs relief pursuant to its state law claims, "[t]his would lead to confusion for consumers, place manufacturers in impossible positions, and undermine the federal scheme and plan for consistent information and testing relating to emissions for new automobiles."

Ford's argument fails because it incorrectly addresses Plaintiffs' state law claims. The Court in *Duramax* said that in order for a car company to argue that claims arising from state consumer protection statutes are impliedly preempted by the CAA, a defendant would have to prove that Congress intended for the CAA to regulate the scope of a vehicle manufacturer's disclosure obligations to consumers. *Duramax*, 298 F. Supp. 3d at 1064. Ford has not provided this Court with any legal authority to support that position. Plaintiffs' state law claims are not impliedly preempted by the CAA.

## C. Rule 9(b)

Ford argues in its Motion that Plaintiffs' state law claims do not comply with Rule 9(b) because they do not adequately plead an actionable misrepresentation or omission.

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is to put defendants on notice of the nature of the claim. *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) ("[I]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." (internal citations omitted)). "Although Rule 9(b) heightens the pleading standard, it always must be read 'against the backdrop' of Fed. R. Civ. P. 8, which aims simply to put a defendant on notice of the claims against him so that he may reasonably respond [to] the allegations in the complaint." *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 788 (E.D. Mich. 2015).

The specificity required for allegations of affirmative misrepresentations is necessarily different than the specificity required for allegations of fraudulent omissions. *Duramax*, 298 F. Supp. 3d at 1055. "When it comes to claims of fraud by omission or fraudulent concealment, the plaintiff faces a slightly more relaxed pleading burden; the claim 'can succeed without the same level of specificity required by a normal fraud claim.' " *Beck v. FCA US LLC*, 273 F.Supp.3d 735, 751 (E.D. Mich. 2017) (quoting *Baggett v. Hewlett–Packard Co.*, 582 F.Supp.2d

1261, 1267 (C.D. Cal. 2007)).  There is a disparate burden between the two types of fraud because fraudulent acts occur at a specific time, but fraudulent omissions occur over a period of time.  *Duramax*, 298 F. Supp. 3d at 1055.  While fraudulent acts can be specifically described, fraudulent omissions are, by very definition, more amorphous.  *Id.*

Even in the context of a fraudulent omission claim, Rule 9(b) requires a plaintiff to set forth the "who, what, when, where, and how" of the alleged omission.  *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012).  Plaintiffs must set forth: (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud.  *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012).

### 1.  Whether Plaintiffs Adequately Comply with Rule 9(b)

Ford claims that Plaintiffs are in violation of Federal Rule of Civil Procedure 9(b) because no Plaintiff states with any specificity what deceptive statements they were exposed to before purchasing their vehicles.  Ford further argues that it did not deceive Plaintiffs, and distinguished their claims from the claims made by the plaintiffs in *Counts I* and *Duramax*.  Specifically, Ford contends that in *Counts I* and *Duramax*, General Motors was responsible for a "pervasive advertising

campaign" that focused on the concept of "clean diesel" or "green" "environmentally friendly trucks." According to Ford, it only made the following claims in its advertisements:

- The 29-page 2011 brochure (Doc # 1, Ex. 6) twice refers to the "cleanest Super Duty diesel ever" – a comparative statement relative to Super Duty engines – but none of the individual Plaintiffs claim to have purchased a 2011 model year vehicle. And when discussing emissions, it measures Ford's compliance *strictly against government standards*.

- The 28-page 2012 brochure (*Id.* at Ex. 7.) refers to the subject vehicles as the "cleanest Super Duty diesel ever" on only *one* occasion, and again measures compliance *strictly against government standards.* The only individual Plaintiff who claims to have purchased a 2012 vehicle bought it used in 2015, and does not allege that he ever saw this brochure (much less this specific statement in this brochure) prior to his purchase.

- The 30-page 2013 brochure (*Id.* at Ex. 8.) refers to the subject vehicles as the "cleanest Super Duty diesel ever" on *one* occasion and again measures compliance *strictly against government standards*. No individual Plaintiff claims to have purchased a 2013 model year vehicle.

- The 24-page 2014 brochure (*Id.* at Ex. 9.) does not make any reference to the Super Duty as a "clean diesel" or "low emission" vehicle. One individual Plaintiff claims to have purchased a new 2014 Super Duty vehicle. (*Id.*)

- The 25-page 2015 brochure (*Id.*) does not refer to the Super Duty as being a "clean diesel" or "low emission" vehicle. It merely mentions that the vehicle's new "high pressure fuel injectors achieve a more efficient, cleaner burn."

- The 25-page 2016 brochure (*Id.* at Ex. 11.) does not refer to the Super Duty as a "clean diesel" or "low emission" vehicle. It merely mentions that the vehicle's "best-in class" diesel fuel economy is

"maintained with the help of high-pressure fuel injectors that achieve a clean, efficient burn."

- The 31-page 2017 brochure (*Id.* at Ex. 12.) does not make any reference to the Super Duty as being a "clean diesel" or "low emission" vehicle.  No individual Plaintiff claims to have purchased a 2017 model year vehicle.

(Doc # 28, Pg ID 1455-1457)  Ford argues that the term "cleanest Super Duty diesel ever," which the Plaintiffs state in their Complaint, was only used sparingly between 2011 and 2013.  Ford further argues that no plaintiff alleges that they viewed any of the aforementioned product brochures, or relied upon any advertisements before buying their vehicles.

