| | |
|---|---|
| **GARNER RICKMAN, individually and on behalf of all others similarly situated,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**BMW OF NORTH AMERICA, et al.,**<br><br>    **Defendants.** | Civil Action No. 18-4363<br><br>**OPINION** |

**Kevin McNulty, U.S.D.J.**

   This putative class action alleges that the diesel engines of two BMW models, the 2009-2013 BMW X5 xDrive35d (the "X5") and the 2009-2011 335d (the "335d") (together, "the Subject Vehicles"), emit nitrogen oxides ("NOx") at levels in excess of federal and state emissions standards. Plaintiffs assert that Defendants BMW of North America ("BMW USA") and Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") (together, "BMW") colluded with Defendants Robert Bosch GmbH and Robert Bosch LLC (together, "Bosch") to market the cars as "clean diesel" while they knew that the Subject Vehicles discharged emissions at impermissible levels. The true level of emissions was allegedly masked during laboratory testing by deceptive technology (a "defeat device") that Defendants developed and employed. The Complaint brings counts under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and various state consumer protection laws. Plaintiffs seek to bring these claims on behalf of themselves and a nationwide class of all persons or entities who purchased or leased the BMW models at issue. Now before the Court are motions by BMW USA (DE 29) and Robert Bosch LLC (DE 30) to dismiss the Consolidated

Class Action Complaint ("the Complaint", DE 26, cited as "Comp.") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

There are some 42 named plaintiffs who allegedly own the X5 or 335D models. Lacking here is a straightforward allegation that an identified plaintiff bought a car which, when tested or analyzed, turned out to contain a defeat device. Rather, the Complaint alleges that one six-year-old X5 model car with 60,000 miles on the odometer was tested. It is not alleged that this car was owned by any plaintiff; it seems to be proffered as an exemplar. That testing revealed a discrepancy between on-road and laboratory emissions levels. There seems to have been no further physical or electronic analysis attributing the discrepancy, which might have a number of explanations, to a defeat device.

Such testing surely suffices to raise suspicions, if little more. The real weak link, however, is the suggested inference that anyone (including the 42 plaintiffs) who bought that model car unknowingly purchased a defeat device. I have examined the allegations in the context of other diesel vehicle defeat device cases in which motions to dismiss were denied. Those complaints tended to offer more corroboration, generally consisting of official findings or testing from independent sources which tended to suggest a uniform practice of installing a defeat device in a particular model.

Here, however, the named Plaintiffs have not adequately alleged that they personally (or the putative class members) have suffered an injury in fact. For the reasons set forth below, Defendants' motions are granted and Plaintiffs' Complaint is dismissed. That dismissal is without prejudice to a properly supported motion to amend the complaint, perhaps following further scientific analysis. Before I will put this massive class action on the road, however, I will require a more careful look under the hood.

2

## I. BACKGROUND[1]

### a. Procedural History

Plaintiffs initiated this action on March 27, 2018, originally under the caption *Garner Rickman v. BMW of North America, et al.* (DE 1). Plaintiffs filed an amended complaint as of right on April 19, 2018, which was captioned *Chad Maccanelli, et al., v. BMW of North America, et al.* (DE 6). On May 8, 2018, certain other plaintiffs, represented by the same counsel, filed a complaint captioned *Ricky Evans, et al. v. BMW of North America LLC, et al.,* Case No. 2:18-cv-08935, which added 21 new plaintiffs but was otherwise substantially identical to the complaint in *Maccanelli.* On August 3, 2018, Plaintiffs consolidated the two actions through the filing of a Consolidated Class Action Complaint, which is the currently operative pleading. (DE 26). In light of the consolidation, Plaintiffs voluntarily dismissed the complaint filed in the *Evans* matter. (DE 28).

On May 16, 2019, this case was reassigned from Judge Vazquez to Judge McNulty for all further proceedings. (DE 57). Presently before the Court are motions to dismiss the Consolidated Class Action Complaint by BMW USA (DE 29) and Robert Bosch LLC (DE 30).[2] Plaintiffs filed briefs in opposition (DE 37, 39), to which Defendants replied (DE 43, 44). After briefing on the motions was

---

[1]    Record items will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated.

| | |
|---|---|
| "DE _" = | Docket Entry number in this case |
| "Comp. ¶ _" = | Consolidated Class Action Complaint (DE 26) |
| "BMW Br." = | BMW's Brief in Support of its Motion to Dismiss (DE 29-1) |
| "Pl. BMW Opp." = | Plaintiffs' Opposition Brief to BMW's Motion (DE 37) |
| "Bosch Br." = | Bosch's Brief in Support of its Motion to Dismiss (DE 30-1) |
| "Pl. Bosch Opp." = | Plaintiffs' Opposition Brief to Bosch's Motion (DE 39) |

[2]    BMW USA and Robert Bosch LLC assert that BMW AG and Robert Bosch GmbH have not been served. (BMW Br. at 14, n. 4; Bosch Br. at 11, n.1). BMW AG and Robert Bosch GmbH have not joined in either motion to dismiss.

complete, Plaintiffs filed notices of supplemental authority (DE 46, 49, 50), and BMW USA and Robert Bosch LLC filed responses (DE 47, 48, 51).

### b. Factual Summary[3]

BMW makes and sells automobiles. Bosch is alleged to have manufactured components that enabled BMW to fool regulatory tests of their cars' emissions.

Recently, several leading auto manufacturers, most prominently Volkswagen, have been embroiled in civil and criminal proceedings involving assertions that they evaded emissions standards for their diesel vehicles. Such evasion typically included the use of a defeat device, consisting of software within a car that alters the emission control system when tested by regulators in a specific test environment. This use of a defeat device would deceptively make a car's emissions appear to be lower when tested in the lab than they would be under normal road conditions. In this way, a defeat device enables the vehicle to pass emissions tests but then reduces the effectiveness of the emissions control system during normal operation.

Other leading diesel manufacturers have been accused of misleading regulators in this fashion. Volkswagen pled guilty to criminal violations of the Clean Air Act; Mercedes is under investigation by the U.S. Department of Justice ("DOJ"); Fiat Chrysler Automobiles ("FCA") has been subjected to civil proceedings by the Environmental Protection Agency ("EPA"). (Comp. ¶¶ 3, 9–11, 74). According to Plaintiffs, these diesel manufacturers used defeat devices made by Bosch that turn off or turn down emission controls when the vehicles electronically sense that they are not in a test environment.

