James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA HU, *et al.*, individually and on behalf of all others similarly situated, | Civil Action No. 18-4363 (KM)(JBC) |
| Plaintiffs, | |
| v. | |
| BMW OF NORTH AMERICA LLC, *et al.*, | |
| Defendants. | |

## OPPOSITION TO BMW OF NORTH AMERICA, LLC'S MOTION TO DISMISS
## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.    FACTUAL BACKGROUND ....................................................................... 3

    A.    Plaintiffs performed substantial, additional testing after dismissal of the CAC. ........................................................................................ 3

        1.    The methodology of Plaintiffs' experts is sound and reliable. ................. 3

        2.    The tests demonstrate the existence of a defeat device ........................... 5

III.    LEGAL STANDARDS .............................................................................. 7

IV.    ARGUMENT ............................................................................................. 8

    A.    That Plaintiffs did not purchase products directly from BMW is irrelevant, because there is a sufficiently direct relationship between BMW's wrongful *conduct* and Plaintiffs' *injury*, as required by RICO. .............. 8

    B.    Plaintiffs adequately allege Article III standing. .................................. 12

        1.    BMW's arguments under Article III ignore the pleading standards. ...................................................................................... 12

        2.    Plaintiffs Adequately Allege an Injury-in-Fact ....................................... 13

            a.    BMW's "inadequate testing" arguments are unpersuasive .................................................................... 13

            b.    BMW's no "corroborating facts" argument lacks merit. ............. 19

            c.    BMW's argument that the "FAC does not identify a defeat device" lacks merit. ......................................... 24

            d.    Overcharge is adequately alleged. ............................................. 25

        3.    Plaintiffs adequately allege an injury fairly traceable to BMW's conduct. .................................................................................... 27

    C.    Plaintiffs allege valid RICO claims. ................................................... 31

        1.    Plaintiffs sufficiently allege predicate acts of mail or wire fraud. ......................................................................................... 31

            a.    The FAC does not engage in impermissible group pleading. ................................................................................ 31

010733-11/1209385 V1

|   |   |   | b. | Plaintiffs sufficiently allege a fraudulent RICO scheme. ............ 32 |
|   |   |   | (1) | The FAC sufficiently alleges that defeat devices exist. ..................................................................32 |
|   |   |   | (2) | Allegations of fraudulent conduct by Bosch, in conjunction with other manufacturers, supports an inference of fraud. ...................................................33 |
|   |   |   | (3) | The FAC does not allege puffery. ......................................34 |
|   |   |   | c. | Plaintiffs sufficiently plead BMW's specific intent to defraud. ....................................................................... 36 |
|   | 2. | Plaintiffs adequately allege RICO injury. ................................................ 37 |
|   | 3. | Plaintiffs sufficiently allege proximate causation. .................................. 38 |
| D. | The FAC adequately alleges all state-law claims. ................................................ 42 |
|   | 1. | The representation of class members is not an issue of standing and should be decided at class certification. ............................................ 42 |
|   | 2. | The FAC adequately alleges consumer-fraud claims. ............................. 43 |
|   | 3. | Plaintiffs' state-law claims satisfy Rule 9(b) pleading requirements. ..................................................................................... 45 |
|   | 4. | Defendants' remaining state-law arguments also lack merit. .................. 46 |
|   |   | a. | Plaintiffs' claim under the New Jersey Consumer Fraud Act ("NJCFA") sufficiently alleges an ascertainable loss. ....................................................................................... 46 |
|   |   | b. | The Mississippi Consumer Protection Act ("MCPA") does not require pre-suit participation in an alternate dispute resolution program. .......................................... 47 |
|   |   | c. | Claims "for notice purposes only" should not be dismissed. ............................................................... 49 |
|   |   | d. | Plaintiffs can pursue Iowa Consumer Protection Fraud Act ("ICPFA") claims on behalf of a class. ................................. 49 |
|   |   | e. | Plaintiffs have standing to seek injunctive relief. ...................... 49 |
|   |   | f. | Plaintiffs allege a valid Kentucky Consumer Protection Act ("KCPA") claim. ................................................. 50 |
| V. | CONCLUSION ............................................................................................ 50 |

010733-11/1209385 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ambulatory Surgical Ctr. of Somerset v. Allstate Fire Cas. Ins. Co.*,
 2017 WL 5053919 (D.N.J. Nov. 3, 2017) ..............................................................48

*Apple Inc. v. Pepper*,
 139 S. Ct. 1514 (2019) ..........................................................................................8

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
 804 F.3d 633 (3d Cir. 2015) ..........................................................................9, 10, 41

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*,
 701 F. Supp. 2d 356 (E.D.N.Y. 2010) ..................................................................42

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................14

*Bezdek v. Vibram USA Inc.*,
 2013 WL 639145 (D. Mass. Feb. 20, 2013) ........................................................42

*Bhatt v. Comm'r of NJDOL*,
 2018 WL 623667 (D.N.J. Jan. 30, 2018) ............................................................27

*Bida v. Shuster Mgmt. LLC*,
 2019 WL 1198960 (D.N.J. Mar. 14, 2019) ..........................................................22

*Bledsoe v. FCA US LLC*,
 378 F. Supp. 3d 626 (E.D. Mich. 2019) ...................................................... *passim*

*Bosch v. Bayer Healthcare Pharm., Inc.*,
 13 F. Supp. 3d 730 (W.D. Ky. 2014) ..................................................................50

*Bridge v. Phoenix Bond & Indem. Co.*,
 553 U.S. 639 (2008) ..................................................................................8, 31, 41

*Burke v. Weight Watchers Int'l, Inc.*,
 983 F. Supp. 2d 478 (D.N.J. 2013) ......................................................................14

*Carlin v. Dairy Am., Inc.*,
 2014 WL 6390569 (E.D. Cal. Nov. 17, 2014) ......................................................37

*Carrol v. S.C. Johnsons & Son, Inc.*,
 2018 WL 1695421 (N.D. Ill. Mar. 29, 2018) ..................................................14, 17

- iii -

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015)............................................................................33

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices., & Prods. Liab. Litig.*,
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ............................................................ *passim*

*Clay v. Cytosport, Inc.*,
   2015 WL 5007884 (S.D. Cal. Aug. 19, 2015) ........................................................17

*Connelly v. Lane Constr. Corp.*,
   809 F.3d 780 (3d Cir. 2016)........................................................................12, 16

*Constitution Party of Pa. v. Aichele*,
   757 F.3d 347 (3d Cir. 2014)...........................................................................7, 8

*Corp. Synergies Grp., LLC v. Andrews*,
   2019 WL 3780098 (D.N.J. Aug. 12, 2019) ............................................................8

*Cottrell v. Alcon Labs.*,
   874 F.3d 154 (3d Cir. 2017).................................................................7, 14, 20, 25

*Counts v. General Motors, LLC*,
   237 F. Supp. 3d 572 (E.D. Mich. 2017)........................................................ *passim*

*Davis v. Wells Fargo*,
   824 F.3d 333 (3d Cir. 2016)........................................................................8, 30

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012)................................................................42

*Dei Rossi v. Whirlpool* Corp.,
   2015 WL 1932484 (E.D. Cal. Apr. 28, 2015) ........................................................14

*Del. Riverkeeper Network v. Soil Safe, Inc.*,
   2017 WL 2829603 (D.N.J. June 30, 2017)............................................................27

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
   784 F. Supp. 2d 508 (D.N.J. 2011) ..................................................................40

*In re Duramax Diesel Litig.*,
   298 F. Supp. 3d 1037 (E.D. Mich. 2018)....................................................... *passim*

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
   725 F.3d 406 (3d Cir. 2013)..........................................................................27

*Enslin v. The Coca-Cola Co.*,
   136 F. Supp. 3d 654 (E.D. Pa. 2015), *aff'd*, 739 F. App'x 91 (3d Cir. 2018) .................27, 29

*Estrada v. Johnson & Johnson,*
  2017 WL 2999026 (D.N.J. July 14, 2017)...................................................................26

*In re FCA US LLC Monostable Elec. Gearshift Litig.,*
  2017 WL 1382297 (E.D. Mich. Apr. 18, 2017)..........................................................26

*Finkelman v. Nat'l Football League,*
  877 F.3d 504 (3d Cir. 2017)........................................................................................30

*Fitzgerald v. Gann Law Books, Inc.,*
  956 F. Supp. 2d 581 (D.N.J. 2013)..............................................................................48

*Fonseca v. Goya Foods Inc.,*
  2016 WL 4698942 (N.D. Cal. Sept. 8, 2016)..............................................................14

*Fowler v. UPMC Shadyside,*
  578 F.3d 203 (3d Cir. 2009).........................................................................................12

*Gamboa v. Ford Motor Co.,*
  381 F. Supp. 3d 853 (E.D. Mich. 2019).........................................................11, 15, 20

*Gayle v. Warden Monmouth Cnty. Corr. Inst.,*
  838 F.3d 297 (3d Cir. 2016).........................................................................................48

*In re Gen. Mills Glyphosate Litig.,*
  2017 WL 2983877 (D. Minn. July 12, 2017) ..............................................................14

*In re Gen. Motors LLC CP4 Fuel Pump Litig.,*
  393 F. Supp. 3d 871 (N.D. Cal. 2019)........................................................................26

*In re German Auto. Mfrs. Antitrust Litig.,*
  392 F. Supp. 3d 1059 (N.D. Cal. 2019) ......................................................................20

*Growth Horizons, Inc. v. Delaware Cty., Pa.,*
  983 F.2d 1277 (3d Cir. 1993).........................................................................................7

*Gubala v. CVS Pharmacy, Inc.,*
  2016 WL 1019794 (N.D. Ill. Mar. 15, 2016)..............................................................17

*Hale v. Stryker Orthopaedics,*
  2009 WL 321579 (D.N.J. Feb. 9, 2009) ......................................................................11

*Hassan v. City of New York,*
  804 F.3d 295 (3d Cir. 2015).........................................................................13, 14, 19, 27

*Heinold v. Perlstein,*
  651 F. Supp. 1410 (E.D. Pa. 1987) ..............................................................................38

- v -

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
    846 F.3d 625 (3d Cir. 2017)...................................................................8, 29

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
    299 F.R.D. 648 (S.D. Cal. 2014) ....................................................................48

*In re Hypodermic Prods. Antitrust Litig.*,
    2007 WL 1959225 (D.N.J. June 29, 2007) ....................................................42

*In re Ins. Brokerage Antitrust Litig.*,
    2017 WL 3642003 (D.N.J. Aug. 22, 2017) ....................................................36

*In re Insulin Pricing Litig.*,
    2019 WL 643709 (D.N.J. Feb. 15, 2019) ..................................................11, 43

*Int'l Tansp. Mgmt. Corp. v. Brooks Fitch Apparel Grp.*,
    2012 WL 295847 (D.N.J. Feb. 1, 2012) .........................................................31

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ................................................................37

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Liab.*
*Litig.*,
    903 F.3d 278 (3d Cir. 2018)............................................................................26

*Kearney v. Bayerische Motoren Werke Aktiengesellschaft*,
    2018 WL 4144683 (D.N.J. Aug. 29, 2018) ....................................................45

*Kedra v. Schroeter*,
    876 F.3d 424 (3d Cir. 2017)............................................................................13

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991)..........................................................................39

*Le v. Kohls Dep't Stores, Inc.*,
    160 F. Supp. 3d 1096 (E.D. Wis. 2016)..........................................................42

*In re Le-Nature's, Inc., Commercial Litig.*,
    2010 WL 11469939 (W.D. Pa. May 13, 2010)...............................................41

*Liberty Bell Bank v. Rogers*,
    726 F. App'x 147 (3d Cir. 2018) ....................................................................36

*Lieberson v. Johnson & Johnson Consumer Cos., Inc.*,
    865 F. Supp. 2d 529 (D.N.J. 2011) ................................................................47

*Link v. Mercedes-Benz of N. Am., Inc.*,
    788 F.2d 918 (3d Cir. 1986)............................................................................11

- vi -

*In re Lipitor Antitrust Litig.*,
  2018 WL 4006752 (D.N.J. Aug. 21, 2018) ...........................................................48

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
  2017 WL 3131977 (D.N.J. July 20, 2017).....................................................42, 48

*Lisk v. Lumber One Wood Preserving, LLC*,
  792 F.3d 1331 (11th Cir. 2015) ............................................................................48

*Long v. Se. Pa. Transp. Auth.*,
  903 F.3d 312 (3d Cir. 2018)....................................................................................7

*Longmont United Hosp. v. Saint Barnabas Corp.*,
  2007 WL 1850881 (D.N.J. June 26, 2007), *aff'd*, 305 F. App'x 892 (3d Cir. 2009) .............41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...............................................................................................27

*Lunderstadt v. Colafella*,
  885 F.2d 66 (3d Cir. 1989).....................................................................................12

*Lynch v. Capital One Bank (USA), N.A.*,
  2013 WL 2915734 (E.D. Pa. June 14, 2013) .........................................................40

*In re Magnesium Oxide Antitrust Litig.*,
  2011 WL 5008090 (D.N.J. Oct. 20, 2011)..............................................................42

*Maniscalco v. Brother Int'l Corp. (USA)*,
  627 F. Supp. 2d 494 (D.N.J. 2009) ........................................................................47

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ...............................................................................12

*McCarthy v. Recordex Serv., Inc.*,
  80 F.3d 842 (3d Cir. 1996).....................................................................................10

*In re McCormick & Co., Inc.*,
  217 F. Supp. 3d 124 (D.D.C. 2016) .......................................................................42

*McDermott v. Clondalkin Grp., Inc.*,
  649 F. App'x 263 (3d Cir. 2016) ..............................................................................8

*McGuire v. BMW of N. Am., LLC*,
  2014 WL 2566132 (D.N.J. June 6, 2014) ..............................................................43

*In re Mercedes Benz Emissions Litig.*,
  2016 WL 7106020 (D.N.J Dec. 6, 2016)...................................................15, 19, 28

- vii -

*In re Mercedes-Benz Emissions Litig.*,
2019 WL 413541 (D.N.J. Feb. 1, 2019) ......................................................... *passim*

*In re Mercedes-Benz Tele Aid Contract Litig.*,
257 F.R.D. 46 (D.N.J. 2009), *opinion clarified*, 267 F.R.D. 113 (D.N.J. 2010),
*opinion modified on reconsideration*, 2010 WL 2976496 (D.N.J. July 22,
2010) ........................................................................................................................39

*Mickens v. Ford Motor Co.*,
900 F. Supp. 2d 427 (D.N.J. 2012) .................................................................46, 47

*Mielo v. Steak'n Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018)............................................................................27, 30

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
549 F.2d 884 (3d Cir. 1977)...................................................................................7

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
2019 WL 1418129 (D.N.J. Mar. 29, 2019).........................................................10

*Muir v. NBTY, Inc.*,
2016 WL 5234596 (N.D. Ill. Sept. 22, 2016) ................................................14, 17

*Murdock v. E. Coast Mortg. Corp.*,
2012 WL 2344515 (D.N.J. June 20, 2012) ..........................................................14

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ..............................................................42, 48

*In re Optical Disk Drive Antitrust Litig.*,
2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) .....................................................48

*Phillips v. Cty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008)...........................................................................14, 25

*Prado v. Allstate Texas Lloyd's*,
2016 WL 9414132 (W.D. Tex. Nov. 16, 2016).....................................................48

*Quinones-Velazquez v. Maroulis*,
677 F. App'x 801 (3d Cir. 2017) ...........................................................................7

*Ramirez v. STi Prepaid LLC*,
644 F. Supp. 2d 496 (D.N.J. 2009) .......................................................................42

*Refundo, LLC v. Drake Enters., Ltd.*,
2013 WL 1750016 (D.N.J. Apr. 22, 2013) ...........................................................43

*In re Remicade Antitrust Litig.*,
    345 F. Supp. 3d 566 (E.D. Pa. 2018) .................................................................30

*In re Riddell Concussion Reduction Litig.*,
    77 F. Supp. 3d 422 (D.N.J. 2015) .......................................................................47

*Estate of Roman v. City of Newark*,
    914 F.3d 789 (3d Cir. 2019) ................................................................................13

*In re Schering-Plough Corp.*,
    2009 WL 2043604 (D.N.J. July 10, 2009) ..........................................................34

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
    678 F.3d 235 (3d Cir. 2012) ................................................................................34

*Schmigel v. Uchal*,
    800 F.3d 113 (3d Cir. 2015) ................................................................................48

*Schuchardt v. President of the United States*,
    839 F.3d 336 (3d Cir. 2016) ........................................................................ *passim*

*Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*,
    2008 WL 3833577 (D.N.J. Aug. 13, 2008) ........................................................42

