**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **GARNER RICKMAN, ZIWEN LI, GARY REISING, JACOB BIGGINS, TOM HOFFMAN, ALEXANDER VANDAMME, SETH DAVIS, CHARLES CHAPMAN, CHARLES ROGERS, ION NICOLESCU, WERNER ROGMANS, ERICA OLSON, ALGREDO ARIAS, JESSE WHITE, RAZMIR AVIC, RICKEY EVANS, MARK MESSINA, LUKAS WILDNER, MIGUEL FRAGOSO, MARK SMITH, WILLIAM BERBAUM, KYLE KERN, ERIC STENGLEIN, CARLOS BUENDIA, TAHANI IBRAHIM, JOHN SAVIANO, GENE QUINT, BRIAN HEMBLING, IRVING COHEN, CHRISTINE GRIFFITH, TARRAH PEE, DARSHAN PATEL, BRIAN BECKNER, JOSHUA HU, JEFFREY PRICE, DEAN WERNER, ERIC SANCHEZ, CHARLES CAMPBELL, ANGELA HUGHES, JAMES TURNER, ELLIS GOLDFRIT, CHAD MACCANELLI, and SALOMON CAMPOS, individually and on behalf of all others similarly situated,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**BMW OF NORTH AMERICA, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT (BMW A.G.), ROBERT BOSCH GMBH, and ROBERT BOSCH LLC,**<br><br>    **Defendants.** | Civ. No. 18–4363(KM) (JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

The named plaintiffs in this case represent a putative class of car buyers who each allegedly own a BMW X5 or BMW 335D vehicle. On behalf of the class, the named plaintiffs sued BMW of North America ("BMW USA"); Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") (together, "BMW"); Robert Bosch GmbH; and Robert Bosch LLC (together, "Bosch") for their alleged roles in the clean-diesel emissions scandal. Plaintiffs' first amended complaint ("1AC", DE 65)[1] asserts one count under the federal RICO statute and seventy-eight counts under the laws of various states.

Now before the Court are the motions to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), of defendants BMW USA (DE 68) and Robert Bosch LLC (DE 69). For the following reasons, the motions are **GRANTED** in part and **DENIED** in part. Plaintiffs have failed to allege standing to bring a claim under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. Because amendment would appear to be futile, the portion of the complaint that purports to state a claim for RICO relief (Count 1) is **DISMISSED**. Because federal-court jurisdiction is unaffected by that dismissal, Plaintiffs may continue to prosecute their state-law claims (Counts 2–79).

## I.   BACKGROUND[2]

Familiarity with this matter is presumed; I write for the parties and do not repeat the factual background described in my June 27, 2019 opinion (DE 59), which dismissed the original consolidated class action complaint. Instead, I will briefly summarize the new allegations contained in the first amended complaint.

### A. New Allegations, Generally

The linchpin issue that doomed the consolidated class action complaint (DE 26) was the lack of "a straightforward allegation that an identified plaintiff

---

[1]     "DE __" refers to the docket entry in this case.

[2]     For purposes of this motion, the facts alleged in the first amended complaint, not yet tested by any fact finder, are assumed to be true.

bought a car which. when tested or analyzed, turned out to contain a defeat device." (DE 59 at 2). Instead, the consolidated class action complaint relied on a single X5 vehicle that "seem[ed] to be proffered as an exemplar." (DE 59 at 2). The first amended complaint also does not allege facts to establish that any named plaintiff's car contained a defeat device. It is true that the new pleadings contain more robust allegations concerning the testing and analysis of five "clean diesel" and one gasoline vehicle. (1AC ¶ 163). Still, no plaintiff claims to have owned any of the tested vehicles; instead, Plaintiffs' theory is that each vehicle is representative of the entire line of cars. (1AC ¶¶ 3 &73).

Plaintiffs emphasize that when a car manufacturer like BMW seeks regulatory approval for a new vehicle, the manufacturers submit to the EPA a single vehicle to stand in for the entire model line. (1AC ¶¶ 3 & 173). The theory is that each subject vehicle is materially and fundamentally identical to every other vehicle in the fleet, and therefore is properly the subject of the clean diesel testing fraud allegations. That theory is the foundation upon which the first amended complaint seeks to cure the deficiencies of the previously dismissed consolidated class action complaint. To that end, Plaintiffs note that after the class action complaint was dismissed, their experts performed tests using the portable emission measurement system ("PEMS") and a chassis dynamometer on several additional vehicles—although, again, none in particular is alleged to have belonged to any named plaintiff.

The tested vehicles consisted of two 2012 BMW X5s, one 2011 BMW X5, two 2011 BMW 335ds, and a gasoline-powered 2012 X5.[3] (1AC ¶¶ 163 & 169–252). The first amended complaint also includes new information about the vehicles that were tested, including allegations that their mileage was close to the certification standard, that they had been properly maintained, and that none had any emission-system faults. (1AC ¶¶ 169, 171 & 172).

---

[3]     Plaintiffs allege that for all material purposes, the tested models represent all makes and model years of the vehicles at issue here. (1AC ¶¶ 2, 3 & 172). All models at issue share a common diesel engine. (1AC ¶¶ 101–15).

Plaintiffs maintain that the first amended complaint sets forth detailed, particularized allegations of:

(1) tests of five diesel vehicles (1AC ¶¶ 3, 20, 125–28 & 169–252);

(2) PEMS testing (1AC ¶¶ 2, 3, 4, 5, 17, 163 & 186–252);

(3) chassis dynamometer testing (1AC ¶¶ 17 & 174–85);

(4) with the test results showing use of defeat devices (1AC ¶¶ 18–24 & 174–252);

(5) the operation of the defeat devices (1AC ¶¶ 25 & 253–66); and

(6) Defendants' manipulation of the EDC17 system (1AC ¶¶ 25, 80, 84, 85, 203, 204, 253–66 & 269–308).

Plaintiffs have also submitted to the Court scientific literature, reports, and testing accounts from independent entities that purport to show that most "clean diesel" vehicles emit far more pollution on the road than in laboratory tests. (1AC ¶¶ 322–32). The first amended complaint also vouches for the reliability of the PEMS testing system.[4] (1AC ¶¶ 4 & 152–68).

Plaintiffs allege that their scientific evidence confirms the superior accuracy of PEMS testing as compared with chassis dynamometer testing.[5] The first amended complaint focuses on the weaknesses inherent in chassis dynamometer testing. These weaknesses of chassis dynamometer testing include that (1) during testing, the front wheels move but do not turn, which does not happen in real-world driving conditions; (2) on a two-wheel drive vehicle, the driven wheels are moving but the non-driven wheels are not; and (3) on a vehicle equipped with GPS, the vehicle's wheels move while the GPS position does not change. (1AC ¶ 166). According to Plaintiffs, an engine can be

---

[4]     European vehicle-emissions regulators use PEMS to test real-world driving conditions. (1AC ¶ 154). The EPA and the California Air Resources Board ("CARB") also use PEMS testing for their heavy-duty in-use compliance program to measure emissions against the not-to-exceed standards. The EPA and the CARB widely use PEMS to evaluate vehicles for defeat devices. (1AC ¶ 154).