Plaintiffs argue that they satisfied Rule 9(b)'s standard that applies when plaintiffs' claims are based on fraudulent omissions because they identified the "who, what, when, where, and how" of Ford's alleged omissions and misstatements. Plaintiffs claim that in their Complaint, they stated that:

> the "who" is defendants; the "what" is the identified Ford Super-Duty Truck models and the representations and omissions knowingly made by Ford; the "when" is prior to the sale or lease of the Affected Vehicles (including during the production years of the Affected Vehicles and during plaintiffs' selection of their vehicles); the "where" is the various means through which defendants promoted the Affected Vehicles as identified in the Complaint, including through the dealerships where plaintiffs bought or leased their vehicles; the "how" is misrepresentations and omissions resulting in premium payments that would not have otherwise been made; and the "why" is "engine power" and "increased profits."

(Doc # 35, Pg ID 1725-1726)  Plaintiffs contend that they are not obligated to address their claims based on Ford's fraudulent omissions with any additional specificity, and claim that Ford has not identified any of their state law claims that require a heightened standard that they are required to abide by.  Plaintiffs also rebut Ford's reliance argument by arguing that reliance is not an element for many of their state law claims, where, as here, the omission or misrepresentation is a material part of an extensive campaign.  Plaintiffs claim that they sufficiently demonstrated that they bought Ford's vehicles on the reasonable but mistaken belief, due to Ford's omission and concealment of material facts, that each vehicle "was a 'clean diesel' and/or a 'low emission diesel,' complied with U.S. emissions standards, was EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life."

Plaintiffs' state law claims have satisfied Federal Rule of Civil Procedure 9(b).  Plaintiffs have stated: (1) precisely what was omitted—material facts regarding the vehicles' engines; (2) who should have made a representation—Ford; (3) the content of the alleged omission and the manner in which the omission was misleading—the content being that the vehicles had clean diesel engines and low emissions diesel engines, and the manner being that those claims were false; and (4) what [defendant] obtained as a consequence of the alleged fraud—increased

profits.  Plaintiffs have sufficiently stated valid fraudulent omissions claims under Rule 9(b).

### 2.  Whether Plaintiffs State Actionable Misrepresentations or Omissions

#### a.  Misrepresentations

Ford argues that affirmative misrepresentation claims fail when they are based on non-actionable puffery upon which no reasonable person would have relied.  Ford claims that the statements it made regarding its vehicles could not have caused individuals to rely on those types of comments, and cannot form the basis of a fraud action.  Ford also argues that Plaintiffs did not state in their Complaint what affirmative misrepresentations state the basis of their claims.

Ford is correct in asserting that Plaintiffs' misrepresentations are non-actionable puffery.  Courts in the Sixth Circuit have explained that statements of cleanliness convey "inherently subjective" concepts and constitute non-actionable opinions.  *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598 (6th Cir. 2013).  Additionally, promises of efficiency and reliability "cannot form the basis for a fraud claim."  *Ram Int'l Inc. v. ADT Sec. Servs., Inc.*, No. 11–10259, 2011 WL 5244936, at *6 (E.D. Mich. Nov. 3, 2011), aff'd, 555 Fed.Appx. 493 (6th Cir. 2014).  Courts are much more likely to find representations actionable when assertions make specific representations, especially numerically quantifiable representations.  *Counts I*, 237 F. Supp. 3d at 597.  However, representations that

merely contain numbers are not necessarily enough to qualify as actionable statements under a fraud theory.  *Id.*  Factors that generally demonstrate that a numerical claim is actionable include: (1) if an advertisement expressly states that the product was tested by the advertising company; and (2) if the advertisement compares the product to a specific competitor by name.[7]  *Id.* (citing *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir. 1997)).

Here, the only advertisement that Plaintiffs allege contain anything related to a specific, numerically quantifiable statement is found in paragraph 96 of the Complaint.  That advertisement states that "[Ford's] cleanest super duty diesel ever reduces nitrogen oxide (NOx) levels by more than 80% compared to last year."  (Doc # 1, Pg ID 65)  As the *Counts I* court stated, this type of a claim regarding emissions, while a statistic, is not quantifiable by itself.  *Counts I*, 237 F. Supp. 3d at 597 (holding that an advertisement that stated that an engine generated at least 90% less NOx was non-actionable).  Further, Ford does not specifically assert in its advertisement that this claim was based on testing, and does not compare their vehicles' engines to any identifiable competitor's product.  Since all of the other representations made by Ford are non-actionable, all of Ford's alleged *affirmative misrepresentations* amount to non-actionable puffery.

### b.  Omissions

---

[7] This does not apply in actions involving the Lanham Act.

Ford argues that Plaintiffs' claims based on fraudulent omissions should be dismissed because Plaintiffs have not proven that Ford had a duty to disclose any alleged omitted information that was material. Ford alludes to the fact that the information that it allegedly omitted was not material because a reasonable consumer would not have behaved differently had the omitted information been disclosed. Additionally, Ford argues that even if it did withhold material information from consumers, this material information only relates to EPA regulations, and would be preempted. In *Duramax*, the Court rejected an argument similar to Ford's, but Ford attempts to distinguish *Duramax* from this case. Ford argues that in *Duramax*, GM's advertisements did not expressly reference EPA regulations, but here, Ford explicitly references regulatory requirements in connection with its cars' emissions. Further, Ford states that even if Ford's misrepresentations and omissions were material, Plaintiffs cannot demonstrate that Ford had exclusive knowledge of these facts.