Plaintiffs assert that BMW and Bosch have similarly engaged in an unlawful scheme to evade emissions standards with a defeat device for the Subject Vehicles. Specifically, plaintiffs claim that due to the use of a defeat

---

[3]     On a facial jurisdictional challenge to a complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), I accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff. *Cardio–Med. Assoc., Ltd. v. Crozer–Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983). *See* Section II, *infra.*

device the Subject Vehicles emit levels of NOx many times higher than (i) their gasoline counterparts; (ii) what a reasonable consumer would expect; (iii) what BMW has advertised; (iv) the EPA's and certain states' maximum standards; and (v) the levels necessary to obtain certificates of conformity, a prerequisite to selling motor vehicles in the United States. (Comp. ¶ 2).

### i. Parties

BMW USA is a corporation doing business in all fifty states and the District of Columbia that is organized under the laws of Delaware with its principal place of business in New Jersey. (Comp. ¶ 61). BMW USA manufactured, sold, and warranted the Subject Vehicles throughout the United States at all relevant times to this action and installed the diesel engine systems. (*Id.* ¶ 62). Germany-based BMW AG, which supervised the manufacturing and advertisements of the Subject Vehicles in the United States, is the parent company of the BMW Group. (*Id.* ¶ 63).

Robert Bosch LLC is organized under the laws of Delaware and has its principal place of business in Michigan. (Comp. ¶ 68). Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Germany and is the parent company of Robert Bosch LLC. (*Id.* ¶ 67). Plaintiffs refer to both entities jointly as "Bosch" and assert that the Bosch entities share a collective identity. (*Id.* ¶ 69–72, 230).

### ii. Plaintiffs' Testing and Defeat Device Allegations

Plaintiffs claim that Bosch developed and manufactured the electronic diesel control ("EDC") that allowed BMW to implement defeat devices in the Subject Vehicles as a means of evading regulatory scrutiny. (Comp. ¶¶ 15, 64, 67 ,70, 201–14). One such Bosch EDC—the EDC17—allegedly is a "perfect enabler" for the use of a defeat device because it empowers software within the car to detect whether the car is experiencing a test environment versus normal driving conditions and alters emissions output accordingly. (*Id.*). Almost all of the diesel vehicle manufacturers who allegedly manipulated emissions in the U.S., *see supra,* used a Bosch EDC17 device. (*Id.*). German and U.S. prosecutors

are currently investigating certain Bosch managers for their role in the emissions scandal involving Volkswagen and other manufacturers. (*Id.* ¶¶ 73, 74). The Complaint alleges that, since the BMW Subject Vehicles use a Bosch EDC17, as did the Volkswagen cars and other suspect diesel vehicles, "Bosch was a participant in the scheme to hide the true emissions" of the Subject Vehicles. (*Id.* ¶ 75).

In order to be sold in the United States, a vehicle must be covered by a certificate of conformity ("COC") issued by the EPA. (Comp. ¶ 77). The COC certifies that the vehicle comports with the specific emissions standards for pollutants set forth in the Clean Air Act. (*Id.* ¶¶ 76–77, 85, 108). To receive a COC, a diesel vehicle must not emit more than a specific amount of both NOx, which is a byproduct of diesel combustion, and particulate matter ("PM"). (*Id.* ¶¶ 82–83, 85, 108).[4] Pollution from NOx and PM has been linked with serious environmental problems and health risks. (*Id.* ¶¶ 6, 78, 81–83, 106, 265–67). Diesel engines have higher NOx and PM emissions than their gasoline counterparts due to differences in fuel combustion and the treatment of emissions within the engine following combustion. (*Id.* ¶ 84).

A manufacturer's application for a COC must accurately describe the vehicle "in all material respects," including any auxiliary emission control device ("AECD") installed in the vehicle. (Comp. ¶¶ 85, 109, 209, 244). A defeat device is a type of AECD. (*Id.*). A manufacturer would not be able to obtain a COC if it disclosed the existence of a defeat device because defeat devices impermissibly reduce the effectiveness of an automobile's emission control system during normal driving use. (*Id.* ¶¶ 4, 110, 209–10).

---

[4]    California emission standards are more stringent than those of the EPA. (Comp. ¶¶ 85, 111). California's state regulator, the California Air Resources Board ("CARB"), requires a similar application from automakers to obtain an executive order confirming compliance with California's emission regulations—the analog to the EPA's COC—as a prerequisite to selling cars in California. (*Id.* ¶¶ 85, 111, 116). Under certain circumstances, a manufacturer could demonstrate compliance with California standards as part of its application to the EPA. (*Id.* ¶ 113).

Here, Plaintiffs allege that BMW failed to disclose to regulators the presence of one or more defeat devices that it developed with Bosch for the two BMW diesel vehicles at issue. (Comp. ¶¶ 15, 210). As discussed below, Plaintiffs base their allegation on an inference from their own testing on one vehicle. They argue that since that one vehicle emitted suspiciously discrepant levels of emissions during road testing and lab testing, it follows that a defeat device must be present in all the Subject Vehicles.

When regulators test emission levels in a lab, they typically do so with a device called a chassis dynamometer, which might be compared to a treadmill. (Comp. ¶¶ 116, 146, 208). A chassis dynamometer is "a fixture that holds a car in place while allowing its driven wheels to turn with varying resistance meant to simulate the actual load on the engine during on-road driving." (*Id.*). The regulators then measure the emission levels at varying speeds and acceleration levels to see if the tested vehicle meets the relevant emission standards. (*Id*) When properly calibrated, the chassis dynamometer can simulate real world driving with a high degree of accuracy. (*Id.* ¶ 146).

A separate form of testing can be done using a portable emission measurement system ("PEMS"), which measures the gaseous emissions from a vehicle, including NOx and PM. Being portable, the device can test emission levels during normal, on-road driving. (Comp. ¶ 143). The critical distinction between PEMS and chassis dynamometer testing, then, is that the PEMS can operate during normal driving, while the chassis dynamometer operates only in a simulated, laboratory setting. (*Id.* ¶ 143, 146).

Previously, defeat devices circumvented regulatory scrutiny by detecting that the vehicle was on a chassis dynamometer—*i.e.*, not actually driving on the road. (Comp. ¶¶ 2, 14, 157–58). If so, the defeat device would limit the emissions output to meet regulatory standards.[5] If not—*e.g.*, when the vehicle was driven

---

5       One way that a defeat device can be triggered is with a change in ambient temperature. (Comp. ¶ 156). Both high and very low ambient temperatures cannot be tested in a chassis dynamometer laboratory, so when the vehicle senses that it is in

7

on the road under normal conditions—the emission levels would not be limited, allowing the car to have better fuel economy and superior driving performance. (*Id.*).