*Silverstein v. Percudani*,
    422 F. Supp. 2d 468 (M.D. Pa. 2006), *aff'd*, 207 F. App'x 238 (3d Cir. 2006) .....................31

*Slukina v. 409 Edgecombe Ave. Hous. Dev. Fund Corp.*,
    2013 WL 4446914 (N.Y. Sup. Ct. N.Y. Cty. 2013) ............................................49

*In re Takata Airbag Prod. Liab. Litig.*,
    396 F. Supp. 3d 1101 (S.D. Fla. 2019) ...............................................................14

*Thiedemann v. Mercedes-Benz USA, LLC*,
    872 A.2d 783 (N.J. 2005) ............................................................................46, 47

*Toll Bros. v. Twp. of Readington*,
    555 F.3d 131 (3d Cir. 2009) ................................................................................30

*United States v. Bryant*,
    655 F.3d 232 (3d Cir. 2011) ................................................................................39

*United States v. Chartock*,
    283 F. App'x 948 (3d Cir. 2008) ........................................................................36

*United States v. Pearlstein*,
    576 F.2d 531 (3d Cir. 1978) ................................................................................35

010733-11/1209385 V1

*United States v. Stackpole*,
   64 F. App'x 842 (3d Cir. 2003) ..................................................................39

*United States v. Vas*,
   497 F. App'x 203 (3d Cir. 2012) ...............................................................36

*Vanderklok v. United States*,
   868 F.3d 189 (3d Cir. 2017)................................................................4, 20

*Victor v. R.C. Bigelow, Inc.*,
   2014 WL 1028881 (N.D. Cal. Mar. 14, 2014)...............................26, 27

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices., & Prods. Liab. Litig.*,
   2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)................................. *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices., & Prods. Liab. Litig.*,
   349 F. Supp. 3d 881 (N.D. Cal. 2018) ...........................................26, 28

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
   2017 WL 1902160 (D.N.J. May 8, 2017) .......................................48, 49

*Walter v. Palisades Collection, LLC*,
   480 F. Supp. 2d 797 (E.D. Pa. 2007) ......................................................40

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004).......................................27

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 56 (3d Cir. 2004)........................................................................39

*Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*,
   2009 WL 4730187 (D.N.J. Dec. 3, 2009) ..............................................42

*Weiss v. First Unum Life Ins.*,
   2003 WL 25713970 (D.N.J. Aug. 27, 2003) ..........................................31

*Young v. Johnson & Johnson*,
   2012 WL 1372286 (D.N.J. Apr. 19, 2012), *aff'd*, 525 F. App'x 179 (3d Cir. 2013) ........26, 38

## OTHER AUTHORITIES

Fed. R. Evid. 404(b)(2)................................................................................33

*The Volkswagen affair*, Rodgers Environmental Law, 2d. edition § 6:35 ....................................23

## I.      INTRODUCTION

BMW's motion to dismiss[1] should be denied. In the First Amended Complaint ("FAC"),[2] Plaintiffs allege BMW and Bosch[3] knowingly devised and implemented a scheme to sell vehicles rigged with "defeat devices" and software algorithms that allowed BMW vehicles to pass tests for federal and state emissions standards while allowing substantially higher emissions in the real world. In its June 27 decision ("*BMW I*"), the Court held that Plaintiffs did not establish Article III standing under the injury-in-fact prong. The Court viewed this as a "concededly . . . close case," but ruled that "the Plaintiffs have not alleged enough to nudge their allegations that the Subject Vehicles contained defeat devices 'across the line from conceivable to plausible.'" Op. at 23. The Court based its decision on the fact that Plaintiffs largely relied on allegations of emissions testing results for a single vehicle to infer the presence of a "defeat device in all of the BMW models at issue, without sufficient corroborating allegations.

In response to the Court's concerns Plaintiffs performed testing on additional vehicles, as explained in detail in Section II, below. As a result, the FAC contains many new, detailed allegations that were not in the CAC. S*ee, e.g.*, ¶¶ 2-5, 17-24, 84-85, 152-53, 156, 160, 163, 168-211, 214, 220-225, 228-252, 326-330.

As a threshold matter, Plaintiffs allege that, when seeking Environmental Protection Agency ("EPA") approval, manufacturers like BMW use only one vehicle to certify the entire model year for the vehicle. Plaintiffs' experts performed two types of testing (chassis dynamometer and Portable Emissions Measurement System ("PEMS") testing on five BMW vehicles: two model year 2012 BMW X5 xDrive35ds (diesel X5), one model year 2011 BMW

---

[1] Def. BMW of North America, LLC's Mot. to Dismiss, & Mem. in Supp., ECF No. 68-1 (BMW Br.). In this brief, "BMW" refers to defendants BMW of North America LLC and Bayerische Motoren Werke Aktiengesellschaft.

[2] *See, e.g.*, First Amended Cons. Class Action Compl., ECF No. 65 ("Complaint"), at ¶ 133. Citations in this brief to "¶" refer to the FAC unless otherwise noted.

[3] In this Opposition, "Bosch" refers to both Robert Bosch GmbH and Robert Bosch LLC; "Bosch GmbH" refers to Robert Bosch GmbH; and "Bosch LLC" refers to Robert Bosch LLC.

X5 xDrive35d (diesel X5), two model year 2011 BMW 335d's (diesel 335), and PEMS testing on one model year 2012 X5 xDrive35i (gasoline X5).

Plaintiffs' experts also enhanced their tests and provided more information to respond to the Court's concern about what inferences could be drawn from testing. First, in addition to testing more exemplar vehicles than before, the FAC also describes (as in *Bledsoe II*) the reliability of the PEMS testing used by experienced experts and explains that a number of studies have confirmed the accuracy of PEMS testing. ¶¶ 152-167. Second, Plaintiffs' experts also performed chassis dynamometer testing. Chassis dynamometer testing is the laboratory testing used to certify vehicles under federal and state emissions regulations. Plaintiffs' laboratory testing followed the Federal Test Procedure ("FTP") protocols and used a CFR compliant laboratory. ¶¶ 174-186.

Plaintiffs' chassis dynamometer tests showed the emission systems in the exemplar vehicles were operating as intended and within or near applicable standards. ¶¶ 183-185. As such, the vehicles also should have met or been near emissions standards during on-road testing. But the exemplar diesel vehicles did not pass during real world PEMS testing. Instead, emissions levels detected during PEMS were many times higher than during dynamometer tests—a hallmark of a defeat device. *See, e.g.,* ¶¶ 192-193. For example, in all cases testing city driving, the PEMS results are 3 times higher than the results found on the "FTP-75" dynamometer during certification testing. ¶ 192. And the testing shows the existence of a temperature triggered defeat device that is a result of software manipulation than turns down or off parts of the emission system. ¶¶ 195-200.

These allegations in the FAC, as set forth in detail below, are more than sufficient to address the Court's concerns and support the plausibility of Plaintiffs' claims that the Class Vehicles contain defeat devices. BMW's additional arguments for dismissing Plaintiffs' RICO and state-law claims contradict the rulings in multiple other diesel emission cheating cases that

- 2 -

the alleged use of "defeat devices" and the manipulation of emissions controls to allow heavy

pollution in real-world driving is inherently fraudulent and supports claims for damages.[4]

## II.     FACTUAL BACKGROUND

**A.     Plaintiffs performed substantial, additional testing after dismissal of the CAC.**

**1.     The methodology of Plaintiffs' experts is sound and reliable.**

When seeking EPA approval, manufacturers like BMW use only one vehicle to certify

the entire model. ¶¶ 3, 173. Here, Plaintiffs' experts performed PEMS and dynamometer testing

on multiple BMW vehicles, including: two model year 2012 BMW X5 xDrive35ds (diesel X5),

one model year 2011 BMW X5 xDrive35d (diesel X5), two model year 2011 BMW 335d's

(diesel 335), and one model year 2012 X5 xDrive35i (gasoline X5). ¶¶ 163, 169-252. The FAC

also includes new information about the vehicles that were tested, including that their mileage

was close to the certification standard, they had proper maintenance, and no emission system

faults. ¶¶ 169, 171-172. *Bledsoe II*, 378 F. Supp. 3d at 637-39 (setting forth similar allegations).

The FAC now sets forth detailed, particularized allegations of: (1) tests of five diesel

vehicles (¶¶ 3, 20, 125-28, 169-252); (2) PEMS testing (¶¶ 2, 3, 4-5, 17, 163, 186-252);

(3) chassis dynamometer testing (¶¶ 17, 174-185); (4) with the results of the tests showing use of

defeat devices (¶¶ 18-24, 174-252); (5) the operation of the defeat devices (¶¶ 25, 253-266); and

(6) Defendants' manipulation of the EDC17 system (¶¶ 25, 80, 84, 85, 203, 204, 253-66, 269-

308). For all material purposes, the models tested represent all makes and model years of the

subject vehicles at issue here. ¶¶ 2, 3, 172. All models at issue (and the tested diesel models)

share a common diesel engine. ¶¶ 101-115. The FAC also sets forth scientific literature and

reports and testing by independent entities showing that most of the diesel vehicles from

---

[4] *See In re Mercedes-Benz Emissions Litig.*, 2019 WL 413541, at \*14 (D.N.J. Feb. 1, 2019) ("*Mercedes II*"); *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626 (E.D. Mich. 2019) ("*Bledsoe II*"); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018) ("*FCAI*"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices., & Prods. Liab. Litig.*, 2017 WL 4890594, at \*15 (N.D. Cal. Oct. 30, 2017) (*Volkswagen*).

manufacturers of the so-called "clean diesel" vehicles, including those made by BMW, emit far more pollution on the road than in laboratory tests. ¶¶ 322-332.

The FAC (as in *Bledsoe II*) now also describes the reliability of the PEMS testing system used by experienced experts. ¶¶ 4, 152-168. PEMS testing is currently used as part of the European vehicle emissions certification process to test real-world driving conditions. ¶ 154. Both EPA and California Air Resources Board ("CARB") use PEMS testing as part of the heavy-duty in-use compliance program to measure emissions against the not-to-exceed standards. And both CARB and EPA make wide use of PEMS to evaluate vehicles for defeat devices. ¶ 154.

Several studies have confirmed the accuracy of PEMS testing. One such study, conducted by experts at Ricardo UK, one of the world's leading vehicle research and development companies, concluded that "'NOx emissions agreed within ~10% across a wide range of values'" When PEMS testing results were compared with chassis dynamometer results for the same vehicles. ¶ 162. "[T]his level of agreement with chassis dynamometer emissions measurement is more than sufficient to identify the presence of defeat devices and to quantify the effects" when defeat devices produce emissions that are multiple times beyond the legal limit in real world (but not laboratory) conditions. *Id.* Researchers for the CAFEE study that uncovered the VW scandal also relied on PEMS. ¶ 168. The "analyzers used in chassis dynamometer testing and PEMS testing have virtually identical levels of accuracy and are subject to the same strict requirements for calibration and drift." ¶ 159. Since "PEMS testing is designed for and is conducted on the road in actual driving, it is potentially *more* accurate than chassis dynamometer testing in certain respects." ¶ 160 (emphasis added). Indeed, on July 31, 2018, CARB initiated a recall of over 500,000 FCA/Cummins trucks based on PEMS testing.[5]

---

[5] *See CARB Investigation Leads to Nationwide Recall of 500,000+ Cummins Heavy-Duty Trucks* (July 31, 2018), available at https://ww2.arb.ca.gov/news/carb-investigation-leads-nationwide-recall-500000-cummins-heavy-duty-trucks. Plaintiffs ask the Court to take judicial notice of these documents on government websites. *See Vanderklok v. United States*, 868 F.3d

- 4 -

### 2.     The tests demonstrate the existence of a defeat device.

The FAC explains the weakness of chassis dynamometer testing. The engine can detect it is being tested on a chassis dynamometer by the following means: (1) during testing, the front wheels move but do not turn, which does not happen in real-world driving conditions (and vehicles can easily detect when wheels are being turned); (2) on a two-wheel drive vehicle, the driven wheels are moving but the non-driven wheels are not, which only happens on a chassis dynamometer; and (3) on a vehicle equipped with GPS, the vehicle's wheels are moving while the GPS position is not changing. ¶ 166. In contrast, vehicles cannot detect the presence of PEMS. Thus, "PEMS is not only accurate for detection and quantification of defeat devices, it is essential." *Id*.

All five of the exemplar BMW diesel vehicles were tested on the chassis dynamometer, following the Federal Test Procedure ("FTP") protocols and using a CFR compliant laboratory. ¶¶ 125-28, 174. EPA created FTP-75 and used it for emission certification and fuel economy testing of passenger vehicles in the United States. ¶ 125. The protocol "simulates an urban route with frequent stops, combined with both a cold- and a hot-start transient phase." ¶ 125; *see also* ¶ 170. The Highway Fuel Economy Test ("HWFET") was "designed to represent driving conditions under 60 mph" while "the test is used to assess highway fuel economy, vehicles are subject to emission standards on this cycle as well." ¶ 180. In laboratory testing the five vehicles all met or were near the emissions standard—meaning the emission system is operating as intended, ¶¶ 180-85. It is therefore expected that the vehicles should demonstrate the ability to meet the standard during on-road testing with the PEMS system.

But, the vehicles did not meet the standard during PEMS on-road testing in real world driving, and the FAC explains that because of the presence of defeat devices the on-road NOx

---

189, 205 (3d Cir. 2017) (court may take judicial notice of "information [that] is publicly available on government websites") (citing *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("It is appropriate to take judicial notice of . . . information . . . made publicly available by government entities[.]")).

emissions are dramatically higher. Specifically, in all cases for all vehicles in city driving conditions emissions are 1.4 to 7.5 times the standard and at times are 9 to 73 times the standard. ¶¶ 19, 192. In highway driving all but one diesel exceeds the standards, with the 2012 X5 exceeding the standard by 3.4 times. ¶ 195. By contrast, the average NOx emission rate for the gasoline model (BMW X5) was well below the emissions standard in both dynamometer and PEMS testing. ¶ 192. The FAC also identifies the use of a temperature defeat device. Temperatures in the test certification cycle are required to be between 68°F to 86°F. The FAC describes in detail how the emissions controls are turned down or off in temperatures outside the test certification window. ¶¶ 196-210. PEMS testing reveals use of a temperature defeat device such that when temperatures are below 68°F emissions can be as high as 526 mg/mile. ¶¶ 196-200.

And the FAC also explains the higher emissions at temperatures outside the testing window are a result of changes in the EGR such that it is disabled. ¶ 202. *See also* ¶¶ 207-210 (depicting emissions increases at temperature outside test certification limits.) This temperature defeat device is the result of software programming. ¶ 197. And the FAC explains that the BMW vehicles have the ability to meet emissions standards if programmed to do and could do so if the emissions system had not been disabled. ¶¶ 213-214. The FAC describes how the emissions were in fact disabled. ¶¶ 215-219. The FAC also describes how PEMS testing shows increased emissions when the cold and hot start conditions of Phase 1 of the FTP-75 are followed. ¶¶ 220-228.

The experts also discovered that the tested vehicles did not pass PEMS testing during the passive regeneration phase (a process used to remove diesel particulate matter). ¶¶ 21-24, 241, 304. Active regenerations are supposed to be infrequent due to their increase in emissions and fuel economy impacts. ¶ 22. But expert "testing reveals active regeneration far in excess of the

- 6 -

permissible frequency," ¶ 241, which is above the frequency allowed for certification of all of the diesel models tested. ¶¶ 21-24, 247-50.

Many of the allegations discussed above (¶¶ 2-5, 17-24, 84-85, 152-53, 156, 160, 163, 168-211, 196-214, 220-225, 228-252, 326-330) were not in the CAC.

## III.    LEGAL STANDARDS

When dealing, as here, with a facial challenge under Article III to jurisdiction under Rule 12(b)(1), the Court must accept as true all material allegations, and must construe all facts in favor of plaintiff. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 356 n.12 (3d Cir. 2014); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).[6] "'[T]he injury-in-fact element is not Mount Everest. The contours of the . . . requirement, while not precisely defined, are very generous, requiring only that claimant allege some specific, identifiable trifle of injury.'" *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 322 (3d Cir. 2018) (quoting *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017)). "Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components, as financial harm is a 'classic' and 'paradigmatic form[ ]' of injury in fact." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017) (citation omitted). "Indeed, [the Third Circuit] ha[s] explained that where a plaintiff alleges financial harm, standing 'is often assumed without discussion.'" *Id.* (citation omitted). Plaintiffs here allege such financial harm. ¶¶ 319-20. And "'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to

---

[6] The Third Circuit has also held that, under Rule 12(b)(1), "[d]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Growth Horizons, Inc. v. Delaware Cty., Pa.*, 983 F.2d 1277, 1280-81 (3d Cir. 1993) (citations and internal quotation marks omitted); *see also Quinones-Velazquez v. Maroulis*, 677 F. App'x 801, 803 (3d Cir. 2017) ("[T]he threshold to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(1) is . . . lower than that required to withstand a Rule 12(b)(6) motion. . . . Under the Rule 12(b)(1) standard, a claim fails to invoke the District Court's jurisdiction only if it is wholly insubstantial and frivolous.") (citations and internal quotation marks omitted).

support the claim.'" *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d at 633-34 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).[7]

As with review under Rule 12(b)(1), "under Rule 12(b)(6), [a court is] 'required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant.'" *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (citation omitted).