[5]     One study concluded that because PEMS testing is designed for—and is conducted on the road in actual driving—it is in certain respects *more accurate* than chassis dynamometer testing. (DE ¶ 160).

designed to detect that it is being tested on a chassis dynamometer, but the same is not true as to PEMS testing. Thus, according to Plaintiffs, "PEMS is not only accurate for detection and quantification of defeat devices, it is essential." (1AC ¶ 166).

Plaintiffs subjected all five subject vehicles to laboratory and real-world testing. The vehicles were first tested on a chassis dynamometer, adhering to federal test protocols in a CFR-compliant laboratory. (1AC ¶¶ 125–28 & 174). In this laboratory testing environment, the five vehicles all met or approached emissions standards. (1AC ¶¶ 180–85). During on-road PEMS testing, however, the vehicles did not meet the standard. The first amended complaint alleges that the defeat device drove the vehicles' on-road NOx emissions dramatically higher. Specifically, under city driving conditions, the vehicles' emissions were 1.4 to 7.5 times the standard and, at times, 9 to 73 times the standard. (1AC ¶¶ 19 & 192). Under highway-driving conditions, all but one diesel vehicle exceeded the standards. The 2012 X5, for example, exceeded the standard by a multiple of 3.4. (1AC¶ 195). The gasoline-powered BMW X5, by contrast, had an average NOx emission rate below the emissions standard in both chassis dynamometer and PEMS testing. (1AC ¶ 192).

Plaintiffs also claim that the first amended complaint adequately alleges the use of a temperature defeat device, embodied in software programming. (1AC ¶ 197) The temperatures in vehicle test-certification cycles must be between 68°F and 86°F, but the first amended complaint details how emissions controls are turned down or off in temperatures outside that range. (1AC ¶¶ 196–210). According to Plaintiffs, PEMS testing revealed the use of a temperature defeat device, yielding emissions as high as 526 mg/mile. (1AC ¶¶ 196–200).

The first amended complaint also alleges that the subject vehicles can reduce NOx to meet emissions standards so long as the effectiveness of the emissions-control system is not otherwise reduced, such as by instruction from the EDC17. (1AC ¶¶ 213 & 214). It also contains allegations that describe how the emissions systems were disabled. (1AC ¶¶ 215–19). Specifically, by

isolating and testing laboratory-like conditions during PEMS testing, Plaintiffs' experts concluded that the subject vehicles are able to detect the certification test cycle and adjust the emissions performance when the EDC17 "knows" the test cycle is not being run. (1AC ¶ 218).

Moreover, the first amended complaint alleges that Plaintiffs' PEMS tests showed increased emissions during cold-start and hot-start conditions, and that the tested vehicles did not pass PEMS testing during the passive regeneration phase that removes diesel particulate matter.[6] (1AC ¶¶ 21–24, 220–28, 241 & 304).

All of these new allegations taken together, Plaintiffs assert, cure the deficiencies identified in the consolidated class action complaint.

## B. New Allegations Directed at Bosch

The first amended complaint also contains revised allegations regarding Bosch's participation in the scheme. According to Plaintiffs, Bosch in 2006 introduced the EDC17 as the "brain of diesel injection" that "controls every parameter that is important for effective, low-emission combustion," because it wanted to enter the lucrative diesel market. (1AC ¶ 269). The EDC17 is a proprietary system over which Bosch exerts complete control to prevent its clients from changing the software without Bosch's participation. (1AC ¶¶ 258 & 271–73).

Plaintiffs allege that Bosch's control over the software allowed BMW to reduce or turn off emissions controls when the vehicle sensed it was not in a testing environment. (1AC ¶¶ 6 & 260). Moreover, Bosch actively marketed clean diesel technology throughout the United States. (DE ¶¶ 25 & 289–94). Plaintiffs allege that Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC17, which

---

[6]     Active regenerations should theoretically occur infrequently because of the increase in emissions and fuel economy impacts. (1AC ¶ 22). But expert testing reveals active regeneration far in excess of the permissible frequency, which is above the permissible certification frequency for all the tested diesel models. (1AC ¶¶ 21–24, 221 & 247–50).

operated as a defeat device and turned off or turned down emissions controls in the BMW vehicles. (1AC ¶ 373). Bosch also allegedly concealed the defeat devices in U.S. documentation and in communications with U.S. regulators. (1AC ¶ 373). Almost all manufacturers to whom Bosch sold the EDC17 are now known to have used defeat devices and to have misled consumers. Bosch was involved in the Volkswagen scandal, actively working to conceal manipulation in the software that it programmed in a collaborative scheme with Volkswagen. (1AC ¶¶ 83–84 & 267–83).

## C. Procedural History

On June 27, 2019, I filed an opinion (DE 59) and order (DE 60), dismissing without prejudice the consolidated class action complaint (DE 26). As discussed in that opinion, the dismissal rested on Plaintiffs' failure to allege Article III standing, and was entered without prejudice to the filing of an amended complaint. On September 20, 2019, Plaintiffs filed the first amended complaint. (DE 65). BMW and Bosch again moved to dismiss. (DE 68 & 69). BMW's motion to dismiss is accompanied by a request for judicial notice and seventeen exhibits, which consist primarily of news articles discussing BMW's role (or lack thereof) in the clean diesel emissions scandal. (DE 68-3 through 68-20).

## II.   DISCUSSION AND ANALYSIS

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 to the extent that Plaintiffs' claims arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

Alternatively, this Court has ordinary diversity jurisdiction because Plaintiffs and Defendants reside in different states and the amount in controversy exceeds $75,000. 28 U.S.C. 1332(a). This Court also has original diversity jurisdiction over this lawsuit pursuant to the pursuant to the Class Action Fairness Act of 2005. 28 U.S.C. § 1332(d). Plaintiffs and Defendants are

citizens of different states; there are more than one-hundred members of the class; the aggregate amount in controversy exceeds $5 million; and class members reside across the United States.