Plaintiffs argue in response that their allegations are not limited to statements concerning federal regulations. Plaintiffs also claim that if Ford had disclosed any relevant information to consumers regarding the presence of defeat devices or unlawful emissions levels to authorized Ford dealerships or to the media, that information would have been passed on to consumers, and Plaintiffs would have behaved differently. Plaintiffs also argue that Ford's lack of exclusive

knowledge argument is without merit because even if it were properly raised, which Plaintiffs do not believe is the case, Ford did have "exclusive knowledge" of the defeat devices due to their status as the manufacturer of the vehicles involved in this case.

The Court agrees that based on the court's decision in *Counts v. Gen. Motors, LLC*, No. 16-CV-12541, 2017 WL 1406938, at *4 (E.D. Mich. Apr. 20, 2017) ("*Counts II*"), Ford had a duty to disclose information about the defeat devices that were installed in their vehicles because the omissions were material and not necessarily connected to EPA regulations. In *Counts II*, GM argued that because the plaintiffs' fraudulent concealment claims were premised on GM secretly using defeat devices in its vehicles, plaintiffs could not succeed with those claims because they were inextricably tied to EPA regulations, and so, even if they were material, they would be preempted by federal law. *Counts II*, 2017 WL 1406938, at *3-4. The *Counts II* court ruled that although it would be relevant to the plaintiffs' claims to prove that the vehicles they bought contained defeat devices as defined by federal law, they could prevail without demonstrating that GM did not comply with EPA regulations because they were attempting to hold GM liable for concealing material facts, specifically the non-functionality of certain technology within the vehicles. *Id.* at 4 The *Counts II* court explained that if GM's argument was to be accepted, "consumers would be unable to hold vehicle

manufacturers liable for any intentionally defective technology, if the technology also impacted or concealed the vehicle's emissions levels." *Id.*

Our case is analogous to *Counts II*. Throughout Plaintiffs' Complaint, several Plaintiffs mention that if Ford did not omit information regarding its vehicles' fuel economy, performance, and emissions, they would either not have purchased their vehicles or paid less money for them. Since Ford's alleged fraudulent omissions are material (because these plaintiffs would have behaved differently) and not all connected to EPA regulations (and therefore not preempted by federal law), Ford's argument with regard to materiality fails at this time. Furthermore, Ford's argument pertaining to it lacking exclusive knowledge of defeat devices also fails. Ford was the company responsible for manufacturing its vehicles, and it would be difficult to argue that it was unaware of any defeat devices in their automobiles. *See Counts I*, 237 F. Supp. 3d at 600 (ruling that it would be impossible for GM to be unaware about defeat devices in its vehicles because they were in a "superior position to know" about their existence).

### D. RICO

RICO establishes bases for both criminal and civil suits. A RICO civil suit may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962 provides that: "It shall be unlawful for any person employed by or associated with

any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id.* at § 1962(c). In other words, a party advancing a civil RICO claim must establish their right to sue and then further allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

### 1. Standing

Plaintiffs may assert a RICO claim only if they can identify an injury to their "business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In so limiting the scope of RICO standing, Congress exhibited an intention to exclude "personal injury—that is, an injury 'to a person, such as a broken bone, a cut, or a bruise' or a 'bodily injury.'" *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 564 (6th Cir. 2013) (quoting *Black's Law Dictionary* 857 (9th ed. 2009)). Similarly, a RICO injury must be concrete, not intangible or speculative. *See Saro v. Brown,* 11 Fed.Appx. 387, 389 (6th Cir. 2001). *See also Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) (explaining that RICO plaintiffs must identify a "reasonable and principled basis of

recovery" which is "not based upon mere speculation and surmise"); *Short v. Janssen Pharm., Inc.*, No. 1:14-CV-1025, 2015 WL 2201713, at *3 (W.D. Mich. May 11, 2015) ("Short must, at a minimum, show some direct, pecuniary injury to his own pocket that is unrelated to the claimed personal injury.").

In *Reiter v. Sonotone Corp.*, the Supreme Court interpreted § 4 of the Clayton Act, which authorizes "[a]ny person who shall be injured in his business or property" by reason of an antitrust law violation to bring suit. 442 U.S. 330, 337 (1979). The Supreme Court held that "where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under § 4." *Id.* at 342. That holding did not involve the RICO statute, but the Sixth Circuit has held that "*Reiter*'s common-sense observation about § 4 applies with equal logical force to § 1964(c)." *Jackson*, 731 F.3d at 564.

Ford argues that Plaintiffs lack the standing necessary to bring a RICO action against it because Plaintiffs do not prove that they were "injured in [their] business or property by reason of a violation of 18 U.S.C. § 1964(c)." Ford argues that Plaintiffs' injuries are speculative. Ford claims that Plaintiffs' RICO claim should be dismissed in its entirety because their "premium price" theory fails. According to Ford, under RICO, it is not enough for Plaintiffs to allege in a

34

conclusory manner that they have cognizable injuries due to paying a "premium price" of approximately $8,400 for their vehicles based on false promises of "power, performance, fuel economy, and environment friendliness." Ford contends that Plaintiffs have not articulated how, in a quantifiable manner, they did not get the benefit of their bargain.