Prior to the revelations of the Volkswagen scandal in 2015, regulators did not perform PEMS testing for the relevant diesel vehicles, but instead relied on chassis dynamometer testing to certify regulatory compliance. (Comp. ¶ 146). Volkswagen's manipulation of chassis dynamometer results came to light when a group of university scientists working with a nonprofit organization performed PEMS testing on Volkswagen diesel cars. They noticed that Volkswagen emissions levels, as revealed by PEMS testing, did not meet regulatory standards, and they reported their findings to regulators. (*Id.* ¶ 144).

An emissions test cycle defines a protocol that specifies certain criteria under which an engine is tested, including lab temperature, vehicle conditions, and varying sample speeds. (Comp. ¶ 115). The test cycle defines the vehicle speed and time intervals at which the vehicle runs at a certain speed. The object is to simulate a typical driving scenario and provide a uniform protocol for testing purposes. (*Id.*). The protocol that the EPA uses for emission certification and fuel economy testing of passenger vehicles is called the FTP-75 (Federal Test Procedure) cycle. (*Id.*).

The FTP-75 is the primary dynamometer cycle used to certify light and medium duty passenger cars and trucks. (Comp. ¶ 117). This cycle incorporates rapid changes in speed and acceleration meant to reflect city driving (*i.e.*, frequent stops), along with some steadier, higher speed sections meant to account for highway driving. (*Id.* ¶¶ 115, 117). Regulators measure emissions during the test cycle and compare those levels to an emissions standard that defines the maximum pollutant levels that can be released during such a predefined cycle. (*Id.* ¶ 116).

---

one of those temperatures, its emission output changes. (*Id.*). For other ways that a device defeat can detect that the vehicle is being tested, *see* Comp. ¶ 208.

The FTP-75 comprises three separate phases. (Comp. ¶ 177). It begins with a "cold start" phase ("Phase 1"), meaning that the vehicle starts the test cycle with the engine having been off for at least eight hours. (*Id.* ¶¶ 118, 178). The "cold start" portion of the FTP-75 test is challenging for diesel engines employing selective catalytic reduction technology because catalysts meant to control emissions are not yet at temperatures where they work effectively. (*Id.*). The second phase ("Phase 2") starts immediately after Phase 1 and is a stabilized phase. (*Id.* ¶¶ 179–80, 185). The third phase ("Phase 3") is a "hot" phase; it occurs after the vehicle is turned off for ten minutes following Phase 2. (*Id.* ¶¶ 179–80, 185). Regulators test emission levels during each of the three phases of the FTP-75 test cycle. (*Id.* ¶ 181).

The plaintiffs here performed emissions testing on one model year 2012 X5 (the "Tested Vehicle").[6] The tests encompassed both PEMS and chassis dynamometer testing meant to replicate the FTP-75 test cycle. (Comp. ¶ 141). The Tested Vehicle had around 60,000 miles on it at the time of Plaintiffs' testing. (*Id.*). Plaintiffs inspected the Tested Vehicle to ensure that it had no engine faults, that regular maintenance had been performed, that the vehicle had not been in an accident, and that the emission control components were functioning properly. (*Id.* ¶ 141).

Plaintiffs assert that the Tested Vehicle is "representative of the entire population" of the Subject Vehicles, including all X5 vehicles for the years 2009 through 2013 and all 335d vehicles for the years 2009 through 2011. (Comp. ¶¶ 141, 161). Plaintiffs contend that it was not necessary to separately test an exemplar of the 335d model, because the "engine architecture is nearly identical for both the X5 and 335d with the only difference being that the X5 employs both high- and low- pressure [exhaust gas recirculation ("EGR")] because of its higher weight, while the 335d uses high pressure EGR only." (*Id.* ¶¶ 91, 100, 161).

---

6    The Complaint is silent as to the owner of the Tested Vehicle. (*See* Comp. ¶ 141). Six of the individual plaintiffs allege that they own a 2012 X5, as opposed to a 335d or a different model year X5, however none of those plaintiffs allege that they are the owner of the Tested Vehicle. (*See* Comp. ¶¶ 30, 40, 49(c), 53, 57, 58).

Otherwise, all other aspects of the engine are "nearly identical." (*Id.* ¶¶ 91, 100, 161). Furthermore, "all other model years [subsequent to 2009] are identical to the 2009 [X5] model year from an emissions standpoint" and BMW "did not change the engine in any significant way with respect to diesel emissions in these models." (*Id.* ¶¶ 161–62).

Plaintiffs evaluated the emission levels of the Tested Vehicle using a chassis dynamometer in a way intended to replicate the FTP-75 test cycle. (Comp. ¶¶ 177–89). For Phase 2, Plaintiffs' testing found that the composite emission levels of the Tested Vehicle on the chassis dynamometer was "quite close to the standard." (*Id.* ¶¶ 186–88). In other words, the Tested Vehicle "appears to be working as designed on the chassis dynamometer" during Phase 2. (*Id.* ¶ 189).

Not so the PEMS testing. Plaintiffs' PEMS testing, which was intended to "closely approximate" the FTP-75 certification test cycle, revealed that the Tested Vehicle had emissions levels that were higher than regulatory standards. (Comp. ¶¶ 163–76). According to Plaintiffs, over the course of 2,401 miles of testing on flat road highway driving, the Tested Vehicle released emissions above the "emission standard" for 82% of the miles it travelled. (*Id.* ¶¶ 163–66).

Based on Plaintiffs' PEMS testing, the emission levels of the Tested Vehicle for flat road testing increased when the ambient temperature was outside of the dynamometer test lab temperature range, which is between 68°F and 86°F. (*Id.* ¶¶ 167–71). When the Tested Vehicle was near 72°F, which is within the certification test window, the emissions met the regulatory standard. (*Id.* ¶ 167). However, when tested between 50°F and 60°F, which is below the certification temperature window, the emissions "increased dramatically." (*Id.* ¶ 168). The implication is that the Defendants intentionally designed the emission controls to game the ambient temperature parameters. (*Id.* ¶¶ 169–71).

For Plaintiffs' PEMS highway testing on hills, emission levels increased as the road grade, or incline, increased. (*Id.* ¶¶ 172–73). The implication here is that emission controls are "de-rated (turned down or off) on hills." (*Id.* ¶ 173). During

PEMS "stop and go testing," Plaintiffs' found emissions to be on average 8.5 times higher than the certification standard. (*Id.* ¶¶ 174–76).