## IV.   ARGUMENT

### A.   That Plaintiffs did not purchase products directly from BMW is irrelevant, because there is a sufficiently direct relationship between BMW's wrongful *conduct* and Plaintiffs' *injury*, as required by RICO.

BMW's effort to graft a privity requirement into RICO by means of an indirect purchaser theory is unfounded. *See* BMW Br. at 17-20. BMW relies on *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019). But that is a red herring, because *Apple* concerned application of an irrelevant antitrust doctrine barring recovery by indirect purchasers claiming damages under a "pass-on theory." That doctrine is in applicable here. There is ample precedent allowing RICO claims, like Plaintiffs', that allege Defendants directly and fraudulently caused them to buy defective and over-priced products.

The "pass-on" limitation in antitrust cases does not apply when a consumer sues under RICO for injuries they suffered from being defrauded. In *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657-58 (2008), the Court explained that the RICO proximate-cause inquiry turns not on the relationship between the plaintiffs and defendants but rather on whether "there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the *proximate-cause principles…." Here, Plaintiffs' alleged a straightforward connection between Defendants' fraudulent scheme and Plaintiffs' injuries: (1) Defendants

---

[7] Allegations made on "information and belief" suffice where they are not conclusory (such as ¶¶ 267, 278, 356, 362, 382) and the information is peculiarly within Defendants' possession or knowledge. *See McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d Cir. 2016); *Corp. Synergies Grp., LLC v. Andrews*, 2019 WL 3780098, at *5 n.8 (D.N.J. Aug. 12, 2019).

jointly designed an engine that would pass emissions tests, but release unreasonably high NOx in ordinary use; (2) Defendants made misleading claims and material omissions to regulators and consumers about their engine and the Vehicles' performance and suppressed the true facts; and (3) as a result, Plaintiffs purchased Vehicles at a premium price not knowing the Vehicles had an engine design that routinely employed active regeneration that increased emissions above reasonable levels and decreased fuel efficiency. Overpayments were the intended, foreseeable, and natural consequence of the fraudulent scheme. Other courts analyzing the same issue in defeat device cases have reached the same conclusion. *See*, *e.g.*, *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 968 (N.D. Cal. 2018) ("[P]assed-on injury requires an examination of the relationship between different injured parties, not the relationship between a RICO plaintiff and different members of the RICO scheme." The law does not require that "each participant in a RICO enterprise must have a direct relationship with the plaintiff directly injured by that enterprise's conduct."); *In re Volkswagen*, 2017 WL 4890594, at *9 ("[W]hat matters, though, is … whether there is a 'sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury.'") (citing *Bridge*, 553 U.S. at 657).

Plaintiffs' claim is also directly supported by *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015). As the Third Circuit explained in *Avandia*, "if there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiffs' injury, the Court has held [in *Bridge*] that a RICO plaintiff who did not directly rely on a defendant's misrepresentation can still establish proximate causation." *Id.* at 643 (footnote omitted). *Avandia* then held that the "conduct that allegedly caused [the] plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused TPPs . . . to place Avandia in the formulary." *Id.* at 644. The Court explained that "drug manufacturers are well

- 9 -

aware that TPPs cover the cost of their drugs" and the defendant's "fraudulent scheme could have been successful only if [the] plaintiffs paid for Avandia, [which] is the very injury that [the] plaintiffs seek recovery for." *Id*. at 645. Thus, the plaintiffs' alleged injury had a direct relation to the alleged RICO violation. *Id*. Similarly here, the fraudulent scheme could only have succeeded if Plaintiffs purchased BMW's vehicles, and Plaintiffs' alleged overpayment for defective vehicles has a direct relation to the alleged direct fraud on consumers committed by Defendants.

BMW fails to cite a single case in which a court has applied the direct purchaser doctrine to RICO claims. Instead, BMW relies on an inapposite case, *McCarthy v. Recordex Serv., Inc*., 80 F.3d 842 (3d Cir. 1996). In *McCarthy*, the plaintiffs were clients of attorneys who bought photocopies of the clients' hospital records. *Id*. at 845. The clients alleged the defendants charged artificially high prices for the photocopies. *Id*. The plaintiffs alleged the costs were passed on to them. *Id*. The court held the plaintiffs lacked antitrust standing, because "the costs of the photocopies are only passed on to the client, if the costs are passed on at all, on a contingent basis…." *Id*. at 851. No allegation was made that the defendants induced patients through fraud to request more photocopies of medical records, or that they otherwise targeted the patients. Here, by contrast, Plaintiffs have alleged that defendants induced them to buy Polluting Vehicles through false representations and omissions.

The other cases BMW cites further illustrates the points made by the Supreme Court regarding the direct purchaser rule in the antitrust context, but which are inapplicable here. In *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *16 (D.N.J. Mar. 29, 2019), the plaintiffs "claim[ed] injury by virtue of inflated prices of their downstream purchase." Therefore, "[p]laintiffs are multiple purchasers down the distribution chain from [d]efendants and are quintessential indirect purchasers for the purposes of the indirect purchaser rule." *Id*. at *18. In contrast, Plaintiffs here do not seek pass-on damages but instead seek damages from their fraudulently-induced purchase of Polluting Vehicles.

- 10 -

Similarly, in another case cited by BMW, the plaintiff consumers were "multiple purchasers down the distribution chain" in a case involving a scheme to "artificially inflat[e] the benchmark prices" for insulin products. *In re Insulin Pricing Litig*., 2019 WL 643709, at \*2 (D.N.J. Feb. 15, 2019). As the court explained, "Plaintiffs have merely alleged a pass-through of the inflated price from one of the various intermediaries to the consumers. Such allegations cannot overcome an indirect purchaser rule challenge." *Id*. at \*12. *Insulin* distinguished *Avandia* on the ground that "the *Avandia* plaintiffs' cause of action was couched in the defendants' alleged failure to disclose known health risks of various drugs ultimately included in their formularies…." *Id*. at \*9.

This case is like *Avandia*, not *Insulin*, because Plaintiffs' claim is not based on passed-on injuries but instead is "couched in the defendants' alleged failure to disclose known" defects in the Polluting BMW Vehicles.[8] Plaintiffs and the Class were the only ones injured in their business or property in overpaying for the Class Vehicles and are the only ones poised to recovery monetary damages for those harms. Other courts in emissions-fraud cases have uniformly concluded that consumer plaintiffs sufficiently allege a direct link between the wrongful conduct and their injuries based on identical allegations of wrongful conduct.[9] BMW's

---

[8] Two more cases cited by BMW are inapposite because the plaintiffs alleged only pass-on injuries, not that the defendants fraudulently caused them to purchase defective products. *See Link v. Mercedes-Benz of N. Am., Inc*., 788 F.2d 918, 929 (3d Cir. 1986) (plaintiffs' antitrust claim "necessarily involved the claim of a pass-on of the wholesale price overcharge from the dealers to class members"); *Hale v. Stryker Orthopaedics*, 2009 WL 321579, at \*1 (D.N.J. Feb. 9, 2009) ("Medicare or the other insurance entities allegedly passed on the increased joint cost to Plaintiffs in the form of an elevated coinsurance payment.").

[9] *See Mercedes II*, 2019 WL 413541, at \*14 ("Plaintiffs have established a sufficiently direct relationship between Bosch and the alleged RICO injury for purposes of RICO causation."); *Gamboa v. Ford Motor Co*., 381 F. Supp. 3d 853, 883-84 (E.D. Mich. 2019) ("Plaintiffs have sufficiently demonstrated that there was a direct link between the injuries that they allege they suffered and Bosch LLC's conduct."); *FCA*, 295 F. Supp. 3d at 968 ("[P]assed-on injury requires an examination of the *relationship between different injured parties, not* the relationship between a RICO plaintiff and different members of the RICO scheme.") (emphasis in original).

- 11 -

discussion of a decades-old antitrust doctrine, which does not apply to claims of fraud on the Plaintiffs, does not change this outcome.

**B.      Plaintiffs adequately allege Article III standing.**

      **1.      BMW's arguments under Article III ignore the pleading standards.**

BMW next seeks to impose a heightened pleading standard, misapplies the *Twombly/Iqbal* standard, and overlooks that general allegations may suffice for Article III standing. Even assuming that the *Twombly/Iqbal* standard applies under Rules 8(a)(1) and 12(b)(1),[10] BMW fails to "distinguish between legal conclusions, which are discounted in the analysis, and "allegations of historical fact, which are assumed to be true even if 'unrealistic or nonsensical,' chimerical, or 'extravagantly fanciful.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789, 790 (3d Cir. 2016); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (factual and legal elements of claim should be separated). The test is whether the FAC pleads "'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Connelly*, 809 F.3d at 789 (citation omitted). All of BMW's arguments ignore that test and challenge factual allegations that must be accepted as true, rather than legal conclusions or allegations that paraphrase statutory language or elements of the claims in question. *See id.* at 790. When the alleged facts are construed in the light most favorable to Plaintiffs (which BMW fails to do), a reasonable and plausible view is that the Polluting Vehicles at issue contain a defeat device.

Rather than address the new allegations, BMW constructs a straw man and premises its arguments on the CAC, not the FAC. It argues the Court's previous opinion created mandatory

---

[10] *Twombly* and *Iqbal* construed Rules 8(a)(2) and 12(b)(6), not the materially different Rules 8(a)(1) and 12(b)(1). The Third Circuit has held that "[t]he threshold to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(1) is . . . lower than that required to withstand a Rule 12(b)(6) motion." *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir. 1989). Thus, *Twombly* and *Iqbal* do not apply to the Article III standing issue. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) ("*Twombly* and *Iqbal* are ill-suited to application in the constitutional standing context"). But even if they do, as discussed below, the FAC more than satisfies those standards.

- 12 -

pleading requirements: Plaintiffs must plead they tested their *own* vehicles, their vehicle maintenance and repair histories, accusations by a governmental organization or independent entity for the diesel engines at issue, a BMW admission of wrongdoing, and mechanical details as to how the defeat devices operate. BMW Br. at 21-25. The Court laid down no such rule. *BMW I* held that, considered collectively, the CAC's allegations did not plausibly plead the presence of a defeat device because they hinged on the results of a single PEMS test performed by Plaintiffs. Op. at 16, 19, 22-23. To the extent BMW argues *BMW I* set down mandatory pleading requirements and that the FAC requires more information, it contradicts Third Circuit law.[11] BMW also mistakenly applies a "divide and conquer" theory: all of its arguments improperly analyze the allegations in isolation from each other rather than as a whole.[12] For all these reasons, BMW's arguments should be rejected.

### 2. Plaintiffs Adequately Allege an Injury-in-Fact.

#### a. BMW's "inadequate testing" arguments are unpersuasive.

BMW challenges Plaintiffs' standing on the erroneous ground that testing of the diesel vehicles did not involve any of their own, personal vehicles. BMW Br. at 21-22. BMW cites no authority to support this novel argument, which amounts to a heightened evidentiary pleading

---

[11] *See Schuchardt v. President of the United States*, 839 F.3d 336, 348 (3d Cir. 2016) (holding that district court's enumeration of types of evidence that would support standing is a suggestion, not a pleading requirement, and that "[s]uch limitations on the scope or source of facts that a plaintiff may plead to reach the threshold of plausibility run counter to the longstanding principles animating pretrial dispositions, as set forth in *Twombly* and *Iqbal*, and come close to the weighing of evidence and credibility determinations") (citations omitted); *Hassan v. City of New York*, 804 F.3d 295, 277, 296 (3d Cir. 2015) (rejecting defendant's "demand for more information" as contrary to *Twombly* and *Iqbal*; "'factual allegations . . . [do not] become impermissible labels and conclusions simply because the additional factual allegations explaining and supporting the articulated factual allegations are not also included'").

[12] *See Estate of Roman v. City of Newark*, 914 F.3d 789, 796–97 (3d Cir. 2019) ("we '*must* consider the complaint in its entirety'") (citation omitted) (emphasis in original); *Kedra v. Schroeter*, 876 F.3d 424, 441 (3d Cir. 2017); *FCA*, 295 F. Supp. 3d at 946 (rejecting defendant's standing arguments that improperly "pick[] apart" and "segment the allegations in a way that misses the point of Plaintiffs' overpayment theory"); *see also Bledsoe II*, 378 F. Supp. 3d at 632 ("key inquiry . . . is whether 'the totality of the allegations'" shows plausible pleading that products "'did not live up to claims made by Defendants'").

- 13 -

standard. *Bell Atl. Corp. v. Twombly* reaffirmed that the purpose of Rule 8(a)(2) is to give the defendant "fair notice" of the claim, 550 U.S. 544, 555 (2007), but the Rule does not require "require heightened fact pleading of specifics," *id.* at 570, or "'detailed factual allegations,'" *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).[13] A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.[14]

The five vehicles tested are materially identical to, and representative of, the models owned by the Plaintiffs. ¶¶ 2, 3, 31-70, 101-115, 173. As such, it is plausible and reasonable to infer that those results adequately represent Plaintiffs' and class members' vehicles for standing purposes. Numerous courts have held that where testing of a product shows it lacks the promised characteristics, it is plausible and reasonable to infer that the same line of that product purchased by the plaintiffs also lacks those characteristics.[15]

---

[13] *See Hassan*, 804 F.3d at 295-96 (pleading of evidence not required); *Murdock v. E. Coast Mortg. Corp.*, 2012 WL 2344515, at *3 (D.N.J. June 20, 2012) ("plaintiff is not required to plead evidence") (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977)); *Dei Rossi v. Whirlpool* Corp., 2015 WL 1932484, at *2 (E.D. Cal. Apr. 28, 2015) (standing met where exact same refrigerator models purchased by plaintiffs were tested by DOE, and no evidence existed that plaintiffs' refrigerators varied from those tested by DOE).

[14] *Cottrell*, 874 F.3d at 170 n.11 (proof of economic theory not required); *Schuchardt*, 839 F.3d at 347 ("Implicit in the notion that a plaintiff need not plead 'specific facts' to survive a motion to dismiss is that courts cannot inject evidentiary issues into the plausibility determination.") (footnote omitted; citation omitted).

[15] *See In re Takata Airbag Prod. Liab. Litig*., 396 F. Supp. 3d 1101, 1124-25 (S.D. Fla. 2019) (standing "supported by numerous alleged instances of General Motor's vehicles experiencing airbag ruptures during testing and in the field"); *Burke v. Weight Watchers Int'l, Inc*., 983 F. Supp. 2d 478, 480, 418-82, 483 (D.N.J. 2013) (standing adequately alleged even though allegations regarding testing of products at issue were conclusory); *Carrol v. S.C. Johnsons & Son, Inc*., 2018 WL 1695421, at *3 (N.D. Ill. Mar. 29, 2018) (results of independent FDA compliant testing deemed adequate to support standing and to put defendant on notice as to products at issue); *In re Gen. Mills Glyphosate Litig*., 2017 WL 2983877, at *1, 3 (D. Minn. July 12, 2017) (standing for all Nature Valley Products adequately alleged; "Defendant's objections that these allegations are not true and concerns regarding the details of the alleged testing [by an independent laboratory] are issues properly addressed at a later stage in the proceedings"); *Muir v. NBTY, Inc.*, 2016 WL 5234596, at *3, 6 (N.D. Ill. Sept. 22, 2016) (Article III standing adequately alleged where plaintiff alleged testing of one or two samples of each of defendants' products); *Fonseca v. Goya Foods Inc.*, 2016 WL 4698942, at *5 (N.D. Cal. Sept. 8,

---

None of the rulings on motions to dismiss involving emissions fraud (or any other decisions of which Plaintiffs are aware) have required PEMS testing of a plaintiff's own vehicle, let alone the testing of multiple vehicles, as a pleading requirement for standing.[16] Contrary to BMW's suggestion that standing in *Bledsoe II* hinged on the testing of a plaintiff's vehicle, BMW Br. at 29, *Bledsoe II* found Article III standing sufficiently pleaded based on nearly identical facts, without relying on any allegations that Plaintiffs' own vehicles were PEMS tested. *See* 378 F. Supp. 3d at 632-34, 636-39.[17]

BMW distinguishes *Volkswagen*, *FCA*, and *Mercedes I* as involving U.S. governmental criminal or civil proceedings or investigations, or accusations by independent entities. BMW Br. at 28-29. But the courts did not hold that allegations of government proceedings are necessary to allege injury-in-fact. *See In re Mercedes Benz Emissions Litig.*, 2016 WL 7106020, at \*4-6 (D.N.J Dec. 6, 2016) ("*Mercedes I*"); *Mercedes II*, 2019 WL 413541, at \*3-5; *FCA*, 295 F. Supp. 3d at 945-52; *Volkswagen*, 2017 WL 4890594, at \*3-4. Nor was there a government investigation in *Bledsoe II* or *Gamboa*.