### A. Standard of Review

Federal courts are courts of limited jurisdiction which are confined to the adjudication of "cases" or "controversies" as permitted by Article III of the Constitution. *See* U.S. Const., Art. III, § 2. The case-or-controversy requirement requires that a plaintiff possess constitutional standing. *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). For a plaintiff to have constitutional standing, the following three elements must be present: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. 1540, 1547. "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro*, 458 F.3d 181, 188. Consequently, a motion to dismiss for lack of standing is properly brought under Federal Rule of Civil Procedure 12(b)(1). *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

Federal Rule of Civil Procedure 12(b)(1) governs jurisdictional challenges to a complaint. These may be either facial or factual attacks. *See* 2 Moore's Federal Practice § 12.30[4] (3d ed. 2007); *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial challenge asserts that the complaint does not allege sufficient grounds to establish subject matter jurisdiction. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced

therein and attached thereto, in the light most favorable to the plaintiff." *Lincoln Ben. Life,* 800 F.3d at 105 (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)). As to a facial jurisdictional attack, then, the standard is similar to the one that applies to an ordinary motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[7]

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 556). While

---

[7]       A factual attack, on the other hand, permits the Court to consider evidence extrinsic to the pleadings. *Lincoln Ben. Life,* 800 F.3d at 105; *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), *holding modified on other grounds by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003).

"[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. 662, 678.

With respect to allegations of fraud, "a party must state with particularity the circumstances constituting fraud," although "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002))). In doing so, "a party must plead [its] claim with enough particularity to place defendants on notice of the precise misconduct with which they are charged." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (internal quotation and citation omitted).

### B. Article III Standing

In this Court's opinion dismissing the consolidated class action complaint (DE 26), I determined, for two reasons, that Plaintiffs' reliance on the test results of single vehicle was insufficient to establish standing:

> I find inadequate the allegation that the Plaintiffs' vehicles contain a defeat device for two primary reasons. First, it depends on testing of a single vehicle which revealed discrepancies between laboratory and on-road emissions results, from which plaintiffs somewhat speculatively infer that the vehicle contained a defeat device. Second, it relies on a further inference that the tested vehicle is a valid exemplar—*i.e.*, that because it contained a defeat device, then the Plaintiffs' vehicles, too, must have contained such a device.

(DE 59 at 16). Now, in the first amended complaint, Plaintiffs return to this Court having tested what they allege are five exemplar vehicles. (1AC). And again, BMW and Bosch challenge the sufficiency of the pleadings and assert that Plaintiffs have not established standing to bring their claims. (DE 68 & 69).

BMW broadly attacks the sufficiency of Plaintiffs' allegations. Specifically, BMW alleges that the first amended complaint does not allege an injury in fact because (1) none of Plaintiffs' vehicles were tested (DE 68-1 at 21–22); (2) the first amended complaint does not allege corroborating facts (DE 68-1 at 22–24); and (3) the first amended complaint does not identify a defeat device (DE 68-1 at 24–25). BMW also notes that some tested vehicle arguably passed PEMS testing. (DE 68-1 at 25–28). Finally, BMW insists that there is no injury fairly traceable to BMW's conduct. (DE 68-1 at 31–34).

Bosch generally adopts these arguments that, adding only that any overpayment by Plaintiffs would have been to BMW—not Bosch—and that Bosch had no control over the subject vehicles. (DE 69-1 at 5–6).

Defendants contend that Plaintiffs still lack standing because they have not alleged that any tested vehicle belonged to any plaintiff. However, Plaintiffs have alleged that the five tested vehicles represent, and are substantially identical to, those owned by Plaintiffs and which are the subject of Defendants' alleged scheme. The purpose of Rule 8(a) is to give a defendant "fair notice" of the claim against him and her, and the allegations here do just that. The allegations contained in the first amended complaint are sufficient to permit a plausible inference that BMW's vehicles, including those purchased by Plaintiffs, contained defeat devices.

Defendants also note that Plaintiffs do not allege specifics as to the driving history or maintenance record of the tested vehicles. This deficiency, they conclude, dooms Plaintiffs case, presumably under the theory that some intervening event could have caused the heightened emissions in Plaintiffs' vehicles. While some such intervening cause may favor Defendants' position at a later point in the proceeding, for now, Plaintiffs' allegations regarding ownership of specific BMW models is sufficient to notify Defendants which of its cars are alleged to contain defeat devices. Rule 8(a) requires no more than that. In any event, the first amended complaint alleges the mileage of each vehicle, that each was screened to ensure it been properly maintained, and that each was free of potential emission-control defects.

11

Defendants make too much of this Court's earlier observation that the Plaintiffs' lack of corroborating evidence of a defeat device did not move their allegations "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570:

> Plaintiffs have not (by analogy to the plaintiffs in *Mercedes I* or *Counts*) cited independent entities that have levied defeat-device accusations against BMW for the particular engines at issue. Rather, Plaintiffs allege more generally that "[i]n Europe, watchdog groups, NGOs, and government agencies have cited virtually every manufacturer, including BMW, for violating the lower European emissions standards." There is no allegation that pinpoints any particular European governmental agency's citation of BMW with respect to its diesel cars in general, or the Subject Vehicles in particular. Rather, Plaintiffs allege (1) that a non-profit organization called Transportation and Environment accused many diesel vehicles of employing defeat devices, including certain BMW models and engines, but did not cite the Subject Vehicles at issue here; and (2) that a group called the International Council on Clean Transportation ("ICCT") released a report analyzing the real world versus lab testing emissions of many manufacturers' vehicles and found a different BMW model (not any of the Subject Vehicles) to have polluted above the European standard. Plaintiffs do not allege that these different BMW models have the same engines or use the same deceptive technology as the Subject Vehicles.

> . . .

> The allegations here fall short of those in *Mercedes*. Plaintiffs have not alleged that any governmental organization has accused BMW of evading regulators with defeat devices in their diesel cars, Plaintiffs also have not alleged that the Defendants admitted any wrongdoing. These corroborating allegations were essential to the *Mercedes I* court's finding that the plaintiffs' testing sufficed to make the defeat device inference plausible.

> Ultimately, without sufficient corroborating allegations, I am persuaded to dismiss the Complaint because the Plaintiffs have presented little beyond emissions test results for a single vehicle— one used 2012 X5.

(DE 59 at 20–21). A closer reading of that opinion reveals that I did not view independent corroborating evidence as a necessary condition that Plaintiffs needed to allege to withstand a Rule 12(b) motion. Rather, the opinion states that in the absence of adequate testing (which Plaintiffs had failed alleged in the consolidated class action complaint), such evidence *might* suffice to burnish the one-vehicle sample size enough to state a claim for relief. To be sure, Defendants have submitted a trove of news articles that emphasize the BMW was never implicated in the clean diesel scandal like many of its competitors. (*See* DE 68-4 through -20). However, the lack of a governmental investigation does not, by itself, demonstrate the absence of a defeat device or, by extension, deprive Plaintiffs of Article III standing.