Plaintiffs respond by stating that they do not lack standing because their claim is in fact cognizable under RICO. Plaintiffs argue that their cognizable injury derives from the fact that they overpaid for their vehicles considering that their vehicles were not sold to them as promised. (Doc # 34, Pg ID 1652-1658) Plaintiffs argue that this court should reach the same conclusion that the Court did in *In re Chrysler-Dodge-Jeep EcoDiesel Litig.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018) ("*EcoDiesel*") with regard to the plausibility of their overpayment injury argument. Plaintiffs assert that in *EcoDiesel*, the Court held that the plaintiffs were allowed to use overpayment as a cognizable RICO injury while claiming that their vehicles "could not achieve the advertised towing power, performance, and/or fuel economy without cheating emissions tests." *EcoDiesel*, 295 F. Supp. 3d at 946.

Courts have held that there is a distinction between damages theories where the (ascertainable and reasonably quantifiable) overpayment occurred at the time of injury and speculative damages theories which are contingent on some future event, lost profit, or unanticipated future expense. *Duramax*, 298 F. Supp. 3d at

1070–71.   Therefore, a RICO plaintiff may recover for money invested on the basis of misrepresentations, but not for loss of the profits, which the plaintiffs expected to receive from that investment.  *See Fleischhauer*, 879 F.2d at 1300. Likewise, a RICO plaintiff may recover for overpayment when they buy a used car after being told it was new, *see Bailey v. Atl. Auto. Corp.,* 992 F. Supp. 2d 560, 579 (D. Md. 2014), but may not recover for overpayment simply because the tires they purchased *may* be defective, *see In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*155 F.Supp.2d at 1095 (S.D. Ind. 2001), *rev'd on other grounds In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002).  A RICO plaintiff may recover money paid pursuant to insurance policies that plaintiffs chose because "the defendants falsely represented that the potential investors could completely avoid payment of any future federal income taxes," *see Hofstetter v. Fletcher*, 860 F.2d 1079, 1988 WL 107371, at *6 (6th Cir. 1988), but cannot recover for loans granted to debtors based upon misrepresentations by the debtors because the plaintiffs would suffer damages only if the debtors defaulted (and because the amount of damages was speculative until the creditor's bargained for remedies were exhausted), *see First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994).

Here, Plaintiffs allege that they overpaid for their vehicles based on Ford's alleged omissions.   Plaintiffs claim that if not for learning of Ford's

misrepresentations, without knowing what information was omitted (that pollutants were only reduced during testing), they would not have purchased Ford's automobiles. Under *Duramax*, Plaintiffs' claims are premised on overpayment that occurred at the time of their injuries and are not speculative. Plaintiffs have adequately alleged that they have cognizable injuries, and therefore standing.

### 2. *Prima Facie* Elements of a RICO Violation

As indicated above, plaintiffs alleging that RICO has been violated are required to plead the essential elements of a violation, including: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich*, 668 F.3d at 404 (6th Cir. 2012) (citations omitted). Ford asserts that Plaintiffs have not met two of these essential elements: (1) the existence of an enterprise; and (2) the required predicate acts.

### a. RICO "Enterprise"

Ford alleges that Plaintiffs are not considered a legal racketeering "enterprise" under RICO. Ford argues that Plaintiffs only offer conclusory allegations suggesting that Ford and Bosch GmbH and Bosch LLC ("Bosch Defendants") constituted an enterprise. Ford claims that RICO does not apply to acts of separate businesses in pursuit of their ordinary business activities, even if those activities cross the line into predicate acts under the statute. Ford further argues that because Ford and Bosch Defendants came together for legitimate

purposes (engaging in a manufacturer-supplier relationship), in the ordinary course of business, no RICO enterprise existed as a matter of law.

Plaintiffs argue that Ford cannot escape liability for its fraudulent activity solely by claiming that it engaged in a legitimate activity. Plaintiffs assert that even if any legitimate activity excuse were plausible, the purpose of an alleged enterprise's activity is a question for the jury, and not a question to be resolved at this stage. Plaintiffs assert that Ford's arguments are only based on non-binding and distinguishable precedent.

In order to state a RICO claim, plaintiffs must plausibly allege the existence of an enterprise engaged in a pattern of racketeering activity. 18 U.S.C. § 1962(c). But, the definition of "enterprise" for RICO purposes is exceedingly "broad." *Boyle v. United States*, 556 U.S. 938, 944 (2009). The statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "On its face, the definition appears to include both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *United States v. Turkette*, 452 U.S. 576, 580–81 (1981). A RICO association-in-fact "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and

longevity sufficient to permit these associates to pursue the enterprise's purpose."
*Boyle,* 556 U.S. at 946.

Case law demonstrates that it is irrelevant whether or not Ford and Bosch Defendants engaged in legitimate activity. A review of Plaintiffs' Complaint shows that all three of the structural features required for a RICO association-in-fact have been alleged: (1) the purpose of the relationship between Ford and Bosch Defendants was to engage in business to manufacture vehicles; (2) the relationship between the parties has been well-documented; and (3) the parties have been in business together for at least ten years. (Doc # 1, Pg ID 34) Plaintiffs have sufficiently alleged a racketeering "enterprise" between Ford and Bosch Defendants for purposes of Plaintiffs' RICO claim.