The FTP-75 test cycle specifies precise speeds at any given time during the test. (Comp. ¶ 191). The required speed at each point during the test is called the "trace." (*Id.*).[7] For Plaintiffs' PEMS testing, during Phase 2 of the FTP-75 test cycle (the stabilized phase), the emission levels corresponded closely with the emission results found on the dynamometer. (*Id.* ¶ 190). However, when the PEMS testing for Phase 2 was conducted under the same overall average speed, "but a different and arbitrary test trace," emission levels "increase[d] dramatically." (*Id.* ¶ 191).[8] In other words, "when the test trace is arbitrarily changed to another trace with a similar profile, emissions increase. . . by a factor of 10." (*Id.* ¶ 192). From this, Plaintiffs deduce that "BMW appears to detect the test trace and reduce the effectiveness of the [selective catalytic reduction] system when it detects [that] the FTP-75 test cycle is not being run." (Comp. ¶¶ 193–94). Stated differently, the Tested Vehicle is "able to detect the certification test cycle and adjust the emissions performance when it 'knows' the test cycle is not being run." (*Id.*).

With respect to Phase 1 of the FTP-75 test cycle (the "cold" start), Plaintiffs' testing indicated that the emissions of the Tested Vehicle during on-road PEMS testing were 3.3 times the level found on the chassis dynamometer. (Comp. ¶ 196). With respect to Phase 3 of the FTP-75 test cycle (the "hot" start), Plaintiffs' testing indicated that the emissions of the Tested Vehicle during on-road PEMS testing was around 5 times the level found on the chassis dynamometer. (*Id.* ¶¶

---

[7]     Plaintiffs include a graph of the FTP-75 test cycle indicating the required speed in miles per hour on the X-axis and the time in seconds on the Y-axis. (Comp. ¶ 181). Ostensibly, this graph indicates the "trace" of the FTP-75 test cycle—*i.e.*, the required speed for a given time. (*Id.* ¶¶ 181, 191).

[8]     Plaintiffs describe this arbitrary and different test trace speed as "parametrically similar" to Phase 2 of the FTP-75 test cycle. (Comp. ¶ 194).

197–98).[9] Plaintiffs contend that these results "show that BMW is employing an illegal software defeat strategy" for both Phase 1 and Phase 3 of the FTP-75 cycle. (*Id.* ¶ 199).

Plaintiffs also allude to a 2016 study conducted by a European group called Transportation and Environment, which allegedly found that certain other BMW diesel vehicles, along with almost every new diesel model, showed significant discrepancies between real-world emissions and laboratory emissions. (Comp. ¶¶ 199, 200, 274–75, 278). Additionally, in September 2017, the International Council on Clean Transportation ("ICCT") authored a report analyzing the real world versus lab testing emissions of many manufacturers' vehicles. (*Id.* ¶ 279). The ICTT found that certain BMW vehicles (not the Subject Vehicles at issue here) produced emissions above European regulatory standards. (*Id.* ¶ 279).

Plaintiffs generally contend that the existence of "a worldwide diesel emissions cheating scandal" lends credence to the plausibility of their specific allegations against BMW and Bosch. (*Id.* ¶¶ 270–79).

### iii. Marketing

BMW promoted the Subject Vehicles to potential consumers as delivering reduced NOx emissions and generally as "clean vehicle[s]." (Comp. ¶ 119). These marketing claims fall into three broad subcategories: (1) the Subject Vehicles meet federal and/or state emission standards (*Id.* ¶¶ 92, 121, 125, 127, 133, 135–36, 138, 140); (2) the Subject Vehicles have "less emissions" than other versions of BMW cars (*Id.* ¶¶ 92, 121, 122, 123, 125–27, 129–30, 132, 135, 137, 139–40); and (3) the Subject Vehicles are generally "environmentally friendly" and actively help to "protect" the environment (*Id.* ¶¶ 125, 128–29, 133, 140).

---

[9]     The Complaint at ¶¶ 197–98 incorrectly refers to Phase 1 when discussing Phase 3. The chart at those paragraphs and the discussion about the hot start phase make clear that the Plaintiffs intended to discuss Phase 3 and that the references to Phase 1 here are a typographical error.

Additionally, Bosch marketed "clean diesel" technology in the United States by communicating with the public through trade organizations about the benefits of "clean diesel." (Comp. ¶¶ 66, 232–242, 258–63).

### iv. Legal Claims

Plaintiffs assert causes of action for violations of RICO (Comp. ¶¶ 298–346) and several states' consumer protection laws (*Id.* ¶¶ 347–1342). With respect to economic harm, Plaintiffs allege that if they had known about the purportedly true level of emissions produced by the Subject Vehicles they would not have purchased or leased them, or would have paid a lower price. (*Id.* ¶ 268). Plaintiffs seek damages, injunctive relief, and equitable relief related to the design, manufacturing, marketing, sale, and leasing of the Subject Vehicles.

## II.   STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction which are confined to the adjudication of "cases" or "controversies" as permitted by Article III of the Constitution. *See* U.S. Const., Art. III, § 2. The case-or-controversy requirement requires that a plaintiff possess constitutional standing. *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). For a plaintiff to have constitutional standing, the following three elements must be present: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. 1540, 1547. "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro*, 458 F.3d 181, 188. Consequently, a motion to dismiss for lack of standing is properly brought under Federal Rule of Civil Procedure 12(b)(1). *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

Federal Rule of Civil Procedure 12(b)(1) governs jurisdictional challenges to a complaint. These may be either facial or factual attacks. *See* 2 Moore's Federal Practice § 12.30[4] (3d ed. 2007); *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial challenge asserts that the complaint does not allege sufficient grounds to establish subject matter jurisdiction. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). A court considering such a facial challenge assumes that the allegations in the complaint are true, and may dismiss the complaint only if it nevertheless appears that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction. *Iwanowa*, 67 F. Supp. 2d 424, 438; *Cardio–Med. Assoc., Ltd. v. Crozer–Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983). As to a facial jurisdictional attack, then, the standard is similar to the one that applies to an ordinary motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). A factual attack, on the other hand, permits the Court to consider evidence extrinsic to the pleadings. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), *holding modified on other grounds by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003). "Where a district court lacks subject-matter jurisdiction, its 'disposition of such a case will . . . be without prejudice." *Siravo v. Crown, Cork & Seal Co.*, 256 F. App'x 577, 580–81 (3d Cir. 2007) (non-precedential) (citing *In re Orthopedic "Bone Screw" Prods. Liab. Litig.*, 132 F.3d 152, 155 (3d Cir.1997)).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. 662, 678.

With respect to allegations of fraud, "a party must state with particularity the circumstances constituting fraud," although "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002))). In doing so, "a party must plead [its] claim with enough particularity to place defendants on notice of the precise misconduct with which they are charged." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (internal quotation and citation omitted).