BMW's assertion that the CAC did "not assert a claim on behalf of the owner of the Tested Vehicle,'" BMW Br. at 21, avails nothing. The Court explained that its previous ruling was based on the "totality of the allegations," Op. at 23, and did not impose any *per se* pleading requirement that Plaintiffs must allege testing of their own vehicles. The central basis of the Court's opinion was that Plaintiffs' testing of "a single vehicle," in the absence of "sufficient corroborating allegations," was inadequate. Op. at 16, 19, 22-23. The language at the end of the

---

2016) (allegations "that 'independent DNA testing'" demonstrated that defendant's representation about product was false set forth plausible factual allegations).

[16] *See*, *e.g.*, *Gamboa*, 381 F. Supp. 3d at 885-86 (testing of one vehicle adequately supported standing); *Duramax*, 298 F. Supp. 3d at 1052 ("Plaintiffs' overpayment theory suffices to provide standing to sue [defendant], which manufactured the vehicles and authorized their sale."); *FCA*, 295 F. Supp. 3d at 945-51 (same); *Counts v. General Motors, LLC*, 237 F. Supp. 3d 572, 583-84 (E.D. Mich. 2017) (same; standing satisfied where no testing of plaintiffs' vehicles was performed).

[17] In *Bledsoe II* none of the plaintiffs' vehicles were PEMS tested.

- 15 -

Court's opinion upon which BMW relies is thus, at best, *dictum*: "[t]he actual owner of the Tested Vehicle, *I suppose*, *might* allege an injury with regard to the performance of that particular car." Op. at 26 (emphasis added). *See Schuchardt*, 839 F.3d at 348 (district court's identification of evidence that would support standing is not pleading requirement). The Court merely added gloss to its decision, stating that "[s]ince [it] could not infer the existence of a defeat device for the entire vehicle class based on these allegations, *and* because the owner of the Tested Vehicle is unknown, the Plaintiff have not identified 'the right person' to bring the claims." Op. at 27 (emphasis added).

Equally unavailing is BMW's contention that Plaintiffs do not allege specifics as to "the 'driving history or maintenance record' of the tested vehicles." BMW Br. at 21 (citing Op. at 22 n.18). Again, there is no such heightened pleading or evidentiary requirement. *See Schuchardt*, 839 F.3d at 347 ("the Supreme Court . . . expressly 'disavow[ed]' the requirement that a plaintiff plead 'specific facts'"). Given the totality of the current allegations, BMW fails to indicate how pleading such information would be necessary to afford it notice as to which vehicle models are alleged to contain defeat devices. Since the Court's previous concern was with the allegations of testing of a single vehicle in the CAC, the language upon which BMW relies for this argument is *dictum*, and irrelevant to the current allegations. *See* Op. at 22 & n.18. At any rate, Plaintiffs' adequately allege the conditions of the vehicles: the FAC alleges their mileages, that the vehicles were "carefully screened prior to testing to ensure they had been properly maintained according to the BMW recommended service guidelines," and were free of potential emission control defects. ¶¶ 169, 171, 172. *See Bledsoe II*, 378 F. Supp. 3d at 637 (similar allegations supported standing). These are factual allegations (not legal conclusions or formulaic recitations of the elements of claims) that are entitled to a presumption of truth. *See*, *e.g.*, *Connelly*, 809 F.3d at 789-90.

- 16 -

BMW's contention that one of the tested vehicles (a 2011 335 Diesel B model) passed Plaintiffs' PEMS test, BMW Br. at 25-26, does not support dismissal. Indeed, courts have rejected this line of argument, holding that a plaintiff need not present the type of factual proof as to testing that would be expected on a summary judgment motion and at the motion to dismiss stage notice is the standard.[18] In any event, BMW overstates the vehicle's performance when examined in the city driving conditions in which PEMS testing was performed, the vehicle emitted 72 mg/mile NOx, above the 50 mg/mile standard ¶ 192. Further, it is important to note that, although emissions are below the standard for one test, they are systematically much higher than the emissions on the highway test than in real-world highway driving; this is true of 2011 335 Diesel B and all the BMW diesels. Table 13 shows that highway-style driving on the road yields emissions 5.2 times higher than the highway on the dynamometer. ¶ 228. This demonstrates behavior that is different in the real world than on the dynamometer test cycle. The same is true when examining the results from Table 9, where the city driving emissions for this vehicle are 2.6 times higher than the Phase 2 FTP-75 emissions, even though the vehicle was driven in the same manner during PEMS testing as during Phase 2 of the FTP-75 test cycle. ¶ 211. Similarly, cold start and hot start emissions are higher on the road than on the FTP-75 cycle for 2011 335 Diesel B. Cold start emissions are 1.3 times the result on the FTP-75 and hot start emissions are 5.9 times higher. ¶¶ 222, 225. These results are indicative of a defect device

---

[18] *See Carrol v. S.C. Johnsons & Son, Inc.*, 2018 WL 1695421, at *3 (rejecting argument that allegations of testing lacked details where they sufficiently put defendant on notice of problem and conduct of defendant); *Gubala v. CVS Pharmacy, Inc.*, 2016 WL 1019794, at *8 (N.D. Ill. Mar. 15, 2016) ("Plaintiff may rely on the testing results attached to the amended complaint to nudge his claims . . . 'across the line from conceivable to plausible.' . . . Whether independent testing [in conformance with the federal standard] confirms Plaintiff's claim . . . is an issue of proof, and Plaintiff does not need to prove his case at the pleading stage of the case."); *Clay v. Cytosport, Inc.*, 2015 WL 5007884, at *3-4 (S.D. Cal. Aug. 19, 2015) (plaintiffs' failure to allege testing in accordance with FDA methodology does not require dismissal; simple allegation that product violates federal law was sufficient to give notice of plaintiffs' claim); *Muir v. NBTY, Inc.*, 2016 WL 5234596, at *5-7 (rejecting argument that FDA-compliant testing needed to be pleaded to survive dismissal).

- 17 -

strategy for all vehicles. Similar hot start behavior was observed in testing BMW diesels in Europe. ¶ 227.

BMW argues that the test results, based on an interpretation that the "90mg/mile NOx standard applies to highway driving of vehicles of over 50,000 miles," show that "two of the five tested vehicles passed Plaintiffs' highway tests." BWM Br. at 26. That is a false construction. The FAC indicates that the 70mg/mile NOx standard (not 90mg/mile) applies to highway driving of vehicles of over 50,000 miles, *see* ¶¶ 169-171, 194, and that these allegations support reasonable inferences of emissions cheating and the presence of a defeat device in all of the diesel vehicles, *see* ¶¶ 169-171, 192-194. BMW similarly falsely argues that overall city driving PEMS results indicate that at least one of the BMW 335ds tested passed testing (or was at the standard). BMW Br. at 26-27. BMW asserts a 70 mg/mile NOx standard applies to city driving of cars over 50,000 miles, *see id*., but Plaintiffs' allegations indicate that a 50 mg/mile NOx standard applies to cars that are close to 50,000 miles (as were all the tested diesels), and that city driving test results showed that emissions for all tested 335d models were above the 50 mg/mile NOx standard (and so did not pass). *See* ¶¶ 169-172 & Tables 1 & 2; ¶¶ 192-194 & Tables 5 & 6.

BMW makes the same mistaken, inference-drawing argument in contending that Table 13, and paragraphs 185 and 228 in the FAC show that four of the five vehicles tested were at or below the standard used by Plaintiffs. BMW Br. at 27. This argument ignores that ¶ 185 alleges that the tested vehicles passed the highway fuel economy testing (HWFET) on a dynamometer, and that Table 13 is a comparison of PEMS testing on the highway to the HWFET, and *did not involve the factors that lead to increased NOx emissions*. ¶ 228. "In all cases, the emissions in PEMS testing are higher than the emissions on the [HWFET] dynamometer indicating that the performance on the certification test cycle is not representative of real-world driving conditions." *Id*. In other words, BMW ignores that Table 13 and the allegations are additional, sufficient facts

- 18 -

to support the reasonable inference that the tested vehicles indicate the presence of a defeat device. *E.g.*, ¶¶ 167, 193-94, 228.[19]

**b.      BMW's no "corroborating facts" argument lacks merit.**

BMW argues the FAC lacks certain allegations that BMW asserts are required. BMW Br. at 22. As noted above, such a requirement, if it existed, would violate Third Circuit law. Again, BMW mistakenly parses and analyzes the allegations in isolation rather than collectively, and wrongly portrays *BMW I* and *Bledsoe I* as mandatory blueprints for its current motion to dismiss.

BMW, for example, argues that Plaintiffs were required to plead "'that any governmental organization has accused BMW of evading regulators with defeat devices in their diesel cars,'" or that Defendants admitted to wrongdoing. BMW Br. at 22. This Court laid down no such requirements.[20] It is true that in addressing the previous allegations, the Court stated that "Plaintiffs have not . . . cited independent entities that have levied defeat-device accusations against BMW for the particular engines at issue," or alleged that Defendants admitted to wrongdoing, Op. at 21. But, again, in making that observation, the Court was assessing the totality of the allegations in the CAC rather than in isolation, and was addressing *Mercedes I*. As

---

[19] BMW complains that the FAC fails to "describe the conditions present for the test results" reproduced in Table 6. BMW Br. at 27 n.28. That seeks to impose an inapplicable heightened pleading standard, and ignores, among other things, allegations that the vehicles were "subject to rigorous on-board diagnostics (OBD) requirements," ¶ 172, that "[h]ighway testing was generally conducted at a steady speed of 60 mph, ¶¶ 190-191, that "acceleration events . . . are limited," ¶ 190, and during which "no variables are changing," ¶ 191.

[20] BMW states that this Court held such "corroborating allegations were essential" to support the plausibility of a defeat device in the vehicles. BMW Br. at 22. That is not true. In *BMW I*, the Court found that the CAC's allegations f[ell] short of the those in *Mercedes [I]*," which, the Court believed, found that allegations of a governmental accusation that Mercedes employed a defeat device to evade regulators, and that Mercedes had admitted to wrongdoing, were essential to supporting a plausible inference of a defeat device. Op. at 22-23. *Mercedes I*, however, involved various allegations that the court examined in "totality," 2016 WL 7106020, at *4-5, and it ultimately declined to find standing based on the separate, fairly traceable element. *See id.*, at *5-9. In any event, the decisions in *Mercedes I* and *BMW I* (even if properly characterized by BMW) are not controlling here because they are based on materially different allegations, and the Third Circuit has rejected the argument that a plaintiff must plead particular types of evidence or facts. *Schuchardt*, 839 F.3d at 348; *Hassan*, 804 F.3d at 295-96.

- 19 -

discussed, *Mercedes I* made no such ruling, and decisions in other diesel emission cases have not imposed any such pleading requirements where, as here, the totality of the allegations support the plausible inference that the vehicles contain a defeat device.[21]

In fact, putting aside the totality of the allegations here, BMW ignores allegations that it has been identified as violating emissions standards. ¶¶ 14, 326, 330-32 (finding the 2013 X5 to be at 12 times the Euro standard).[22] Further, the FAC points out that to compete with its rivals, to appeal to environmentally-conscious consumers, and to comply with new emissions standards, BMW deceptively marketed its diesels as having low emissions and clean technology. ¶¶ 15-24, 101-102, 129-30. These allegations, including that most of the leading diesel manufacturers have been involved in emissions fraud and subject to investigations and accusations of diesel emissions, ¶¶ 9-15, 25, 83-85, 267-310, 321-28, support the reasonable and plausible inference that BMW engaged in such conduct. *See Bledsoe II*, 378 F. Supp. 3d at 633, 636 (noting allegations of "worldwide emissions scandal" and that plaintiffs "provided factual allegations of an alleged 'motive' by defendants" supported standing). Further, contrary to BMW's suggestion, an accusation of civil or criminal fraud by a governmental body for a statutory violation is not a prerequisite for Article III standing.[23]

---

[21] *See Bledsoe II*, 378 F. Supp. at 635-39 (standing alleged without regard to accusations by independent authorities or admissions of wrongdoing); *Gamboa*, 381 F. Supp. 3d at 886 (same); *Duramax*, 298 F. Supp. 3d at 1052 (same); *Counts*, 237 F. Supp. 3d at 583-84 (same).

[22] In April 2019, BMW, along with Volkswagen and Daimler, were charged by EU antitrust regulators with colluding to restrict competition on the development of technology to clean the emissions of diesel passenger cars, during meetings held by the "circle of five" between 2006 and 2014. *See* https://ec.europa.eu/commission/presscorner/detail/en/IP_19_2008. These charges, which may be judicially noticed, are consistent with Plaintiffs' allegations that BMW installed a defeat device in the vehicles at issue. *See, e.g.*, *Vanderklok*, 868 F.3d at 205; *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1063 & n.2 (N.D. Cal. 2019) (judicial notice of European Commission press release).

[23] *Cf. Cottrell*, 874 F.3d at 164 ("The most important is this: in this context, whether a plaintiff has alleged an invasion of a 'legally protected interest' does not hinge on whether the conduct alleged to violate a statute does, as a matter of law, violate the statute."); *Bledsoe II*, 378 F. Supp. 3d at 642 ("Plaintiffs' claims do not depend on proof of noncompliance with federal emissions standards.") (citation omitted).

- 20 -

Still other allegations of independent sources support the plausible inference of the presence of a defeat device. In this regard, Plaintiffs' allegations in the FAC of "scientific literature and reports and testing," ¶ 322, further nudge the allegations across the line from conceivable to plausible. *See* ¶¶ 322-332; Op. at 23. Plaintiffs allege that the EPA has widened its probe of auto emission to include other diesel manufacturers, ¶ 322, and that various studies and reports (including a May 2015 study on behalf of the Dutch Ministry of Infrastructure and the Environment, ¶¶ 323-24, reports by the Transportation and Environment organization ("T&E") dated September 2015, June 2016, and September 2016, ¶¶ 226, 326 & n.57, 331; an index published by Emissions Analytics ("EQUA Index"), ¶¶ 328-30; and a report by the International Council on Clean Transportation ("ICCT"), ¶ 332), confirmed the presence of "drastic differences" between emissions occurring during laboratory testing and during on-the-road testing, ¶ 325, with the resulting conclusion that laboratory testing produces "'meaningless results,'" ¶ 327. The T&E reports of 2015 and 2016, the Emissions Analytics EQUA Index, and the ICCT report, further implicate diesel vehicles in connection with European emissions standards, including BMW diesels and the models at issue here, *see* ¶¶ 326 & n.57, 328-332. No matter how BMW attempts to spin them, these are all factual allegations that must be accepted as true, and that support reasonable inferences adding to the plausibility of Plaintiffs' defeat device allegations. *See*, *e.g.*, *Bledsoe II*, 378 F. Supp. 3d at 636 (plaintiffs plausibly pled presence of defeat device where they in part pled "[t]here is a worldwide emissions scandal"); *Duramax*, 298 F. Supp. 3d at 1052-53 (holding that plaintiffs' overpayment theory established standing to sue GM over diesel emission fraud, without requiring allegations of independent testing or reports).