The first amended complaint also adequately alleges an injury fairly traceable to Defendants' conduct. Plaintiffs allege that Defendants misled them by advertising and failing to disclose material information, that they were exposed to these misrepresentations or nondisclosures, that but for Defendants' conduct they would not have bought the vehicles or would have paid less for them, and that all Plaintiffs overpaid for their vehicles. Each plaintiff has also pled reliance on misrepresentations and omissions, has alleged BMW's and Bosch's conduct in that enterprise, and claimed that he or she paid an artificially high market price because of Defendants' false advertisements and conduct. Taken together, these specific allegations demonstrate that Plaintiffs' alleged injuries are fairly and directly traceable to the conduct of BMW and Bosch.

Accordingly, I find that the first amended complaint has cured the deficiencies of the consolidated class action complaint with respect to the threshold issue of Article III standing.

## C. Federal Law Claim (RICO)

Plaintiffs allege that Defendants' conduct violates the federal RICO statute. *See* 18 U.S.C. § 1962(c)–(d); *see also* 18 U.S.C. § 1964 (granting civil remedies for RICO violation). The RICO enterprise is alleged to be one by which

the BMW and Bosch defendants coordinated their operations through the design, manufacture, distribution, testing process, and sale of the subject vehicles.

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) ); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362–63 (3d Cir. 2010). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To establish a claim under section 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482–83 (1985); *see also District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F.Supp.2d 508, 518–19 (D.N.J. 2011) (citation omitted).

The term "enterprise" for RICO purposes is exceedingly broad. *See Boyle v. United States*, 556 U.S. 938, 944 (2009). It includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Ins. Brokerage*, 618 F.3d at 362–63 (citing 18 U.S.C. § 1961(4)). With respect to the pattern of racketeering activity, the statute "requires at least two acts of racketeering activity within a ten-year period," which may include federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343. *Id.* (citations omitted). In addition, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496.

The racketeering predicate acts alleged here are mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. Both statutes provide that "[w]hoever, having devised a scheme or artifice to defraud . . . for the purpose of executing such scheme or artifice" either (a) "places in any post office or

authorized depository for mail matter, any matter or thing," or (b) "transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce" virtually any sort of material shall be guilty of an offense. *See* 18 U.S.C. §§ 1341 & 1343.

In addition to the requirements described above, a successful RICO plaintiff must also demonstrate standing to bring a RICO claim in the first place. This is not the minimal jurisdictional showing of Article III standing, but a judge-made limitation. One absolute bar to RICO standing is the so-called "indirect purchaser rule." The Supreme Court developed the indirect purchaser rule in the antitrust context, when it held that Clayton Act plaintiffs may not demonstrate injury by providing evidence only of indirect purchases. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977).

It must be acknowledged that the rule is somewhat arbitrary and policy-based; after all, if Smith is overcharged for an item and resells the item to Jones, then Jones, too, may be overcharged as a result. The *Illinois Brick* Court warned, however, that allowing Jones or other indirect purchasers down the line to recover under such a theory would "transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 739. Moreover, the indirect purchaser rule prevents defendants from being exposed to "multiple liability" should both indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of a single overcharge. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996).

Because 18 U.S.C. § 1964(c), RICO's private cause of action, was modeled on the Clayton Act, "antitrust standing principles apply equally to allegations of RICO violations." *McCarthy*, 80 F.3d at 855; *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270–74 (1992). In *Holmes*, the Court explicitly held that federal jurisprudence interpreting antitrust principles governs RICO claims, because Congress modeled RICO's civil action provision on a substantially similar provision in the Clayton Act:

The key to better interpretation lies in some statutory history. We have repeatedly observed, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150-51, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) . . . that Congress modeled § 1964(c) . . . [of RICO after] the federal antitrust laws, § 4 of the Clayton Act …

In *Associated General Contractors* [*v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)] . . . we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier. Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation . . . and as we reasoned, as many lower federal courts had done before us . . . that congressional use of the § 7 language in § 4 presumably carried the intention to adopt "the judicial gloss that avoided a simple literal interpretation." . . . Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury[] but was the proximate cause as well.

The reasoning applies just as readily to § 1964(c) [of RICO]. We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. . . . It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

*Holmes*, 503 U.S. at 267–68.

Here, none of the subject vehicles were acquired directly from BMW (or Bosch, for that matter). (1AC ¶¶ 31–70). Instead, the Plaintiffs allege that they acquired their vehicles from a dealer, from a private party, or at auction. In fact, very few of the subject vehicles were acquired from an authorized BMW dealer at all; most seem to have been acquired on the secondary market.[8] The Third Circuit and courts in this District have repeatedly held that such indirect purchasers lack standing to assert RICO claims. *See, e.g.*, *McCarthy*, 80 F.3d at

---

[8]   Perhaps more appropriately stated, the vast majority of the subject vehicles were acquired on the *tertiary* market, because, for RICO purposes, car dealerships themselves are already considered a secondary market.

854 (plaintiffs were not direct purchasers of allegedly overpriced photocopies and therefore lacked antitrust and RICO standing); *Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, No. 18-14999, 2020 WL 2394155 at *8–9 (D.N.J. Mar. 31, 2020) (plaintiffs lacked RICO standing because none purchased insulin directly from defendants); *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 18-2211, 2019 WL 1418129 at *16 (D.N.J. Mar. 29, 2019) (heightened coinsurance payments and fraudulent benchmark prices of insulin did not bestow RICO standing because plaintiffs failed to allege they directly purchased insulin from defendants); *In re Insulin Pricing Litig.*, No. 17-699, 2019 WL 643709 at (D.N.J. Feb. 15, 2019) (allegation that benchmark prices "directly" affected price paid by consumers did not overcome indirect purchaser bar to RICO standing; indirect purchaser rule applies even when alleged improper price inflation is passed along on a "dollar for dollar basis"). Under the law within this Circuit, then, Plaintiffs do not have standing to pursue their RICO claims against BMW and Bosch, because each plaintiff is an indirect purchaser of his or her vehicle.[9]

In response, Plaintiffs argue that Defendants are attempting "to graft a privity requirement into RICO by means of an indirect purchaser theory," (DE 73 at 8), and that both *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), and *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015), carved out exceptions to the indirect purchaser rule in RICO cases. (DE 73 at 8–10).

First, there is no question of "grafting" anything. The Third Circuit has clearly and directly held that "only the purchaser immediately downstream

---

[9]    Practically speaking, of course, applying the indirect purchaser rule to car buyers forecloses all consumer RICO claims against car manufacturers, because state laws generally prohibit manufacturers' direct sales of automobiles. A RICO remedy would thus seem to be confined to car dealers, and there are no dealers (at least *qua* dealers) among the plaintiff class. So far as our research has disclosed, there is no automobile exception to the indirect purchaser rule.

from the alleged [RICO violator]" possesses standing to pursue an action. *McCarthy*, 80 F.3d at 848. If this be privity, make the most of it.