### b. Mail and Wire Fraud

Ford argues that this Court should dismiss Plaintiffs' RICO claim for failure to sufficiently plead predicate acts of mail or wire fraud for three reasons. First, Ford claims that Plaintiffs' claim is predicated on a preempted fraud-on the-regulators theory. According to Ford, because Plaintiffs allege that Ford and Bosch Defendants formed an enterprise for the express purpose of fraudulently obtaining certificates of conformity ("COC") from the EPA in order to sell vehicles, this constitutes an attempt to privately enforce the CAA, and is preempted and within exclusive province of the EPA. Second, Ford asserts that

39

Plaintiffs' claim that are predicated on advertisements to consumers is non-actionable because: "(i) Plaintiffs have failed to identify with any specificity which statements are at issue; (ii) the few supposed misrepresentations they do identify are puffery; and (iii) Plaintiffs have failed to allege that the alleged affirmative misrepresentations and or omissions were material." Finally, Ford claims that Plaintiffs have not alleged multiple instances of mail and wire fraud that are plead with factual specificity as mandated by Rule 9(b).

Plaintiffs respond by arguing that Ford's assertions regarding their failure to plead predicate acts of mail or wire fraud are unfounded. First, Plaintiffs state that their RICO claim is not predicated on a preempted fraud-on-the-regulators theory because plaintiffs allege they were defrauded. Plaintiffs argue that even though they allege that Ford intended to deceive regulators and made fraudulent mail and wire communications to regulators, neither of those allegations are essential to their RICO claim. Plaintiffs said that those allegations are merely collateral matters. Second, Plaintiffs argue that they do offer their allegations about Ford's concealment with specificity in their Complaint. Plaintiffs specifically point to paragraphs 92 through 110 of their Complaint to find specific allegations. For those reasons, Plaintiffs contend that their allegations are sufficient under Rule 9(b).

To state a claim based on mail or wire fraud, the Plaintiffs must allege the following three elements: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so." *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997)). Plaintiffs must allege that Defendants possessed the "specific intent to deceive or defraud." *Frost*, 125 F.3d at 354. The "scheme to defraud must involve 'misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979)). Plaintiffs need not show "actual reliance," but must demonstrate that the misrepresentations or omissions were "material." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003). Specific intent to defraud or deceive exists if "the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken." *Id.* at 488.

Importantly, "[a] defendant may commit mail fraud even if he personally has not used the mails." *Frost*, 125 F.3d at 354 (citing *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir.1994)). "A mail fraud conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the

ordinary course of business, or that a reasonable person would have foreseen use of the mails." *Id.* In other words, there is no requirement that the defendant have actually intended that the mails (or wire) be used. *Id.* And, further, "'[t]he mailings may be innocent or even legally necessary.'" *Id.* (quoting *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988)). The use of the mails "'need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions.'" *Id.* (quoting *Oldfield*, 859 F.2d at 400).

"When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Heinrich*, 668 F.3d at 404 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).

This Court finds that based on a review of Plaintiffs' Complaint, they have sufficiently stated allegations of mail or wire fraud in relation to their RICO claim. First, Plaintiffs have alleged that Ford intended to defraud Plaintiffs based on its undoubted knowledge of its vehicles' defeat devices. Second, Plaintiffs allege that Ford defrauded Plaintiffs by omitting facts through U.S. mail and online. (Doc # 1, Pg ID 164-167) Third, Plaintiffs allege that Ford has engaged in a scheme due to engaging in a course of action to deprive Plaintiffs of their money. *See United*

*States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (explaining that a scheme to defraud "includes any plan or course of action by which someone intends to deprive another by…deception of money or property by means of false or fraudulent pretenses, representations, or promises."). According to the relevant standards, Plaintiffs properly alleged the existence of mail or wire fraud.

### c. Bosch LLC's Duty to Disclose

Bosch LLC argues that in order for Plaintiffs to succeed on a theory of fraud by omission, Plaintiffs must allege that Bosch LLC had an independent duty to disclose information to them. Bosch LLC cites to cases where courts have determined that omissions intended to create fraudulent representations can only constitute a violation of a mail fraud if the defendant had a duty to disclose material information. According to Bosch LLC, Plaintiffs have not alleged any facts that would support that Bosch LLC owed them a duty to disclose.

Plaintiffs argue that they are not required to allege that Bosch LLC had an independent duty to disclose information to them. Plaintiffs assert that they alleged in their Complaint that Defendants concealed the truth from, and communicated half-truths to, Plaintiffs and class members. Plaintiffs further assert that in those instances, courts have held that plaintiffs need not allege that RICO defendants had an independent duty to disclose.

Some non-controlling cases do appear to support the proposition that in order for plaintiffs to be able to rely on omissions to establish fraud, they need prove that defendants must have a duty to disclose. *See United States v. Skeddle*, 940 F.Supp. 1146, 1149 (N.D. Ohio 1996) ("Because the "scheme to defraud of property or money" counts are based on what was not said (i.e., omissions), the defendants are culpable under this branch of the mail fraud statute only if the government proves the defendants had a duty to disclose their interest in the transactions."); *Gould, Inc. v. Mitsui Min. & Smelting Co.*, 750 F.Supp. 838, 843 (N.D. Ohio 1990) ("[T]here has been no attempt to delineate what facts were omitted or what duty defendants had to disclose information to Gould, which is necessary when one alleges a material omission."). *See also United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986) ("[A] non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged."); *United States v. Rabbitt*, 583 F.2d 1014, 1026 (8th Cir. 1978).