## III.   ANALYSIS

Defendants maintain that Plaintiffs fail to plead factually that their Subject Vehicles contained a defeat device, which is the source of the alleged injury.

Without a cognizable injury, Defendants contend, the Plaintiffs lack standing (and, for that matter, have failed to state a claim). (*See* BMW Br. at 33).[10] Specifically, Defendants contend, *inter alia*, that "the fact that one BMW X5 flunked [Plaintiffs' testing]. . . does not raise a plausible inference that all 2009-2013 BMW X5 and 2009-2011 BMW 335d vehicles contain illegal defeat devices." (BMW Br. at 24–25, 44; Bosch Br. at 21; DE 43 at 8, 10, 18). Plaintiffs counter that they "provide copious detail about the existence of the defeat device in their vehicles, how it was detected, and its effect on the vehicles." (Pl. BMW Opp. at 19). I find that the Plaintiffs have not alleged enough to merit a plausible inference that there is a defeat device in their vehicles, and therefore have not sufficiently alleged that they possess an injury in fact sufficient to confer standing.

In section (a) I examine the sufficiency of the allegations that the vehicles purchased by the Plaintiffs contain a defeat device. In section (b) I apply a standing analysis to the results of the analysis in section (a).

### a. Sufficiency of Defeat-Device Allegations

I find inadequate the allegation that the Plaintiffs' vehicles contain a defeat device for two primary reasons. First, it depends on testing of a single vehicle which revealed discrepancies between laboratory and on-road emissions results, from which plaintiffs somewhat speculatively infer that the vehicle contained a defeat device. Second, it relies on a further inference that the tested vehicle is a valid exemplar—*i.e.,* that because it contained a defeat device, then the Plaintiffs' vehicles, too, must have contained such a device.

Defendants rely heavily on *Bledsoe v. FCA US LLC,* 307 F. Supp. 3d 646 (E.D. Mich. 2018) ("*Bledsoe I*"). (*See* BMW Br. at 34–35, 44–45; DE 51 at 2; Bosch Br. at 22). Like Plaintiffs here, the *Bledsoe I* plaintiffs alleged that Fiat Chrysler Automobiles ("FCA") installed in two diesel truck models a defeat device that

---

[10]     Bosch joined in BMW's motion to dismiss and made their own argument regarding standing. (*See* Bosch Br. at 21–22).

enabled the vehicles to pass emissions testing, but switched off or limited the emissions reduction system during normal driving conditions. *Id.* at 648–49.[11] To support this allegation, the *Bledsoe I* plaintiffs performed PEMS testing on a single truck, "the results of which allegedly show[ed] that the vehicle emitted emissions at amounts greater than those permitted by federal and state regulations, . . . and higher than levels set for vehicles to obtain certificates of compliance." *Id.* at 649, 651. As general support, the *Bledsoe I* plaintiffs pointed to a "worldwide emissions scandal" including Volkswagen, unrelated EPA regulatory enforcement actions directed at other vehicles manufactured by FCA, and a prior regulatory enforcement action involving defeat devices brought against Cummins—a defendant in *Bledsoe I* and the engine manufacturer for the trucks at issue. *Id.* at 652–53.

The *Bledsoe I* court determined that the plaintiffs' allegations were not plausible and dismissed the complaint without prejudice for lack of Article III standing. *Id.* at 657. Specifically, the court determined that the plaintiffs failed to plausibly allege the existence of a defeat device for the entire vehicle class based on the PEMS testing of one used vehicle. *Id.* at 654, 659–60 ("[T]he Complaint lacks sufficient well-pleaded facts that allow this Court to draw a reasonable inference that the results from Plaintiffs' PEMS testing of one vehicle plausibly show[] the presence of a defeat device, a defect in the tested truck, or a defect that exists in the 'Affected Vehicles.'"). Beyond their own test results, the plaintiffs failed to adduce sufficient corroborating allegations that would contribute to the inference that the defendants engaged in a scheme to implement a defeat device, deceive regulators, and mislead consumers.[12]

---

[11]     The plaintiffs' allegations in *Bledsoe I* are strikingly similar to the allegations here. *Compare Bledsoe I* at 649 ("Plaintiffs tested one 2012 Dodge Ram 2500, the results of which allegedly show that the vehicle emitted emissions at amounts greater than those permitted by federal and state regulations, higher than its 'gasoline engine counterpart,' higher than what a reasonable consumer would expect, and higher than levels set for vehicles to obtain certificates of compliance."), *with* Comp. ¶ 2.

[12]     *See Bledsoe I*, at 655–56 (distinguishing *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018) ("*Duramax*") because the plaintiffs there alleged that

In reviewing the well-pleaded factual matter outside of the plaintiffs' PEMS testing, the *Bledsoe I* court compared two prior cases that "rais[ed] almost identical claims" in which the courts found the defeat device allegations to be sufficient. *Bledsoe I*, 307 F. Supp. 3d 646, 658. The court reasoned that in those cases "the claims relied not only [on] the plaintiffs' own testing, but also on tests and studies by other entities." *Id.*[13] Consequently, the *Bledsoe I* court dismissed the plaintiffs' complaint without prejudice.

After the parties had briefed the motions to dismiss in this case, the *Bledsoe* court issued another opinion denying the defendants' motion to dismiss an amended version of the complaint. *See Bledsoe v. FCA US LLC*, No. 16-cv-14024, 2019 WL 1379588, at *1 (E.D. Mich. Mar. 27, 2019) ("*Bledsoe II*"). (*See* DE 49, 51). The court in *Bledsoe II* denied the defendants' motion with respect to plaintiffs' RICO and consumer protection claims because the amended

---

the defendants used a Bosch EDC17, which is "a good enabler for manufacturers to employ defeat devices," and the plaintiffs also described in detail the nature of the three alleged defeat devices in the vehicles at issue.), 656–57 (distinguishing *United States v. FCA US LLC*, No. 2:17–cv–11633, 2017 WL 2242762 (E.D. Mich. May 23, 2017) ("*United States v. FCA*"), a case filed by the DOJ on behalf of the EPA against FCA, because there the EPA identified eight specific defeat devices that caused the vehicles to perform effectively when being tested for compliance and then reduce the effectiveness of the emissions control system during normal use.).

13    *See Counts v. General Motors*, 237 F.Supp.3d 572 (E.D. Mich. 2017) ("*Counts*"), and *In re Mercedes–Benz Emissions Litigation*, No. 16-cv-881 (JLL) (JAD), 2016 WL 7106020 (D.N.J. Dec. 6, 2016) ("*Mercedes I*").