BMW further unpersuasively attacks allegations of reliability and accuracy of PEMS testing by drawing false inferences in its favor—and, again, by addressing the allegations in isolation. None of the allegations challenged by BMW in the following instances were necessary to support a finding of plausibility by the court in *Bledsoe II*, based upon nearly identical

- 21 -

allegations. For example, BMW contends that the PEMS testing used by the Center for Alternative Fuels Engine and Emissions ("CAFEE") and ICCT on a U.S. model BMW X5 xDrive35 found that this model passed the road test. BMW Br. at 23. First, BMW relies on material outside the FAC (Exhibits 2 and 4 to BMW's RJN) that is not appropriate for judicial notice here because it is not attached to or relied upon in the FAC. *See id.* at 23 n. 22; ¶¶ 154, 168.[24] Second, Exhibits 2 and 7 of BMW's RJN do not indicate that any of the BMW models at issue passed PEMS testing performed by CAFEE on the BMW model, *see* BMW Br.at 23 n.23; RJN, Exs. 2 & 7, and in any event cannot substitute for reasonable inferences in Plaintiffs' favor that the PEMS testing is a reliable and accurate method of testing, and that, considered with other allegations, plausibly shows the presence of a defeat device, *see* ¶¶ 152-168. Plaintiffs cited to PEMS testing and a study by CAFEE showing that PEMS testing indicate the presence of defeat devices in Volkswagen diesels to corroborate their allegations that PEMS testing is highly accurate, ¶¶ 154, 168, allegations that are well pled, must be accepted as true, and that BMW fails to contest. Third, *Bledsoe II* upheld Article III standing based in part on same allegations of CAFEE PEMS testing. *See* 378 F. Supp. 3d at 634.

BMW also parses the allegations in isolation by arguing that "a study Emissions Analytics" cited in the FAC "does not describe the testing performed" and concerns "European emissions standards, not U.S. ones." BMW Br. at 23. Emissions Analytics, however, is alleged to have published the "EQUA Index" (not a "study"), which shows that testing of a specific BMW model at issue here resulted in emissions "12 times the Euro 6 emissions standard," and that

---

[24] Exhibits 2 and 4 to BMW's RJN are one article and one press release that are not attached to or relied upon in the FAC, and both of which BMW relies upon for the truth of the matter asserted therein. As such, they are improper subjects for judicial notice. *See Bida v. Shuster Mgmt. LLC*, 2019 WL 1198960, at *5 n.3 (D.N.J. Mar. 14, 2019) ("the Court may only consider such documents if they are attached to or relied on in the Complaint, or subject to judicial notice. Even if certain documents are subject to judicial notice, a court may take judicial notice only of the existence of the document, not for the truth *contained therein.*"). Although the document consisting of Exhibit 7 was relied upon in the FAC, *see* ¶ 154 n.9, that article does not indicate that any of the BMW models at issue passed PEMS testing.

testing of another "3 series 2012 model year" BMW failed the "Euro 6 limit." ¶ 330 & n.59. These allegations, considered with the other allegations showing that many European diesel models failed the lower European emissions standards, including the BMW models at issue, ¶¶ 321-332, are consistent with the totality of the allegations and support the plausibility of the presence of a defeat device here. *Bledsoe II*, 378 F. Supp. 3d at 636 (allegations of "worldwide emissions scandal" supported plausibility of allegations).[25] Even more so because the Euro standard is lower than the U.S. standard, so why is it plausible BMW could meet the higher U.S. standard, but not the Euro. Even if the EQUA Index allegations do not provide specific details of the testing performed, or do not reflect the exact 3 series model that was tested, the allegations that German diesel car manufacturers had to stay competitive with one another and ensure their vehicles appealed to consumers, ¶¶ 15-24, 101-102, 129-30, considered collectively with the allegations that diesel fraud occurred worldwide and that Bosch committed diesel fraud in the U.S., ¶¶ 268-314, 321-32, further render it plausible that BMW used defeat devices in their diesel vehicles.

BMW's selective quotation of the language from the European Analytics press release, that "differences [in diesel emission results] may be well explained by limitations in the official system, rather than through illegality,'" BMW Br. at 24, refers to a speculative sentence that is quoted out of context. The release states in the preceding sentence, "[t]his matters [*i.e.*, the high

---

[25] *See also The Volkswagen affair*, Rodgers Environmental Law, 2d. edition § 6:35 ("And, as it turned out, Volkswagen wasn't the only one evading the law. Less flagrantly, but to similar effect, the vast majority of diesel cars were making a mockery of emissions rules. In the wake of the revelations in the US, European governments road-tested other big brands too. In Germany, testers found all but three of 53 models exceeded NOx limits, the worst by a factor of 18. In London, the testing firm Emissions Analytics found 97% of more than 250 diesel models were in violation; a quarter produced NOx at six times the limit. 'As the data kept coming in, our jaws just kept dropping. Because it is just so systematic, and so widespread,' German says. 'VW isn't even in the worst half of the manufacturers.' With a few honourable exceptions, 'everybody's doing it'."), *quoting* Beth Gardiner, *Dirty Lies: How the Car Industry Hid the Truth About Diesel Emissions, The 'Dieselgate' Scandal was Suppressed for Years—While We Should Have Been Driving Electric Cars*, Mar. 22, 2019, https://www.theguardian.com/environment/2019/mar/22/dirty-lies-how-the-car-industry-hid-the-truth-about-diesel-emissions.

- 23 -

level of real world diesel emissions well above the official levels], even if no illegality is found." Ex. 8 to RJN. At bottom, BMW's arguments as to the Emissions Analytics Index are another improper attempt to selectively parse, and weigh the credibility of, allegations that must be accepted as true, considered collectively, and construed in Plaintiffs' favor.

BMW's criticism of the 2016 study by Transport and Environment is also unpersuasive. The FAC alleges that the results of Plaintiffs' PEMS testing plausibly alleging the presence of a defeat device are consistent with this study, which reflects that PEMS testing showed four BMW models are among the top 30 most polluting diesel vehicles in the EU and suggests the presence of a defeat device in those vehicles. ¶ 226. These allegations must be construed as true and support reasonable inferences in Plaintiffs' favor. BMW nonetheless points to language in the T&E study stating that some BMW models meet emissions standards, *see* BMW Br. at 24, but ignores that those models are not at issue in this litigation. Thus, BMW improperly draws inferences in its favor from language it selectively isolates from the T&E study and requests a weighing of the credibility of the allegations.

### c.   BMW's argument that the "FAC does not identify a defeat device" lacks merit.

BMW argues that the defects articulated in the Court's last opinion with respect to the CAC are not cured in the FAC, BMW Br. at 24-25—in contradiction of *Schuchardt* and *Hassan*, as discussed above. In other words, BMW, rather than addressing the allegations in the FAC, attacks the FAC for facts that it purportedly does not plead, and bases its arguments on a phantom complaint not before the Court. *See* BMW Br. at 24-25.

Specifically, BMW contends there is no allegation as to how the Bosch EDC17 "was configured or programmed in a manner that was unlawful, deceptive, or otherwise improper" or any allegations describing with "particularity a function, algorithm, or process that 'cheats' during testing." BMW Br. at 25. First, the allegations adequately detail how the Bosch EDC17 was used as a defeat device to evade emissions regulations and indicate that the EDC17 was used

- 24 -

in the vehicles of numerous diesel car manufacturers as a defeat device. ¶¶ 253-307. In fact, the FAC describes how the SCR[26] was programmed to be derated in certain driving conditions. *See*, *e.g.*, ¶¶ 212-219. The FAC further describes how EGR is disabled in certain temperatures as a result of software commands. ¶ 197. Second, *BMW I* noted that the CAC's allegations "exceed those of *Bledsoe I*" based in part on the fact that the "Plaintiffs here . . . assert that the presence of Bosch's EDC17 generally bolsters their case," and that "*Bledsoe I* and *Duramax* acknowledged that this fact at least generally supported the plausibility of the allegations." Op. at 19. Indeed, the level of detail in the FAC regarding the EDC17 is equal to, if not more particularized than that examined in other diesel emission decisions that upheld Article III standing. *Compare* ¶¶ 84-85, 212-219, 253-278, *with FCA*, 295 F. Supp. 3d at 942-43, 944-54; *Duramax*, 298 F. Supp. 3d at 1048, 1052-54; *Mercedes II*, 2019 WL 413541, at *1, 8. Third, the heightened level of pleading demanded by BMW, BMW Br. at 16-17, 25, is way beyond that required by Rules 8(a), 12(b)(1), or even 12(b)(6).[27] Fourth, BMW improperly argues for a standard that requires Plaintiffs to show how use of Bosch's EDC17 was "unlawful," "deceptive," or "improper," BMW Br. at 25, which is a merits-based showing not required here. *See Cottrell*, 874 F.3d at 164; *Bledsoe II*, 378 F. Supp. 3d at 642.

### d.    Overcharge is adequately alleged.

BMW asserts that Plaintiffs' damage allegations are not sufficiently specific and erroneously argues the FAC lacks facts as to how the diesel vehicles were more expensive than comparable gasoline-powered vehicles. BMW Br. at 29-32. BMW argues the FAC lacks details

---

[26] "SCR" is Selective Catalytic Reduction. ¶ 114. By derating or turning down SCR there is less NOx reduction.

[27] *See Schuchardt*, 839 F.3d at 347, 349 ("Implicit in the notion that a plaintiff need not plead 'specific facts' to survive a motion to dismiss is that courts cannot inject evidentiary issues into the plausibility determination. . . . Although the technical details . . . are not specified, 'on a motion to dismiss, we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'") (quoting *Lujan*, 504 U.S. at 561); *Phillips*, 515 F.3d at 231 (*Twombly* "leaves intact" that "detailed factual allegations" are not required).

- 25 -

as to how any premium or overpayment was calculated. *Id*. But, these allegations, which improperly apply a heightened pleading standard, were not previously upheld by the Court.[28]

There is no Article III standing requirement that a plaintiff must allege the particularized sort of economic injury demanded by BMW.[29] Plaintiffs allege that, as a result of Defendants' deceptive scheme, they "suffered losses in money and/or property." ¶ 319. Had Plaintiffs known the truth, "they would not have purchased or leased the vehicles, or would have paid substantially less . . . in an amount of at least $1500." *Id*. Plaintiffs' allegations more than clear the low thresholds for alleging injury-in-fact, as other decisions have held.[30]

---

[28] BMW's reliance upon *Estrada v. Johnson & Johnson*, 2017 WL 2999026, at *4, 15 n.10 (D.N.J. July 14, 2017), BMW Br. at 31, is unavailing. In *Mercedes II*, the Court rejected that reliance as "misplaced," because in *Estrada* the alleged physical harm at issue caused no ill effects, whereas in the emission-fraud cases the plaintiffs have pled that a misrepresentation caused them economic harm. 2019 WL 413541, at *4. The facts of *Young v. Johnson & Johnson*, 2012 WL 1372286, at *4 (D.N.J. Apr. 19, 2012), *aff'd*, 525 F. App'x 179 (3d Cir. 2013), are similar to *Estrada*, *i.e.*, a plaintiff failed to allege any physical harm, and has likewise been distinguished as inapposite to the diesel emission fraud context. *See FCA*, 295 F. Supp. 3d at 953 (distinguishing *Young* as inapposite as there "the FDA had approved the product labeling at issue, [and] the courts held that the plaintiffs' claims of overpayment were speculative. That is not the case here, as Plaintiffs allege that each of the Class Vehicles contained software that qualified as a defeat device, which is clearly prohibited by federal regulations").

[29] *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 287 (3d Cir. 2018) ("This is not to say that a plaintiff is required to allege the *exact* value of her economic injury at the pleading stage. Calculating and proving damages is indeed one of the major phases of a civil trial, and a plaintiff need not develop detailed economic models at the pleading stage to establish that she has standing."); *FCA*, 295 F. Supp. 3d at 945-51 (rejecting argument demanding particularized overpayment allegations).

[30] *See also Mercedes II*, 2019 WL 413541, at *4 ("accepting Plaintiffs' allegations as true, they paid a higher price for the BlueTEC clean diesel engines, which, in reality, polluted at levels far higher than would be expected. . . . Claims of overpayment for a misrepresented product are 'classic form[s] of injury in fact,' that '[are] concrete and particularized.'") (citations omitted) (citing *In re Gerber Probiotic Sales Practice Litig.*, 2013 WL 4517994, at *5 (D.N.J. Aug. 23, 2013)); *Bledsoe II*, 378 F. Supp. 3d at 641 ("Plaintiffs do not have to plead with specificity how this overcharge is calculated yet…. Rather, they must simply plead the fact that damages have been incurred by plaintiffs, and estimate the amount of those damages. Taken together, the allegations in the SAC clearly allege an injury-in-fact.") (citation omitted); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 884 (N.D. Cal. 2019); *Volkswagen*, 349 F. Supp. 3d 881, 897 (N.D. Cal. 2018); *Duramax*, 298 F. Supp. 3d at 1052; *FCA*, 295 F. Supp. 3d at 945-51; *Counts*, 237 F. Supp. 3d at 582-83; *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 1382297, at *5 (E.D. Mich. Apr. 18, 2017); *Victor v. R.C. Bigelow, Inc.*, 2014

### 3.     Plaintiffs adequately allege an injury fairly traceable to BMW's conduct.

BMW argues that allegations of a fairly traceable injury lack merit because the FAC fails

to allege that Plaintiffs "actually relied on the COCs and suffered a resulting injury," or that

Plaintiffs "saw or relied" on any advertising regarding "the environment or emissions." BMW

Br. at 31, 33. That argument mischaracterizes the FAC (*see* ¶¶ 31-70) and misapprehends the

"fairly traceable" prong, and ignores that Plaintiffs' case rests largely on omissions. BMW's

claim of a "reliance" requirement lacks merit because reliance is an element of proximate cause,

which is not part of an Article III standing analysis. *See Bledsoe II*, 378 F. Supp. 3d at 641

("'Proximate causation is not a requirement of Article III standing.'") (quoting *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014)); *Duramax*, 298 F. Supp.

3d at 1053 (same). This interpretation is consistent with Third Circuit law. *See, e.g., Bhatt v.*

*Comm'r of NJDOL*, 2018 WL 623667, at *8 (D.N.J. Jan. 30, 2018) ("'The causation requirement

of standing is "akin to 'but for' causation and . . . the traceability requirement [can be] met even

where the conduct in question might not have been a proximate cause of the harm, due to

intervening events.'") (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d

Cir. 2013)); *see also Mielo v. Steak'n Shake Operations, Inc.*, 897 F.3d 467, 481 (3d Cir. 2018)

(same).[31]

---

WL 1028881, at *4 (N.D. Cal. Mar. 14, 2014); *In re Warfarin Sodium Antitrust Litig.*, 212
F.R.D. 231, 246 (D. Del. 2002), *aff'd*, 391 F.3d 516, 531 (3d Cir. 2004).

[31] By faulting Plaintiffs for not adequately alleging reliance, BMW urges a heightened,
proximate cause, merits-based standing requirement; it "wrongly equate[s] . . . injury 'fairly
traceable' to the defendant with injury as to which the defendant's actions are the very last step
in the chain of causation." *Hassan*, 804 F.3d at 293 (citations and internal quotation marks
omitted). The "'fairly traceable' requirement for constitutional standing sets a lower bar than the
showing of causation required on the merits." *Edmonson*, 725 F.3d at 424 n.15. "[I]ssues of
liability [are] not determinative of" the fairly traceable prong, *Del. Riverkeeper Network v. Soil*
*Safe, Inc.*, 2017 WL 2829603, at *19 (D.N.J. June 30, 2017), and "general factual allegations of
injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561. Thus, "an
indirect causal relationship will suffice, so long as there is a fairly traceable connection."
*Hassan*, 804 F.3d at 293 (citation and internal quotation marks omitted); *see also Enslin v. The*
*Coca-Cola Co.*, 136 F. Supp. 3d 654, 666 (E.D. Pa. 2015) (Third Circuit has held that
traceability requirement is met where plaintiffs' injury allegedly would not have occurred but for
defendant's conduct), *aff'd*, 739 F. App'x 91 (3d Cir. 2018).

The fairly traceable-related allegations in the FAC (¶¶ 31-70), that BMW challenges are nearly identical to those upheld in *Mercedes II*. *See* 2019 WL 413541, at *7-8. There, the Court rejected arguments like those raised here by BMW. *See id.* (rejecting Mercedes' argument that fairly traceable injuries were not alleged where, Mercedes contended, "[p]laintiffs do not allege that they viewed or relied on Mercedes' ads before buying or leasing their vehicle"); *see also Bledsoe II*, 378 F. Supp. 3d at 641 (rejecting defendant's argument that, for the fairly traceable prong, "[p]laintiffs have failed to identify the very specific advertisement to which they each were exposed, and that caused them to purchase their vehicles"). Not surprisingly, BMW ignores this language in *Mercedes II* and *Bledsoe II* and relies upon earlier reasoning from *Mercedes I* and *Gerber*, which *Mercedes I* adopted. BMW Br. at 32, 33. *See Mercedes I*, 2016 WL 7106020, at *7-8. But in *Mercedes I*, "the [c]ourt agree[d] with [p]laintiffs that they do not need to point to specific advertisements that they relied upon." *Id*.