Second, Plaintiffs' reliance on *Bridge* and *Avandia* conflates the standing and causation issues under RICO. Those are distinct issues which require discrete analyses. Thus, Plaintiffs' claim would still fail for lack of RICO standing even if *Bridge* and *Avandia* controlled the issue of causation.

*Bridge* at least addresses standing, but it does not undercut the indirect purchaser rule as it applies to Plaintiffs' RICO claims. In *Bridge*, the Court held that a plaintiff who is injured "by reason of" a pattern of mail fraud may have RICO standing "even if he [or she] has not relied on any misrepresentations." 553 U.S. at 649–50. The *Bridge* plaintiff, however, was not an indirect purchaser; the case does not support any argument for RICO standing on behalf of plaintiffs multiple levels down the consumer chain.

In *Avandia*, the Third Circuit explained that "if there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiffs' injury, . . . a RICO plaintiff who did not directly rely on a defendant's misrepresentation can still establish *proximate causation.*" (DE 73 at 9 (quoting 804 F.3d at 643) (emphasis added)). Apart from the fact that *Avandia* speaks to reliance and causation, not standing, the case presents numerous factual differences. The *Avandia* plaintiffs were third-party payors who included the drug Avandia in their formulary decisions at favorable rates, relying on material misrepresentations made by the defendant manufacturer. *Avandia*, 804 F.3d at 636. By contrast, Plaintiffs here allege that their damages stem from inflated prices paid by car dealers and original owners before Plaintiffs purchased the vehicles from those intermediaries.

Critically, the *Avandia* plaintiffs did not seek a remedy for payments made to third parties based on misrepresentations made by a manufacturer. Instead, the claim there concerned the defendants' failure to disclose known health risks of various drugs ultimately included in their formularies:

> The conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the

> complaint—the misrepresentation of the heart-related risks of
> taking Avandia that caused [third-party payors] and [pharmacy
> benefit managers] to place Avandia in the formulary. The injury
> alleged by the [third-party payors] is an economic injury
> independent of any physical injury suffered by Avandia users. *And,
> as far as we can tell, prescribing physicians did not suffer RICO
> injury from [the] marketing of Avandia.*

*Avandia*, 804 F.3d at 644 (emphasis added). *Avandia* suggests by analogy, that
if there was a RICO injury in our case, it was the car dealer—not any Plaintiff—
who suffered it.

Each Plaintiff here is an indirect purchaser and therefore lacks standing
to maintain a RICO claim against Defendants. Accordingly, Plaintiffs' RICO
claim (Count 1) is **DISMISSED**.

### D. State Law Claims

Plaintiffs also bring common-law and statutory claims under the laws of
various states. Counts 2 through 53 allege fraudulent concealment and
violations of the consumer-protection laws of the twenty-four states in which at
least one named plaintiff resides. Counts 54 through 79 concern the statutory
consumer-protection laws of the remaining twenty-six states.

Plaintiffs' common-law claims proceed on a fraudulent-concealment
theory:

> BMW understood that a consumer deciding between a gas BMW
> and a diesel BMW had to have a reason to pay more for a diesel.
> For this reason BMW made numerous statements about lower
> emissions, the environment, and fuel economy that omitted
> material. BMW made these statements because it understood that
> information about lower emissions, fuel economy, and performance
> were material to potential consumers of diesel vehicles. The
> misrepresentations and omissions common to all state law claims
> can be summarized as follows:
>
> > The vehicles "met emissions standards in all states." [false];
> >
> > "BMW Efficient Dynamics Means Less Emissions"; [false and
> > misleading];
> >
> > Its engines "protect the environment every day." [misleading];

Its engines turned nitric oxides "into environmentally friendly compatible nitrogen and water vapor." [false and misleading];

Its engines offered "increased power with decreased fuel consumption and emissions." [misleading as in many circumstances with emissions manipulation there is no decrease in emissions.];

BMW claimed its SCR catalyst ensured effective reduction of NOx, in part by urea dosing (¶ 123) [false as SCR efficiency was manipulated to allow increased emissions];

BMW claimed its polluting vehicles generated "less emissions" [misleading as this is true only in certain circumstances and emissions are not less than a comparable BMW gas model].

"Exemplary fuel economy" [false and misleading as fuel economy is decreased during active regeneration, and any fuel economy advantage only occurs when the emissions system is manipulated].

"Consistent distribution of AdBlue . . . is ensured by the SCR mixer [false as the SCR mixer is programmed to reduce admissions control].

(1AC ¶ 400).

Plaintiffs allege that both BMW and Bosch were required to disclose concealed facts:

(1) [T]hey each made or were complicit in statements that were misleading for failure to disclose material facts; (2) Defendants knew the omitted facts were material to consumers which is why they made or were complicit in statements made about emissions, the environment and fuel economy; (3) Defendants were in a superior position and had exclusive knowledge of the true facts; and (4) these omissions related to the core function of a diesel vehicle. As to exclusive knowledge defendants had contractual agreements requiring strict confidentiality as to the software programming used to manipulate emissions performance.

(1AC ¶ 401).

Defendants argue that this Court should dismiss Plaintiffs' consumer-protection and fraudulent-concealment claims. BMW and Bosch claim that Plaintiffs have failed plead facts showing (1) standing to bring claims in states in which they do not reside (DE 68-1 at 42–43; DE 69-1 at 19); and (2) the requirements of Rule 9(b) (DE 68-1 at 45–47; DE 69-1 at 19). Bosch also alleges that Plaintiffs have not properly alleged a duty to disclose. (DE 69-1 at 19–21).

### 1. State-Law Standing Issues

Essentially, Defendants' first argument is that Counts 54–79—the claims relating to the consumer-protection statutes of the states in which no named plaintiff resides—should be dismissed because the named plaintiffs, as non-residents of those states, lack standing to bring those claims. A more prudent approach would be to defer consideration of this argument until the certification stage. To the extent the proposed class is not certified, or is limited, many of these issues might be rendered moot. I here follow the lead of other cases that have declined to address similar issues in advance of class certification. *See, e.g.*, *Sheet Metal Workers Nat. Health Fund v. Amgen Inc.,* No. 07–5295, 2008 WL 3833577 at *9 (D.N.J. Aug.13, 2008) (declining to address argument that plaintiff lacks standing to bring claims under laws of states in which plaintiff failed to allege an injury and explaining that "because class certification creates the jurisdictional issue, the Court must treat the statutory standing issue before it deals with Article III standing, as instructed by *Ortiz*") (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)); *In Re Hypodermic Prods. Antitrust Litig.,* No. 05-1602, 2007 WL 1959225 at *15 (D.N.J. June 29, 2007) (deferring consideration of argument that "Plaintiffs do not enjoy standing to raise state antitrust claims in jurisdictions in which they do not reside" until after class certification issues have been resolved); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J.2003) (considering it appropriate to decide class certification before resolving Article III standing challenges where defendant had argued that "Clark does not enjoy standing to assert claims on behalf of

class members regarding restaurants that Clark has not visited, or in states Clark has not visited").