But, other courts have expressly rejected this rationale. *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) ("Concealment often is accompanied by an affirmative misrepresentation or a violation of an independent statutory or fiduciary disclosure duty, but neither is "essential" for actionable fraud."); *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985) ("It requires no extended

44

discussion of authority to demonstrate that omissions or concealment of material information can constitute...fraud cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation."); *United States v. Allen*, 554 F.2d 398, 410 (10th Cir. 1977).

The Sixth Circuit has, however, repeatedly confirmed that concealment of material facts can constitute a fraudulent scheme sufficient to establish RICO liability.  *See, e.g., Daniel*, 329 F.3d at 487; *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 885 (6th Cir. 1990); *Am. Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 354 (6th Cir. 1990); *Bender*, 749 F.2d at 1216. *See also United States v. Chew*, 497 Fed.Appx. 555, 563 (6th Cir. 2012) ("[I]n relation both to mail fraud and wire fraud, there is no technical or precise definition of an unlawful 'scheme to defraud.' The standard is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.") (internal citations omitted); *In re ClassicStar Mare Lease Litig.*, 823 F.Supp.2d 599, 627 (E.D. Ky. 2011) ("A fraudulent scheme may be demonstrated by proof that it was reasonably calculated to deceive persons of ordinary prudence and comprehension, and communications of half-truths and concealment of material facts are both actionable.").  Since to the Court's knowledge, the Sixth Circuit has never articulated a duty to disclose requirement, the Court declines to abide by such a requirement.  Therefore, Plaintiffs were not

required to prove that Bosch LLC had a duty to disclose any information about the defeat devices.

### d. Whether Ford Proximately Caused Plaintiffs' Injuries

Ford argues that even if Plaintiffs adequately pleaded a RICO injury and required predicate acts, they have not alleged that the injury was "by reason of" a RICO violation under Rule 9(b)'s heightened pleading requirements. Ford claims that any type of causal link between Ford's alleged "fraud-on-the-regulator" conduct and Plaintiffs' claimed injuries is indirect and attenuated. Ford argues that the court in *Duramax* incorrectly ruled that the plaintiffs did not fail to plead proximate causation because alleged intervening acts were carried out by co-conspirators, and not third parties. Ford argues that this conclusion reached in *Duramax* was wrong because the Court overlooked the EPA's acceptance of allegedly fraudulent COC's, which Ford believes was an intervening factor by a third party that broke the casual link between the violations and the injury.

Plaintiffs respond by contending that the court was not incorrect in *Duramax*. Plaintiffs assert that there is no case law that demonstrates that if a manufacturer defrauds the EPA and the public, it may escape liability as a matter of law by claiming that the EPA's approval of the fraudulent COC breaks the chain of proximate causation. Plaintiffs argue that if the EPA knew that the Defendants' submissions were false, that might constitute an intervening cause. However,

Plaintiffs are arguing that the EPA did not know about Defendants' fraud; therefore, their approval of the fraudulent COCs did not constitute an intervening cause.

The Supreme Court has "held that a plaintiff's right to sue...required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Sec. Inv'r Prot. Corp.,* 503 U.S. 258, 268 (1992). The plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Importantly, the causation inquiry must focus on the alleged link between the "predicate acts" and the asserted injury. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 405 (6th Cir. 2012). A purported link that is "too remote," "purely contingent," or "indirect" is insufficient to confer standing. *Holmes*, 503 U.S. at 271. According to the Supreme Court, "'[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Id.* (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983)). An attenuated causation theory creates difficulties in apportioning damages between plaintiffs and attributing damages to defendants. *See id.* at 273. A challenge to a RICO suit based on asserted lack of proximate causation, however, is often best resolved at summary judgment, not at the pleading stage. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004).

The connection between the predicate acts (Ford's alleged deceit) and the asserted injury (Plaintiffs' economic loses) are sufficient to demonstrate that Ford is the proximate cause of Plaintiffs' injuries. Plaintiffs allege that but for Ford's alleged fraudulent omissions, they would not have purchased Ford's vehicles. This connection is not too distant or indirect. There is also no support for Ford's argument that the EPA's approval of the fraudulent conduct broke the chain of causation. As Plaintiffs argue, the EPA did not know about any alleged omissions.

### e. Whether Bosch LLC Proximately Caused Plaintiffs' Injuries

Bosch LLC claims that Plaintiffs fail to allege that they were injured "by reason of" a predicate offense committed by Bosch LLC. Bosch LLC argues that Plaintiffs do not sufficiently allege that its actions were a substantial cause of their injuries. Bosch asserts that even though Plaintiffs allege that Bosch LLC produced the Electronic Diesel Control Unit 17 and sold it to Ford, there were additional factors that substantially caused Plaintiffs' alleged injuries, including, but not limited to: (1) the alleged premium that Ford charged for the vehicles; (2) Ford's advertising campaign related to the vehicles; (3) fluctuations in consumer demand for vehicles like Plaintiffs' and other market forces; and (4) potential future modifications to the vehicles. Bosch LLC also argues that Plaintiffs do not allege a direct link between their claimed injuries and Bosch LLC's purported conduct.