The plaintiffs in *Counts* alleged that six European agencies from four countries—including the Dutch Ministry of Infrastructure, the British Department of Transportation, the French Ministry of the Environment, and the German Federal Department of Motor Vehicles—tested and found that other similar vehicles with common engine designs were noncompliant with European regulations, despite meeting regulatory testing in laboratory settings. *See Counts*, 237 F.Supp.3d 572, 577–78, 596 (noting the significance of the "uniformity of the European testing and its consistency with Plaintiffs' own testing").

The plaintiffs in *Mercedes I* relied in part upon corroborating allegations from France and Germany to sufficiently allege the existence of a defeat device. *Mercedes I*, 2016 WL 7106020, at *5. The plaintiffs also alleged that the defendants had admitted part of the wrongful conduct, which the court noted in its plausibility analysis. *Id.*

complaint more plausibly alleged the presence of a defeat device. *See generally Bledsoe II*, 2019 WL 1379588. Those plaintiffs had cured the deficiencies of the original complaint by, *inter alia*, alleging test results for three of the vehicles at issue instead of just one, providing a more detailed account of their own PEMS testing, conducting chassis dynamometer testing in addition to PEMS testing, and adding more detailed allegations about the defeat device itself. *Bledsoe II*, at *6 (citing *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018) ("*Duramax*")); *see* n.12, *supra*.

Here, Plaintiffs' allegations fall somewhere between those of *Bledsoe I* and those of *Bledsoe II* or *Mercedes I* in terms of the plausibility of the inference that Defendants employed a defeat device in the Subject Vehicles.

In some respects, the allegations in this case exceed those of *Bledsoe I*. Here, the Plaintiffs have conducted comparative chassis dynamometer testing in addition to PEMS testing. Such allegations are significant because the results during PEMS road testing are allegedly irreconcilable with the results from the chassis dynamometer testing. (*See* pp. 6–10, *supra* (discussing relationship between PEMS and chassis dynamometer testing); Pl. BMW Opp. at 37). Plaintiffs here also assert that the presence of Bosch's EDC17 generally bolsters their case. (*Bledsoe I,* although it did not involve an EDC17, noted that the EDC17 would be an "enabler" for someone who is of a mind to install a defeat device.) The courts in *Bledsoe I* and *Duramax* acknowledged that this fact at least generally supported the plausibility of the allegations.

In other respects, however, the allegations fall short of those upheld in *Bledsoe II* or *Mercedes I*. Here, Plaintiffs only tested one X5 model, and have extrapolated from this minuscule sample an inference that one or more defeat devices exist in all of the Subject Vehicles. *Compare Bledsoe I,* 307 F. Supp. 3d 646, 659 ("[p]laintiffs' PEMS results from one tested vehicle do not raise a plausible inference of wrongdoing"), *with Bledsoe II*, 2019 WL 1379588, at *6 (recognizing that allegations of emission deficiencies in multiple vehicles added to plausibility of defeat device inference). Although the Complaint alleges that

the general engine structure is similar for these models, that does not say much about whether a defeat device was installed across the board, as alleged.

Moreover, Plaintiffs have not (by analogy to the plaintiffs in *Mercedes I* or *Counts*) cited independent entities that have levied defeat-device accusations against BMW for the particular engines at issue. Rather, Plaintiffs allege more generally that "[i]n Europe, watchdog groups, NGOs, and government agencies have cited virtually every manufacturer, including BMW, for violating the lower European emissions standards." (Comp. ¶ 11). There is no allegation that pinpoints any particular European governmental agency's citation of BMW with respect to its diesel cars in general, or the Subject Vehicles in particular. Rather, Plaintiffs allege (1) that a non-profit organization called Transportation and Environment accused many diesel vehicles of employing defeat devices, including certain BMW models and engines, but did not cite the Subject Vehicles at issue here (*Id.* ¶¶ 199, 200, 274–76, 278); and (2) that a group called the International Council on Clean Transportation ("ICCT") released a report analyzing the real world versus lab testing emissions of many manufacturers' vehicles and found a different BMW model (not any of the Subject Vehicles) to have polluted above the European standard. (*Id.* ¶ 279). Plaintiffs do not allege that these different BMW models have the same engines or use the same deceptive technology as the Subject Vehicles.[14]

The Complaint's description of the defeat devices here, while more detailed than the complaint in *Bledsoe I,* is less detailed than the complaint in *Duramax.* The *Duramax* complaint specifically enumerated the alleged defeat devices and described how each one functioned over the course of several pages. (*See Duramax,* Complaint at Docket Entry 18 ¶¶ 83, 126–139.) Here, the Plaintiffs fail

---

[14]    In *Bledsoe I,* it was not enough to create a plausible inference of wrongdoing with respect to the vehicles in question for the plaintiffs to allege that "unrelated regulatory enforcement actions [were] directed at other vehicles manufactured by FCA." *Bledsoe I* at 649. The EPA issued a Notice of Violation to FCA regarding a failure to disclose defeat devices in other FCA vehicles that were not the subject of the suit. *Bledsoe I* at 653.

to pinpoint whether the Subject Vehicles contain one defeat device or more, or state how each one functions in particular. Instead, the Plaintiffs lay out suspect test results, state in conclusory terms that a defeat device must exist, and leave the court to fill in the details.[15]

Each party argues that *Mercedes I*, 2016 WL 7106020, supports its position. The plaintiffs in that case asserted claims against Mercedes and Daimler AG for unlawfully misleading consumers into purchasing certain diesel vehicles "by misrepresenting the environmental impact of these vehicles during on-road driving." *Mercedes I*, at *1. With respect to standing and injury-in-fact, the court held that the plaintiffs "plausibly pled that the products received did not live up to the claims made by Defendants." *Mercedes I*, at *4. The plaintiffs in *Mercedes I*, to establish that marketing materials were misleading as to emission levels, cited (1) the plaintiffs' own testing; (2) tests conducted by foreign entities;[16] and (3) the defendants' own admissions regarding use of a defeat device. *Mercedes I*, at *5.[17]

The allegations here fall short of those in *Mercedes*. Plaintiffs have not alleged that any governmental organization has accused BMW of evading regulators with defeat devices in their diesel cars. Plaintiffs also have not alleged that the Defendants admitted any wrongdoing. These corroborating allegations

---

[15]    Plaintiffs rather obliquely seem to be asserting that one or more defeat devices alter emissions upon detecting (i) certain ambient temperature ranges; (ii) the slope of the road; and (iii) whether the vehicle is engaging in the FTP-75 test cycle or a different trace. The allegations are not very specific as to the devices involved.