And in any event, the court revisited Article III standing in *Mercedes II*, and rejected the same arguments BMW makes here based on similar allegations. *See* 2019 WL 413541, at *6 ("Plaintiffs argue that they have cured [the complaint's Article III standing] defects by retooling their complaint and 'focusing on Mercedes' omissions and referencing the "clean diesel" marketing campaign to demonstrate that those omissions were plausibly material to the targeted consumers.' . . . The Court agrees."). The ruling in *Mercedes II* agrees with decisions by other courts that have rejected the fairly-traceable analysis in *Mercedes I* and *Gerber* or any reliance requirement. *See Volkswagen*, 349 F. Supp. 3d at 902-03 ("To the extent that the court in [*Mercedes I*] . . . reached a different result [by imposing a reliance requirement as part of the fairly traceable analysis] . . . the [c]ourt disagrees with that decision, as have other courts.") (citing cases); *FCA*, 295 F. Supp. 3d at 947-48, 952; *Counts*, 237 F. Supp. 3d at 584-86 (rejecting

- 28 -

reasoning of *Mercedes* and *Gerber* imposing "reliance" requirement as part of fairly traceable analysis).[32]

Plaintiffs adequately allege injuries that are fairly traceable to Defendants' misconduct. They allege that Defendants misled them (including advertising and failure to disclose material information), that they were exposed to these misrepresentations or nondisclosures, that but for Defendants' conduct they would not have bought the vehicles or would have paid less for them, and that all Plaintiffs overpaid for their vehicles. ¶¶ 31-70; *see Enslin*, 136 F. Supp. 3d at 666-67. Even if Plaintiffs had to allege Article III causation with the heightened specificity demanded by BMW, they have done so: each Plaintiff alleges reliance on misrepresentations and omissions, ¶¶ 31-70, and alleges BMW's conduct in that regard, ¶¶ 101-105, 129-150. Also, they paid an artificially high market price because of BMW's false advertisements and conduct, further demonstrating their injuries are fairly and directly traceable to BMW's conduct. ¶¶ 31-70, 319.

BMW's argument that two Plaintiffs lack standing because they bought their vehicles from an independent dealer, BMW Br. at 32-33—an argument that was previously raised but not upheld by the Court—lacks merit. Plaintiff Charles Chapman purchased his vehicle from "BMW of Roxbury, a BMW authorized dealer," ¶ 53, and Plaintiff Werner Rogman bought his BMW vehicle used from "M Sport Motors," ¶ 37. The allegations do not specify whether or not the dealership Rogman bought from is a BMW authorized dealership, *see id.*, and must be construed accordingly, *see In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d at 633-34

---

[32] BMW incorrectly argues the allegations in *Mercedes II* are materially different than those in this case. BMW Br. at 32 n.32. The allegations here are substantially similar, if not nearly identical, to those in *Mercedes II. See* allegations of BMW's promotion and advertising of the diesel vehicles as "environmentally friendly," ¶¶ 1, 5, 11, 70, 103, 104, 129, 139, 397; allegations that Plaintiffs "purchased [their] vehicle[s] on the reasonable but mistaken belief that [the] vehicle was a 'clean diesel' and/or a 'low emission diesel,'" ¶¶ 31-70; allegations that the vehicles were "clean" or had "low emissions," ¶¶ 5, 11, 15, 24, 25, 76, 129-151. *Mercedes II* also reviewed decisions in three other diesel emission cases and found that "[t]he allegations in th[ose] . . . cases finding Article III standing above are sufficiently similar to those before this Court to support a finding that the alleged injury in fact was fairly traceable to Mercedes' conduct." 2019 WL 413541, at *7. As noted, Plaintiffs' allegations here are substantially similar to those in these three decisions and in *Mercedes II*.

(general allegations presumed to embrace those specific facts necessary to support claim). And BMW's argument wrongly imposes privity requirement. "[A]n indirect causal relationship will suffice, . . . so long as there is 'a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant,'" *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (citation omitted); *see Mielo*, 897 F.3d at 481, and the alleged injury is "not the result of the independent action of some third party not before the court," *Finkelman v. Nat'l Football League*, 877 F.3d 504, 510 (3d Cir. 2017); *see also In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 585 (E.D. Pa. 2018) (noting that indirect purchasers have Article III standing). On the allegations here, which plausibly plead that Plaintiffs' injuries resulted from BMW's conduct, ¶¶ 37, 53, 101-105, 129-150, BMW's interpretation turns this precedent on its head.

Further, BMW's argument as to who was legally responsible improperly goes towards the merits. *See Davis*, 824 F.3d at 347 n.17 (Supreme Court's interpretation of fairly traceable prong not "meant to transform ordinary merits arguments about who is legally responsible for an injury into questions of jurisdiction"); *see also id.* at 347 ("Like all merits arguments, the question of whether a plaintiff has sued the correct defendant should ordinarily be addressed at the pleading stage by affording the plaintiff the protections provided by Rule 12(b)(6).").[33]

---

[33] This and other courts in emission-fraud cases have rejected BMW's argument. *See Mercedes II*, 2019 WL 413541, at *4-5, 8 (standing satisfied despite indirect relationship and absence of privity of contract between Bosch and plaintiffs, who alleged overpayment for vehicles due to Bosch's involvement in scheme); *Duramax*, 298 F. Supp. 3d at 1054 n.8 (argument that standing is absent because defendant was not a party to vehicle-purchase contracts with consumers is irrelevant because "consumer can establish a concrete injury by alleging that he or she 'received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect,' regardless of whether the purchase was made pursuant to a contract"); *FCA*, 295 F. Supp. 3d at 952 ("Plaintiffs do not need to identify a statement on which they relied that was made by the . . . Defendants to plausibly trace their economic injuries to these entities. Nor do Plaintiffs need to allege that they had a contract with the . . . Defendants. The . . . Defendants played a role in designing the accused device that caused vehicles to perform in a way that deceived consumers and regulators, and allegedly did so knowingly and purposefully as part of a conspiracy with the other Defendants. The injuries suffered by Plaintiffs are sufficiently traceable to the . . . Defendants.").

**C.     Plaintiffs allege valid RICO claims.**

    **1.     Plaintiffs sufficiently allege predicate acts of mail or wire fraud.**

        **a.     The FAC does not engage in impermissible group pleading.**

BMW erroneously asserts that "by impermissibly 'lump[ing] together' BMW NA, BMW AG, Robert Bosch GMBH and Robert Bosch LLC, the FAC fails to 'provide sufficient notice of which defendants allegedly made the misrepresentations.'" BMW Br. at 35 (quoting *Silverstein v. Percudani*, 422 F. Supp. 2d 468, 473 (M.D. Pa. 2006), *aff'd*, 207 F. App'x 238 (3d Cir. 2006)). For that proposition, BMW cites only *one* phrase from *one* sentence in paragraph 379 of the FAC and ignores that paragraph 379 then lists 17 specific examples of how Defendants used the mails and wires to implement the fraudulent scheme. Plainly, BMW and Bosch know which defendant used the mails or wires in those 17 examples, and BMW does not even try to explain otherwise in seeking dismissal.

Moreover, BMW's argument falsely implies that the purpose of paragraph 379 is to allege misrepresentations, when in fact it alleges the "use of the mails and wires" in support of the RICO scheme. Those mails and wires need not themselves constitute fraud.[34] Therefore, BMW's contention that paragraph 379 does not provide notice of which defendant "allegedly made the representations," BMW Br. at 35, badly misses the purpose of that paragraph. And once again, the cases cited by BMW are inapposite, because the plaintiffs in those cases did not put the defendants on notice of their purported *misconduct*, not that allegations of use of the wires and mail were purportedly inadequate.[35] In contrast, as described above, Plaintiffs adequately put BMW on notice of the misconduct with which it is charged.

---

    [34] *See Bridge*, 553 U.S. at 647 ("any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' … even if the mailing itself 'contain[s] no false information'") (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989)).

    [35] *See Silverstein*, 422 F. Supp. 2d at 472 ("it is impossible to discern who made the misrepresentations to Plaintiffs"); *Int'l Tansp. Mgmt. Corp. v. Brooks Fitch Apparel Grp.*, 2012 WL 295847, at *5 (D.N.J. Feb. 1, 2012) (defendants were not put on notice of the "misconduct with which they are charged") (footnote omitted); *Weiss v. First Unum Life Ins.*, 2003 WL 25713970, at *7 (D.N.J. Aug. 27, 2003) ("plaintiff fails to differentiate between any of the defendants in describing their alleged fraudulent conduct").

- 31 -

     **b.**     **Plaintiffs sufficiently allege a fraudulent RICO scheme.**

BMW next erroneously claims that the FAC does not allege the use of mail and wire transmissions with particularity. BMW Br. at 35-37. In fact, Plaintiffs allege numerous instances of BMW's use, or causing the use, of the mail and wires in furtherance of its scheme, including the advertisements, brochures, and manuals cited above, for which Plaintiffs provide internet links and exhibits. *See* ¶¶ 131-151. These examples illustrate that BMW used its own website and internet forums to publish misleading materials about the fuel efficiency, emissions standards, and other performance metrics of the Polluting Vehicles. And Plaintiffs allege in detail that BMW and Bosch made use, or caused use, of U.S. mail, interstate facsimile, and interstate electronic mail in furtherance of the scheme. The fraudulent COC applications transmitted to the EPA were a component of the scheme. ¶ 380.[36] Additional uses of the mails and wires are alleged in paragraph 379, but BMW ignores them. These acts furthered the fraudulent scheme and establish BMW's use, or causing the use, of the mails or wires. In other defeat-device cases, courts held that the plaintiffs adequately alleged mail and wire fraud based on virtually identical allegations. *See Duramax*, 298 F. Supp. 3d at 1084; *FCA*, 295 F. Supp. 3d at 979; *Volkswagen*, 2017 WL 4890594, at *15.

Moreover, BMW's specific arguments regarding allegations of a fraudulent RICO scheme lack merit, as shown in the following subsections.

     **(1)**     **The FAC sufficiently alleges that defeat devices exist.**

As explained above in detail, there is no merit to BMW's argument that Plaintiffs fail to allege that defeat devices exist in Plaintiffs' vehicles. *See* BMW Br. at 35-36.

---

[36] As ¶ 380 states, "The RICO Defendants, in furtherance of their scheme, used the wires and mails to apply for, or submit revisions to, certificates of compliance with the Clean Air Act of 1990. The RICO Defendants used the mails on at least the following dates for this purpose on at least August 31, 2009, September 25, 2009, March 8, 2011, August 27, 2009, September 11, 2009, June 30, 2009, July 3, 2009, June 30, 2009, July 3, 2009, June 30, 2009, July 3, 2009, March 1, 2011, March 16, 2011, March 28, 2011, September 6, 2011, March 8, 2012, and March 23, 2012."

> **(2)    Allegations of fraudulent conduct by Bosch, in conjunction with other manufacturers, supports an inference of fraud.**

BMW incorrectly argues that Plaintiffs' allegations about other car manufacturers using defeat devices raise no inference that BMW and Bosch did so here. BMW Br. at 36. BMW ignores that those other lawsuits involved BMW's co-defendants, Bosch GmbH and Bosch LLC, and the exact same engine control unit, the Bosch EDC17. As Plaintiffs allege, "[a]lmost all of the vehicles found or alleged to have been manipulating emissions in the United States (including vehicles by Mercedes, FCA, Volkswagen, Audi, Porsche, and General Motors) use a Bosch EDC17 device." ¶ 25. Similarly, here, "Bosch LLC developed, manufactured, and tested the electronic diesel control (EDC) that allowed BMW (and Ford, GM, Volkswagen, Mercedes, and FCA) to implement defeat devices." *Id.* Moreover, Plaintiffs allege "the same level of coordination between Bosch and Volkswagen also occurred between Bosch and BMW." ¶ 267. Plaintiffs further allege Bosch played a critical role in the defeat device scheme in many diesel vehicles in the U.S., and that Bosch went far beyond the role of an equipment supplier by actively helping to promise and lobby for "clean diesel" in the U.S. ¶¶ 305-308. All of this gives rise to a strong inference that Bosch played a key role in implementing the BMW emission fraud strategy. Such other wrongful acts by Bosch is relevant, for example, to the plausibility of the alleged scheme in this action, and to Bosch's intent in devising and implementing the scheme. *See* Fed. R. Evid. 404(b)(2) ("Evidence of a crime, wrong, or other act . . . may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). As explained by the Third Circuit in a case upon which BMW relies, "if two markets are sufficiently similar or adjacent and the relevant activities therein are sufficiently linked or tied in some way, e.g., the people involved in the conspiracies are the same or overlapping, it may be reasonable to use evidence of a foreign conspiracy to support an inference of a domestic conspiracy." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015) (footnote omitted). Similarly here, Plaintiffs

- 33 -

allege that Bosch is the overlapping member of the fraudulent enterprises in all of the defeat-device cases.

The other Third Circuit case cited by BMW is inapposite, because it involved allegations of wrongs concerning unrelated products. In *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 248 (3d Cir. 2012), the Court explained that it "is pure conjecture to conclude that because Schering's misconduct caused *other* doctors to write prescriptions for ineffective off-label uses for *other* products, Local 331 ended up paying for two prescriptions for Rebetol due to the same kind of misconduct." (Emphasis added.) Here, Bosch provided the same basic defeat device to all the manufacturers and engaged in the same wrongful conduct with respect to use of that device.

### (3)    The FAC does not allege puffery.

BMW next incorrectly claims that statements "by 'BMW' about vehicles being 'clean' and 'environmentally friendly' are puffery that cannot support a claim of mail or wire fraud." BMW Br. at 36. The court rejected a similar argument in *Duramax*, in which the plaintiffs identified GM advertisements that characterized diesel trucks "as having low emissions and as being friendly to the environment." 298 F. Supp. 3d at 1084. The court rejected the defendants' claim that those advertisements were nonactionable puffery, because "regardless of whether these advertisements would be actionable on their own, they were material to the scheme. The advertisements urged consumers to buy Duramax vehicles because they were environmentally friendly even though the Defendants had purposefully worked together to obfuscate the true level of emissions." *Id*. at 1084. And "nondisclosure of the true operation of the Duramax engine was material precisely because GM worked so hard to convince consumers that it was a 'clean diesel' engine." *Id*. The same analysis holds here, so the cases cited by BMW are inapposite.[37] *Accord*,

---

[37] *See In re Schering-Plough Corp.*, 2009 WL 2043604, at *13 (D.N.J. July 10, 2009) (claims that drugs were safe constituted puffery where there was "some data to support the claims that the Subject Drugs were safe and as effective or more effective than available alternative

*Mercedes II*, 2019 WL 413541, at *18 ("'The level of emissions produced by a diesel engine was a material consideration for consumers purchasing a vehicle. [Mercedes'] extensive advertising which emphasized the low emissions and environmentally-friendly nature of its "clean diesel" engine underscores its understanding of that fact. Thus, regardless of whether these advertisements would be actionable on their own, they were material to the scheme.'") (quoting *Duramax*, 298 F. Supp. 3d at 1084).

And in any event, BMW does not cite a single allegation in the FAC that purportedly constitutes puffery, let alone show that the RICO claims should be dismissed as alleging only puffery in their entirety. Moreover, BMW ignores Plaintiffs' claim that BMW "promoted the X5 and 355d vehicles as clean and environmentally friendly because BMW knew the environment and fuel economy are material to a reasonable consumer of a diesel car." FAC. at p. 95 (heading "C"). Plaintiffs support that assertion with detailed allegations in paragraphs 131 to 151 of the FAC about BMW's uniform claims in brochures and advertising that those vehicles have low emissions and meet emissions standards in all 50 states.

Finally, BMW argues that Plaintiffs' allegations rest on puffery because "NOx is not the only component of diesel emissions," so that the misrepresentations and omissions at issue "are not plausibly alleged to be statements regarding the amount of NOx those vehicles produce." BMW Br. at 37. Nonsense. When NOx emissions are excessive, the vehicles plainly are not environmentally friendly, whether or not BMW explicitly referred to NOx. Moreover, BMW conveniently ignores allegations that it *did* explicitly tell consumers that NOx emissions were reduced. *See*, *e.g.*, ¶ 144 ("In brochures for 2013 and later, BWM promised its emissions system reduced NOx to environmentally compatible nitrogen and water vapor and met emissions standards in all 50 states….").[38]

---

therapies"); *United States v. Pearlstein*, 576 F.2d 531, 540 n.3 (3d Cir. 1978) ("description of Elgin Pens as 'among the finest writing instruments in the world'" is puffery).