### 2. Fraudulent Concealment and Rule 9(b)

Defendants also seek dismissal of the common-law claims. The parties are less than specific about which states' common law applies, and do not point to any relevant distinctions between the laws of those states. I therefore default to the New Jersey law of fraudulent concealment, which has five essential elements: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997); *Delaney v. Am. Express Co.*, No. 06-5134, 2007 WL 1420766 at *5 (D.N.J. May 11, 2007).

Rule 9(b)'s specificity requirement applies to fraudulent concealment claims. *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, No. 09-4656, 2010 WL 2179094 at *4 (D.N.J. May 26, 2010). Fraud-by-omission claims, however, are by their nature less susceptible of precise formulation than affirmative misrepresentation claims.[10] *See Feldman v. Mercedes Benz USA*, No. 11-984, 2012 WL 6596830 at *10 (D.N.J. Dec. 18, 2012). A fraud-by-omission claim is sufficient so long as it places "the defendant on notice of the precise misconduct with which it is charged," *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 443 (D.N.J. 2012) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).

BMW[11] contends that Plaintiffs have failed to specify the who, what, when, where, and how of the allegedly fraudulent scheme, as required by Rule 9(b). (DE 68-1 at 46). Here, however, BMW mistakenly focuses on the alleged

---

[10]     We need not tarry over the paradoxes inherent in a requirement of stating the precise time, place, location, and manner in which something did not occur.

[11]     Bosch fully adopts BMW's argument on this point. (DE 69-1 at 19).

affirmative misrepresentations to the exclusion of the claimed omissions. For example, BMW argues that "[r]ather than allege conduct specifically and separately as to each BMW entity, the FAC refers to supposed misrepresentations and omissions by 'BMW' or the 'Defendants,' which is insufficient under Rule 9(b)" and that "the FAC fails to identify with specificity the statements on which named Plaintiffs relied, when those statements were made, or who made them." (DE 68-1 at 46). BMW's argument asks too much of Rule 9(b), which imposes a less specific pleading standard on fraudulent omissions than it does on affirmatively fraudulent statements. The "who, what, when, where and how" is not so strictly required here, because Plaintiffs cite BMW's affirmative statements primarily to establish the context for what BMW should *also* have said to ensure that those statements did not mislead. Moreover, the first amended complaint does not engage in impermissible group pleading, because it distinctly pleads the roles that that BMW and Bosch allegedly played in carrying out the scheme. Plaintiffs cite numerous specific examples of how each defendant furthered the allegedly fraudulent conduct. (1AC ¶ 379).

Plaintiffs' allegations of misrepresentations, and particularly those involving omissions, have sufficiently notified BMW and Bosch of the precise misconduct with which they are charged: "Each Plaintiff alleges exposure to the materially deficient messaging because each 'selected and ultimately purchased [his or her vehicle], in part, because of the diesel system, as represented through advertisements and representations made by BMW,' including 'advertisements on BMW's website and representations from the dealership touting the efficiency, fuel economy, and power and performance of the engine.'" (DE 73 at 45–46).

Moreover, Plaintiffs allege that Defendants designed the defeat device to provide the perception of reduced emissions while avoiding the cost of reduced emissions. These allegations are sufficient to permit an inference fraudulent intent, and they meet the specificity requirements of Rule 9(b). Similar allegations have been found in other automotive-defect cases, both within and

without this district, to satisfy Rule 9(b). *See Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 599 (E.D. Mich. 2017) (plaintiffs sufficiently alleged that GM "actively concealed and had exclusive knowledge of the alleged 'defeat device'"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 349 F. Supp. 3d 881, 915 (N.D. Cal. 2018) (finding that fraudulent omissions claims survived, because plaintiffs identified "the specifics of what VW failed to disclose: (1) that 'the Clean Diesel engine systems were not EPA-compliant,' and (2) that the class vehicles 'used software that caused the vehicles to operate in low-emission test mode during emissions testing'"); *Feldman*, 2012 WL 6596830 at *10 (holding that plaintiffs adequately stated a claim of fraud by omission where they "allege[d] specific facts showing Defendants' knowledge and concealment of the alleged defect").

This Court will not dismiss Plaintiffs' state-law fraudulent-concealment claims for failure to meet the standards of Rule 9(b).

### 3. Bosch's Duty to Disclose

Concerning Bosch, Plaintiffs' allegations of fraudulent concealment rest on a theory of fraud by omission. (1AC ¶¶ 414–15). Under New Jersey law, "courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The categories of relationships that give rise to a duty to disclose are: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposes trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.*

Plaintiffs also draw attention to a similar case which held that where an omission makes the representation misleading—that is, where "Plaintiffs allege active concealment of the truth"—then Plaintiffs "need not establish a duty to disclose." (DE 72 at 7 n.12):

Defendants contend that a number of states—namely, Massachusetts, Maryland, Maine, New Jersey, Nevada, Oregon, Pennsylvania, South Carolina, and Tennessee—recognize a fraudulent concealment claim only where there is a fiduciary relationship between the plaintiff and defendant. *See* FCA/VM Mot. at 54. Defendants are incorrect. Although Defendants do cite some authority to support their position,

> [T]here is substantial authority [that] a fiduciary relationship is not the only time a duty to disclose arises; also, an affirmative act of concealment by the defendant effectively negates the duty-to-disclose requirement (*i.e.*, there is a difference between silence, where a duty to disclose is required, and active concealment, where there is no such requirement). In this regard, Plaintiffs do not claim that Defendants were simply silent but rather that they took affirmative steps to conceal the defeat devices—including not identifying them for the EPA and CARB. . . . A duty to disclose thus may obtain in a variety of circumstances or indeed, may not even be required in some situations[.]
>
> . . .
>
> > *See U. Jersey Bank v. Kensey*, 306 N.J. Super. 540, 704 A.2d 38, 45 (1997) (indicating agreement with Restatement (Second) of Torts that there is a duty "to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake . . . and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts'").

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1009 (N.D. Cal. 2018).

Here, Plaintiffs do not assert that they fall into one of the special relationship categories with Bosch. The focus of the inquiry is only whether a duty to disclose existed to prevent a previous statement from being misleading.