Plaintiffs argue that they adequately allege that Bosch LLC's conduct was a substantial factor in causing their purported injuries. Plaintiffs argue that they would not have overpaid for Ford's vehicles if they did not contain the defeat devices that Bosch LLC designed and helped implement as part of Defendants' unlawful scheme. Plaintiffs argue that the "direct link" between their injuries and Bosch LLC's conduct is that Bosch entities participated not just in the development of the defeat devices, but also in the scheme to prevent U.S. regulators from uncovering the device's true functionality. Plaintiffs further argue that without Bosch LLC's knowing participation, the scheme would not have existed at all.

Based on the above standards that courts have implemented to analyze proximate causation under RICO, Plaintiffs have sufficiently demonstrated that there was a direct link between the injuries that they allege they suffered and Bosch LLC's conduct. But for Bosch LLC working with Ford to make the defeat devices, Plaintiffs would not have overpaid for the vehicles. Further, as courts have noted, Bosch LLC's assertion about proximate causation is best resolved at the summary judgment stage.

## V. Whether Plaintiffs are Permitted to Assert Claims on Behalf of Absent Class Members Under the Laws of Other States

Ford argues that Plaintiffs are not permitted to bring claims under the laws of forty-seven states because there are only six named Plaintiffs who reside in five

49

states, and who allegedly bought trucks in five states. Those states being: (1)
Arizona; (2) California; (3) Illinois; (4) Pennsylvania; and (5) Texas. Ford asserts
that this Court should determine that the named Plaintiffs lack standing to assert
claims in all of the states where they do not reside or claim to have suffered an
injury. Ford acknowledges that federal courts have deferred this question of
standing until the class certification stage, but argues that some courts are
beginning to address this question sooner in the litigation process in order to
refrain from subjecting defendants to the expense and burden of nationwide
discovery without first securing plaintiffs who clearly have standing.

In response, Plaintiffs argue that courts have been very clear about not
resolving questions regarding the standing of plaintiffs until the class certifications
stage. Plaintiffs point to several cases to demonstrate this "growing consensus"
among federal courts. Further, Plaintiff argues that the main case that Ford relies
on in making its argument is an outlier and runs afoul of many other cases.

"Threshold individual standing is a prerequisite for all actions, including
class actions." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir.
1998). "A potential class representative must demonstrate individual standing vis-
as-vis the defendant; he cannot acquire such standing merely by virtue of bringing
a class action." *Id.* The growing consensus, however, is that "class certification

issues are...'logically antecedent' to Article III concerns," at least when the named plaintiffs possess Article III standing. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999); *Kaatz v. Hyland's Inc.*, No. 16 CV 237 (VB), 2016 WL 3676697, at *4 (S.D.N.Y. July 6, 2016); *Storey v. Attends Healthcare Prod., Inc.*, No. 15-CV-13577, 2016 WL 3125210, at *3 (E.D. Mich. June 3, 2016); *In re Auto. Parts Antitrust Litig.*, 29 F.Supp.3d 982, 1000 (E.D. Mich. 2014). In other words, "where 'class certification is the source of the potential standing problems,' class certification should precede the standing inquiry." *In re Digital Music Antitrust Litig.*, 812 F.Supp.2d 390, 406 (S.D.N.Y. 2011) (quoting *In re Grand Theft Auto Video Game Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. Oct. 25, 2006)).

All of the named Plaintiffs in our case have Article III standing. If the class is certified, those Plaintiffs will be able to advance state law claims on behalf of unnamed Plaintiffs. The question of whether the state law claims may be advanced on behalf of unnamed Plaintiffs is indistinguishable from the Federal Rule of Civil Procedure 23 analysis. *See Kaatz v. Hyland's Inc.,* No. 16 CV 237, 2016 WL 3676697, at *4 (S.D.N.Y. July 6, 2016) ("That standing inquiry is more appropriately addressed at the class certification stage when courts consider the commonality and typicality prerequisites of class actions."). The claims premised

on the law of states where no named Plaintiff lives will therefore not be dismissed for lack of standing. *See Duramax*, 298 F. Supp. 3d at 1089.

## VI.  Article III Standing

Bosch LLC makes a separate argument in its Motion with regard to Plaintiffs' Article III standing. Bosch LLC argues that Plaintiffs lack Article III standing for three reasons. First, Bosch LLC argues that Plaintiffs seek redress based on hypothetical future events, namely injuries that may occur "when and if" Ford recalls its vehicles and degrades the Ford clean diesel engine performance and fuel efficiency in order to make its vehicles complaint with EPA standards. According to Bosch LLC, Plaintiffs' harms are not "actual" or "imminent" in accordance with Article III. Second, Bosch LLC relies on *Bledsoe v. FCA US LLC*, 307 F. Supp. 3d 646 (E.D. Mich. 2018), a recent decision in which the Court held that in the context of Fiat-Chrysler vehicles, the plaintiffs' claims to Article III standing were disregarded for being conclusory, or upon implausible inferences because the plaintiffs injuries were based on their expert's testing of a single vehicle that purportedly showed higher NOx emissions than the federal standards allow. Bosch LLC claims that Plaintiffs' claims are similar since they also failed to put forth any description of the purported defeat device or when and under what circumstances it is triggered in the truck they tested. Third, Bosch LLC argues that Plaintiffs' overpayment theory cannot be traced to Bosch LLC because there is no

evidence that Bosch LLC advertised directly to consumers or had any control over the price of Ford's vehicles.