[16]    The plaintiffs in *Mercedes I* cited to testing from the German Federal Department of Motor Vehicles and the French government, who both found problems with NOx emissions related to *Mercedes* diesel engines. *See Mercedes I*, Complaint at Docket Entry 17 ¶¶ 137–38.

[17]    Plaintiffs stress that the *Mercedes I* court dismissed the complaint for lack of standing, however, on the separate ground that plaintiffs' alleged injuries were not "fairly traceable to any of Defendants' representations" in their marketing materials. *Mercedes I*, at *8. After *Mercedes I*, the plaintiffs filed an amended complaint which was found by the court to have cured the prior pleading deficiency as to traceability. *See In re Mercedes-Benz Emissions Litig.*, No. 16-cv-881 (JLL) (JAD), 2019 WL 413541, at *5 (D.N.J. Feb. 1, 2019) ("*Mercedes II*").

were essential to the *Mercedes I* court's finding that the plaintiffs' testing sufficed to make the defeat device inference plausible. *Mercedes I*, at *5; *see also Bledsoe I*, 307 F. Supp. 3d 646, 658.

Ultimately, without sufficient corroborating allegations, I am persuaded to dismiss the Complaint because the Plaintiffs have presented little beyond emissions test results for a single vehicle—one used 2012 X5. *See Bledsoe I*, 307 F. Supp. 3d 646, 659 (dismissing claims and holding that "[p]laintiffs' PEMS results from one tested vehicle do not raise a plausible inference of wrongdoing because they do not 'permit the court to infer more than the mere possibility' that the Affected Vehicles perform as alleged by [p]laintiffs.") (quoting *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937).[18]

It is true that complaints in some defeat-device cases included test results from only one vehicle yet survived motions to dismiss. Most of those complaints, however, contained persuasive independent allegations beyond the plaintiffs' own testing of an allegedly typical car. These have included allegations of defendants' admissions, independent accusations from authoritative sources, or more detailed descriptions about the specific defeat devices and how they functioned. *See Bledsoe I*, 307 F. Supp. 3d 646; *Bledsoe II*, 2019 WL 1379588; *Mercedes I*, 2016 WL 7106020; *Mercedes II*, 2019 WL 413541; *Counts*, 237 F. Supp. 3d 572; *Duramax*, 298 F. Supp. 3d 1037; *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 943 (N.D. Cal. 2018) (finding defeat device allegations plausible where, in addition to the other allegations, the EPA issued a Notice of Violation against FCA "for failing to disclose eight auxiliary emission control devices"); *but see Gamboa v. Ford Motor Co.*, No. 18-10106, 2019 WL 1441615, at *18–*19 (E.D. Mich. Mar. 31, 2019).

---

[18]     To that criticism, Defendants add the fair point that Plaintiffs have provided few specifics regarding the "driving history or maintenance record" of this six-year-old car. (BMW Br. at 24, 27; Bosch Br. at 21; *but see* Comp. ¶ 141 (describing how Plaintiffs' investigators inspected the Tested Vehicle to ensure proper functioning and maintenance prior to testing)).

This is concededly a close case. I have, however, considered the totality of the allegations, and I find myself constrained to hold that the Plaintiffs have not alleged enough to nudge their allegations that the Subject Vehicles contained defeat devices "across the line from conceivable to plausible." *Twombly*, 550 U.S. 544, 570; *see Bledsoe I*, 307 F. Supp. 3d 646, 650, 659–60 ("A 'plausibility' determination is a context-specific task that requires the reviewing court to draw on its judicial expertise and common sense." (citing *Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937)); *Bledsoe II*, 2019 WL 1379588, at *2 ("The key inquiry. . . is whether the totality of the allegations amounted to plaintiffs having plausibly pled that the products received did not live up to the claims made by Defendants." (internal quotations and citation omitted)). Plaintiffs have not alleged enough to plausibly claim that Defendants engaged in a scheme to affirmatively "[c]onceal the existence of [] defeat devices and the unlawfully high emissions from regulators and consumers." (Comp. ¶¶ 319, 326).

Having found the allegations that the Plaintiff's automobiles contain a defeat device insufficient, I consider whether the Plaintiffs have alleged an injury in fact.

### b. Injury in Fact

The Plaintiffs allege that they suffered a financial injury in fact because the Defendants "affirmatively concealed" information from regulators, conspired to cheat government agencies during tests, and distributed marketing materials to intentionally mislead consumers. (Comp. ¶¶ 210, 319). The strength of those knock-on inferences, however, is dependent on the strength of the inference that the defeat device was present in the Plaintiffs' vehicles.[19]

For standing to exist, three elements must be satisfied: injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61,

---

[19]    The parties seem to be in accord that if standing were established, those secondary allegations of a fraudulent scheme would then be subject to a heightened Rule 9(b) analysis. (*See* BMW Br. at 41, 58; Bosch Br. at 43, 48; Pl. BMW Opp. at 48, 65). Such an analysis would encompass, *inter alia,* the "who, what, when, where, and how" of the presence of the defeat device in Plaintiffs' cars, the concealment of that fact, and so on.

112 S. Ct. 2130 (1992). *See* Section II, *supra*. Injury in fact exists when a plaintiff has suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *Id.*; *Nickelodeon*, 827 F.3d 262, 272. A harm is "concrete" only if it is "'*de facto*'; that is, it must actually exist"; it cannot be merely "abstract." *Nickelodeon*, 827 F.3d 262, 272 (quoting *Spokeo*, 136 S. Ct. 1540, 1548).

Here, Plaintiffs allege three categories of economic injury in their Complaint:

> (1) overpayment of the Subject Vehicles because Plaintiffs would not have purchased their cars or would have paid less for them had they known of the alleged defeat device;
>
> (2) the payment of a diesel premium for which the Plaintiffs did not receive value; and
>
> (3) additional expenses for repairs and fuel costs related to the allegedly deficient emissions system.

As Defendants accurately point out, all of these alleged injuries are contingent upon an inference that the Subject Vehicles had some type of defeat device to evade regulators in the test environment but permit greater emissions during normal driving conditions. (*See* Comp. ¶¶ 2, 4 ("[T]he vehicles' promised power, fuel economy, and efficiency are obtained only by turning off or turning down emission controls when the software in these vehicles senses that they are not in an emissions testing environment.")); (BMW Br. at 34; DE 43 at 27 ("[A] finding of 'injury' rests on the existence of a defeat device.")); *see Bledsoe I*, 307 F. Supp. 3d 646, 660 ("[A]ll of Plaintiffs' purported injuries hinge on the Complaint's conclusory allegations that the Defendants defrauded or misled consumers because the 'Affected Vehicles' perform in a manner consistent with Plaintiffs' PEMS testing results, contain a defective emission control system, contain a 'defective device,' and/or contain defeat devices.").