[38] BMW's citation to *Counts* does not support its arguments. In *Counts*, the court ruled only that "promises of efficiency and reliability" are puffery. *Counts*, 237 F. Supp. 3d at 597.

###### c.   Plaintiffs sufficiently plead BMW's specific intent to defraud.

BMW incorrectly contends that Plaintiffs do not allege its specific intent to defraud.

BMW Br. at 37-38. Specific intent need not be alleged with particularity. *In re Ins. Brokerage*

*Antitrust Litig.*, 2017 WL 3642003, at *9 (D.N.J. Aug. 22, 2017) ("Under Rule 9(b), unlike other

elements of fraud, '[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally.' Fed. R. Civ. P. 9(b)."). And specific intent can be inferred from a fraudulent

scheme. *See Liberty Bell Bank v. Rogers*, 726 F. App'x 147, 154 (3d Cir. 2018) ("While there is

no 'smoking gun' evidence establishing Rogers' intent [under RICO claim] to defraud the bank

in this regard, such as the email to FaxPlus, intent may be inferred from circumstantial

evidence.").[39] *See In re Ins. Brokerage Antitrust Litig.*, 2017 WL 3642003, at *9 ("each

Defendant allegedly participated in the [RICO] scheme by adhering to the anti-competitive

business practices"); *Volkswagen*, 2017 WL 4890594, at *15 ("Bosch's intent to defraud

reasonably can be inferred from the scheme itself" absent "a lawful purpose" for "software that

effectively turns a vehicle's emission systems on or off depending on whether the vehicle is

undergoing emissions testing or being operated under normal driving conditions.").

BMW erroneously contends that the FAC "defaults to the shopworn contention" that

BMW "behaved improperly because it wanted to increase its profits and market share." BMW

Br. at 38. As in *Duramax*, Plaintiffs allege in detail that BMW and Bosch "collaborated to create

an engine which performed one way when being tested for emissions and another way when in

normal use. . . . In other words, Plaintiffs have plausibly alleged that both Bosch and [BMW]

were engaged in an enterprise with the manifest purpose of defrauding both regulators and

consumers." 298 F. Supp. 3d at 1080 (footnote omitted). The allegation that Defendants profited

---

[39] *See also United States v. Vas*, 497 F. App'x 203, 207 (3d Cir. 2012) (nondisclosures and acts of concealment comprise "circumstantial evidence from which the jury could have inferred that Vas knew his actions were unlawful and acted with fraudulent intent"); *United States v. Chartock*, 283 F. App'x 948, 954 (3d Cir. 2008) ("the requisite knowledge and intent can be demonstrated circumstantially, and where sufficient circumstantial evidence is presented, a jury may properly infer that the defendants were culpably involved with, and knowingly furthered, the fraudulent scheme").

- 36 -

from that scheme, as they intended, provides further support for the existence of the scheme. *See id*. at 1081 ("Although GM's profits from sales of Duramax-equipped vehicles might be distinct from Bosch's profits for development and implementation of EDC17 in those vehicles, all Defendants clearly profited from the alleged scheme.").

The two cases cited by BMW are inapposite, because the courts found that the desire to profit *alone* does not suffice to allege intent to defraud. *See Carlin v. Dairy Am., Inc.*, 2014 WL 6390569, at *7 (E.D. Cal. Nov. 17, 2014) (profit motive does not show intent to defraud where "email conversations fall short of evincing an intent to cheat or deceive for the specific purpose of causing financial loss to Plaintiffs"); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 284 (D.N.J. 2007) ("[T]he desire to remain profitabl[e] is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA.").

### 2.  Plaintiffs adequately allege RICO injury.

BMW incorrectly contends Plaintiffs do not adequately allege RICO injury. BMW Br. at 38-40. BMW falsely asserts that Plaintiffs fail to plead any quantified alleged overcharge…." *Id*. at 38. This case is like *FCA*, in which the plaintiffs "identified a specific range by which they allegedly overpaid for the Class Vehicles—'between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles.' ... As noted above, these allegations of overpayment are not based on speculation as to the indirect effect of the fraud on the market but on the premiums that FCA US directly charged Plaintiffs for the Class Vehicles." 295 F. Supp. 3d at 971. Similarly here, Plaintiffs allege that "[h]ad Plaintiffs and Class members known of the higher emissions at the time they purchased or leased their Polluting BMW Vehicles, or had they known of the effects on fuel economy if the emissions were not manipulated, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did, in an amount of at least $1,500 and based on analysis of other emissions cases more likely in the range of $5,000 to $20,000 per vehicle." ¶ 319. *See also* ¶ 398(a) ("Plaintiffs would not have paid a diesel premium of up to $1,500 or more if proper disclosures had been

made, and at a proper time."); ¶¶ 31-70 (alleging that each Plaintiff paid a premium of at least $1,500 because of the fraudulent scheme). These allegations, which Bosch simply chooses to ignore, plainly suffice under the holdings of three emissions-fraud cases cited by Bosch. *See* Bosch Br. at 38–39 (citing *Counts*, *Gamboa*, and *Volkswagen*).

Two additional cases cited by BMW are inapposite, as *FCA* explained. *See Young v. Johnson & Johnson*, 2012 WL 1372286, at *4 (D.N.J. Apr. 19, 2012) ("Plaintiff's complaint amounts to no more than subjective allegations that the presence of any amount of trans fat and partially hydrogenated oils renders Defendant's health claims misleading and Benecol unhealthy. Such allegations, however, are insufficient to establish injury-in-fact, particularly in light of Plaintiff's failure to allege any adverse health consequences . . . .");[40] *Heinold v. Perlstein*, 651 F. Supp. 1410, 1411 (E.D. Pa. 1987) (rejecting plaintiff's argument that even if diamond was worth *more* than he paid for it, he "should be permitted under RICO to recover the difference between the represented and actual value of the diamond" as expectation damages).[41]

### 3. Plaintiffs sufficiently allege proximate causation.

BMW incorrectly claims the FAC does not allege proximate causation. *See* BMW Br. at 40-42. BMW first incorrectly contends that with "respect to advertising materials, … the FAC does not adequately allege reliance on any specific fraudulent misstatements…." *Id*. at 41. BMW ignores Plaintiffs' allegations that it "fail[ed] to disclose that under normal operating conditions the Polluting BMW Vehicles are not 'clean' diesels, emit more pollutants than do gasoline-powered vehicles, and emit more pollutants than permitted under federal and state laws…." ¶ 319. Moreover, all Plaintiffs allege that "[u]nknown to [Plaintiffs] at the time the vehicle was purchased, the vehicle only achieved its promised fuel economy and performance because it was

---

[40] *See FCA*, 295 F. Supp. 3d at 953 (rejecting defendants' argument based on *Young*, because unlike the speculative injury asserted in that case, "Plaintiffs allege that each of the Class Vehicles contained software that qualified as a defeat device," for which they overpaid).

[41] *See FCA*, 295 F. Supp. 3d at 960 (distinguishing *Heinold*, where "there was no actual overpayment because the [plaintiff] did not pay more than the fair market value of the items").

equipped with an emissions system that, during normal driving conditions, exceeded the allowed level of pollutants such as NOx." ¶¶ 31-70. All Plaintiffs also alleges they "purchased [the] vehicle on the reasonable but mistaken belief that his vehicle was a 'clean diesel' and/or a 'low emission diesel,' complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life." *Id.* And all Plaintiffs allege that "[h]ad BMW or Bosch disclosed this design or the fact that the vehicle actually emitted unlawfully high levels of pollutants, [Plaintiff] would not have purchased the vehicle or would have paid less for it." *Id.*

These allegations properly plead reliance and causation. "It is well-established that plaintiffs asserting fraud claims *involving primarily failure to disclose material information* need not demonstrate 'positive proof of reliance' in order to recover." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 74 (D.N.J. 2009), *opinion clarified*, 267 F.R.D. 113 (D.N.J. 2010), *opinion modified on reconsideration*, 2010 WL 2976496 (D.N.J. July 22, 2010) (emphasis added). "All that is necessary is that the facts withheld be material in the sense that a reasonable [purchaser] might have considered them important in the making of [his or her] decision." *Id.* (citing *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972)). *See also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528-29 (3d Cir. 2004) ("DuPont's alleged deceptive conduct arose from a broad-based, national campaign conducted by and directed from corporate headquarters, and individual reliance on the misrepresentations was irrelevant to liability.").[42]

---

[42] *See also United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) ("As we have said, 'fraudulent representations, as the term is used in [section] 1341, may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments.'") (citation omitted); *United States v. Stackpole*, 64 F. App'x 842, 842-43 (3d Cir. 2003) ("Appellants rely on the long settled common law rule that the failure to divulge material information is only fraudulent where there was some duty to disclose…. But the record here makes clear that appellants were prosecuted not just for mere nondisclosure, but for a broad range of fraudulent conduct including misrepresentations, half-truths, as well as material nondisclosures intended to deceive."); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) ("Under the mail fraud statute, a scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of

- 39 -

The cases cited by BMW are once again inapposite, because they did not involve material omissions, and the plaintiffs did not adequately allege that anyone relied on alleged *affirmative* representations. *See Lynch v. Capital One Bank (USA), N.A.*, 2013 WL 2915734, at *3 (E.D. Pa. June 14, 2013) ("Although Plaintiff states that he relied upon the false documentation in hiring an attorney, the complaint and exhibits thereto undermine this assertion."); *Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 808-809 (E.D. Pa. 2007) ("there can be no 'scheme to defraud' based on a misrepresentation if the plaintiff is aware that the representation is false"); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 532 (D.N.J. 2011) (under New Jersey law, not RICO, "Plaintiffs have not alleged that physicians *relied* on Defendants' misrepresentations about Risperdal").

BMW next raises a red herring when it states, without explaining why it purportedly requires dismissal, that "license or regulatory approvals fraudulently obtained from regulators are not 'property in the victim's hands' supporting a mail or wire charge." BMW Br. at 41 (citing *Cleveland v. United States*, 531 U.S. 12, 26 (2000)). In *Cleveland*, the Supreme Court held that the defendant did not commit mail fraud because it did not obtain money or property *from anyone*. The Court held "that § 1341 requires the object of the fraud to be 'property' in the victim's hands and that a Louisiana video poker license in the State's hands is not 'property' under § 1341." *Id.* at 26-27. Here, the object of BMW's fraud was money in Plaintiffs' hands, which *Bridge* establishes need not be obtained by misrepresentations to Plaintiffs directly.

BMW also erroneously claims that, with respect to certification by the EPA and CARB, "the Complaint lacks any suggestion that Plaintiffs actually relied on any COC or any statement made by any BMW entity (much less BMW NA) regarding certification, in deciding to acquire their vehicles." BMW Br. at 41. Plaintiffs' case does not require proof that the EPA and CARB were deceived, as explained above, but Plaintiffs nonetheless adequately allege the regulators

---

ordinary prudence and comprehension . . . [and] [t]he scheme need not involve affirmative misrepresentation.") (quoting *United States v. Pearlstein*, 576 F.2d at 535).

(like the public) were deceived.[43] Those allegations support Plaintiffs' claim, because they need not allege first-person reliance. *See Bridge*, 553 U.S. at 649 ("a person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations"); *Avandia*, 804 F.3d at 645 ("The plaintiffs in *Bridge* were the 'primary and intended victims of the scheme to defraud' and their injury was a 'foreseeable and natural consequence of [the] scheme,' regardless of whether they relied on the misrepresentations."). BMW ignores that *the regulators* relied on their fraud in issuing the COCs, without which the Plaintiffs' vehicles could not have been sold. As the Third Circuit explained in *Avandia*, "if there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiffs' injury, the Court has held that a RICO plaintiff who did not directly rely on a defendant's misrepresentation can still establish proximate causation." 804 F.3d at 643 (footnote omitted).

BMW relies on yet another inapposite case, *Longmont United Hosp. v. Saint Barnabas Corp.*, 2007 WL 1850881 (D.N.J. June 26, 2007), *aff'd*, 305 F. App'x 892, 893 (3d Cir. 2009), in which the defendant "allegedly received excessive Medicare payments by reporting inflated patient treatment costs." The plaintiff hospital alleged the defendant's fraud on the government caused it to suffer injuries indirectly, even though it was not defrauded and even though the government suffered financial injuries in the form of overpayments. As one court explained, "[t]here is no suggestion that in *Longmont*, the defendant's goal was to reduce payments to other hospitals such as the plaintiff. In contrast, in this case, the relationship between the alleged fraud and injury is not so attenuated. Plaintiff avers that Krones made misrepresentations with the goal of luring investors such as Plaintiff, 'substantially assisted' by CIT and Marshall." *In re Le-Nature's, Inc.*, *Commercial Litig.*, 2010 WL 11469939, at *2 (W.D. Pa. May 13, 2010). Similarly here, Defendants' goal was to deceptively sell Polluting Vehicles to Plaintiffs.

---

[43] *See, e.g.*, ¶¶ 21, 30, 38, 46, 52, 61, 68, 76, 85, 93, 101, 108, 115, 123, 130, 139, 147, 155, 164, 172, 181, 189, 198, 205, 214, 222, 231, 240.

**D.      The FAC adequately alleges all state-law claims.**

**1.      The representation of class members is not an issue of standing and should be decided at class certification.**

BMW erroneously contends that Plaintiffs lack standing to bring claims under laws of states in which they do not reside. BMW Br. at 42-43. According to courts in this District and throughout the country, whether plaintiffs from one state may represent putative class members with claims under the laws of other states is not an issue of standing but rather is an issue for class certification.[44] Courts in emissions-fraud cases have uniformly rejected the argument BMW makes here. *Duramax* held that the named plaintiffs' standing to assert claims for class members from other states was "indistinguishable" from a Rule 23 analysis— *i.e.*, the issue would arise only if and when plaintiffs moved for class certification *and* included such class members in the proposed class or subclasses. 298 F. Supp. 3d at 1088-89 (denying motion to dismiss state law claims where no named plaintiff lived). *Accord*, *FCA*, 295 F. Supp. 3d at 953-56 (deferring analysis of standing to assert "sister state" law claims to class certification stage); *Counts*, 237 F. Supp. 3d at 587 ("the cases which defer the standing inquiry regarding the claims advanced on behalf of unnamed class members until class certification provide the best approach").

Two cases cited by BMW offer little support to its argument. *See In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *8 n.10 (D.N.J. Oct. 20, 2011) (holding named plaintiffs alleging antitrust claims under laws of states to which they have no ties lacked standing under state law "which require a showing that such conduct occurred, or whose effect

---

[44] *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *19 (D.N.J. July 20, 2017). *Accord*, *Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*, 2008 WL 3833577, at *8-9 (D.N.J. Aug. 13, 2008); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, 2009 WL 4730187 (D.N.J. Dec. 3, 2009); *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 505 (D.N.J. 2009); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at *15 (D.N.J. June 29, 2007); *Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1114 (E.D. Wis. 2016); *In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 144 (D.D.C. 2016); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016); *Bezdek v. Vibram USA Inc.*, 2013 WL 639145, at *10 (D. Mass. Feb. 20, 2013); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213-14 (S.D.N.Y. 2012); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010).

- 42 -

was felt, in-state" but had standing under state laws that had "no discernible requirement of in-state conduct or effect"); *McGuire v. BMW of N. Am., LLC*, 2014 WL 2566132 (D.N.J. June 6, 2014) (Linares, C.J., reconsidered the issue in *Liquid Aluminum Sulfate* and found the issue of who can represent absent class members from other states is for class certification). The only other case cited by BMW is an outlier and unpersuasive in light of the growing consensus discussed above and should not be followed. *See Insulin*, 2019 WL 643709, at *17.

### 2.     The FAC adequately alleges consumer-fraud claims.

BMW incorrectly claims the following three types of misrepresentations are not deceptive: 1) class vehicles meet emissions standards, 2) class vehicles have "less emissions" than other BMW vehicles, and 3) class vehicles are "environmentally friendly" or "protect" the environment. BMW Br. at 43. BMW first claims that misrepresentations related to emissions standards rely on the existence of a defeat device, which they argue the FAC does not adequately allege. *Id.* But as discussed in Sections II and IV(B), above, Plaintiffs sufficiently allege existence of a defect and, thus, the wrongful conduct by BMW.

BMW then argues that misrepresentations related to "less emissions" were not false even if the diesel engines produced more NOx emissions because, with respect to all types of emissions (including CO2 emissions), "diesel engines are substantially 'cleaner'" than gasoline engines. BMW Br. at 43-44. This is a factual issue, as BMW implicitly concedes when it cites to an article outside the pleadings for support. *Id*. at 44. As such, it is inappropriate at the motion to dismiss stage. *See*, *e.g*., *Refundo, LLC v. Drake Enters., Ltd.*, 2013 WL 1750016, at *5 (D.N.J. Apr. 22, 2013) (defendant's "argument raises a question of fact that would be inappropriate to decide on a motion to dismiss").