Bosch claims that "Plaintiffs fail to allege facts to show that Bosch LLC owed a duty of disclosure to Plaintiffs," (DE 69-1 at 19–20), and that "[a]s far as Plaintiffs were concerned, Bosch LLC was 'a complete stranger' that 'dealt with [Plaintiffs] only through impersonal [and indirect] market transactions.'" (DE

69-1 at 21 (quoting *Chiarella v. United States*, 445 U.S. 222, 232–33 (1980)). Nevertheless, Plaintiffs' allegations here suffice to show that Bosch had a duty to Plaintiffs to disclose the falsity of its statements. Bosch is alleged to have knowingly participated in designing the fraudulent emissions system (1AC ¶¶ 268–78); developed coded language about the defeat device and concealing the defeat device (1AC ¶¶ 279–80); and actively and knowingly deceived U.S. regulators about its diesel technology for the benefit of all affected vehicles (1AC ¶¶ 281–83). These allegations are sufficient to establish an obligation by Bosch to correct the record. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL 1902160 at *20 (D.N.J. May 8, 2017) (finding that the plaintiffs pled a partial disclosure after which the defendant had a duty to disclose "any and all information regarding the Timing Chain System" to plaintiffs, where the plaintiffs alleged that the defendant "represent[ed] in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance"); *Strawn v. Canuso*, 271 N.J. Super. 88, 104 (App. Div. 1994) (establishing a duty on buyers and brokers of real estate to disclose the existence of off-site conditions that were unknown to the buyer but that were known or should have been known to the seller and that would reasonably and foreseeably affect the value or desirability of the property), *aff'd*, 140 N.J. 43 (1995).

In *Strawn*, the New Jersey Supreme Court adopted the Restatement (Second) of Torts which imposes a "duty upon a party to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake . . . and the other, because of the relationship between them, the customs of the trade[,] or other objective circumstances, would reasonably expect a disclosure of those facts,'" where the nondisclosure of those facts amounts to taking advantage of a plaintiff's ignorance, such that it would be "shocking to the ethical sense of the community, and [would be] so extreme and unfair, as to amount to a form of swindling.'" *U. Jersey Bank*, 306

26

N.J. Super. at 554 (citations omitted). Bosch's active concealment of the existence of the defeat device amounts to such a situation. *Cf. Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 1009 (finding that allegations of defendants' active concealment of the defeat devices was sufficient to establish a duty to disclose under); *Counts*, 237 F. Supp. 3d at 600 (noting that defendant's alleged active concealment of the defeat device was sufficient to establish a duty to disclose). Accordingly, Plaintiffs' claims of fraudulent concealment by Bosch will not be dismissed on this basis.

### 4. Statutory Consumer-Fraud Issues

#### i. New Jersey's Consumer Fraud Act (Count 32)

Defendants allege that the New Jersey Consumer Fraud Act requires plaintiffs to plead "ascertainable loss." That element, Defendants say, "require[s] plaintiffs to specify the price paid for the product and the price of comparable products to adequately state a claim." (DE 68-1 at 48 (quoting *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 439 (D.N.J. 2015)); *see also* N.J. Stat. Ann. § 56:8-2).

Defendants are correct that a claim under the New Jersey Consumer Fraud Act requires an allegation of ascertainable loss. *See Riddell*, 77 F. Supp. 3d at 436–37. The plaintiff need not, however, plead ascertainable loss with pinpoint specificity. *See Maniscalco v. Brother Int'l Corp. (USA)*, 627 F.Supp.2d 494, 503 (D.N.J.2009) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111 (App. Div. 2006)) ("Here, plaintiff alleged in her complaint that she suffered an ascertainable loss. She did not allege the nature of that loss, nor was she so required at that stage. Defendant's motion to dismiss, unlike the summary judgment procedure, did not require, in order to avoid dismissal, that the plaintiff provide evidential material to rebut defendant's contention that she had not sustained ascertainable loss . . . ."); *Lamont v. OPTA Corp.*, 2006 WL 1669019 (N.J. Super. Ct. App. Div. 2006) ("There is nothing . . . that requires the pleading of an ascertainable loss element of a Consumer Fraud Act cause of action with any special specificity . . . ."). Even in opposition to a motion for

summary judgment, "[a]n estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 249 (2005) (internal quotation and citation omitted). At the motion to dismiss stage, alleging a diminution in value due to the defect is sufficient. *Maniscalco,* 627 F.Supp.2d at 503 (finding that conclusory statement about the replacement cost of a defective machine was an adequate allegation of ascertainable loss); *Strzakowlski v. GMC*, No. 04-4740, 2005 WL 2001912 at *6–7 (D.N.J. Aug. 16, 2005) (alleging diminution in value satisfies the CFA's loss requirement); *cf. Perkins,* 383 N.J. Super. at 110–11

Here, each New Jersey plaintiff alleges the actual price paid for the car and the amount of the price premium allegedly attributable to the fraud. The first amended complaint also alleges that these calculations are "based on analysis of other emissions cases." (1AC ¶ 319). The plaintiff need not adduce his evidence at this, the pleading stage. These allegations satisfy the ascertainable loss element of the New Jersey Consumer Fraud Act.

### ii.   Mississippi's Consumer Protection Act (Count 28)

Defendants argue that the Mississippi Consumer Protection Act claim must be dismissed for failure to comply with Mississippi's requirement of participation in settlement programs before filing suit. *See* Miss. Code Ann. § 75-24-15(2).[12]

The legal question boils down to one of federalism. A matter may proceed as a federal class action, regardless of a state procedural bar, so long as the application of Rule 23 does not "abridge, enlarge or modify any substantive right." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (quoting Rules Enabling Act, 28 U.S.C. § 2072(b)). Courts applying *Shady Grove* have gone so far as to hold that a federal class action may proceed on state-law claims despite state statutes prohibiting class action

---

[12]   Defendants do not address—apart from the arguments that have already been discussed, *supra*—the sufficiency of the factual allegations.

treatment. *See, e.g., In re Hydroxycut Marketing and Sales Practices Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014) (permitting claims under state consumer-protection statutes to proceed as class action under Rule 23 even where state statutes do not allow class actions); *see also Lisk v. Lumber One Wood Preserving, LLC*, 792 1331 (11th Cir. 2015) (same application).