Plaintiffs argue in response that they sufficiently alleged that they suffered economic injuries at the time they purchased their vehicles as a result of overpaying for them due to Defendants' wrongful conduct. Plaintiffs further argue that in nearly identical circumstances, courts have rejected Bosch LLC's argument that such allegations are conjectural. Further, Plaintiffs claim that Bosch LLC misreads the court's standing rule in *Bledsoe*. Plaintiffs claim that in *Bledsoe*, the court held that plaintiffs lacked standing for failure to allege the injury-in-fact prong of the standing analysis because they solely relied on test results for a single vehicle and extrapolations from those results. Plaintiffs argue that here, they assert reasonable, plausible grounds for why their testing indicates that defeat devices were used in Ford's vehicles, and falls within the category of diesel emissions fraud cases that the court in *Bledsoe* distinguished. Plaintiffs also argue that courts have repeatedly rejected Bosch LLC's argument that the lack of a direct connection between itself and plaintiffs who are purchasers of the vehicles in question precludes Article III standing.

Federal courts have a duty to confirm subject matter jurisdiction in every case pending before them. *Valinski v. Detroit Edison*, 197 Fed.Appx. 403, 405

(6th Cir. 2006). Article III, § 2 of the U.S. Constitution limits federal court jurisdiction to "Cases" and "Controversies." The doctrine derived from Art. III, § 2 imposes the requirement of standing: federal jurisdiction exists only if the dispute is one "which [is] appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). For standing to exist, three elements must be satisfied: injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Injury in fact exists when the plaintiff has suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *Id.* at 560 (citations omitted). Causation exists if the injury is one "that fairly can be traced to the challenged action of the defendant." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976). The redressability requirement is satisfied if the plaintiff's injury is "likely to be redressed by a favorable decision." *Id.* at 38. Standing can exist even if the alleged injury "may be difficult to prove or measure." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016).

Plaintiffs' overpayment theory is sufficient to provide standing to sue Bosch LLC because of its role in the use and concealment of a cheat device that allegedly constrained the emissions control system of the vehicles purchased by Plaintiffs. Accepting Plaintiffs' allegations as true, they paid a premium for a "clean diesel"

vehicle, which actually polluted at levels dramatically higher than a reasonable consumer would expect. In other words, they paid for a product that did not operate in the way they believed it did. Claims of overpayment, wherein a plaintiff paid a premium but did not receive the anticipated consideration, are cognizable injuries in fact. *See Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 794 (6th Cir. 2009). The alleged injuries are traceable to Bosch LLC's actions, and there is, accordingly, a traceable connection between the plaintiffs' injuries and the complained-of conduct of the defendant. *Id.* at 796 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). And, financial damages are fully redressable by a favorable decision. *Duramax*, 298 F. Supp. 3d at 1053. Therefore, although Bosch LLC's role in the alleged fraudulent concealment is more indirect than Ford's role, "the causation requirement in standing is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense; the plaintiff need only allege 'injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'" *Wuliger*, 567 F.3d at 796 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). While Bosch LLC may ultimately prevail in its argument that it should not be held liable for Plaintiffs' overpayment, Plaintiffs' allegation that Bosch LLC was intimately

involved in the creation of the component that caused the overpayment establishes Article III standing.

## VII.    CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants' Motions to Consolidate Cases (Doc # 39; Doc # 46) are **GRANTED**.

IT IS FURTHER ORDERED that the following cases are consolidated: *Gamboa et al. v. Ford Motor Company et al.*, Case No. 2:18-cv-10106; *Ruston et al. v. Ford Motor Company et al.*, Case No. 2:18-cv-11108; *Goodroad, Jr. et al. v. Ford Motor Company et al.*, Case No. 2:18-cv-11900; and *Badagliacco v. Ford Motor Company et al.*, Case No. 2:18-cv-12379.

IT IS FURTHER ORDERED that Plaintiffs' Motion for the Appointment of Interim Class Counsel (Doc # 27) is **GRANTED**.

IT IS FURTHER ORDERED that Defendants Ford Motor Company and Robert Bosch LLC's Motions to Dismiss (Doc # 28; Doc # 29) are **DENIED**; although these Motions are denied, as noted above, Plaintiffs are not permitted to proceed with their claims that pertain to Defendants' alleged affirmative misrepresentations.

IT IS FURTHER ORDERED that Plaintiffs will have 30 days from the date of the entry of this Order to file a single consolidated amended complaint.

IT IS FURTHER ORDERED that Defendants will have 30 days from when Plaintiffs' consolidated amended complaint is filed to file an answer to the consolidated amended complaint.

IT IS FURTHER ORDERED that the parties shall meet and confer and submit a Rule 26(f) report with proposed scheduling dates 21 days from when Defendants' answer is filed; after the Rule 26(f) report has been filed, the Court will issue a scheduling conference order.

IT IS SO ORDERED.

s/Denise Page Hood
Chief Judge, U. S. District Court

DATED: March 31, 2019