The same can be said for Plaintiffs' allegations with respect to misleading marketing materials and their consumer fraud claims. The alleged marketing misrepresentations fall into three subcategories: (1) the Subject Vehicles meet federal or state emission standards; (2) the Subject Vehicles have "less

emissions" than other BMW cars; and (3) the Subject Vehicles are generally "environmentally friendly" and actively help to "protect" the environment. *See* Subsection I.b.iii., *supra*.

For the first subcategory, the alleged noncompliance with federal and state regulatory standards necessarily stems from the inference that the Subject Vehicles' apparent compliance with regulatory standards was an artifact of the operation of the defeat device. Plaintiffs are not basing their state law claims directly on the contravention of EPA and state regulations but instead on general "deception aimed at consumers." (Comp. ¶ 7). This alleged deception, however, depends on the allegations regarding the defeat device.

The second subcategory is inherently comparative—*i.e.*, the Subject Vehicles release emissions at lesser levels than do other BMW vehicles. However, the Complaint is devoid of any allegations about how other BMW models perform with respect to emissions. *See Counts*, 237 F. Supp. 3d 572, 598 ("[A]ssertions that a product has '90% less emissions' raises the question: 90% less than what? . . .The Complaint includes no data about the level at which 'previous-general diesels,' however that phrase is defined, produced emissions. . . . [T]he [affected vehicle] might simultaneously produce more emissions than expected when being driven and still produce, in total, 90% less emissions than previous-generation diesels."). Those earlier BMW models could have emitted more, less, or the same level of emissions as the Subject Vehicles; the Complaint does not say.

The final subcategory, it could be argued, is not entirely dependent upon a defeat-device allegation. It is based on alleged representations that the Subject Vehicles are "environmentally friendly," despite the well-known environmental and health effects of diesel emissions. (*See* Comp. ¶¶ 6, 78, 81–83, 106, 125, 128–29, 133–34, 140, 265–67). Defendants' advertisements go so far as to say that the purchaser would be "helping to protect the environment every day." (*Id.* ¶ 134). Whether or not it complies with a particular regulatory standard, a diesel

vehicle may nevertheless fail to "help[] protect the environment."[20] Plaintiffs, however, have specifically disavowed any theory that relies upon general harm to the environment. (*See Id.* ¶¶ 264, 267). Factoring out that theory, we are again left with the plausibility of the defeat-device allegation, which sets forth the essential wrongful conduct that allegedly caused injury.

Without a sufficiently pled injury that is traceable to the Defendants' allegedly wrongful conduct, Plaintiffs do not have Article III standing to assert claims on behalf of themselves or the class. *Spokeo*, 136 S.Ct.1540, 1548; *Nickelodeon*, 827 F.3d 262, 272.

Conceptually, there is the potential for an overlap between failure to allege an injury in fact and failure to state as claim. *See Bell v. Hood*, 327 U.S. 678, 682, 66 S. Ct. 773, 776, 90 L. Ed. 939 (1946); *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 897–98 (3d Cir. 1987) ("[T]he truth of the facts alleged in the complaint is a question on the merits, as is the legal question whether the facts alleged establish a violation."). Causation and damages, for example, are common substantive elements of a cause of action. "Only where the claim upon which federal jurisdiction hinges is 'insubstantial on [its] face'" is dismissal for want of jurisdiction required." *Afran v. McGreevey*, 115 F. App'x 539, 541 (3d Cir. 2004) (quoting *Kulick*, 816 F.2d 895, 898); *Bell*, 327 U.S. 678, 682–83, 66 S. Ct. 773, 776. The claims here, I believe, become facially "insubstantial" when the defeat-device inference is removed. Because that inference, I have found, is not well pled, I am left with a complaint that does not put forward or identify a person who possesses an actual injury in fact.

The actual owner of the Tested Vehicle, I suppose, might allege an injury with regard to the performance of that particular car. *See Bledsoe I*, 307 F. Supp. 3d at 657 ("While the allegations in Plaintiffs' Complaint may be accepted for the

---

[20]    Here again, however, we have the "compared to what" issue. To drive a BMW in lieu of walking does not "protect the environment." To drive a BMW in lieu of driving a tractor trailer (or a coal-burning locomotive) may be said, I suppose, to "protect" the environment, if only from oneself. Assuming one is not constrained to buy a BMW, as between a diesel or gasoline car, it is difficult to see how either of those options would "protect" the environment.

factual proposition that the *tested* vehicle—during the testing in question—produced emissions at levels shown by the test results, plaintiffs offer no well-pleaded factual content for the court to accept as true that" the entire class of vehicles contains a defeat device or defective emissions control system.). This Complaint, however, does not identify the owner of the Tested Vehicle, or state whether that person is one the named plaintiffs. *See* n. 6, *supra.* "Although standing and merits questions may involve overlapping facts, standing is generally an inquiry about the plaintiff: is this the right person to bring this claim." *Davis v. Wells Fargo,* 824 F.3d 333, 348 (3d Cir. 2016). The Complaint does not assert a claim on behalf of the owner of the Tested Vehicle; rather, it puts forward this Tested Vehicle as an exemplar or representative of a class of BMW vehicles, and asks the court to infer that anyone who bought one of those vehicle models unknowingly purchased a defeat device. Since the Court cannot infer the existence of a defeat device for the entire vehicle class based on these allegations, and because the owner of the Tested Vehicle itself is unknown, the Plaintiffs have not identified "the right person" to bring their claims. *Id.*

I will therefore dismiss the Complaint pursuant to Rule 12(b)(1) for failure to allege standing in the sense of injury in fact. As jurisdiction is a threshold issue, I do not reach the remaining arguments for dismissal. *See Mercedes I,* 2016 WL 7106020, at *8; *Brahamsha v. Supercell OY,* No. 16-8440, 2017 WL 3037382, at *7 (D.N.J. July 17, 2017).[21]

---

[21] For the same reason, I also do not reach Defendants' request for the Court to take judicial notice of some 22 exhibits, which mostly include news articles. (DE 29-4). Plaintiffs oppose Defendants' request. (DE 38).

## V.  CONCLUSION

For the reasons stated above, Defendants' motions (DE 29, 30) to dismiss the Complaint are **GRANTED**. The dismissal is without prejudice to the submission of a proposed amended complaint within 60 days.

An appropriate Order accompanies this Opinion.

Dated: June 27, 2019

Kevin McNulty, U.S.D.J.