BMW's additional argument with respect to misrepresentations related to "less emissions" is similarly unavailing. According to BMW, the Court recognized that Plaintiffs must compare affected vehicle emissions to emissions of "previous generation diesels, not equivalent gasoline models" to properly allege that the "less emissions" representations were false. BMW

Br. at 44. The Court did no such thing but instead explained that the "second subcategory is inherently comparative – *i.e.*, the Subject Vehicles release emissions at lesser levels than *other BMW vehicles*" and therefore the complaint must contain "allegations about how *other BMW models* perform with respect to emissions." Op. at 25 (emphasis added). The only reference to previous generation diesels appears in the quote from other cases cited by that Court which involved claims of less emissions than previous generation diesels and so that court required allegations regarding previous generation diesels. *See id.* at 25.

BMW's arguments as to misrepresentations related to fuel economy claims being non-actionable puffery are similarly without merit. BMW Br. at 44-45. BMW understood that a diesel vehicle's pollution footprint and fuel economy were key factors in consumer's decision to purchase a diesel vehicle. ¶¶ 129-51. The FAC includes detailed allegations and examples of promotional materials with specific, quantifiable representations. *See, e.g.*, ¶ 132 ("setting the standard for torque and pulling power that could never be achieved by a similar displacement gasoline engine – while consuming 25 percent less fuel"); ¶ 133 ("with the most current and demanding standards for preserving resources and reducing emissions"); ¶ 138 ("Cleaner, quicker and far more efficient . . . achieve up to 36 mpg, for a range of 580 miles per tank . . . less CO2 than conventional vehicles, while posting 0-60 mph"); ¶ 142 ("a vehicle of unsurpassed capabilities that offers best-in-class performance and efficiency").

*Duramax* rejected GM's argument that promotional statements characterizing its vehicles "as having low emissions and as being friendly to the environment" were irrelevant puffery. 298 F. Supp. 3d at 1084. The court stated that "regardless of whether these advertisements would be actionable on their own, they were material to the scheme. The advertisements urged consumers to buy Duramax vehicles because they were environmentally friendly even though the Defendants had purposefully worked together to obfuscate the true level of emissions." *Id*. And

- 44 -

"nondisclosure of the true operation of the Duramax engine was material precisely because GM worked so hard to convince consumers that it was a 'clean diesel' engine." *Id.*

3.     **Plaintiffs' state-law claims satisfy Rule 9(b) pleading requirements.**

Plaintiffs' state-law claims of fraudulent concealment and consumer fraud satisfy Rule 9(b). BMW first argues that Plaintiffs do not allege "conduct specifically and separately as to each BMW entity, instead referring to misrepresentations or omissions by "BMW" or "Defendants." BMW Br. at 46. But such allegations satisfy Rule 9(b). *See Duramax*, 298 F. Supp. 3d at 1056 ("Given Plaintiffs' allegation that Bosch employees and constituent entities often blur the legal boundaries between Bosch subsidiaries, the allegations against the Bosch Defendants are sufficiently specific."). *Duramax* explained that in "a complex case, involving multiple actors and spanning a significant period of time, where there has been no opportunity for discovery, the specificity requirements of Rule 9(b) should be applied less stringently." *Id.* (internal quotation and alteration marks omitted). *See also Kearney v. Bayerische Motoren Werke Aktiengesellschaft*, 2018 WL 4144683, at *9 (D.N.J. Aug. 29, 2018) ("pre-discovery differentiation among related defendants is difficult when … 'factual information is peculiarly within the defendant's knowledge or control'"). Further, "allegations of omissions—as opposed to affirmative misrepresentations—will inevitably be less specific." *Duramax*, 298 F. Supp. 3d at 1083. And "[i]t must be remembered that the essential purpose of Rule 9(b) is to provide the defendants with adequate notice of the allegations so that they can defend against the claims." *Id.* As in *Duramax*, Plaintiffs here allege sufficient facts to put BMW on notice of the nature of their claims, connecting specific plaintiffs to the exact misrepresentations or omissions by the exact entity that made them is not required. 298 F. Supp. 3d at 1056.

BMW then erroneously claims the FAC does not allege the exact statements on which the named Plaintiffs relied. BMW Br. at 46. Each Plaintiff alleges exposure to the materially deficient messaging because each "selected and ultimately purchased [vehicle], in part, because of the diesel system, as represented through advertisements and representations made by BMW,"

- 45 -

including "advertisements on BMW's website and representations from the dealership touting the efficiency, fuel economy, and power and performance of the engine." *See, e.g.*, ¶ 31 (Plaintiff "Hu recalls that before he purchased the vehicle, he reviewed advertisements on BMW's website and representations from the dealership touting the efficiency, fuel economy, and power and performance of the engine."); *see also* ¶¶ 32-70 (all other plaintiffs). All Plaintiffs allege that had Defendants disclosed "the vehicle actually emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle or would have paid less for it." ¶¶ 31-70.

Finally, BMW incorrectly asserts the fraudulent concealment claims are insufficiently pled because Plaintiffs fail to allege who at BMW knew, and when, of the defeat device and how BMW decided to conceal it. BMW Br. at 47. Such allegations are unnecessary. Plaintiffs allege the purpose of the defeat device was to provide the perception of reduced emissions while avoiding the reality of reduced emissions, which is sufficient to infer fraudulent intent and meet the heightened specificity requirements of Federal Rule of Civil Procedure 9(b). Indeed, multiple courts have found that emissions cheating schemes materially identical to the scheme here are "inherently deceptive" and satisfy Rule 9(b). *See FCA*, 295 F. Supp. 3d at 977 (finding EDC17 "inherently deceptive"); *Duramax*, 298 F. Supp. 3d at 1080 (defeat-device scheme is "inherently deceptive"); *Volkswagen*, 2017 WL 4890594, at *15 ("Bosch's intent to defraud reasonably can be inferred from the scheme itself."); *Counts*, 237 F. Supp. 3d at 600 ("the only plausible purpose" of a defeat device is "active concealment").

### 4. Defendants' remaining state-law arguments also lack merit.

#### a. Plaintiffs' claim under the New Jersey Consumer Fraud Act ("NJCFA") sufficiently alleges an ascertainable loss.

Contrary to BMW's argument, *see* BMW Br. at 48, Plaintiffs adequately allege facts to show ascertainable loss under the NJCFA. A plaintiff must only allege a loss that "is quantifiable or measurable." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 793 (N.J. 2005). The plaintiff "need not . . . plead ascertainable loss with pinpoint specificity." *Mickens v. Ford Motor*

*Co.*, 900 F. Supp. 2d 427, 446 (D.N.J. 2012); *see also Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 503 (D.N.J. 2009) (conclusory statement about replacement cost of a defective machine adequately alleged ascertainable loss). The FAC alleges how much each New Jersey Plaintiff paid for his or her car and how much was a price premium. ¶¶ 52-53; *see also*, *e.g.*, ¶ 52 ("Mr. Berbaum paid approximately $15,000 for the vehicle and paid a diesel premium of at least $1500."); ¶ 53 ("Mr. Chapman paid approximately $56,657 for the vehicle and paid a diesel premium of at least $1500."). The calculation is "based on analysis of other emissions cases." ¶ 319. Plaintiffs therefore allege a loss capable of calculation as required at the pleading stage.

The cases cited by BMW are not to the contrary. The plaintiffs in *Mercedes II* did not allege how much they paid for their vehicles or how much a comparable vehicle would cost. *See* 2019 WL 413541, at *24 (plaintiffs did "not set forth any instances of a price comparison," but rather only "set the table for a price comparison, alleging that [they] would not have purchased or leased the [subject] vehicles at the prices they paid, or would have purchased or leased a less expensive alternative"). Similarly, the plaintiffs in *Riddell* alleged only that "each plaintiff paid a 'price premium' for [d]efendants' product and fail[] to identify the specific price paid or allege any other facts necessary to plead injury or ascertainable loss." *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 438 (D.N.J. 2015).[45] And the plaintiff in *Lieberson* did "not allege[] the price she paid for the [p]roducts … nor … the price of the [p]roducts generally." *Lieberson v. Johnson & Johnson Consumer Cos., Inc.*, 865 F. Supp. 2d 529, 541 (D.N.J. 2011) (internal citations and quotation marks omitted).

> **b.   The Mississippi Consumer Protection Act ("MCPA") does not require pre-suit participation in an alternate dispute resolution program.**

BMW incorrectly argues that the MCPA requires a party participate in a pre-suit settlement program approved by the state's AG as a condition precedent to filing suit. BMW Br.

---

[45] *Riddell* is unpersuasive for the additional reason that it is dicta. *See* 77 F. Supp. 3d at 438.

at 49. State law restrictions on class claims do not apply in this federal proceeding. Following *Shady Grove*, numerous courts, including the District of New Jersey,[46] have found that state-law prohibitions, pre-suit requirements, and other restrictions on class claims do not apply in diversity cases.[47]

For example, Mississippi's requirement that parties avail themselves of ADR programs conflicts with Rule 16 (which empowers district courts to consider and "take appropriate action" to facilitate settlement discussions and use of "special procedures" for dispute resolution) and, in a class action, with Rule 23 (which imposes specific procedural requirements to settle proposed class claims). *See*, *e.g.*, *Prado v. Allstate Texas Lloyd's*, 2016 WL 9414132 (W.D. Tex. Nov. 16, 2016) (under *Shady Grove*, state mediation requirements do not apply; instead, 28 U.S.C. § 652 and Fed. R. Civ. P. 16 govern dispute resolution).

---

[46] *See*, *e.g.*, *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *24 (D.N.J. May 8, 2017) ("*VW Timing Chain*") (declining to apply Georgia and South Carolina prohibitions on class damages claims); *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *25 (refusing to apply Illinois, Alabama, and South Carolina class action bars); *Ambulatory Surgical Ctr. of Somerset v. Allstate Fire Cas. Ins. Co.*, 2017 WL 5053919, at *2 (D.N.J. Nov. 3, 2017) (Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action"); *Fitzgerald v. Gann Law Books, Inc.*, 956 F. Supp. 2d 581, 587 (D.N.J. 2013) (same); *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015) (state restrictions on class actions inapplicable, because "Rule 23 controls"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 724 (Mississippi's ban on class actions does not control); *In re Hydroxycut Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 652-654 (S.D. Cal. 2014) (refusing to apply Georgia, Louisiana, Montana, and South Carolina class action restrictions); *In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (refusing to apply South Carolina class action restrictions).

[47] In *In re Lipitor Antitrust Litig.*, 2018 WL 4006752, at *13 (D.N.J. Aug. 21, 2018), the court erroneously assumed the Third Circuit has determined not to follow the plurality in *Shady Grove*—i.e., whether Rule 23 categorically trumps state class action restrictions. In fact, the Third Circuit has twice adopted the plurality's categorical approach. *Schmigel v. Uchal*, 800 F.3d 113, 127 (3d Cir. 2015) (citing plurality opinion in *Shady Grove* and explaining that a "Federal Rule of Procedure is not valid in some jurisdictions and invalid in others—or valid in some cases and invalid in others—depending upon whether its effect is to frustrate a state substantive law (or a state procedural law enacted for substantive purposes)"); *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 310 n.14 (3d Cir. 2016) (citing plurality opinion concerning the categorical "primacy" of Rule 23 for class actions in diversity suits).

c.      **Claims "for notice purposes only" should not be dismissed.**

BMW seeks dismissal of claims brought for notice purposes under consumer fraud laws

of Alaska and West Virginia. BMW Br. at 49. As the FAC states, "[o]nce the statutory notice

period has expired, Plaintiffs will amend their complaint to bring this claim…." *See, e.g.*, ¶ 1181.

Thus, there is no need to dismiss those claims, and any dismissal should be without prejudice. In

the case cited by BMW, the court dismissed a complaint against a defendant who was not named

*at all* other than for notice purposes. *Slukina v. 409 Edgecombe Ave. Hous. Dev. Fund Corp.*,

2013 WL 4446914, at *7 (N.Y. Sup. Ct. N.Y. Cty. 2013) (complaint "do[es] not assert *any*

causes of action against" defendant Citibank) (emphasis added). Here, Plaintiffs assert seventy-

seven counts in addition to the two counts brought for notice purposes only.

d.      **Plaintiffs can pursue Iowa Consumer Protection Fraud Act ("ICPFA") claims on behalf of a class.**

BMW also erroneously asserts that Plaintiffs cannot seek class relief under state laws that

limit class actions. BMW Br. at 49-50. First, this argument is premature. Plaintiffs will determine

at the class certification stage which claims they seek to certify, and the Court will resolve any

actual disputes at that time. *See, e.g.*, *VW Timing Chain*, 2017 WL 1902160, at *24 (rejecting as

premature at dismissal stage arguments that some state laws bar class actions); *FCA*, 295 F.

Supp. 3d at 1016 (same); *Counts*, 237 F. Supp. 3d at 594 n.9 (same). Second, as discussed in

Subsection b above, such limitations on class claims do not apply in diversity cases.

e.      **Plaintiffs have standing to seek injunctive relief.**

The Georgia and Minnesota consumer fraud claims should proceed because Plaintiffs

have standing to seek injunctive relief (such as a recall or replacement program) due to ongoing

harm. *See* FAC Request for Relief ¶¶ B, C. As the court recognized in *FCA* when it rejected the

very same arguments, "Plaintiffs have alleged that they are still suffering ongoing harm based on

Defendants' past conduct—at the very least, the Class Vehicles need to be fixed." 295 F. Supp.

3d at 1017 (denying dismissal); *see also VW Timing Chain*, 2017 WL 1902160, at *25 (denying

dismissal; even if plaintiffs themselves ultimately cannot seek injunction "that does not

- 49 -

necessarily preclude an award of injunctive relief for currently unascertained members of the putative class who may later be identified through discovery").

      **f.**     **Plaintiffs allege a valid Kentucky Consumer Protection Act ("KCPA") claim.**

BMW incorrectly asserts Plaintiffs' KCPA claim fails for lack of privity. BMW Br. at 51. KCPA does not require privity for claims based on express representations, such as the ads and website Kentucky Plaintiff Avic alleges. *See, e.g.,* ¶ 47; *Bosch v. Bayer Healthcare Pharm., Inc.*, 13 F. Supp. 3d 730, 750 (W.D. Ky. 2014) (sustaining KCPA cause of action where manufacturer allegedly made express warranties).

## V.     CONCLUSION

Plaintiffs respectfully request that BMW's motion to dismiss be denied.

DATED: December 13, 2019             Respectfully Submitted,

                                     By */s/ James E. Cecchi*
                                       James E. Cecchi
                                   Caroline F. Bartlett
                                   Michael A. Innes
                                   CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
                                   5 Becker Farm Road
                                   Roseland, NJ 07068
                                   Telephone: (973) 994-1700
                                   Facsimile:  (973) 994-1744
                                   JCecchi@carellabyrne.com

                                   By */s/ Steve W. Berman*
                                       Steve W. Berman
                                   Shelby R. Smith
                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                   1301 Second Avenue, Suite 2000
                                   Seattle, WA 98101
                                   Telephone: (206) 623-7292
                                   Facsimile:  (206) 623-0594
                                   steve@hbsslaw.com
                                   shelby@hbsslaw.com

Christopher A. Seeger
Jennifer R. Scullion
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: (212) 584-0700
Facsimile:  (212) 584-0799
cseeger@seegerweiss.com
jscullion@seegerweiss.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM PC
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

Daniel E. Gustafson (#202241)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK, PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone:(612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
jrissman@gustafsongluek.com

Richard M. Hagstrom, MN Bar No. 39445
Michael R. Cashman, MN Bar No. 206945
HELLMUTH & JOHNSON, PLLC
8050 West 78th Street
Edina, MN 55439
Telephone: (952) 941-4005
Facsimile:  (952) 941-2337
rhagstrom@hjlawfirm.com
mcashman@hjlawfirm.com

- 51 -

Daniel K. Bryson, N.C. State Bar No. 15781
WHITFIELD BRYSON & MASON LLP
900 West Morgan St.
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile:  (919) 600-5035
dan@wbmllp.com

Gregory F. Coleman
GREG COLEMAN LAW PC
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile:  (865) 522-0049
greg@gregcolemanlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

- 52 -

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2019, I filed the foregoing Opposition to BMW of North America, LLC's Motion to Dismiss with the clerk of the court via CM/ECF, which will effect service on all counsel of record.

_____*/s/ James E. Cecchi*___
JAMES E. CECCHI

010733-11/1209385 V1