Under the Supreme Court's decision in *Shady Grove*, state rules, even if procedural in form, may control in federal court when they are "part of a State's framework of substantive rights or remedies." 559 U.S. at 419 (Stevens, J., concurring). There is no consensus among the federal cases as to whether pre-suit notice or settlement requirements are "substantive" or "procedural." Some have applied such provisions, reasoning that failure to do so "would encourage forum shopping and the inequitable administration of laws." *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 387–88 (D.N.J. 2018) (quoting *In re Asacol Antitrust Litig.*, No. 15-12730, 2016 WL 4083333 at *15 (D. Mass. July 20, 2016)); *see also In re Insulin Pricing Litigation*, No. 17-699, 2020 WL 831552 at 9 (D.N.J Feb. 20, 2020) (dismissing claim for failure to comply with Mississippi's pre-suit dispute resolution requirement); *In re Lipitor Antitrust Litigation*, 336 F.Supp.3d 395, 415–17 (D.N.J. 2018) ("In sum, the Court finds that the . . . notice provisions . . . are applicable here and Plaintiffs failed to comply."); *In re Chocolate Confectionary Antitrust Litig.*, 749 F.Supp.2d 224, 232 (M.D. Pa. 2010) (finding failure to comply with Hawaii notice requirement "warrants dismissal"). Others have treated such provisions as procedural, *i.e.,* not sufficiently a part of the relevant states' framework of substantive rights or remedies to be controlling. *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F.Supp.3d 145, 156 (E.D.N.Y. 2018) ("Hawaii's law regulates only when private plaintiffs can litigate the case. It does not alter the substantive elements of plaintiffs' claims."); *In re Propranolol*, 249 F.Supp.3d at 728 n.24 (dismissal not required for failure to comply with Hawaii's procedural notice rule); *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 817 (N.D. Ill. 2017) (declining to dismiss Arizona antitrust

claim notwithstanding late notice to attorney general); *In re Aggrenox Antitrust Litig.*, 94 F.Supp.3d 224, 254 (D. Conn. 2015) (declining to dismiss based on the plaintiffs' failure to plead compliance with the notice requirements of the Hawaii antitrust statute); *In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, 2009 WL 3754041 at *6 (N.D. Ill. Nov. 5, 2009) (finding Hawaii antitrust "statute does not provide for dismissal of the action for failure to comply [with the pre-suit notice requirement], and that dismissal is inconsistent with the remedial purposes of the statute").

Whether Rule 23 would abridge a substantive right, however, is an issue that need not be faced until the certification stage. The elements of a cause of action are set forth. The motion to dismiss the Mississippi claim is, at least for now, denied.

### iii.   Alaska's Unfair Trade Practices and Consumer Protection Act (Count 54)

The first amended complaint pleads violations of the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. Ann. § 45.50.471 *et seq.*, "for notice purposes only." (1AC ¶ 1181). Defendants argue that because the complaint does not identify an Alaska plaintiff, the putative class does not have standing to bring this claim. (DE 68-1 at 49). Defendants have a point, but for the reasons discussed *supra*, the issue of standing to bring claims on behalf of unnamed plaintiffs, some of them potentially from Alaska, is more appropriately resolved at the certification stage.

### iv.   West Virginia's Consumer Credit and Protection Act (Count 78)

Likewise, the first amended complaint pleads violations of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-1-101 *et seq.*, "for notice purposes only." (1AC ¶ 1379). Again, I will defer consideration until the certification stage.

### v.     Iowa's Private Right of Action for Consumer Frauds Act (Count 61)

Defendants argue that the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.1 *et seq.*, requires that class actions under that act secure pre-clearance from the attorney general. (DE 68-1 at 50). Plaintiffs have not alleged such preclearance. Whether Rule 23 would abridge a substantive right, *see Shady Grove*, 559 U.S. at 407, is an issue that need not be faced until the certification stage. At least for now, the motion to dismiss the Iowa claim is denied.

### vi.     Georgia's Uniform Deceptive Trade Practices Act (Count 13)

The Georgia Uniform Deceptive Trade Practices Act does not authorize private damages lawsuits. *See* Ga. Code Ann. § 10-1-373. This lawsuit, however, is about injunctive relief at least as much as it is about damages. The first amended complaint sufficiently alleges that, for Rule 12(b)(6) purposes, the subject vehicles need to be fixed and that Plaintiffs' injuries can be redressed, at least in part, by a recall or a replacement. The motion to dismiss the Georgia UDTPA claim is therefore denied.

### vii.     Minnesota's Deceptive Trade Practices Act (Count 26)

Similarly, the Minnesota Deceptive Trade Practices Act does not permit private damages lawsuits. *See* Minn. Stat. Ann. § 325d.45. The motion to dismiss the Minnesota DTPA claim is denied. *See* subsection vi, immediately preceding.

### viii.     Kentucky's Consumer Protection Act (Count 19)

Defendants point out that the Kentucky Consumer Protection Act, contains a privity requirement. *See* Ky. Rev. Stat. Ann. § 367.220(1). However, courts applying this statute have recognized an exception to the privity requirement when breach of an express warranty is alleged:

> To maintain a private action under Kentucky's Consumer Protection Act, a plaintiff must generally be in privity of contract with the defendant. *Naiser* [*v. Unilever U.S., Inc.*]*,* 975 F.Supp.2d [727,] 743 [(2013)] (citing *Ky. Laborers Dist. Council Health &*

*Welfare Trust Fund v. Hill & Knowlton, Inc.,* 24 F.Supp.2d 755, 772–73 (W.D.Ky.1998) (noting that the KCPA "requires that privity of contract exist between the parties[]")). The statute typically cited for the KCPA's privity requirement states:

> *Action for recovery of money or property; when action may be brought*—(1) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property . .  may bring an action . . . .

K.R.S. § 367.220(1). Kentucky courts have held that this language "plainly contemplates an action by a purchaser against his immediate seller." *Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.,* 836 S.W.2d 907, 909 (Ky. App. 1992). *As noted in Naiser, however, there is an exception to the privity requirement when express representations are alleged.*

. . .

According to the Court in *Naiser,* since the plaintiffs had sufficiently alleged that the manufacturer made valid express warranties for Plaintiffs' benefit, . . . [t]he plaintiffs were permitted to maintain a KCPA claim despite the absence of a direct buyer-seller relationship.

*Bosch v. Bayer Healthcare Pharm., Inc.,* 13 F. Supp. 3d 730, 750 (W.D. Ky. 2014) (emphasis added); *see also Skilcraft,* 836 S.W.2d at 909 (a subsequent purchaser could not "maintain an action against a seller with whom he did not deal *or who made no warranty for the benefit of the subsequent purchaser*") (emphasis added).

Here, Plaintiffs have alleged that Defendants made an express warranty with regard to the subject vehicles. That allegation is sufficient to overcome the privity requirement, and the motion to dismiss the Kentucky CPA claim is denied.

## III.   CONCLUSION

For the foregoing reasons, the motions of BMW USA (DE 68) and Robert Bosch LLC (DE 69) are **GRANTED** in part and **DENIED** in part. Count 1 of the first amended complaint (1AC) is **DISMISSED**. The dismissal is with prejudice because it appears that further amendment would be futile.

A separate order will issue.

Dated: June 25, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**